# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CASE NO. MJG 00-CV-2602 |
| WESTVACO CORPORATION | |
| Defendant. | |

## DEFENDANT WESTVACO CORPORATION'S RESPONSE TO THE UNITED STATES' OPENING BRIEF REGARDING THE PROPER STANDARD FOR MEASURING "PRE-CHANGE" OR "BASELINE" EMISSIONS

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

Andrea Bear Field
*afield@hunton.com*
Maida O. Lerner
*mlerner@hunton.com*
James D. Elliott
*jelliott@hunton.com*
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C.  20006-1109
(202) 955-1500 (voice)
(202) 778-2201 (facsimile)

*Counsel for Defendant Westvaco Corporation*

Defendant Westvaco Corporation ("Westvaco") hereby respectfully submits this brief in response to the United States' Opening Brief Regarding the Proper Standard for Measuring "Pre-Change" or "Baseline Emissions" (the "United States' Opening Brief" or "Gov't Opening Brief").

## I.      Introduction

Westvaco met its Clean Air Act Prevention of Significant Deterioration ("PSD") obligations when it carefully determined, prior to the construction of the Digester Expansion Project ("DEP") at the Luke Mill, that the project did not require a PSD permit.  Westvaco notified the State of Maryland, and after receiving a construction permit in 1980, commenced the project.  In 1984, Westvaco again evaluated whether incinerating digester gas in Power Boiler #25 would trigger PSD requirements. Westvaco concluded, based on the language of the 1980 PSD regulations, that incinerating digester gas in Power Boiler #25 would not trigger PSD review.  Westvaco notified Maryland, West Virginia, and EPA.  Maryland and West Virginia confirmed Westvaco's PSD applicability determination; EPA never responded.

These determinations by Westvaco and its regulators at the time of the DEP are at the core of the baseline emissions issue presently before the Court, yet the United States' Opening Brief fails to mention them.  Nor does the United States attempt to reconcile the ten-year effort by Westvaco, Maryland, and EPA to develop an appropriate sulfur dioxide emissions limit for the mill with its current assertion that the mill's source-specific emissions limit is irrelevant to PSD applicability.  And the United States fails to acknowledge the plain language of EPA's 1980 PSD regulations and all of the *contemporaneous* statements by EPA confirming that a source may presume that its "source-specific allowable emissions" limits are equivalent to actual emissions.

This Court should recognize the extensive efforts of the mill to comply with rapidly evolving emission standards, and specifically its efforts to ensure compliance with PSD requirements through candid consultation with its regulators.  Moreover, the actual language of the 1980 PSD regulations and the contemporaneous interpretive guidance issued by EPA fully support the conclusions reached by the mill and its regulators at the time.  Accordingly, Westvaco respectfully requests that this Court conclude that Westvaco was permitted to, and reasonably did, rely on its "source-specific allowable emissions" as representative of "actual emissions" for the purposes of determining its pre-DEP emissions baseline.

## II.      Argument

The United States cannot just interpret-away express regulatory language that it now finds inconvenient.  The language of 40 C.F.R. § 52.21(b)(21)(iii) in the definition of "actual emissions" plainly endorses the presumption that source-specific allowable emissions limits, like the sulfur dioxide emissions cap at the Luke Mill, are the equivalent of "actual emissions" for the purpose of PSD applicability determinations.  In fact, the mill in this case spent extraordinary amounts of time, effort, and money to manage its emissions to assure that this cap was not violated. Westvaco reasonably relied on the plain language of the PSD regulations and on the repeated confirmation by its regulators that it had applied that language correctly in determining its pre-DEP baseline emissions.

**A.      The United States' Current Position That "Source-Specific Allowable Emissions" Cannot Represent "Actual Emissions" Is Inconsistent With The Language Of The 1980 PSD Regulations And Contemporaneous Agency Interpretations.**

A substantial portion of the United States' Opening Brief is dedicated to the argument that the concept of "actual emissions," rather than "potential or allowable emissions," is the touchstone of the Clean Air Act PSD program.  Gov't Opening Br. at 6-10.  But at issue in this case is the particular definition of "actual emissions" adopted by EPA in its 1980 PSD regulations.  *See* Requirements for

Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of

Implementation Plans, 45 Fed. Reg. 52,676, 52,737 (Aug. 7, 1980).  That definition specifically

incorporates a presumption that "source-specific allowable emissions" are equivalent to "actual

emissions."  *See* 40 C.F.R. § 52.21(b)(21)(iii) ("The Administrator[1] may presume that source-specific

allowable emissions for the unit are equivalent to the actual emissions of the unit").  The United States

does not suggest that it was beyond the statutory authority of the EPA to adopt that definition.[2]

---

[1]  As discussed in Westvaco's Opening Brief, the State of Maryland has incorporated the provisions of
40 C.F.R. § 52.21 into its State Implementation Plan by reference, and "the reviewing authority is
the Department [of Health and Mental Hygiene] instead of the Administrator . . . . " Proposed
Revision of the Maryland State Implementation Plan, 46 Fed. Reg. 60,015 (Dec. 8, 1981).
Therefore, each reference to "the Administrator" in 40 C.F.R. § 52.21(b)(21) in the government's
briefs and in Westvaco's briefs should be read to mean "the Maryland Department of Health and
Mental Hygiene." *Id.*

[2]  The government does cite *New York v. EPA's* discussion of the 2002 "Clean Unit" provisions for the
proposition that a net emissions increase must be determined based on actual emissions, and not on
allowable or potential emissions.  Gov't Opening Brief at 9-10 (citing *New York v. EPA*, 413 F.3d 3
(D.C. Cir. 2005)).  Setting aside the fact that the discussion in *New York v. EPA* related to Clean Unit
provisions in the 2002 PSD rules that have nothing to do with the current dispute, the government's
expansive reading of that case would invalidate 40 C.F.R. § 52.21(b)(21)(iii) and (iv) in their
entirety, as those provisions define "actual emissions" using "source-specific allowable emissions"
or a unit's "potential to emit."  Moreover, *New York v. EPA* specifically evaluated a change made in
the 2002 PSD rules that eliminated 40 C.F.R. § 52.21(b)(21)(iii), but nowhere suggested that EPA's
1980 use of source-specific allowable emissions was contrary to the Clean Air Act.

The government's reliance on *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561
(2007) is similarly misplaced.  Gov't Opening Br. at 7.  That case does not stand for the proposition
that source-specific allowable emissions cannot be used to determine whether a net emissions
increase has occurred.  Rather, the court there was only addressing EPA's interpretation of the
averaging time for actual emissions under subsection (ii) of 40 CFR §51.166(b).  The Court does not
mention, much less reject, the use of source-specific allowable emissions under subsection (iii).

Instead, the United States posits a reading of that definition that is entirely inconsistent with the regulatory language and EPA's contemporaneous interpretation of 40 C.F.R. § 52.21(b)(21)(iii).  The government asserts:

> The touchstone of PSD emissions calculations under the applicable regulations is a comparison of potential post-change emissions to the *actual* annual amount of pollution emitted during a two year period before a change.  In some cases, however, actual emissions for this two-year period may not be known (for example, because a modification occurs shortly after a source begins operating).  In those limited circumstances, the regulations allow the use of a presumption that a unit's allowable emissions are equivalent to its actual emissions.  *See* 40 C.F.R. § 52.21(b)(21)(iii).

Gov't Opening Br. at 10-11.

The United States cites no regulatory language to support its reading of 40 C.F.R. § 52.21(b)(21)(iii), and, in fact, there is none.  That subsection provides that "[t]he Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit"—there is nothing to indicate that this presumption may only be made in the absence of actual emissions data.  *Id*.  To accept the government's reading of 40 C.F.R. § 52.21(b)(21)(iii), "would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000).

The United States' reading also is inconsistent with statements made by EPA at the time it promulgated 40 C.F.R. § 52.21(b)(21)(iii).  At the time it issued the 1980 PSD regulations, EPA interpreted the language of 40 C.F.R. § 52.21(b)(21)(iii) to create a rebuttable presumption that allowable emissions limits represent actual emissions. 45 Fed. Reg. at 52,718 ("EPA believes that, in calculating actual emissions, emissions allowed under federally enforceable source-specific requirements ***should be presumed*** to represent actual emission levels.") (emphasis added).  While EPA noted that this presumption could be rebutted if "the source-specific requirement is not representative of

actual emissions," *id.*, it nowhere stated that the presumption in favor of using "source-specific allowable emissions" was contingent on a lack of representative emissions data from the source.  *See id.* at 52,705 (EPA describing how "the definition of actual emissions allows the reviewing authority to presume that the allowable emissions in Source A's PSD permit reflects its actual emissions…." despite the fact that actual emissions data exists for Source A).  Indeed, EPA stated in the preamble that in the absence of "actual emissions data," a source would use its "best engineering judgment" to determine actual emissions.  *Id.* at 52,718 ("Best engineering judgments may be used in the absence of acceptable test data.").[3]

