UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
          :

UNITED STATES OF AMERICA,      :
          :
     *Plaintiff,*      :
          :
     v.      :     Civil Action No. MJG 00-CV-2602
          :

WESTVACO CORPORATION,      :
          :
     *Defendant.*      :
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## UNITED STATES' BRIEF REGARDING THE PROPER BASELINE PERIOD AND THE PROPER STANDARD FOR MEASURING POST-CHANGE EMISSIONS

ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (PHONE)

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

MARK C. ELMER
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
1961 Stout Street, 8th Floor
Denver, CO 80294
(303) 312-7311 (PHONE)

OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

*Attorneys for the United States of America*

1

I.      **INTRODUCTION**

Westvaco has raised three issues concerning how emissions increases should be measured under the 1980 PSD rules.  First, Westvaco challenges the method for measuring pre-change (or baseline) emissions.  Second, Westvaco challenges the time period that should be used to determine baseline emissions.  Finally, Westvaco challenges the method for measuring post-change emissions.  This brief addresses the second and third issues:[1] the proper baseline period and the proper method for measuring post-change emissions.

With respect to the baseline period, Westvaco claims that the two-year period before July 1975, when the Luke Mill's daily sulfur dioxide ("$SO_2$") emissions limit took effect, is "more representative of normal source operation" and, therefore, should be used as the baseline period. The United States contends that the 1980 rules require the use of the two years immediately before the Digester Expansion Project ("DEP")[2] (i.e. February 1979 through February 1981) because EPA has not determined that a different two-year period would be more representative of normal source operation.  The United States contends in the alternative that Westvaco's proposed baseline period is not more representative of normal source operations or, at the very least, raises disputed issues of fact.  With respect to the emissions increase methodology (which includes the post-change emissions issue), Westvaco claims that the 1980 rules require the use of

---

[1] The first issue has already been briefed and argued.  We understand that the Court will defer ruling on this issue until Westvaco's other two issues have been briefed and argued.

[2] The United States uses the term DEP to refer both to (a) the construction of the No. 11 and No. 12 digester units (which the Court has determined include the No. 25 power boiler (*see* Phase I Decision (Dec. 3, 2009) (Doc. No. 230) at 16, 32)) and (b) the physical and operational changes made directly to the No. 25 and No. 26 power boilers (in approximately 1985) to allow them to incinerate non-condensible gases ("NCGs") from the digesters.

2

an "allowable to allowable" test or, alternatively, an "actual to projected actual test."  The United

States contends that the rules require the use of an "actual to potential" test.

## II.     LEGAL STANDARD

The resolution of each of these issues involves a determination of the meaning of the

1980 PSD rules.  There are well-established rules for determining the meaning of regulations,

which should be followed here.  To begin, the language of the regulation should be examined.  If

it is unambiguous, the regulation's plain language controls.  *See Humanoids Group v. Rogan*,

375 F.3d 301, 305 (4th Cir. 2004); *United States v. Deaton*, 332 F.3d 698, 709 (4th Cir. 2003).  If

the regulation is ambiguous, however, the agency's interpretation of the regulation is entitled to

deference as long as it is not plainly erroneous or inconsistent with the regulation.  *Humanoids*,

375 F.3d at 305 (citing *Auer v. Robbins*, 519 U.S. 452 (1997)); *Deaton*, 332 F.3d at 709 (citing

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)).  Deference to an agency's

interpretation of its own regulations is commonly known as *Seminole Rock* or *Auer* deference.  A

more complete discussion of these principles is included in the United States' Opening Brief

Regarding The Proper Standard For Measuring "Pre-Change" Or Baseline Emissions (Doc. No.

236) at 4-5.

## III.    ARGUMENT

### A.     The Two-Year Period Immediately Before the DEP Should be Used to Determine Pre-Change (or Baseline) Emissions.

Westvaco now argues that baseline emissions for the DEP should be determined using

the two-year period before July 1975 — more than five years before the beginning of the DEP —

based on the fact that the Luke Mill's daily $SO_2$ emissions limit first took effect then.  This

argument is inconsistent with the 1980 rules and with EPA's longstanding interpretation of the

rules because EPA did not make (indeed, Westvaco did not seek) a contemporaneous

determination that this two-year period was more representative of normal source operation.

