Case 1:00-cv-02602-MJG   Document 246-1   Filed 03/19/10   Page 1 of 19

**D R A F T**
**OCTOBER 1990**

# New Source Review Workshop Manual

## Prevention of Significant Deterioration and Nonattainment Area Permitting

**D R A F T**
**OCTOBER 1990**

modification (reviewing agencies may use the date construction is <u>scheduled</u> to commence provided that it is reasonable considering the time needed to issue a final permit) and ending when the emissions increase from the modification occurs.  An increase resulting from a physical change at a source occurs when the new emissions unit becomes operational and begins to emit a pollutant.  A replacement that requires a shakedown period becomes operational only after a reasonable shakedown period, not to exceed 180 days.  Since the date construction actually will commence is unknown at the time the applicability determination takes place and is simply a scheduled date projected by the source, the contemporaneous period may shift if construction does not commence as scheduled.  Many States have developed PSD regulations that allow different time frames for definitions of contemporaneous.  Where approved by EPA, the time periods specified in these regulations govern the contemporaneous timeframe.

### III.B.3.   CREDITABLE CONTEMPORANEOUS EMISSIONS CHANGES

There are further restrictions on the contemporaneous emissions changes that can be credited in determining net increases.  To be creditable, <u>a contemporaneous reduction must be federally-enforceable</u> on and after the date construction on the proposed modification begins.  The actual reduction must take place before the date that the emissions increase from any of the new or modified emissions units occurs.  In addition, the reviewing agency must ensure that the source has maintained any contemporaneous decrease which the source claims has occurred in the past.  The source must either demonstrate that the decrease was federally-enforceable at the time the source claims it occurred, or it must otherwise demonstrate that the decrease was maintained until the present time and will continue until it becomes federally-enforceable.  <u>An emissions decrease cannot occur at, and therefore, cannot be credited from an emissions unit which was never constructed or operated, including units that received a PSD permit.</u>

Reductions must be of the same pollutant as the emissions increase from the proposed modification and must be qualitatively equivalent in their

A.38

**D R A F T**
**OCTOBER 1990**

effects on public health and welfare to the effects attributable to the proposed increase.  Current EPA policy is to assume that an emissions decrease will have approximately the same qualitative significance for public health and welfare as that attributed to an increase, unless the reviewing agency has reason to believe that the reduction in ambient concentrations from the emissions decrease will not be sufficient to prevent the proposed emissions increase from causing or contributing to a violation of any NAAQS or PSD increment.  In such cases, the applicant must demonstrate that the proposed netting transaction will not cause or contribute to an air quality violation before the emissions reduction may be credited.  Also, in situations where a State is implementing an air toxics program, proposed netting transactions may be subject to additional tests regarding the health and welfare equivalency demonstration.  For example, a State may prohibit netting between certain groups of toxic subspecies or apply netting ratios greater than the normally required 1:1 between certain groups of toxic pollutants.

   A contemporaneous emissions increase occurs as the result of a physical change or change in the method of operation at the source and is creditable to the extent that the new emissions level exceeds the old emissions level.  The "old" emissions level for an emissions unit equals the average rate (in tons per year) at which the unit actually emitted the pollutant during the 2-year period just prior to the physical or operational change which resulted in the emissions increase.  In certain limited situations where the applicant adequately demonstrates that the prior 2 years is not representative of normal source operation, a different (2 year) time period may be used upon a determination by the reviewing agency that it is more representative of normal source operation.  Normal source operations may be affected by strikes, retooling, major industrial accidents and other catastrophic occurrences.  The "new" emissions levels for a new or modified emissions unit which has not begun normal operation is its potential to emit.

   An emissions increase or decrease is creditable only if the relevant reviewing authority has <u>not</u> relied on it in issuing a PSD permit for the source, and the permit is still in effect when the increase in actual

**D R A F T**
**OCTOBER 1990**

emissions from the proposed modification occurs.  A reviewing authority relies on an increase or decrease when, after taking the increase or decrease into account, it concludes that a proposed project would not cause or contribute to a violation of an increment or ambient standard.  In other words, an emissions change at an emissions point which was considered in the issuance of a previous PSD permit for the source is <u>not</u> included in the source's "net emissions increase" calculation.  This is done to avoid "double counting" of emissions changes.