The United States cites only one document that provides any support for its reading of 40 C.F.R. § 52.21(b)(21)(iii), a Draft NSR Workshop Manual, purportedly "published by EPA in 1990."  Gov't Opening Br. at 12-13 n.7.[4]  The 1990 Draft NSR Workshop Manual asserts that "[i]n certain limited

---

[3]  Much of the discussion of "source-specific allowable emissions" in the preamble to the 1980 PSD regulations takes place in the context of "Increment Consumption," but EPA specifically cross-references that discussion in the "Major Modification" section of the preamble.  *Id.* at 52,698.

[4]  The government in its Opening Brief also cites two guidance memoranda from 1983, but neither supports the government's interpretation of 40 C.F.R. § 52.21(b)(21)(iii).  In fact, the July 14, 1983 memorandum cited by the government concerning the Puerto Rico Electric Power Authority confirms that "in calculating actual emissions, emissions allowed under federally enforceable source-specific requirements ***should be presumed*** to represent actual emission levels."  Letter from Charles Elkins, EPA, to Alberto Vega, PREPA (July 14, 1983) (emphasis added) (Gov't Opening Br., Ex. 5 at 2).  The memorandum goes on to rebut the presumption in that case because "PREPA has consistently operated well below its allowable emission rates," *id.*, but does not reject the presumption simply because emissions data is available.  Similarly, in the July 28, 1983 memorandum, EPA determined that the allowable emissions of the pulp and paper mill at issue did not reflect actual emissions "since the recovery boiler could not have operated at a level higher than that provided by the existing digester capacity."  Memorandum from Edward Reich, EPA, to Michael M. Johnston, EPA Region X (July 28, 1983) (Gov't Opening Br., Ex. 6 at 3).  Again, that

[Footnote continued on next page]

circumstances, where sufficient representative operating data do not exist to determine historic actual emissions and the reviewing agency has reason to believe that the source is operating at or near its allowable emissions level, the reviewing agency may presume that source-specific allowable emissions [or a fraction thereof] are equivalent to (and therefore used in place of) actual emissions at the unit." 1990 Draft NSR Workshop Manual (brackets in original) (Gov't Opening Br. Ex. 7 at A-41).  This draft manual, of course, was developed ten years after the DEP commenced and well after the DEP concluded, and therefore cannot be said to represent EPA's interpretation of the PSD regulations at the time of the DEP.  The interpretation advanced in the 1990 Draft NSR Workshop Manual also, as noted above, is inconsistent with language of the regulatory provision it purports to interpret and the pronouncements of EPA at the time it promulgated the 1980 PSD regulations.  *Taylor v. Progress Energy, Inc.*, 493 F.3d 454, 462 (4th Cir. 2007) ("We do not defer to an agency's interpretation if an alternative reading is compelled by indications of the [agency's] intent at the time of the regulation's promulgation.") (citation omitted), superseded by regulation on other grounds.

As importantly, the United States failed to cite an earlier version of EPA's Workshop Manual, which EPA actually finalized and published in 1980, and which supports Westvaco's position.  That 1980 PSD Workshop Manual interprets 40 C.F.R. § 52.21(b)(21)(iii) as creating a broad presumption in favor of using source-specific allowable emissions as actual emissions:  "In the case of emissions units for which permits have been issued or proposed according to PSD requirements, the PSD allowable emission rate *will generally be used as the actual emission rate*."  Seley Decl. Ex. J at I-A-14 (emphasis

---

[Footnote continued from previous page]
    memorandum does not reject the use of the source-specific allowable emissions presumption based on the availability of emissions data.

added).  The 1990 draft manual's later re-interpretation of the presumption as limited to situations where actual emissions data for a source is unavailable is found nowhere in EPA's 1980 PSD Workshop Manual.[5]