Moreover, even if Westvaco had sought such a determination, it would have been denied as none

of the factors that EPA considers in determining whether some other period is more

representative of normal source operation were present.

> **1.     Under The 1980 Rules, The Two Years Immediately Preceding A Project Must Be Used Unless EPA Determines That A Different Two-Year Period Is More Representative Of Normal Source Operation.**

The plain language of the 1980 rules provides for the use of the two years immediately

preceding a change to establish baseline emissions unless EPA determines that a different two-

year period is more representative of normal source operation:

> In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant *during a two-year period which precedes the particular date and which is representative of normal source operation.*  The Administrator shall allow the use of a different time period *upon a determination that it is more representative of normal source operation.* Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of material processed, stored, or combusted during the selected time period.

40 C.F.R. §52.21(b)(21)(ii) (emphasis added).[3]  In effect, this provision creates a presumption

that the two years immediately before a project should be used to establish baseline emissions.

For a source to obtain approval to use a different period, EPA must make a "determination" that

it is more representative of normal source operation.[4]  Westvaco has never sought from EPA, let

---

[3] Unless otherwise indicated, all citations to the PSD regulations are to the 1980 regulations, which govern the changes at issue in this case.

[4] The PSD program imposes *pre*-construction requirements.  *See e.g.*, 42 U.S.C. § 7475 (Preconstruction Requirements); *United States v. Ohio Edison Co.*, 276 F.Supp.2d 829, 865 (S.D. Ohio 2003) (holding that PSD program requires a source to determine whether a project

alone obtained, a determination that some period other than the two years immediately before the DEP was more representative of normal source operation. Therefore, the two years immediately before the DEP should be used to establish baseline emissions.

2.      **EPA's Interpretation That The Rules Require The Use Of The Two Years Immediately Before A Project Is Entitled To Deference.**

EPA's interpretation of its rules is entitled to deference. *See Humanoids*, 375 F.3d at 305. Going back to the Preamble to the 1980 rules, EPA has consistently interpreted the rules as creating a presumption that the two years immediately preceding a change should be used to determine baseline emissions. *See* 45 Fed. Reg. 52,676, 52,718 (col. 2) (Aug. 7, 1980) (noting that two-year period "immediately preceding" a change should be used unless EPA determines that some other period is more representative of normal source operation). *See also* 57 Fed. Reg. 32,314, 32,317 (col. 1) (July 21, 1992) (noting that "EPA has typically used the 2 years immediately preceding the physical or operational change to establish the baseline"); *New York v. EPA*, 413 F.3d 3, 22 (D.C. Cir. 2005) (noting that under the 1980 rules "EPA historically used the two-year period immediately preceding the change to calculate baseline actual emissions"); *United States v. Cinergy Corp.*, 2005 WL 3018688 at *1 (S.D. Ind. Nov. 9, 2005) (indicating that "[t]he baseline period is generally the two years preceding the change"); *United States v. Ohio Edison*, 276 F.Supp.2d 829, 864 (S.D. Ohio 2003) (finding that the appropriate baseline under the 1980 rules is the "24 months immediately preceding the physical change").

---

would cause a significant net emissions increase <u>before</u> it begins construction). Therefore, Westvaco should have sought from EPA a determination that some other two-year period was more representative of normal source operation before it began construction of the DEP. Its post-hoc attempt to use a different baseline period should be rejected as inconsistent with the pre-construction requirements imposed by the PSD regulations.

EPA reiterated this interpretation in the NSR Workshop Manual:

> The "old" emissions level for an emissions unit equals the average rate (in tons per year) at which the unit actually emitted the pollutant during the two-year period just prior to the physical or operational change which resulted in the emissions increase.  In certain limited situations where the applicant adequately demonstrates that the prior 2 years is not representative of normal source operation, a different (2 year) time period may be used upon a determination by the reviewing agency that it is more representative of normal source operation. Normal source operations may be affected by strikes, retooling, major industrial accidents and other catastrophic occurrences.  The "new" emissions level for a new or modified emissions unit which has not begun normal operation is its potential to emit.