> *For example, an emissions increase or decrease already considered in a source's PSD permit (state or federal) can not be considered a contemporaneous increase or decrease since the increases or decrease was obviously relied upon for the purpose of issuing the permit.  Otherwise the increase or decrease would not have been specified in the permit.  In another example, a decrease in emissions from having previously switched to a less polluting fuel (e.g., oil to gas) at an existing emissions unit would not be creditable if the source had, in obtaining a PSD permit (which is still in effect) for a new emissions unit, modeled the source's ambient impact using the less polluting fuel.*

Changes in PM (PM/PM-10), $SO_2$ and $NO_x$ emissions are a subset of creditable contemporaneous changes that also affect the available increment.  For these pollutants, emissions changes which do not affect allowable PSD increment consumption are not creditable.

### III.B.4.   CREDITABLE AMOUNT

As mentioned above, only contemporaneous and creditable emissions changes are considered in determining the source-wide net emissions change.  All contemporaneous and creditable emissions increases and decreases at the source must, however, be considered.   The amount of each contemporaneous and

**D R A F T**
**OCTOBER 1990**

## CHAPTER C

## THE AIR QUALITY ANALYSIS

### I. INTRODUCTION

An applicant for a PSD permit is required to conduct an air quality analysis of the ambient impacts associated with the construction and operation of the proposed new source or modification. The main purpose of the air quality analysis is to demonstrate that new emissions emitted from a proposed major stationary source or major modification, in conjunction with other applicable emissions increases and decreases from existing sources (including secondary emissions from growth associated with the new project), will not cause or contribute to a violation of any applicable **NAAQS** or **PSD increment**. Ambient impacts of noncriteria pollutants must also be evaluated.

A separate air quality analysis must be submitted for each regulated pollutant if the applicant proposes to emit the pollutant in a significant amount from a new major stationary source, or proposes to cause a significant net emissions increase from a major modification (see *Table I-A-4*, chapter A of this part). [*Note: **The air quality analysis requirement also applies to any pollutant whose rate of emissions from a proposed new or modified source is considered to be "significant" because the proposed source would construct within 10 kilometers of a Class I area and would have an ambient impact on such area equal to or greater than 1 $\mu g/m^3$, 24-hour average.*]* Regulated pollutants include (1) pollutants for which a NAAQS exists (criteria pollutants) and (2) other pollutants, which are regulated by EPA, for which no NAAQS exist (noncriteria pollutants).

Each air quality analysis will be unique, due to the variety of sources and meteorological and topographical conditions that may be involved. Nevertheless, the air quality analysis must be accomplished in a manner consistent with the requirements set forth in either EPA's PSD regulations under 40 CFR 52.21, or a State or local PSD program approved by EPA pursuant to 40 CFR 51.166. Generally, the analysis will involve (1) an assessment of existing air quality, which may include ambient monitoring data and air

**D R A F T**
**OCTOBER 1990**

quality dispersion modeling results, and (2) predictions, using dispersion modeling, of ambient concentrations that will result from the applicant's proposed project and future growth associated with the project.

In describing the various concepts and procedures involved with the air quality analysis in this section, it is assumed that the reader has a basic understanding of the principles involved in collecting and analyzing ambient monitoring data and in performing air dispersion modeling. Considerable guidance is contained in EPA's <u>Ambient Monitoring Guidelines for Prevention of Significant Deterioration</u> [Reference 1] and <u>Guideline on Air Quality Models (Revised)</u> [Reference 2]. Numerous times throughout this chapter, the reader will be referred to these guidance documents, hereafter referred to as the <u>PSD Monitoring Guideline</u> and the <u>Modeling Guideline</u>, respectively.

In addition, because of the complex character of the air quality analysis and the site-specific nature of the modeling techniques involved, applicants are advised to review the details of their proposed modeling analysis with the appropriate reviewing agency before a complete PSD application is submitted. This is best done using a modeling protocol. The modeling protocol should be submitted to the reviewing agency for review and approval prior to commencing any extensive analysis. Further description of the modeling protocol is contained in this chapter.