In sum, the post-hoc interpretation offered by the United States of the "actual emissions" definition is directly contrary to the plain language of the 1980 PSD regulations, the preamble to those regulations, and EPA guidance issued contemporaneously with the DEP.  The 1990 Draft NSR Workshop Manual, upon which the United States so heavily relies, post-dates the commencement of the DEP by almost a decade, and advances an interpretation of 40 C.F.R. § 52.21(b)(21)(iii) that is inconsistent with the regulatory language and the prior statements made by the agency.  Certainly, this Court owes no deference to post hoc interpretations that are "inconsistent with what the [agency] said it intended the regulation to mean at the time it was promulgated."  *Taylor*, 493 F.3d at 461.  Nothing cited or asserted by the United States undermines Westvaco's reasonable reliance on the language of the 1980 PSD regulations, and the pronouncements of EPA at the time those regulations were promulgated, that source-specific allowable emissions are presumed to be equivalent to actual emissions.

---

[5] The government argues at length that an agency's interpretation of its own regulations is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997).  While that may be true, "[a]n agency may not interpret its regulations in a manner so as to nullify the effective intent or wording of a regulation."  *Bahramizadeh v. INS*, 717 F.2d 1170, 1173 (7th Cir. 1983); *see also Riverkeeper, Inc. v. EPA*, 475 F.3d 83, 117 (2d Cir. 2007) ("Implicit in the rule that an agency cannot interpret a regulation contrary to its unambiguous meaning is the requirement that 'an agency must adhere to its own rules and regulations.'") (citation omitted).  Moreover, no deference is owed to an agency interpretation that is inconsistent with the agency intent expressed at the time of the regulation's promulgation.  *Taylor*, 493 F.3d at 461-62.  If deference is owed to EPA's interpretation of its 1980 PSD regulations under *Auer* or any other standard, that deference is owed to EPA's interpretation at the time of the DEP, and not to any subsequent contrary interpretation.

**B.    Westvaco And Its Regulators Correctly Concluded That The Luke Mill's Allowable Emissions Limit Is Equivalent To Actual Emissions.**

1.      Under the 1980 PSD regulations, "sources remain responsible in the first instance for determining what permitting requirements apply to their activities."  Requirements for Preparation, Adoption and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans; Standards of Performance for New Stationary Sources, 57 Fed. Reg. 32,314, 32,321 (July 21, 1992); *see also* 1980 PSD Workshop Manual at II-A-1 (attached as Exhibit A to the Supplemental Declaration of Peter E. Seley submitted herewith) ("In the PSD review process the applicant is responsible for . . . performing all required analyses.").  In making this determination, the source is to apply the same provisions in the PSD Regulations as its reviewing authority.  *Id.* at II-A-6 (instructing reviewing authorities to evaluate how a source applied PSD requirements: "The fourth step is to perform the applicability tests outlined in the application guidance package.  Has the applicant correctly applied these tests, to determine if the proposed source is subject to PSD review, and what requirements must be met?").  This is precisely what Westvaco did, concluding that its pre-DEP baseline actual emissions were equivalent to its 49 ton per day source-specific allowable emissions limit.

2.      Westvaco notified its regulators on two separate occasions of its determination that the DEP did not require PSD review as a result of the 49 ton per day source-specific allowable emissions limit.  *See* Seley Decl. Ex. H (application for permit to construct two new digesters, stating that "PSD requirements are met because . . . addition of the SO2 to the stack from TRS incineration will not raise the allowable emission of SO2 from the stack."); *Id.* Ex. Q (Westvaco informing the Maryland Air Programs Administration that its decision to incinerate TRS compounds in Power Boiler #25 instead of the lime kiln flare would not require PSD review because any resulting emissions from the power boiler were included in the existing SO2 emissions cap).  Maryland agreed with Westvaco's assessment of

PSD applicability, issuing a construction permit for the DEP, *id*. Ex. I, and issuing a subsequent permit

allowing digester gas to be incinerated in Power Boiler #25, stating that "[r]esultant SO2 emissions from

destruction of the gases in No. 25 Boiler will be included in the total plantwide SO2 limit (daily) as

specified in the revised Order." *Id*. Ex. S; *see also id*. Ex. U (West Virginia stating that "a permit under

Regulation XIV and federal PSD regulations is apparently not required for this modification" because

"31.8 TPY of SO2 emitted from the Luke Mill power boiler stack [from digester gas incineration] falls

under the applicable Maryland emission limitation for the Luke Mill.").[6]

      3.      Neither Westvaco nor its regulators had any reason to reject the source-specific allowable

emissions presumption based on emissions data from the mill.  Rebutting the presumption in 40 C.F.R.