1990 NSR Workshop Manual (relevant excerpt attached as Ex. 1) at A.39.

EPA has consistently and repeatedly confirmed that the rules require the use of the two years immediately preceding a project unless EPA determines that some other two year period is more representative of normal source operation.  *See* PSD Applicability Determination for Cyprus Casa Grande (Nov. 6, 1987) (Ex.2) at 8 ("The regulations provide that actual emissions shall be the rate at which the source actually emitted the pollutant during the two-year period immediately preceding the particular date (the date of the change), unless EPA determines that a different two-year period is more representative of normal source operation."); PSD Applicability Determination for Wisconsin Electric Power Company (Ex.3) at 5 ("The Agency historically has followed a presumption that the most recent 2 years should be used, but has allowed another period where the source demonstrates that recent operations are abnormal."); PSD Applicability Determination for Cyprus Northshore Mining Corporation (Ex. 4) at § B.2. ("EPA policy presumes a calculation based on the 2 years that immediately preceded the change. . . . [T]he Administrator's power to use a different baseline period is limited to those circumstances where the source demonstrates that some time period other than the 2 years that

precede the change is more representative of normal source operation."); In re Monroe Electric

Generating Plant (Ex. 5) at 13-15 ("The regulations give EPA (or the permitting authority)

discretion to set a different period for determining baseline emissions if such a period is more

representative of normal source operations.  EPA, however, has applied its discretion narrowly in

assigning representative periods other than the two years immediately preceding the physical or

operational change."); Letter to John Yntema from R. Douglas Neeley regarding Establishing

Emissions Representative of Normal Source Operation for Furnace E, Owens-Brockway Glass

Container, Inc. (March 2, 2000) (Ex.6) (responding to request for determination regarding use of

an alternative baseline period).

        This interpretation is not plainly erroneous or inconsistent with the regulations.  The goal

of the PSD program is to protect air quality in areas that already meet the National Ambient Air

Quality Standards.  *See* 42 U.S.C. § 7470(1).  To meet this goal, the program requires sources

that make non-routine changes that increase emissions to take steps to ensure that air quality is

protected.  Use of the two-year period immediately preceding a project as the baseline most

accurately reflects the impact of the project on air quality.  If a stale baseline were used, historic

periods of high emissions could distort the impact of the project (making it appear that the

project did not have an impact on emissions) and lead to a degradation of air quality — precisely

the problem the PSD program was intended to prevent.

        **3.      If Westvaco Had Sought EPA Approval To Use A Pre-July 1975
                Baseline, It Would Have Been Denied.**

        Westvaco now argues that the two years before July 1975 — the date a daily $SO_2$

emissions limit took effect — should be used to determine baseline emissions.  Westvaco claims

that this period is more representative because the emissions limit disrupted normal source

7

operation.  This argument fails for at least two reasons.

First, EPA would not consider the pre-July 1975 period more representative of normal source operation.[5]  While the term "normal source operation" is not explicitly defined in the rules, EPA has interpreted it by identifying what is *not* "normal source operation."  Specifically, EPA has explained that normal source operation may be disrupted by strikes, retooling, major industrial accidents and other catastrophic occurrences.  *See* NSR Workshop Manual (Ex. 1) at p. A.39; PSD Applicability Determination for Cyprus Northshore Mining Corporation (Ex. 4) at § B.2 (indicating that the provision applies "to catastrophic occurrences such as strikes and major industrial accidents").

Strikes, major industrial accidents, and other catastrophic occurrences share several things in common.  Each is an atypical occurrence, of relatively short or temporary duration, which significantly disrupts source operations.  The same cannot be said about an emissions limit, the justification offered by Westvaco.  To begin, emissions limits are not unusual.  Many, indeed most, major sources of pollution have some form of emissions limits.  Next, the Luke Mill emissions limit was not temporary.  While there was some chance that the specific numerical amount could change (as a result of future monitoring and modeling),[6] the limit itself

---

[5] Under the rules, EPA clearly has retained the exclusive authority to make this determination. In other words, sources are not entitled to unilaterally determine that some period other than the two years immediately preceding a change is more representative of normal source operation. *See* 40 C.F.R. § 52.21(b)(21)(ii).