The PSD applicant should also be aware that, while this chapter focuses primarily on compliance with the NAAQS and PSD increments, additional impact analyses are required under separate provisions of the PSD regulations for determining any impairment to visibility, soils and vegetation that might result, as well as any adverse impacts to Class I areas. These provisions are described in the following chapters D and E, respectively.

**D R A F T**
**OCTOBER 1990**

## II. NATIONAL AMBIENT AIR QUALITY STANDARDS AND PSD INCREMENTS

As described in the introduction to this chapter, the air quality analysis is designed to protect the ***national ambient air quality standards*** (NAAQS) and ***PSD increments***. The NAAQS are maximum concentration "ceilings" measured in terms of the total concentration of a pollutant in the atmosphere (See *Table C-1*). For a new or modified source, compliance with any NAAQS is based upon the total estimated air quality, which is the sum of the ambient estimates resulting from existing sources of air pollution (modeled source impacts plus measured background concentrations, as described in this section) and the modeled ambient impact caused by the applicant's proposed emissions increase (or net emissions increase for a modification) and associated growth.

A PSD increment, on the other hand, is the maximum allowable <u>increase</u> in concentration that is allowed to occur above a baseline concentration for a pollutant (see section II.E). The baseline concentration is defined for each pollutant (and relevant averaging time) and, in general, is the ambient concentration existing at the time that the first complete PSD permit application affecting the area is submitted. Significant deterioration is said to occur when the amount of new pollution would exceed the applicable PSD increment. It is important to note, however, that the air quality cannot deteriorate beyond the concentration allowed by the applicable NAAQS, even if not all of the PSD increment is consumed.

### II.A   CLASS I, II, AND III AREAS AND INCREMENTS.

The PSD requirements provide for a system of area classifications which affords States an opportunity to identify local land use goals. There are three area classifications. Each classification differs in terms of the amount of growth it will permit before significant air quality deterioration would be deemed to occur. Class I areas have the smallest increments and thus allow only a small degree of air quality deterioration. Class II areas can

**D R A F T**
**OCTOBER 1990**

TABLE C-1.   National Ambient Air Quality Standards

| Pollutant/averaging time | Primary Standard | Secondary Standard |
|---|---|---|
| **Particulate Matter** | | |
| o $PM_{10}$, annual[a] | 50 µg/m³ | 50 µg/m³ |
| o $PM_{10}$, 24-hour[b] | 150 µg/m³ | 150 µg/m³ |
| **Sulfur Dioxide** | | |
| o $SO_2$, annual[c] | 80 µg/m³ (0.03 ppm) | |
| o $SO_2$, 24-hour[d] | 365 µg/m³ (0.14 ppm) | |
| o $SO_2$, 3-hour[d] | | 1,300 µg/m³ (0.5 ppm) |
| **Nitrogen Dioxide** | | |
| o $NO_2$, annual[c] | 0.053 ppm (100 µg/m³) | 0.053 ppm (100 µg/m³) |
| **Ozone** | | |
| o $O_3$, 1-hour[b] | 0.12 ppm (235 µg/m³) | 0.12 ppm (235 µg/m³) |
| **Carbon Monoxide** | | |
| o CO, 8-hour[d] | 9 ppm (10 mg/m³) | -- |
| o CO, 1-hour[d] | 35 ppm (40 mg/m³) | -- |
| **Lead** | | |
| o Pb, calendar quarter[c] | 1.5 µg/m³ | -- |

a Standard is attained when the expected annual arithmetic mean is less than or equal to 50 µg/m³.
b Standard is attained when the expected number of exceedances is less than or equal to 1.
c Never to be exceeded.
d Not to be exceeded more than once per year.

**D R A F T**
**OCTOBER 1990**

accommodate normal well-managed industrial growth.  Class III areas have the largest increments and thereby provide for a larger amount of development than either Class I or Class II areas.

Congress established certain areas, e.g., wilderness areas and national parks, as mandatory Class I areas.  These areas cannot be redesignated to any other area classification.  All other areas of the country were initially designated as Class II.  Procedures exist under the PSD regulations to redesignate the Class II areas to either Class I or Class III, depending upon a State's land management objectives.