§ 52.21(b)(21)(iii) "by demonstrating that the source-specific requirement is not representative of actual

emissions," 45 Fed. Reg. at 52,718, contemplates a significant difference between allowable emissions

limits and actual emissions data, *e.g.* where a source is permitted to burn a high-sulfur fuel but actually

burns a low sulfur fuel.  1980 PSD Workshop Manual at I-C-37 (describing a situation where a chemical

plant was permitted to burn oil with a 0.7 percent sulfur content, but instead was burning natural gas: "If

there is a significant difference between actual and allowable emissions, modeling can then be

performed using the actual rather than the allowable emissions."); *see also* 45 Fed. Reg. at 52,721 (EPA

---

[6] Although sources make PSD applicability determinations in the first instance, there is no requirement that the source notify its reviewing authority when it determines that PSD is inapplicable to a project.  45 Fed. Reg. at 52,725 (for projects not triggering PSD, "today's regulations do not contain a formal preconstruction notice requirement").  Even if the language of 40 C.F.R. § 52.21(b)(21)(iii) could be construed to require notice to, or concurrence by, a source's reviewing authority before the source-specific allowable emissions presumption can apply, in this case Westvaco clearly notified its regulators and received the concurrence of its PSD reviewing authority in applying the presumption.

describing its concerns where "sources may be allowed to burn fuels with higher sulfur contents, as in the Gulf Coast area, or may have high allowable limits that would permit sources to relax existing pollution controls. . . [and] no PSD review or SIP revision would be required.").

In this case, there was no significant difference between the mill's pre-DEP actual emissions and its 49 ton per day allowable emissions limit. The mill constantly adjusted its operations to maintain emissions below the cap, and spent millions of dollars to avoid exceeding the 49 ton per day limit. Seley Dec. Ex. D (Hearing Transcripts); *id.* Ex. F (Dandridge Deposition testimony); *id.* Ex. G (Blanke Memorandum). Those adjustments and expenditures would not have been necessary if the 49 ton per day cap was not representative of actual emissions. Maryland had access to all of the emissions data from the mill's continuous emissions monitoring system, Seley Decl. Ex. B (1975 Administrative Order), and concluded that the 49 ton per day cap constituted an "artificial constraint of the [mill's] daily emission limits," and the mill's actual emissions would have been higher but for the cap. Seley Decl. Ex. L. In other words, in the language of EPA's 1980 preamble, Westvaco's reviewing authority did not "reject" the presumption in 40 C.F.R. § 52.21(b)(21)(iii) based on actual emissions data, or believe that actual emissions data from the mill "rebutted" the presumption that the 49 ton per day source-specific allowable emissions limit was representative of actual emissions.

4.      The United States' Opening Brief makes only passing reference to any comparison between source-specific allowable emissions and actual emissions data, and certainly provides no grounds for overturning a PSD applicability decision made by Westvaco's reviewing authority almost 30 years ago. The government theorizes an annual emissions limit for the mill by "multiplying the applicable daily limit by 365 (the number of days in a typical [sic] year). Using 49 tons per day, this theoretical annual limit would be 17,885 tons." Gov't Opening Br. at 4. The government then

concludes that "[i]n reality, however, the Luke Mill does not (indeed could not without violating its daily limit) actually emit anything close to this theoretical annual limit." *Id.*  The government's hypothetical calculation would, as a practical matter, read 40 C.F.R. § 52.21(b)(21)(iii) out of the PSD regulations.  On one hand, as the government impliedly concedes, a daily emissions limitation is far more restrictive than an annual emissions limitation, and a source's annual emissions would never approximate a daily cap that is simply multiplied by 365.  Gov't Opening Br. at 4.  On the other hand, EPA has stated that permits with annual limits are not enforceable and thus cannot be used as source specific allowable emissions limits.  54 Fed. Reg. 27,274, 24,283 (June 28, 1989) ("an emissions limit expressed only in tons of pollution per year would not be considered practically enforceable").  There is simply no basis to conclude that EPA's 1980 PSD regulations would require a source to hypothesize a non-existent annual limit and then engage in such a nonsensical "apples to oranges" comparison.[7]