[6] At the time of the DEP, Westvaco understood that the specific numerical amount could go up, down, or remain the same.  *See* Letter from Thomas R. Long to Ann Marie De Biase (March 12, 1983) (Ex. 7) at 5 (acknowledging that "emission limitation could go up or down from 49 tons depending on the results of the study").  As noted elsewhere, PSD determinations must be made before construction begins — even in an enforcement context.  *See Ohio Edison*, 276 F.Supp.2d at 865.  Thus, at the time of the DEP, when Westvaco should have determined

was permanent.  Thus, beginning in 1975 (nearly six years before the start of the DEP) mill

operations under the emissions limit became the new norm.[7]  Finally, the 1975 emissions limit

did not significantly (if at all) disrupt source operations.[8]  Indeed, Westvaco has quantified the

impact of the emissions limit on source operations for fiscal years 1978 through July 1982.  *See*

September 3, 1982 memorandum regarding the costs of complying with the 49 ton per day $SO_2$

limit (attached as Ex. G to Memorandum of Points and Authorities in Support of Westvaco's

Motion for Determination of Baseline Emissions) (Doc. No. 235) (hereinafter "Westvaco's

Baseline Brief").  The memorandum includes a chart, which contains estimated compliance costs

for fuel (fuel oil, coal, natural gas), purchased power, and machine downtime.  Notably, the chart

indicates that there was <u>no</u> machine downtime due to the $SO_2$ limit in the years before the DEP[9]

and only modest costs attributable (presumably) to the difference in cost between the dirty, high

sulfur coal the Mill historically used and cleaner (but slightly more expensive) fuels.  This

negligible impact simply cannot be said to represent the type of significant disruption of

---

whether PSD would apply, it had no idea whether the numerical limit would change.

  [7] To find otherwise would completely undermine the PSD program and defeat the goals of the
Clean Air Act.  If sources could use their pre-limit emissions as their baseline emissions, PSD
would rarely be triggered because even though actual emissions would increase (when compared
to recent operations) the source would always be able to point to some period in the past, before
the imposition of an emissions limit, when emissions were higher.

  [8] In a very real sense, the limit did not affect source operations at all.  After the imposition of
the emissions limit, the mill continued to operate 24 hours per day, 7 days per week, 350 odd
days per year.  The mill continued to use the same equipment, using the same process, to make
the same product at roughly the same production levels.  There is simply no evidence that the
emissions limit changed in any material way the basic operations of the mill.

  [9] During the approximately five years covered by the memorandum, the only production
curtailment identified is a 6 hour period in May 1981.

operations envisioned by the EPA guidance.[10]  Certainly, the emissions limit did not disrupt

operations in the same way or to the same degree that a strike, major industrial accident, or other

catastrophic occurrence would.

Second, there was a restriction applicable to the Luke Mill even before the July 1975

daily emissions limit was imposed.  In approximately 1970, the State of Maryland adopted

regulations prohibiting the burning of fuel containing more than 1% sulfur.  *See* July 6, 1975

Order (attached as Ex. B to Westvaco Baseline Brief) at 1.  To avoid complying with this

requirement, Westvaco entered into a Plan for Compliance with the State on July 14, 1970.  *Id.*

The Plan required Westvaco to select and implement a sulfur control system or utilize low sulfur

coal.  *Id.*  Thus, even before July 1975, Westvaco was under a legal obligation (which it

apparently did not fully comply with)[11] to limit its $SO_2$ emissions.  Westvaco's rationale for

using a pre-July 1975 baseline — because it allegedly reflects mill operations before the

imposition of an emissions limit — is, therefore, not logically supportable because the Mill was

also under an obligation to control $SO_2$ emissions before July 1975.

Taken to its logical extreme, Westvaco's rationale would mean that even today the Luke

Mill's operations would not be representative of normal source operations (or at least that the

early 1970s would be more representative) because the Luke Mill is still subject to a daily

---

[10] To put these costs in context, Westvaco spent more than $1.25 billion on capital projects at
the Luke Mill during the period 1985 through 2004.  *See* Trial Tr. 907:10-14 (Dandridge)
(attached as Ex. 8).  The $5 million in compliance costs claimed by Westvaco, thus, represents
only a tiny fraction of the amount (0.004% to be exact) Westvaco spent modernizing and
expanding the Luke Mill.