PSD increments for $SO_2$ and particulate matter--measured as total suspended particulate (TSP)--have existed in their present form since 1978.  On July 1, 1987, EPA revised the NAAQS for particulate matter and established the new PM-10 indicator by which the NAAQS are to be measured.  (Since each State is required to adopt these revised NAAQS and related implementation requirements as part of the approved implementation plan, PSD applicants should check with the appropriate permitting agency to determine whether such State action has already been taken.  Where the PM-10 NAAQS are not yet being implemented, compliance with the TSP-based ambient standards is still required in accordance with the currently-approved State implementation plan.)  Simultaneously with the promulgation of the PM-10 NAAQS, EPA announced that it would develop PM-10 increments to replace the TSP increments.  Such new increments have not yet been promulgated, however.  Thus the national PSD increment system for particulate matter is still based on the TSP indicator.

The EPA promulgated PSD increments for $NO_2$ on October 17, 1988.  These new increments become effective under EPA's PSD regulations (40 CFR 52.21) on November 19, 1990, although States may have revised their own PSD programs to incorporate the new increments for $NO_2$ on some earlier date.  Until November 19, 1990, PSD applicants should determine whether the $NO_2$ increments are being implemented in the area of concern; if so, they must include the necessary analysis, if applicable, as part of a complete permit application.  [NOTE:  the "trigger date" (described below in section II.B) for the $NO_2$ increments has been established by regulation as of February 8, 1988.  This applies to all State PSD programs as well as EPA's Part 52 PSD program.  Thus,

C.5

**D R A F T**
**OCTOBER 1990**

consumption of the $NO_2$ increments may actually occur before the increments become effective in any particular PSD program.]  The PSD increments for $SO_2$, TSP and $NO_2$ are summarized in *Table C-2*.

## II.B  ESTABLISHING THE BASELINE DATE

As already described, the ***baseline concentration is*** the reference point for determining air quality deterioration in an area.  The baseline concentration is essentially the air quality existing at the time of the first complete PSD permit application submittal affecting that area.  In general, then, the submittal date of the first complete PSD application in an area is the "baseline date."  On or before the date of the first PSD application, most emissions are considered to be part of the baseline concentration, and emissions changes which occur after that date affect the amount of available PSD increment.  However, to fully understand how and when increment is consumed or expanded, three different dates related to baseline must be explained.  In chronological order, these dates are as follows:

- *the **major source baseline date***;
- *the **trigger date***;  and
- *the **minor source baseline date***.

The ***major source baseline date*** is the date after which actual emissions associated with construction (i.e., physical changes or changes in the method of operation) at a major stationary source affect the available PSD increment. Other changes in actual emissions occurring at any source after the major source baseline date do not affect the increment, but instead (until after the minor source baseline date is established) contribute to the baseline concentration.  The ***trigger date*** is the date after which the minor source

C.6

**D R A F T**
**OCTOBER 1990**

TABLE C-2.   PSD INCREMENTS

($\mu g/m^3$)

| | Class I | Class II | Class III |
|---|---|---|---|
| **Sulfur Dioxide** | | | |
| o $SO_2$, annual[a] | 2 | 20 | 40 |
| o $SO_2$, 24-hour[b] | 5 | 91 | 182 |
| o $SO_2$, 3-hour[b] | 25 | 512 | 700 |
| **Particulate Matter** | | | |
| o TSP, annual[a] | 5 | 19 | 37 |
| o TSP, 24-hour[b] | 10 | 37 | 75 |
| **Nitrogen Dioxide** | | | |
| o $NO_2$, annual[a] | 2.5 | 25 | 50 |

a Never to be exceeded.

b Not to be exceeded more than once per year.

**D R A F T**
**OCTOBER 1990**

baseline date (described below) may be established. Both the major source baseline date and the trigger date are fixed dates, although different dates apply to (1) $SO_2$ and particulate matter, and (2) $NO_2$, as follows:

444444444444444444444444444444444444444444444444444444444444444444444
| Pollutant | Major Source Baseline Date | Trigger Date |
|---|---|---|
| PM | January 6, 1975 | August 7, 1977 |
| $SO_2$ | January 6, 1975 | August 7, 1977 |
| $NO_2$ | February 8, 1988 | February 8, 1988 |

The **minor source baseline date** is the earliest date after the trigger date on which a complete PSD application is <u>received</u> by the permit reviewing agency. If the application that established the minor source baseline date is ultimately denied or is voluntarily withdrawn by the applicant, the minor source baseline date remains in effect nevertheless. Because the date marks the point in time after which actual emissions changes from <u>all</u> sources affect the available increment (regardless of whether the emissions changes are a result of construction), it is often referred to as the "baseline date."