Moreover, in suggesting that actual emissions data is different from the Luke Mill's source-specific allowable emissions limit, the government does not consider whether the pre-DEP "actual emissions data" is "representative of normal source operation."  40 C.F.R. § 52.21(b)(21)(ii).  As previously noted, the State of Maryland in 1984 determined that the mill's emissions while operating under the 58 ton per day sulfur dioxide emissions cap and the 49 ton per day sulfur dioxide emissions

---

[7]  The government's hypothetical annual approach also makes no practical sense.  Applying the government's methodology to the 3-hour, 17.0 ton cap approved by EPA for the Luke Mill in 1984, for example, would yield a "theoretical annual cap" of roughly 49,674 tons of sulfur dioxide per year.  Applying the same methodology to the 66 ton per day cap approved by EPA for the Luke Mill at the same time would yield a "theoretical annual cap" of 24,090 tons per year.  Both the 3-hour and daily limits are "source-specific allowable emission" limits approved by EPA and contained in the Maryland SIP, but the government does not suggest any rationale for determining which of these "hypothetical annual caps" to compare against annual emissions data in testing the presumption in 40 C.F.R. § 52.21(b)(21)(iii).

cap were not "representative of normal source operation." *See* Seley Decl. Ex. L at 6 (explaining that the operations of the Luke mill under the cap were not "representative of normal source operation" because "Westvaco was operating under a daily sulfur dioxide emission cap . . . . In order to comply with the limits, Westvaco had to alter its normal use of fuel and, at times, its production.").

In sum, Westvaco and its regulators correctly concluded on multiple occasions that, for the purpose of the DEP, the mill's "source-specific allowable emission" limit was representative of "actual emissions." Westvaco reached that conclusion in the first instance, as required by PSD regulations, and received the concurrence of the State of Maryland, its PSD reviewing authority. Maryland also concluded that actual emissions data from the mill demonstrated that source-specific allowable emissions were representative (and indeed, underrepresented) actual emissions at the time of the DEP. Maryland did not "reject" or "rebut" the use of the source-specific allowable emissions presumption for determining emissions prior to changes in the DEP. The United States has provided no basis for reconsidering these conclusions reached almost 30 years ago by Westvaco and the State of Maryland.

### III.   Conclusion

The 'United States' Opening Brief disregards the definition of "actual emissions" in EPA's 1980 PSD regulations. It ignores the multiple PSD applicability determinations regarding the DEP made by Westvaco and by its reviewing authority, that were consistent with the language of those 1980 PSD regulations. The government's effort now to "interpret" an additional limitation into the language of 40 C.F.R. § 52.21(b)(21)(iii) should not be countenanced by this Court. The language of the regulation was plain, and EPA's contemporaneous interpretation of that regulation was consistent. Any post-hoc effort by EPA to change the language of the regulation, in guidance, rulemaking, or in this litigation, should

have no impact on this Court's consideration of whether Westvaco acted reasonably at the time of the DEP.

The United States has not established that the 1980 PSD regulations precluded Westvaco from calculating pre-DEP baseline emissions by reference to the mill's source-specific allowable emissions or that Westvaco was unreasonable in applying 40 C.F.R. § 52.21(b)(21)(iii) to the DEP.  *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 831 (E.D. Tenn. 2009) (the "inquiry is whether Defendant TVA's prediction that it did not need a permit was 'reasonable' under the circumstances existing before the projects in 1988").  Indeed, Westvaco's regulators repeatedly confirmed Westvaco's application of the PSD regulations.  Accordingly, Westvaco requests that this Court find, based on the language of the 1980 PSD regulations and the pronouncements of Westvaco's regulators, that the Luke <u>Mill's</u> 49-ton-per-day "source-specific allowable emissions" were representative of "actual emissions" for the purpose of the pre-DEP baseline emissions calculation.

Respectfully submitted,

_____/s/_____
Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

Andrea Bear Field
*afield@hunton.com*
Maida O. Lerner
*mlerner@hunton.com*
James D. Elliott

*jelliott@hunton.com*
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C.  20006-1109
(202) 955-1500 (voice)
(202) 778-2201 (facsimile)

Dated: January 29, 2010                    *Counsel for Defendant Westvaco Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2010, a true and correct copy of the foregoing Defendant Westvaco Corporation's Response to the United States' Opening Brief Regarding the Proper Standard for Measuring "Pre-Change" or "Baseline" Emissions was filed using the Court's electronic case filing system, which results in service on all counsel of record registered on the case management/electronic filing ("CM/ECF") system.

_____/s/_____
Charles H. Haake