[11] According to the Notice of Violation and Order to Appear for Hearing (attached as Ex. B.
to Westvaco Baseline Brief), Westvaco was accused of violating the 1% sulfur limit and failing
to comply with a portion of the Plan for Compliance.

emissions limit.  The idea that the early 1970s is more representative of normal source operations

than at any time in the last 35 years is ludicrous on its face, as well as completely inconsistent

with the goals of the Clean Air Act in general and the PSD program in particular.  It has long

been understood that existing sources would not be permanently exempted from the

requirements of the PSD program.[12]  To accept Westvaco's argument would effectively mean

that PSD for the mill's power boilers would almost never be triggered because (Westvaco now

claims) emissions from 35 years ago were higher than they are today.

**4.      Westvaco's Reliance On A State Position Paper Is Misplaced.**

Westvaco is likely to argue that the State of Maryland, in 1983, made a determination

that the two-year period before January 17, 1978 was not representative of normal source

operations.  *See* Westvaco Baseline Brief, Ex. L.  Westvaco will argue that this means the two-

year period before the DEP (February 1979 through February 1981) was not representative of

normal source operations either.  This argument should be rejected.  First, EPA, not the State of

Maryland, was the PSD permitting authority at the time of the DEP.  *See* 47 Fed. Reg. 7,834

(Feb. 23, 1982) (approving Maryland's PSD program effective March 25, 1982); Joint Pretrial

Order (Doc. No. 174), Stip. Fact No. 18.  Therefore, the State's opinion about normal source

operations is irrelevant.  Second, the State was looking at a different time period than the time

---

[12] *See, e.g.*, *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990); *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (noting that "[i]mplementation of the statute's definition of 'modification' will undoubtedly prove inconvenient and costly to affected industries; but the clear language of the statute unavoidably imposes these costs except for de minimis increases.  The statutory scheme intends to 'grandfather' existing sources; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program"); *Ohio Edison*, 276 F.Supp.2d at 835 (noting that "Congress expressly intended the Clean Air Act and the 1977 Amendments to become applicable to pre-existing plants, as such facilities were modified").

period at issue in this case. The State was looking at January 1976 through January 1978. The two-year period at issue in this case is February 1979 through February 1981. Thus, the States's "determination" would be irrelevant even if it had been the permitting authority at the time of the DEP. Third, the basis for the State's determination — that the emissions limit "artificially restricted the production rate" — is incorrect. There is no evidence that the emissions limit restricted production at the mill. Finally, and most importantly, the State's "determination" was rejected by EPA.

The State's "determination" was included in a paper titled "Argument in Support of State's PSD Determination with Respect to the Westvaco Consent Order," which was submitted to EPA in connection with EPA approval of the Luke Mill emissions limit. In effect, the State was arguing that the change in the Luke Mill emissions limit should not consume PSD increment[13] because, in part, the two-year period immediately preceding the baseline date (i.e. January 17, 1978) was not representative of normal source operation. According to this argument, actual emissions from some earlier period (when the mill was presumably emitting

---

[13] The PSD rules are intended to protect air quality in areas that already meet the National Ambient Air Quality Standards or NAAQS. To do that, the rules contain procedures for determining the existing air quality (referred to as the "baseline concentration") as of a particular date (referred to as the "baseline date"). The rules allow some variation from the baseline concentration. The amount of variation depends on how the area is classified: Class I, Class II, or Class III. The maximum allowable increase in concentration above the baseline concentration is referred to as PSD increment. When a new or modified source would cause an increase above the baseline concentration, it is said to "consume" increment." For a general discussion about PSD increment, see the 1990 NSR Workshop Manual (Ex. 1) at C.1 through C.15.