The minor source baseline date for a particular pollutant is triggered by a PSD applicant only if the proposed increase in emissions of that pollutant is significant. For instance, a PSD application for a major new source or modification that proposes to increase its emissions in a significant amount for $SO_2$, but in an insignificant amount for PM, will establish the minor source baseline date for $SO_2$ but not for PM. Thus, the minor source baseline dates for different pollutants (for which increments exist) need not be the same in a particular area.

**D R A F T**
**OCTOBER 1990**

## II.C   ESTABLISHING THE BASELINE AREA

The area in which the minor source baseline date is established by a PSD permit application is known as the ***baseline area***.  The extent of a baseline area is limited to intrastate areas and may include one or more areas designated as attainment or unclassified under Section 107 of the Act.  The baseline area established pursuant to a specific PSD application is to include 1) all portions of the attainment or unclassifiable area in which the PSD applicant would propose to locate, amd 2) any attainment or unclassifiable area in which the proposed emissions would have a significant ambient impact.  For this purpose, a significant impact is defined as at least a 1 µg/m$^3$ annual increase in the average annual concentration of the applicable pollutant.  Again, a PSD applicant's establishment of a baseline area in one State does not trigger the minor source baseline date in, or extend the baseline area into, another State.

## II.D   REDEFINING BASELINE AREAS (AREA REDESIGNATIONS)

It is possible that the boundaries of a baseline area may not reasonably reflect the area affected by the PSD source which established the baseline area.  A state may redefine the boundaries of an existing baseline area by redesignating the section 107 areas contained therein.  Section 107(d) of the Clean Air Act specifically authorizes states to submit redesignations to the EPA.  Consequently, a State may submit redefinitions of the boundaries of attainment or unclassifiable areas at any time, as long as the following criteria are met:

> ! *area redesignations can be no smaller than the 1 µg/m$^3$ area of impact of the triggering source*;  and

> ! *the boundaries of any redesignated area cannot intersect the 1 µg/m$^3$ area of impact of any major stationary source that established or would have established a minor source baseline date for the area proposed for redesignation.*

**DRAFT**
**OCTOBER 1990**

## II.E  INCREMENT CONSUMPTION AND EXPANSION

The amount of PSD increment that has been consumed in a PSD area is determined from the emissions increases and decreases which have occurred from sources since the applicable baseline date.  It is useful to note, however, that in order to determine the amount of PSD increment consumed (or the amount of available increment), no determination of the baseline concentration needs to be made.  Instead, increment consumption calculations must reflect only the ambient pollutant concentration <u>change</u> attributable to increment-affecting emissions.

Emissions increases that consume a portion of the applicable increment are, in general, all those <u>not</u> accounted for in the baseline concentration and specifically include:

! *actual emissions increases occurring after the **major source baseline date**, which are associated with physical changes or changes in the method of operation (i.e., construction) at a major stationary source*;  and

! *actual emissions increases at any stationary source, area source, or mobile source occurring after the **minor source baseline date***.

The amount of available increment may be added to, or "expanded," in two ways.  The primary way is through the reduction of actual emissions from any source after the minor source baseline date.  Any such emissions reduction would increase the amount of available increment to the extent that ambient concentrations would be reduced.

Increment expansion may also result from the reduction of actual emissions after the major source baseline date, but <u>before</u> the minor source baseline date, if the reduction results from a physical change or change in the method of operation (i.e., construction) at a major stationary source.  Moreover, the reduction will add to the available increment only if the reduction is included in a federally enforceable permit or SIP provision.  Thus, for major stationary sources, actual emissions <u>reductions</u> made prior to the minor source baseline date expand the available increment just as <u>increases</u> before the minor source baseline date consume increment.