One of the main issues concerning the change in the Luke Mill emissions limit (from 49 to 66 tons-per-day) was whether it consumed increment. The issue can have consequences for economic development in a state, as there is only so much PSD increment available. If a source consumes the available increment (or some portion of it), there may not be sufficient additional increment available for future development.

more pollution) should be used to estimate whether there was a change in emissions.  This argument was rejected by EPA.  EPA found instead that the increased emissions limit *would* consume PSD increment.  In determining how much increment would be consumed, EPA used the two-year period immediately preceding the baseline date (i.e. January 1976 through January 1978) to determine baseline emissions.  By using the two years immediately before the relevant date, EPA necessarily rejected the argument that those years were not representative of normal source operation.  *See* Proposed Approval of the Revised Sulfur Dioxide (SO$_2$) Emissions Limitation for the Westvaco Paper Mill, Luke, Maryland, Technical Support Document (Ex. 9) at 13 (determining baseline emissions using the two years immediately preceding the baseline date); 49 Fed. Reg. 49,457, 49,458 (col. 3) (Dec. 20, 1984) (Ex. 10) (determining increment consumption using the two years immediately preceding baseline date as the baseline period).

> **B.      The Proper Measure Of Post-Change Emissions From New And Modified Emissions Units Is The Units' "Potential to Emit."**

Westvaco's last argument concerns how post-change emissions should be measured.  For emissions units that have not begun normal operations, the rules require that "actual emissions shall equal the potential to emit of the unit."  40 C.F.R. § 52.21(b)(21)(iv).  Thus, the issue is whether the new digester emissions units, installed as part of the DEP, had begun normal operations.  If they had not, then the 1980 rules are clear: actual emissions equals the potential to emit of the unit.  *Id.*

> **1.      The Plain Language Of The Rules Requires That Post-Change Emissions From The New Digesters Be Measured Using The Units' "Potential To Emit."**

The relevant provision of the 1980 rules is contained in the definition of "actual emissions."  That provision states that "for any emissions unit which has not begun normal

13

operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date." 40 C.F.R. § 52.21(b)(21)(iv).  The reason for this is simple.  PSD is a preconstruction program.  It requires major sources to make determinations about applicability before construction begins.  *See Ohio Edison*, 276 F.Supp.2d at 865.  As a result, "[w]here the emissions unit has not 'begun normal operations,' EPA regulations recognize that future actual emissions are difficult to predict and employ future 'potential' emissions as a proxy."  57 Fed. Reg. 32,314, 32,317 (col. 1) (July 21, 1992).

The DEP involved the construction and installation of two, new digesters.  Along with the No. 25 power boiler, these two digesters constituted *new* emissions units.  Before these units were constructed, they had not begun operation at all, let alone "normal operation."  Therefore, pursuant to the plain language of the rules, post-change emissions from the new digester units (including the No. 25 power boiler) must be measured using the units' "potential to emit."

**2.     To The Extent The Rules Are Unclear, EPA's Interpretation Is Entitled To Deference.**

EPA interprets the "potential to emit" provision within the definition of "actual emissions" as applying to new and modified units:

> [T]he PSD regulations provide that the increase in emissions is determined by subtracting the affected units' pre-change "actual emissions" (referred to above as the "baseline") from their post-change "actual emissions."  For units that have not "begun normal operations," the regulations generally provide that actual emissions are equal to the units' "potential to emit."  ***EPA interprets this provision to mean that units which have undertaken a non-routine physical or operational change have not "begun normal operations" within the meaning of the PSD regulations***, since pre-change emissions may not be indicative of how the units will be operated following the non-routine change.  In practice, the provision merely establishes a regulatory presumption that the units will operate at their maximum design capacity following the change.

In re Monroe Electric Generating Plant (Ex. 5) at 15 n.15 (emphasis added) (citations omitted).

14

*See also* 45 Fed. Reg. 52,675, 52,677 (col. 2) (Aug. 7, 1980) (explaining that post-change emissions "will generally be the potential to emit of the new or modified unit"); 1980 PSD Workshop Manual (attached as Ex. J to Westvaco Baseline Brief) at I-A-34 (noting that post-change emissions from new units equal the units' "potential to emit"); September 18, 1989 memorandum from John Calcagni to William B. Hathaway (Ex.11) at 3 (noting that where a change will affect normal operations of an existing unit "(as in the case of a change which could result in increased use of the unit), 'actual emissions' after the change must be assumed to be equal to 'potential to emit'"); PSD Applicability Determination for Detroit Edison (Ex. 12) at 18 (explaining that for emissions units that will undergo a non-excluded physical or operational change post-change emissions equal the "potential to emit" of the unit); August 8, 2001 letter from R. Douglas Neeley to Dr. Donald R. Van der Vaart (Ex. 13) at 2 (confirming use of the "actual to potential" test for a modification at a fiberglass production facility in 1980).