**D R A F T**
**OCTOBER 1990**

The creditable increase of an existing stack height or the application of any other creditable dispersion technique may affect increment consumption or expansion in the same manner as an actual emissions increase or decrease. That is, the effects that a change in the effective stack height would have on ground level pollutant concentrations generally should be factored into the increment analysis. For example, this would apply to a raised stack height occurring in conjunction with a modification at a major stationary source prior to the minor source baseline date, or to any changed stack height occurring after the minor source baseline date. It should be noted, however, that any increase in a stack height, in order to be creditable, must be consistent with the EPA's stack height regulations; credit cannot be given for that portion of the new height which exceeds the height demonstrated to be the good engineering practice (GEP) stack height.

Increment consumption (and expansion) will generally be based on changes in actual emissions reflected by the normal source operation for a period of 2 years. However, if little or no operating data are available, as in the case of permitted emission units not yet in operation at the time of the increment analysis, the **potential to emit** must be used instead. Emissions data requirements for modeling increment consumption are described in *Section IV.D.4*. Further guidance for identifying increment-consuming sources (and emissions) is provided in *Section IV.C.2*.

**DRAFT**
**OCTOBER 1990**

## II.F  BASELINE DATE AND BASELINE AREA CONCEPTS -- EXAMPLES

An example of how a baseline area is established is illustrated in *Figure C-1*. A major new source with the potential to emit significant amounts of $SO_2$ proposes to locate in County C. The applicant submits a complete PSD application to the appropriate reviewing agency on October 6, 1978. (The trigger date for $SO_2$ is August 7, 1977.) A review of the State's $SO_2$ attainment designations reveals that attainment status is listed by individual counties in the state. Since County C is designated attainment for $SO_2$, and the source proposes to locate there, October 6, 1978 is established as the minor source baseline date for $SO_2$ for the entire county.

Dispersion modeling of proposed $SO_2$ emissions in accordance with approved methods reveals that the proposed source's ambient impact will exceed 1 ug/m$^3$ (annual average) in Counties A and B. Thus, the same minor source baseline date is also established throughout Counties A and B. Once it is triggered, the minor source baseline date for Counties A, B and C establishes the time after which all emissions changes affect the available increments in those three counties.

Although $SO_2$ impacts due to the proposed emissions are above the significance level of 1 μg/m$^3$ (annual average) in the adjoining State, the proposed source does not establish the minor source baseline date in that State. This is because, as mentioned in Section II.C of this chapter, baseline areas are <u>intrastate</u> areas only.

The fact that a PSD source's emissions cannot trigger the minor source baseline date across a State's boundary should not be interpreted as precluding the applicant's emissions from consuming increment in another State. Such increment-consuming emissions (e.g., $SO_2$ emissions increases resulting from a physical change or a change in the method of operation at a

C.12



**Figure C-1.  Establishing the Baseline Area.**

major stationary source after January 6, 1975) that affect another State will consume increment there even though the minor source baseline date has not been triggered, but are not considered for increment-consuming purposes until after the minor source baseline date has been independently established in that State.    A second example, illustrated in *Figure C-2*, demonstrates how a baseline area may be redefined.  Assume that the State in the first example decides that it does not want the minor source baseline date to be established in the western half of County A where the proposed source will not have a significant annual impact (i.e., 1 $\mu g/m^3$, annual average).  The State, therefore, proposes to redesignate the boundaries of the existing section 107 attainment area, comprising all of County A, to create two separate attainment areas in that county.  If EPA agrees that the available data support the change, the redesignations will be approved.  At that time, the October 6, 1978 minor source baseline date will no longer apply to the newly-established attainment area comprising the western portion of County A.

If the minor source baseline date has not been triggered by another PSD application having a significant impact in the redesignated western portion of County A, the $SO_2$ emissions changes occurring after October 6, 1978 from minor point, area, and mobile sources, and from nonconstruction-related activities at all major stationary sources in this area will be transferred into the baseline concentration.  In accordance with the major source baseline date, construction-related emissions changes at major point sources continue to consume or expand increment in the westerm poriton of County A which is no longer part of the original baseline area.



**Figure C-2.  Redefining the Baseline Area.**