This interpretation is not plainly erroneous or inconsistent with the regulations. The regulations state that for any emissions unit that "has not begun normal operations" the unit's post-change emissions shall equal its "potential to emit." 40 C.F.R. § 52.21(b)(21)(iv). EPA interprets this provision to apply to all new units and all existing units that will undergo a non-exempt physical or operational change. There is nothing erroneous about this. A new unit has not begun operations at all. An existing unit that will undergo a non-exempt physical or operational change (other than a "like kind replacement")[14] has no operating history in its altered

---

[14] The Seventh Circuit, in *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990), created an exception to the actual to potential test for "like kind replacements" undertaken at electric utilities. This exception does not apply here. The DEP was not a "like kind replacement" project, and the Luke Mill is not an electric utility.

state.  It is, therefore, reasonable for EPA to presume that the new or modified unit will be operated at its maximum capacity.  This interpretation is entirely consistent with the regulations.  Indeed, this interpretation is compelled by the plain language of the regulations.  Accordingly, EPA's interpretation is entitled to deference.

Because the DEP involved the construction of new digester emissions units and/or non-exempt physical and operational changes directly to the power boilers, the Court should defer to EPA's interpretation of the 1980 rules as requiring the use of the "actual to potential" test to determine whether the projects would result in a significant net emissions increase.

> **3.      The Case Law Supports The Use Of An "Actual To Potential" Test Under The Circumstances Of This Case.**

Numerous courts have upheld EPA's use of the "actual to potential" test.  For example, the First Circuit upheld the use of the test to determine PSD applicability for a cement kiln project.  *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989).  The project involved converting an existing kiln (kiln no. 6) from a "wet" to a "dry" process and combining it with another existing kiln (kiln no. 3).  At the time of the project, kilns 3 and 6 were operating at 60% of their combined capacity.  The converted kiln would have more capacity than the combined capacities of kilns 3 and 6 but a lower emissions rate.  Therefore, at any given production level, the converted kiln would emit less pollution than the two existing kilns.  If the converted kiln was operated at full capacity, however, it would produce more pollution than the existing kilns produced when operated at 60% of their capacity.  In determining the change in emissions attributable to this project:

> EPA calculated the actual historical amount of pollutants that Kilns 3 and 6 emitted in the past (which, under the regulations, equals the average emissions over the past two years), and compared that with the amount of pollutants that the

16

> converted kiln would be capable of emitting in the future.  Since the Company
> operated the kilns at only 60 percent of their capacity in 1985-86, the new kiln,
> though cleaner and more efficient, is obviously capable of emitting significantly
> more pollutants.

*Id.* at 296.  The company challenged EPA's use of the actual to potential test calling it improper,

arbitrary, and inconsistent with the regulations.  The First Circuit disagreed.  The Court found

that the "language and expressed intent of the regulations both support[ed] EPA's

interpretation."  *Id.*

In *United States v. Murphy Oil USA, Inc.*, 143 F.Supp.2d 1054 (W.D. Wisc. 2001), the

court had to determine the proper emissions test to use in connection with a project involving an

existing sulfur recovery unit at an oil refinery:

> In 1987 and 1988, defendant made physical changes to the sulfur recovery unit at
> a cost of more than $250,000 by upgrading the primary burner, replacing the
> catalyst, installing a new and larger combustion chamber, adding an acid gas
> knock-out drum and a tail gas analyzer, as well as adding a hydrocarbon coalescer
> in the upstream amine unit and installing a distributed control system.  These
> changes served to improve the reliability of the unit and to improve its sulfur
> recovery efficiency.

*Id.* at 1066.  The court explained that the relevant inquiry was whether the changes to the

existing sulfur recovery unit "were sufficiently significant to support a finding that normal

operations had not begun before the improvements."  *Id.* at 1104.  The court went on to state that

"[i]f normal operations had not begun, an actual-to-potential test applies; otherwise, an actual-to-

future-actual prediction is appropriate."  *Id.*  Applying a literal definition of "normal operations,"

the Court found that the changes to the sulfur recovery unit were "significant enough to make the

post-construction unit effectively a new unit that had not begun normal operations at the start of

construction."  *Id.* at 1105.  Of particular importance to the court was the fact that the changes

did not simply involve replacing old parts with equivalent new ones.  *Id.*  The court concluded

by noting that courts give substantial deference to an agency's interpretation of its own regulations: "I cannot say that [EPA's] interpretation of the applicable test is unreasonable.  I conclude that the "actual-to-potential" test is appropriate to determine whether defendant is subject to [PSD] standards."  *Id.*

In *Sierra Club v. Morgan*, 2007 WL 3287850 (W.D. Wisc. 2007), the court considered the applicable emissions test to changes to several existing coal-fired boilers used to provide building heat.  The court found that four projects (numbered 2 through 5) were non-exempt physical changes and that this fact gave rise to "the presumption that the projects were sufficiently significant to support a finding that normal operations had not begun before the physical changes occurred."  *Id.* at *19.  The court then analyzed each of the four projects.  Other than the first (project 2), which "involved the changing of old tubes with new tubes without any change in the design or functionality," the court found that each project sufficiently changed the units so that it could not be said that they had begun normal operations before the changes.  For these projects, the court determined that emissions changes should be measured using the "actual to potential" test.  *Id.*

If anything, the DEP was even more significant than any of the changes at issue in *Puerto Rican Cement*, *Murphy Oil*, or *Sierra Club*.  Accordingly, these cases support the use of an actual to potential test to measure emissions increases attributable to the DEP.

## IV.    CONCLUSION

The plain meaning of the 1980 rules and EPA's interpretation of those rules require the use of the "actual to potential" test for determining whether the DEP would result in a significant net emissions increase.  The rules (and EPA interpretation) also require the use of the two years

18

immediately before the projects as the baseline period for determining whether there would be an emissions increase.  Accordingly, the Court should enter a decision finding that emissions increases in this case will be determined using the "actual to potential" test and that the baseline period will be February 1979 through February 1981 (the two years immediately preceding the DEP).[15]

        Respectfully submitted,


        ROD J. ROSENSTEIN
        United States Attorney

        MICHAEL DIPIETRO
        Assistant United States Attorney
        36 South Charles Street
        Fourth Floor
        Baltimore, MD 21201
        (410) 209-4800



        IGNACIA S. MORENO
        Assistant Attorney General
        Environment and Natural Resources Division


           /s/
        MARK C. ELMER
        U.S. Department of Justice
        Environment and Natural Resources Division
        Environmental Enforcement Section
        1961 Stout Street, 8th Floor
        Denver, CO 80294
        (303) 844-1352 (PHONE)

---

[15] In the event the physical and operational changes to the power boilers are considered separately from the construction of the No. 11 and No. 12 digesters, the baseline period would be the two years before the beginning of those changes.

19

OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

*Attorneys for the United States of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Brief Regarding The Proper Baseline Period And The Proper Standard For Measuring Post-Change Emissions on March 19, 2010, using the court's CM/ECF system which sent notification of such filing to:

Charles Harry Haake
Peter Eric Seley
Raymond B. Ludwiszewski
GIBSON DUNN AND CRUTCHER LLP
1050 Connecticut Ave NW
Washington , DC 20036
chaake@gibsondunn.com
pseley@gibsondunn.com

John Jay Range
Mark B. Bierbower
HUNTON AND WILLIAMS LLP
1900 K St NW Ste 1200
Washington , DC 20006
jrange@hunton.com
mbierbower@hunton.com

Howard B. Epstein
Mark Kieran Dowd
Sami B. Groff
SCHULTE ROTH AND ZABEL LLP
919 Third Ave
New York , NY 10022
howard.epstein@srz.com
mark.dowd@srz.com
sami.groff@srz.com

s/ Mark C. Elmer
Mark C. Elmer