**BEFORE THE ADMINISTRATOR**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

|  |  |  |
|---|---|---|
| IN THE MATTER OF | ) | PETITION NO. 6-99-2 |
| MONROE ELECTRIC GENERATING | ) | ORDER RESPONDING TO |
| PLANT | ) | PETITIONER'S REQUEST THAT |
| ENTERGY LOUISIANA, INC. | ) | THE ADMINISTRATOR OBJECT |
| PROPOSED OPERATING PERMIT | ) | TO ISSUANCE OF A STATE |
|  | ) | OPERATING PERMIT |
| Proposed by the Louisiana | ) |  |
| Department of Environmental | ) |  |
| Quality | ) |  |
|  | ) |  |

**ORDER PARTIALLY GRANTING AND PARTIALLY**
**DENYING PETITION FOR OBJECTION TO PERMIT**

On February 9, 1999, Ms. Merrijane Yerger, Managing Director of the Citizens for Clean Air & Water ("CCAW" or "Petitioner"), petitioned the Environmental Protection Agency ("EPA"), pursuant to section 505(b) of the Clean Air Act ("CAA" or "the Act"), to object to issuance of a proposed State operating permit to Entergy Louisiana, Inc.'s Monroe Electric Generating Plant in Monroe, Louisiana ("Monroe plant"). The proposed operating permit for the Monroe plant was proposed for issuance by the Louisiana Department of Environmental Quality ("LDEQ") pursuant to title V of the Act, CAA §§ 501 - 507, the federal implementing regulations, 40 CFR Part 70, and the State of Louisiana regulations, Louisiana Administrative Code ("L.A.C."), Title 33, Part III, Chapter 5, sections 507 <u>et</u> <u>seq</u>.

Petitioner has requested that EPA review, investigate, and make an administrative determination on the entire matter of the proposed operating permit and planned restart of the Monroe plant, pursuant to section 505(b) of the Act and 40 CFR § 70.8(c). Petitioner alleges that the proposed operating permit is not in compliance with applicable requirements of the Act including Prevention of Significant Deterioration ("PSD") permitting requirements and New Source Performance Standards ("NSPS"). Petitioner also alleges that Entergy's operating permit application fails to adequately demonstrate compliance with hazardous waste disposal requirements under the Resource Conservation and Recovery Act ("RCRA").

For the reasons set forth below, I find that the proposed title V permit does not assure compliance with applicable PSD requirements as set forth in the Louisiana State Implementation Plan ("SIP"). I therefore grant the Petitioner's request in part and object to issuance of the proposed title V permit unless the

permit is revised in accordance with this Order.  I deny the
Petitioner's remaining claims.

## I.  <u>STATUTORY AND REGULATORY FRAMEWORK</u>

Section 502(d)(1) of the Act calls upon each State to
develop and submit to EPA an operating permit program to meet the
requirements of title V.  The State of Louisiana submitted a
title V program governing the issuance of operating permits on
November 15, 1993, and subsequently revised this program on
November 10, 1994.  40 CFR Part 70, Appendix A.  In September of
1995, EPA granted full approval of the Louisiana title V
operating permits program, which became effective on October 12,
1995.  60 <u>Fed</u>. <u>Reg</u>. 47296 (Sept. 12, 1995); 40 CFR Part 70,
Appendix A.  This program is codified in L.A.C. Title 33, Part
III, Chapter 5, sections 507 <u>et</u> <u>seq</u>.  Major stationary sources of
air pollution and other sources covered by title V are required
to obtain an operating permit that includes emission limitations
and such other conditions as are necessary to assure compliance
with applicable requirements of the Act.  <u>See</u> CAA §§ 502(a) and
504(a).

The title V operating permits program is a vehicle for
ensuring that existing air quality control requirements are
appropriately applied to facility emission units in a single
document and that compliance with these applicable requirements
is assured.  <u>See</u> Order <u>In re Roosevelt Regional Landfill</u>, at 2
(May 4, 1999).  Such applicable requirements include the
requirement to obtain preconstruction permits that comply with
applicable new source review requirements.  <u>Id</u>. at 8.[1]

Under section 505(b) of the Act and 40 CFR § 70.8(c), states
are required to submit all operating permits proposed pursuant to
title V to EPA for review and EPA will object to permits

---

[1]  Louisiana defines "federally applicable requirement" in
relevant part to include "any standard or other requirement
provided for in the Louisiana State Implementation Plan ("SIP")
approved or promulgated by EPA through rulemaking under title I
of the Clean Air Act that implements the relevant requirements of
the Clean Air Act, including any revisions to that plan
promulgated in 40 CFR part 52, subpart T." L.A.C. 33:III.502.
EPA approved a PSD program in the State of Louisiana's SIP on
April 24, 1987.  52 <u>Fed</u>. <u>Reg</u>. 13671; 40 CFR § 52.986.  Thus, the
applicable requirements of the Act respecting the Monroe plant
permit include the requirement to comply with the applicable PSD
requirements under the Louisiana SIP.

determined by the Agency not to be in compliance with applicable
requirements or the requirements of 40 CFR Part 70.  If EPA does
not object to a permit on its own initiative, section 505(b)(2)
of the Act and 40 CFR § 70.8(d) provide that any person may
petition the Administrator, within 60 days of the expiration of
EPA's 45-day review period, to object to the permit.

To justify exercise of an objection by EPA to a title V
permit pursuant to section 505(b)(2), a petitioner must
demonstrate that the permit is not in compliance with the
requirements of the Act, including the requirements of Part 70.
Petitions must, in general, be based on objections to the permit
that were raised with reasonable specificity during the public
comment period.  A petition for review does not stay the
effectiveness of the permit or its requirements if the permit was
issued after the expiration of EPA's 45-day review period and
before receipt of the objection.  If EPA objects to a permit in
response to a petition and the permit has not been issued, the
permitting authority shall not issue the permit until EPA's
objection has been resolved.  40 CFR § 70.8(d).

## II. **BACKGROUND**

The Monroe plant, located in Monroe, Louisiana,[2] currently
consists of three units (Units 10, 11 and 12), each with a boiler
and ancillary equipment, which were installed in 1961, 1963, and
1968, respectively.[3]  Each boiler is fired primarily with natural
gas, but is also capable of being fired with diesel fuel oil.[4]

---

[2]  The Monroe area is currently designated as attainment for
all National Ambient Air Quality Standards ("NAAQS") established
by EPA.

[3]  The City of Monroe built the plant in approximately 1895,
and owned and operated the plant until 1978, when Louisiana Power
& Light became the operator and subsequently the owner of the
plant.  Louisiana Power & Light changed its name to Entergy
Louisiana, Inc. in 1996.
Units 10, 11 and 12 are the most recent additions Units 1
through 9 at the Monroe plant have been permanently
decommissioned.  The last of these, Unit 9, was permanently
retired effective December 31, 1987.  See Memo from D.L. Aswell,
LP&L, to William Phillips, SSI (Dec. 18, 1987).  This memo and
other documents referred to in this Order are on file with EPA.

[4]  The proposed title V permit would allow up to 15 percent
of the facility's fuel use to be diesel fuel oil.

The rated capacities of the units are 23 megawatts ("MW"), 41 MW, and 74 MW, respectively.  The total heat input for the units is 1,961 million British thermal units ("MMBtu").  Installation of these boilers was not subject to PSD review because it predated the PSD program.

On July 1, 1988, Louisiana Power & Light ("LP&L"), predecessor to Entergy Louisiana, Inc. ("Entergy"), placed the plant's three units in extended reserve shutdown ("ERS").[5] According to Entergy, these units were placed in extended reserve shutdown because of the addition of new electric generating capacity in the area.  Memo from Entergy to EPA, "Actions Taken By Entergy At Monroe Generating Station."  At the time of shutdown, LP&L projected that Units 10, 11 and 12 would not be needed for three to five years.  Id.  That period grew to eleven years as a result of "many factors," according to Entergy, including increased competition and demand-side management.  Id.

Some time around September, 1988, LP&L initiated a number of activities at the Monroe plant to prepare the plant for extended shutdown, including draining, disconnecting and covering equipment, and installing and operating dehumidification equipment to prevent corrosion of the units.  During shutdown, LP&L/Entergy conducted some inspection and maintenance activities, primarily in response to problems with the

---

[5]   Memo from E.M. Ormond, LP&L, to Glenn F. Phillips (June 28, 1988). Extended reserve shutdown is a program implemented by the Entergy Operating Companies (of which Entergy Louisiana is a member) in the mid-1980's to save money by placing units in inactive status and reducing operating staff, maintenance costs, and deferring the cost of repairing units.  See Louisiana Public Service Commission, Order No. U-20925-G at 8-9 (Nov. 18, 1998).
    The record further reflects that the units were not in regular operation for several years prior to placing the units in extended reserve shutdown.  See Letter from Entergy to Jayne Fontenot, Chief, Permits Issuance Section, EPA, Region VI (July 18, 1994) (noting that Monroe plant has not operated on a routine basis since 1981).  Internal LDEQ memoranda further suggest that the Monroe plant ceased operating around January 1988. See Memo from Paul Laird, LDEQ Northeast Regional Office, to John R. Newton, LDEQ, Air Quality Div. (Feb. 8, 1989); Memo from Paul Laird, LDEQ Northeast Regional Office, to John R. Newton, LDEQ, Air Quality Div. (Feb. 24, 1988).

dehumidification system.[6]  During this period, LP&L/Entergy also
maintained relevant environmental permits for the Monroe plant,
including payment of air quality maintenance fees to LDEQ
(between $1,100 and $1,300 per year), maintenance of water
permits, and applications for an acid rain permit (received
October 23, 1996) and a title V operating permit.

Entergy now proposes to restart Units 10, 11 and 12 at the
Monroe plant beginning this summer.  On September 16, 1996,
Entergy submitted a title V permit application to LDEQ.  The
total estimated annual emissions of air pollutants associated
with the plant, in tons per year ("tpy"), are as follows:
nitrogen oxides ("$NO_x$"), 4,972.65 tpy; sulfur dioxide ("$SO_2$"),
679.84 tpy; carbon monoxide ("CO"), 361.65 tpy; particulate
matter ("$PM_{10}$"), 32.46 tpy; and volatile organic compounds
("VOCs"), 12.74 tpy.  These projected annual emission rates are
incorporated as annual emission limits in the proposed title V
permit.  The requested operating permit includes no limitations
on the hours of operation or the capacities at which the units
would operate.  Most relevant for purposes of this Order, neither
the permit application nor the proposed permit provides for
obtaining a PSD permit for the units prior to restart, under the
Louisiana PSD program.

LDEQ submitted a proposed title V permit to EPA Region VI
for review on November 16, 1998.  The permit went out for public
comment on November 25, 1998.  Public commenters requested a
public hearing.  Notice of a public hearing was published on
January 16, 1999.  A public hearing was held by LDEQ on February
18, 1999.  The public comment period ended April 20, 1999.  EPA's
45-day review period expired on December 31, 1998.  On February
9, 1999, Citizens for Clean Air & Water filed a timely petition
with EPA pursuant to section 505(b)(2) of the Clean Air Act
requesting that EPA object to issuance of the proposed permit for
the Entergy Monroe plant.  As of this date, no final permit has
been issued.

## III.  <u>ISSUES RAISED BY PETITIONER</u>

Petitioner objects to issuance of the proposed permit on
five grounds: (1) LDEQ failed to subject the Monroe plant to PSD
review; (2) the maximum capacity of the Monroe plant may have
been increased by some unknown method at some time between 1976

---

[6]  Other activities included stack inspections in 1992,
installation of an oil/water separator for the stormwater system
in 1996, and cleaning of the diesel fuel oil tank system in 1996.

and the time of the title V application without being subject to PSD review or NSPS; (3) the proposed permit fails to incorporate enforceable one-hour maximum emission rate limitations for sulfur dioxide and other criteria pollutants; (4) the proposed permit includes apparent annual emissions increases that suggest PSD review should be conducted for the sulfur dioxide emissions; and (5) sufficient information has not been provided in Entergy's permit application to ensure compliance with RCRA disposal requirements.[7]

In addition, the Petitioner requests the following: (1) that EPA issue an information request letter to Entergy and the City of Monroe under section 114 of the Act, requiring them to disclose all matters raised by this petition; and (2) that EPA conduct an on-site inspection of the Monroe plant to determine whether PSD and NSPS have been triggered.

Items (1), (3) and (4) are either addressed in the PSD applicability analysis or rendered moot by EPA's conclusion that the proposed title V permit must be revised to ensure compliance with applicable PSD requirements.  Section V addresses Item (2); Section VI addresses Item (5).  In response to Petitioner's request for an inspection, on May 17, 1999, EPA conducted an inspection of the Monroe plant to verify the activities being conducted at the plant and to confirm that the plant is not operating.  Finally, in response to Petitioner's request that EPA issue an information request letter, EPA believes it has sufficient information to respond to the Petition and that there is no need at this time for such a letter.

## IV.  **PSD APPLICABILITY ANALYSIS**

The following sections describe EPA's analytical tests for determining PSD applicability and apply these tests to the proposed restart of the Monroe plant.  EPA concludes that the proposed restart of the Monroe plant should be subject to PSD requirements and thus, that the title V permit does not assure compliance with the applicable PSD requirements set forth in the Louisiana SIP.  The analysis in this Order, however, does not

---

[7]  These objections were also raised during the public hearing and in correspondence to LDEQ and Region VI from Mr. Alexander J. Sagady, Environmental Consultant, on behalf of CCAW, dated February 18, 1999.  Accordingly, Petitioner has met her obligation to base the petition on objections to the permit raised with reasonable specificity during the public comment period.

purport to dictate the specific PSD permit terms that the State should adopt in revising the title V permit.

A.   Analytical Approach

Part C of title I of the Clean Air Act establishes the statutory framework for protecting public health and welfare from adverse effects of air pollution, notwithstanding attainment and maintenance of all NAAQS.  Congress specified that the PSD program is intended to:

(1) "insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources"; and
(2) "assure that any decision to permit increased air pollution . . . is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process."

CAA § 160.

To accomplish these purposes, the Act relies primarily on a permitting program as the mechanism for reviewing proposals to increase air pollution in areas meeting the NAAQS.  The Act generally requires PSD permits prior to construction and/or operation of new major stationary sources and major modifications to stationary sources in areas designated attainment or unclassified for the pollutants to be emitted by the sources. See CAA §§ 165(a) and 169(2)(C).  "Modification" is defined to include, "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  CAA § 111(a)(4).  By regulation, EPA has limited the facially broad sweep of the PSD provisions to only "major" modifications.  40 CFR § 51.166(i); see also L.A.C. 33:III.509(I).

As described in the following sections, reactivation of facilities that have been in an extended condition of inoperation may trigger PSD requirements as "construction" of either a new major stationary source or a major modification of an existing stationary source.  Where facilities are reactivated after having been permanently shutdown, operation of the facility will be treated as operation of a new source.  Alternatively, shutdown and subsequent reactivation of a long-dormant facility may trigger PSD review by qualifying as a major modification.  This section describes EPA's approach for analyzing whether restart of

7

a facility triggers PSD review as: (1) a new major source under EPA's Reactivation Policy; (2) a major modification by virtue of a physical change resulting in a significant net emissions increase; or (3) a major modification by virtue of a change in the method of operation resulting in a significant net increase in emissions.[8]

 1.   Restart Treated as New Source -- EPA's Reactivation
      Policy

EPA has a well-established policy that reactivation of a permanently shutdown facility will be treated as operation of a new source for purposes of PSD review.[9]   The key determination to be made under this policy is whether the facility to be reactivated was "permanently shutdown."   In general, EPA has explained that whether or not a shutdown should be treated as permanent depends on the intention of the owner or operator at the time of shutdown based on all facts and circumstances. Shutdowns of more than two years, or that have resulted in the removal of the source from the State's emissions inventory, are presumed to be permanent.   In such cases it is up to the facility owner or operator to rebut the presumption.

To determine the intent of the owner or operator, EPA has

_____

 [8]   Whether a source is subject to preconstruction review as a new source or as a major modification may be significant in particular cases for determining the appropriate analysis of control technology options and other PSD requirements.   For example, analysis of control technology for major modifications might consider the age or configuration of the source where review for new sources might not.   Likewise, analysis of alternatives for new sources might consider alternative locations where the same analysis for major modifications might not.

 [9]   See Memo from Edward E. Reich, Director, Div. of Stationary Source Enforcement, to Stephen A. Dvorkin, Chief, General Enforcement Branch, Region II (Sept. 6, 1978); Memo from Edward E. Reich, Director, Stationary Source Enforcement Div., to William K. Sawyer, General Enforcement Branch, Region II (Aug. 8, 1980); Memo from John S. Seitz, Director, Stationary Source Compliance Div., OAQPS, to David P. Howekamp, Director, Air Mgt. Div., Region IX (May 27, 1987); Letter from David P. Howekamp, Director, Air Mgt. Div., Region IX, to Robert T. Connery, Holland & Hart (Nov. 6, 1987); Memo from John B. Rasnic, Director, Stationary Source Compliance Div., OAQPS, to Douglas M. Skie, Director, Air Programs Branch (Nov. 9, 1991).

examined factors such as the amount of time the facility has been out of operation, the reason for the shutdown, statements by the owner or operator regarding intent, cost and time required to reactivate the facility, status of permits, and ongoing maintenance and inspections that have been conducted during shutdown.  No single factor is likely to be conclusive in the Agency's assessment of these factors, and the final determination will often involve a judgment as to whether the owner's or operator's actions at the facility during shutdown support or refute any express statements regarding the owner's or operator's intentions.[10]

While the policy suggests that the key determination is whether, <u>at the time of shutdown</u>, the owner or operator intended shutdown to be permanent, in practice, after two years, statements of original intent are not considered determinative. Instead, EPA assesses whether the owner or operator has demonstrated a continuous intent to reopen.  To make this assessment, EPA looks at activities during time of shutdown that evidence the continuing validity of the original intent not to permanently shut down.

Thus, to preserve their ability to reopen without a new source permit, EPA believes owners and operators of shutdown facilities must continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future.  If they cannot make such a demonstration, it suggests that for at least some period of the shutdown, the shutdown was intended to be permanent.  Once it is found that an owner or operator has no real plan to restart a particular facility, such owner or operator cannot overcome this suggestion that the shutdown was intended to be permanent by later pointing to the

_____

[10]   <u>See</u> Memo from John S. Seitz, Director, Stationary Source Compliance Div., OAQPS, to David P. Howekamp, Director, Air Mgt. Div., Region IX (May 27, 1987) (finding shutdown of Noranda Lakeshore Mines' roaster leach plant to be permanent despite express statements from the facility owners that shutdown was temporary, and evidence that the plant was maintained during shutdown); but <u>cf.</u> Memo from John B. Rasnic, Director, Stationary Source Compliance Div., OAQPS, to Douglas M. Skie, Chief, Air Programs Branch (Nov. 19, 1991) (finding reactivation of Watertown Power Plant did not trigger PSD based on the fact that the statements of intent by the owners were supported by documentation regarding maintenance of the facility during shutdown and, as a result, the ability to reactivate the plant easily).

most recent efforts to reopen the facility.[11]

   2.   Restart as a Major Modification -- Physical Change

   In addition to possibly triggering PSD requirements as a new source, restart of an idle facility may also trigger PSD review if it meets the definition of a major modification.  EPA's PSD regulations define "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 CFR § 51.166(b)(2)(i); <u>see</u> <u>also</u> L.A.C. 33:III.509(B).[12]

   "Physical change" is not defined in the Clean Air Act or in EPA's PSD regulations.  Instead, EPA's regulations describe those activities that are <u>not</u> considered physical changes; most notably, the regulations exclude routine maintenance, repair and replacement.  Outside these exceptions, the Agency and courts have interpreted "physical change" broadly.  <u>See, e.g.</u>, <u>Wisconsin Elec. Power Co. v. Reilly ("WEPCO")</u>, 893 F.2d 901, 908 (7th Cir. 1990) (noting that "courts considering the modification provisions of NSPS and PSD have assumed that 'any physical change' means precisely that").

   As a result of this broad statutory definition, most analysis of whether PSD review is triggered under this provision will focus on whether the activities at the facility fit within

_____

   [11]  This approach for assessing the intent of the owner or operator is consistent with the general notion that a company cannot sit indefinitely on a governmental permission to emit air pollution without showing some definite intention to use it.  <u>See</u> 40 CFR § 52.21(r) (construction must be commenced within 18 months of receiving a permit); L.A.C. 33:III.509(R); <u>see</u> <u>also</u> <u>In re West Suburban Recycling and Energy Center, L.P.</u>, PSD Appeal No. 97-12, slip op. at 8 (EAB, Mar. 10, 1999) (finding PSD permit should be denied because "there is no realistic prospect that the resource recovery facility described in WSREC's permit application will be completed").

   [12]  Net emissions increases are calculated by combining any increase in actual emissions from a particular physical change or change in the method of operations, with any increase or decrease in actual emissions at the source that are contemporaneous with the particular change and otherwise creditable.  40 CFR § 51.166(b)(3); <u>see</u> <u>also</u> L.A.C. 33:III.509(B).  <u>See</u> <u>infra</u> at V.A.4.

one of the regulatory exceptions, in particular the routine maintenance, repair and replacement exception provided in 40 CFR § 50.21(b)(2)(iii)(a).  To distinguish between physical changes and work that is routine, "EPA makes case-by-case determinations by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." <u>WEPCO</u>, 893 F.2d at 910 (quoting Memo from Don R. Clay, Acting Assistant Admin. for Air and Radiation, to David A. Kee, Director, Air and Radiation Div., Region V (Sept. 9, 1988)); <u>see</u> <u>also</u> Letter from David P. Howekamp, Director, Air Mgt. Div., Region IX, to Robert T. Connery, Holland & Hart ("Cyprus Casa Grande Letter") (Nov. 6, 1987) (concluding work conducted at facility was not routine "when viewed as a whole").

      3.    Restart as a Major Modification -- Change in the Method of Operation

     Restart of a long-dormant facility may also be treated as a major modification subject to PSD review if it represents a "change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 CFR § 51.166(b)(2)(i); <u>see</u> <u>also</u> L.A.C. 33:III.509(B).  As with the term "physical change," the regulations do not define the meaning of "change in the method of operation" except by listing those activities that do not constitute such changes.  40 CFR § 51.166(b)(2)(iii); <u>see</u> <u>also</u> L.A.C. 33:III.509(B).  The most relevant exception for analyzing whether restart of a shutdown facility might be treated as a change in the method of operation is 40 CFR § 51.166(b)(2)(iii)(f); <u>see</u> <u>also</u> L.A.C. 33:III.509(B).  This provision exempts from PSD review "[a]n increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166."  40 CFR § 51.166(b)(2)(iii)(f); <u>see</u> <u>also</u> L.A.C. 33:III.509(B).

     The purpose of this "increase in hours" exception was to avoid undue disruption by allowing routine increases in production during the normal course of business in order to respond to market conditions.  In the preamble to the PSD rulemaking, EPA explained:

     While EPA has concluded that as a general rule Congress intended any significant net increase in such emissions to undergo PSD or nonattainment review, it is also convinced that Congress could not have intended a company to have to

get an NSR permit before it could lawfully change hours or
rate of operation.  Plainly, such a requirement would
severely and unduly hamper the ability of any company to
take advantage of favorable market conditions.

45 Fed. Reg. 52676, 52704 (Aug. 7, 1980).  The court in WEPCO
explained further, "This exclusion . . . was provided to allow
facilities to take advantage of fluctuating market conditions,
not construction or modification."  893 F.2d at 916 n.11.

Analysis of whether restart of a facility constitutes a mere
increase in the hours of operation or production rate must
consider whether the proposed activity is of the kind intended to
be covered by the provision.  Specifically, EPA will look at
whether the proposed change requires enhanced flexibility to
avoid hampering a company's ability to respond to market
fluctuations.  In general, reactivation after long periods of
shutdown, though obviously motivated by long-term changes in the
market, is not a response to the same type of market fluctuations
and does not merit the same permitting flexibility envisioned by
the regulations.

Restart of a long-dormant facility also may not be entitled
to coverage under the "increase in hours" exemption if it would
disturb a prior assessment of the environmental impact of the
source.  In the preamble for the 1980 PSD rulemaking, after
expressing its belief that Congress intended to allow certain
facilities flexibility to respond to market fluctuations, EPA
explained, "At the same time any change in hours or rate of
operation that would disturb a prior assessment of a source's
environmental impact should have to undergo scrutiny."  45 Fed.
Reg. 52676, 52704 (Aug. 7, 1980).  As a result, EPA will not
exempt increases in the hours of operation in situations where
the increase in hours would be prohibited by a permit condition
or where the increase would "interfere with a state's efforts in
air quality planning . . . ."  Letter from David P. Howekamp,
Director, Air Mgt. Div., Region IX, to Robert T. Connery, Holland
& Hart (Nov. 6, 1987).

In the Cyprus Casa Grande PSD applicability determination,
EPA concluded that restart of a roaster/leach/acid ("RLA") plant
after 10 years of shutdown constituted a change in the method of
operation.  EPA distinguished restart of the plant from a mere
increase in the hours of operation, explaining that the exemption
was not intended to cover restart of facilities after long
periods of shutdown.  The letter explained:

EPA's original intention to disallow the [increase in hours]

12

exclusion where it would "disturb a prior assessment of a
source's environmental impact" leads me to conclude that the
exclusion should not be applied here.  This is so because
our present assessment as well as that of the State of
Arizona, is that the RLA plant in its current non-operating
condition has no environmental impact.  This is evidenced in
part by the removal of the plant from the state's emission
inventory and the surrender of operating permits.  An
additional factor is the simple physical fact that the RLA
plant has had zero emissions for ten years.

Letter from David P. Howekamp, Director, Air Mgt. Div., Region
IX, to Robert T. Connery, Holland & Hart (Nov. 6, 1987).

    4.    Restart as a Major Modification -- Emissions Netting
          Baseline

    Once restart is found to be involve either a physical change
or a change in the method of operation, the Agency must determine
if the change results in a significant net emissions increase of
a pollutant subject to regulation under the Act.  40 CFR
§ 51.166(b)(2)(i); see also L.A.C. 33:III.509(B).  The first step
in calculating the net emissions increase is to determine whether
the particular physical or operational change in question would
itself result in a significant increase in "actual emissions."
See 40 CFR § 51.166(b)(3)(i)(a) and (b)(21); see also L.A.C.
33:III.509(B).  If so, the second step is to identify and
quantify any other prior increases and decreases in "actual
emissions" that would be "contemporaneous" with the particular
change and otherwise creditable.  See 40 CFR
§ 51.166(b)(3)(i)(b); L.A.C. 33:III.509(B).  The third step is to
total the increase from the particular change with the other
contemporaneous increases and decreases.  See 40 CFR
§ 51.166(b)(3)(i)(b); L.A.C. 33:III.509(B).  If the total would
exceed zero, then a "net emissions increase" would result from
the change.  Whether this net emissions increase of a regulated
pollutant is "significant" is determined in accordance with the
annual tonnage thresholds set forth in 40 CFR § 51.166(b)(23) and
L.A.C. 33:III.509(B).

    The primary issue in calculating the net emissions increase
associated with the restart of a shutdown facility is usually
calculation of the actual emissions increase.  To calculate the
actual emissions increase associated with the change, the
emissions from the source after the change is made must be
compared to the "baseline emissions" of the source, which are the
actual emissions of the source as of a "particular date" (i.e.,
immediately prior to the physical or operational change in

13

question).  The regulations provide, "In general, actual emission as of a particular date shall equal the average rate . . . at which the unit actually emitted the pollutant during a two-year period which precedes the particular date [the date of the change] and which is representative of normal source operations." 40 CFR § 51.166(b)(21)(ii); see also L.A.C. 33:III.509(B).

The regulations give EPA (or the permitting authority) discretion to set a different period for determining baseline emissions if such a period is more representative of normal source operations.  40 CFR § 51.166(b)(21)(ii); see also L.A.C. 33:III.509(B).  EPA, however, has applied its discretion narrowly in assigning representative periods other than the two years immediately preceding the physical or operational change.  One exception was provided in the preamble to the 1992 "WEPCO rulemaking."  57 Fed. Reg. 32314, 32325 (July 21, 1992). There EPA said that for utilities it would consider as "representative," actual emission levels from any two years within the five years preceding the physical or operational change.[13]  In that same preamble, however, EPA specifically rejected one commenter's argument that EPA should consider a two-year period within the last five years of a plant's operation as the representative period for plants that have been shut down for more than five years.  See 57 Fed. Reg. 32314, 32325 (July 21, 1992).

On more than one occasion, EPA has made clear that in calculating the net emissions increase for reactivation of long-dormant sources potentially subject to PSD, the source is considered to have zero emissions as its baseline.  In both the Cyprus Casa Grande applicability determination and the Cyprus Minnesota applicability determination, EPA set the baseline emissions level at zero for facilities that had been shut down or idle for 10 years.  See Letter from David P. Howekamp, Director, Air Mgt. Div., Region IX, to Robert T. Connery, Holland & Hart (Nov. 6, 1987); Memo from John Calcagni, Director, Air Quality Mgt. Div., to David Kee, Director, Air and Radiation Div., Region V ("Cyprus Minnesota") (Aug. 11, 1992).  In the Cyprus Minnesota applicability determination, after noting EPA's policy announcement in the WEPCO rulemaking, EPA explained that it has

---

[13]   See also Memo from John Calcagni, Director, EPA Air Quality Management Div., to David Kee, Director, Air and Radiation Div., EPA Region V (Aug. 11, 1992) (noting that representative period other than previous two years generally limited to catastrophic occurrences); EPA, Draft New Source Review workshop Manual at A.39 (Oct. 1990).

14

limited flexibility to adjust the "representative period."

For many reactivations of long-shutdown facilities that fall within the definition of a physical or operational change, the only step in calculating "significant net emissions increase" will be a determination of whether the increase in emissions resulting from the change is significant under 40 CFR § 51.166(b)(23)[14] because the baseline for actual emissions will be zero, and there will be no other emissions increases or decreases that are contemporaneous with the change.[15]

_____

[14]   For Louisiana, the thresholds are provided at L.A.C. 33:III.509(B) in the definition of "significant" and are the same as the federal thresholds relevant here.

[15]   As discussed above, the PSD regulations provide that the increase in emissions is determined by subtracting the affected units' pre-change "actual emissions" (referred to above as the "baseline") from their post-change "actual emissions."  For units that have not "begun normal operations," the regulations generally provide that actual emissions are equal to the units' "potential to emit."  40 CFR § 51.166(b)(21)(iv).  EPA interprets this provision to mean that units which have undertaken a non-routine physical or operational change have not "begun normal operations" within the meaning of the PSD regulations, since pre-change emissions may not be indicative of how the units will be operated following the non-routine change.  See 57 Fed. Reg. 32314, 32326 (amending rules only for certain modifications at electric utility steam generating units and reserving "begun normal operations" language for other modifications); 63 Fed. Reg. 39857, 39859 n.4 (July 24, 1998) (post-change emissions of unit following non-routine change is potential to emit).  In practice, this provision merely establishes a regulatory presumption that the units will operate at their maximum design capacity following the change.  Sources can and frequently do rebut this presumption and avoid PSD applicability.  They do so by agreeing to add pollution controls and/or accepting operational restrictions in a "minor NSR" permit or similar instrument that limits their emissions following the change to levels that are not significantly greater than pre-change actual emissions.  See 40 CFR § 51.166(b)(4).
Since 1992, EPA regulations have allowed states to adopt a somewhat different approach to determining emissions increases for electric utility steam generating units.  See 40 CFR § 51.166(b)(21)(iv), (v).  Such units' post-change emissions may be established by a source estimating the future emissions of the unit and submitting to the state information to confirm the

15

B.   Applicability of PSD to Restart of Monroe Plant

   1.   PSD Applicability Under EPA's Reactivation Policy

   Entergy is proposing to restart three units at its Monroe
plant that have been placed in "extended reserve shutdown" since
July 1, 1988.  At the outset, under EPA's Reactivation Policy,
because these units have been shut down for more than two years,
shutdown of these units is presumed to be permanent.  Unless
Entergy provides adequate support to rebut this presumption,
restart of these units will be treated as activation of a new
source subject to PSD.  The remainder of this section discusses
whether Entergy has adequately demonstrated that the units were
never intended to be permanently shut down.[16]

   Before formally placing the Monroe plant into extended
reserve shutdown, then-owner LP&L prepared an Extended Reserve
Shutdown Plan dated October 27, 1987, which described plans to
maintain the plant in a reserved status to be available when the

---

accuracy of those estimates.  See 40 CFR §§ 51.166(b)(21)(v),
(b)(32).  However, states and localities are not required to
include these special provisions for electric utility steam
generating units in their PSD programs.  See 40 CFR § 51.166(b)
(allowing variations from federal rules when local rules are more
stringent).  Louisiana has not adopted the special provisions;
accordingly, Entergy's post-change emissions will in this case be
determined by its potential to emit, rather than by its
projections of future emissions.  In this case, however, even if
Louisiana had adopted the special provisions for utilities, it
would not change the outcome.  This is so because Entergy has
projected, and its proposed title V permit reflects, that it will
operate at its full, unrestricted maximum capacity of 8760 hours
per year.  See Proposed Operating Permit, Monroe Electric
Generating Plant, at 15 (General Condition III) (incorporating
projected annual and hourly emissions rates).

   [16]   Entergy has submitted its own self-determination on PSD
applicability.  Letter from Frank Harbison, Sr. Lead
Environmental Analyst, Entergy, to Larry Devillier, Asst.
Administrator, LDEQ (Jan. 28, 1999).  In addition, Entergy has
provided various materials regarding maintenance activities, work
needed to bring the plant back on line, permitting activities,
and ERS decisionmaking.  Letter from Gerald G. McGlamery,
Louisiana Enviro. Admin., Entergy, to Hilry Lantz, Air Quality
Div., LDEQ (Feb. 3, 1999); Memo from Entergy to EPA, "Actions
Taken By Entergy At Monroe Generating Station" (w/ attachments).

demand for electricity increased.  This plan included the
installation of dehumidification systems, which were subsequently
installed, to preserve the electric generation units.  At the
time of shutdown, at least, it appears that LP&L did not envision
a permanent shutdown, but rather a temporary shutdown to respond
to market conditions at the time.  See Memo from Entergy to EPA,
"Actions Taken By Entergy At Monroe Generating Station."

During shutdown, LP&L/Entergy continued to conduct minimum
maintenance at the plant.  These activities primarily involved
responding to problems with the dehumidification system.  Entergy
has provided maintenance records dating back to May 9, 1988
showing maintenance undertaken at the plant each year throughout
the shutdown period and indicating that LP&L/Entergy staff made
multiple inspection or maintenance visits to the facility.

During the period of shutdown, LP&L/Entergy also continued
to pay annual state air quality maintenance fees.  Entergy has
provided receipts for these payments for the period October 7,
1988 through August 18, 1998.  On December 14, 1995, Entergy
applied for a title IV Acid Rain permit, which it received
October 23, 1996.

Based on this record it would appear that Entergy did not
intend at the time of shutdown, and has never intended, to
permanently shut down the Monroe plant.  On the other hand, it
appears that Entergy has not, until very recently, had definite
plans to restart these units.

The Louisiana Public Service Commission ("LPSC"), in a
review of whether Entergy had properly included ERS facilities,
including the Monroe plant, in its list of "available"
facilities,[17] found that Entergy had not adequately demonstrated
that these ERS facilities would be returned to service.  LPSC,
Order No. U-020925-G (Nov. 18, 1998).  Specifically, LPSC found
that Entergy had not analyzed the costs of returning the ERS
units to service, could not give a time frame for returning any

---

[17]   The dispute before the LPSC centered around a tariff
agreement between Entergy companies whereby each company had to
identify its available capacity and pay or receive compensation
according to whether it produced power below or in excess of its
listed available capacity.  LPSC. Order No. U-020925 at 8-10.
The agreement defined a unit as "available" if it was under the
control of the system operator, was down for maintenance, or was
in extended reserve shutdown with the intent of returning the
unit to service at a future date.  Id. at 10.

of the units to service beyond saying that they would be needed
some time in the next 10 years, and had not made any efforts to
confirm that they would be needed in the next 10 years.  LPSC
concluded that the fees resulting from Entergy's inclusion of the
capacity of these ERS facilities could not be justified because
Entergy had not made efforts to reach a decision "based on
consideration of current and future resource needs, the projected
length of time the unit would be in ERS status, the projected
cost of maintaining such unit, and the projected cost of
returning the unit to service."

     The record before the EPA includes significant
circumstantial evidence suggesting that Entergy has never
intended the shutdown of the Monroe plant to be permanent.
Despite this evidence, however, EPA continues to have serious
doubts as to whether Entergy truly intended during much of the
11-year shutdown to expect to use the Monroe plant in the
foreseeable future.[18]  Because restart of the plant more clearly
triggers PSD as a major modification involving a change in the
method of operation, EPA does not need to make a final conclusion
regarding Entergy's regulatory status under the Reactivation
Policy at this time.
     2.   Physical Changes Triggering PSD

     As described previously, changes at a facility may be
treated as a major modification subject to PSD review in one of
two ways -- changes involving a physical change of the source and
changes involving a change in the method of operation at the
source.  Entergy has submitted a description of the work, and
associated costs, being conducted in order to restart the three
units at the Monroe plant.  The total projected cost is
approximately $5.3 million.  Of that, Entergy states that $1.4
million will be spent on capital improvements.  These include
replacement of PCB-contaminated transformers, replacement of
controls using mercury, and installation of continuous emissions
monitoring equipment.  The remaining work includes inspection and

---

[18]  The disparity between the company's efforts to maintain
the plant to avoid the appearance of permanent shutdown, and its
failure to adequately demonstrate to the LPSC its plans to use
the plant in the future, highlight one of the weaknesses of EPA's
Reactivation Policy in determining the appropriate regulatory
treatment of the restart of facilities after a lengthy shutdown.
As a result, I have directed my staff to reevaluate EPA's
Reactivation Policy to determine if steps can be taken to clarify
the circumstances under which restart of a long-dormant source
should be subject to new source review as a new source.

cleaning of equipment, some minor repairs of valves and piping, and replacement of auxiliary equipment such as batteries and lab equipment.

Analysis of whether these changes trigger PSD applicability must consider whether, "as a whole," the changes are exempt as routine maintenance, repair and replacement. See 40 CFR § 51.166(b)(2)(iii); L.A.C. 33:III.509(B).  In our review of the proposed reactivation of the Cyprus Casa Grande RLA plant EPA explained:

> Although the [contractor's] report notes the good condition of the acid plant and characterizes some of the needed work as "minor" or "moderate," viewed as a whole, the minimum necessary rehabilitation effort is extensive, involving replacement of key pieces of equipment . . . and substantial time and cost [(four months and $905,000)].  In an operating plant some of the individual items of the planned rehabilitation, e.g. painting, if performed regularly as part of a standard maintenance procedure while the plant was functioning or in full working order, could be considered routine.  Here, however, this and other numerous items of repair, as well as replacement and installation of new equipment, are needed in order for the RLA plant to begin operation.  The fact that the plant requires four months of extensive rehabilitation work despite the adequate maintenance Noranda claims to have undertaken during the shutdown underscores the non-routine nature of the physical change that will occur at the plant.

Letter from David P. Howekamp, Director, Air Mgt. Div., Region IX, to Robert T. Connery, Holland & Hart (Nov. 6, 1987).

While the activities necessary to restart the Monroe plant might, collectively, appear to be part of a large, non-routine effort, EPA is not, at this time, making a finding as to whether this effort amounts to a physical change of the source.  Because restart of the plant most clearly amounts to a change in the method of operation, as described below, EPA need not reach a final conclusion on whether such concentrated efforts without repair or replacement of key pieces of equipment or key components should be considered routine.[19]

---

[19]  It is worth noting that while the Cyprus rehabilitation effort included replacement of key pieces of equipment, the rationale for our conclusion in Cyprus Casa Grande turned on the non-routine collection of activities, and not on whether

3.    Change in the Method of Operation of the Monroe Plant

For the last eleven years the Monroe plant has been inoperative.  To operate the plant now after such a long shutdown constitutes a change in the method of operation within the meaning of the PSD regulations.  The mere fact that the plant is changing from a lengthy "non-operational" and "unmanned" condition,[20] to one in which the plant is fully operational, fits the common sense meaning of a "change in the method of operation."

The proposed changes in the operation of the plant do not qualify as exempt increases in either the hours of operation or the rate of production, see 40 CFR § 51.166(b)(2)(iii)(f), and L.A.C. 33:III.509(B), because they are not the type of changes intended to be covered by the regulatory exemption.  As discussed above, the purpose of the "increase in hours" exception was to provide flexibility to allow sources to adjust their operations to take advantage of currently favorable or changing market conditions without requiring a PSD permit.  Restart of the Monroe plant neither calls for the same type of permitting flexibility nor can be considered a response to the kind of short-term, real-time market fluctuations envisioned by EPA in adopting the exemption.

This is not a situation where the sources's ability to plan ahead for permitting is constrained by the need for quick responses to short-term changes in the market.  In its own analysis of PSD applicability, Entergy notes that unlike normal work outages where overtime is required to get the plants operational again, repairs at the Monroe plant will be conducted using "straight time" because "there will be no need to have the units available for dispatch in a short time frame."  Memo from Mark G. Adams, Entergy to Myra Costello, Entergy (Aug. 3, 1998).  Further, unlike the situations envisioned by the exemption, restart of a long-dormant facility involves permits for more than

individual activities were themselves routine or non-routine.

[20]  In a 1994 letter to LDEQ, Entergy states that as a result of placing the plant in ERS status in 1988, "[the] plant is non-operational and unmanned."  Letter from Entergy to Cheryl LeJeune, Office of Water Resources, LDEQ (July 18, 1994).  Entergy also noted that, "It has not generated electricity for six years and has not operated on a routine basis since 1981."  Letter from Entergy to Jayne Fontenot, Chief, Permits Issuance Section, EPA, Region VI (July 18, 1994).

just air releases.  Entergy has budgeted over $175,000 to obtain
all of the necessary permits including a new water discharge
permit to reflect the change from inoperation.  Where a facility
requires numerous permits to once again operate, PSD permit
review is no longer the solitary hindrance that the exemption was
designed to avoid.

EPA also believes the decision to operate after eleven years
of shutdown, while certainly motivated by changes in the
marketplace, is not the kind of quick decision to respond to
quick market fluctuations that EPA intended to allow without the
burden of the PSD permitting process.  In the WEPCO rulemaking,
EPA discussed its view of the time period in which one would
expect to see the effect of market fluctuations for the utility
sector:[21]

> By presumably allowing a utility to use any 2 consecutive
> years within the past 5, the rule better takes into
> consideration that electricity demand and resultant utility
> operations fluctuate in response to various factors such as
> annual variability in climatic or economic conditions that
> affect demand, or changes at other plants in the utility
> system that affect the dispatch of a particular plant.  By
> expanding a baseline for a utility to any consecutive 2 in
> the last 5 years, these types of fluctuations in operations
> can be more realistically considered, with the result being
> a presumptive baseline more closely representative of normal
> source operation.

57 Fed. Reg. 32314, 32325 (July 21, 1992).  The eleven-year
shutdown of the Monroe plant is well beyond the period in which
one would expect to see changes in operation in response to the
kind of market fluctuations addressed by the "increase in hours"
exception.  The decision to restart the plant after such a long
period is a more fundamental change in the way the company has
done and plans to do business.  Entergy's decision to restart the
Monroe plant looks less like a quick decision to take advantage
of market conditions at an already-operational plant and more
like a decision to begin operation of a source that has not
previously participated in the market.

EPA has also made clear that the "increase in hours"

_____

[21]  EPA's comments were made in the context of describing
the representative period for determining baseline emissions from
utilities, but the analysis of what constitutes normal operations
is equally relevant to the discussion here.

exemption is not available where it would "disturb a prior
assessment of a source's environmental impact."  For the last
eleven years, the State has carried the Monroe plant in its
emissions inventory with zero actual emissions.  From all
accounts, the State has treated the plant as having no
environmental impact.  Restart of the plant would disturb this
assessment and is not, therefore, entitled to the "increase in
hours exemption."

The State's assessment of the plant's environmental impact
is further demonstrated by the State's submittal for the Ozone
Transport Assessment Group ("OTAG") modeling effort to assess
interstate NOx transport contributions to ozone nonattainment in
downwind States.  In late 1995, 37 States including Louisiana,
provided their emissions inventories to EPA for modeling and
analysis.  Fifteen of those 37 States (including Louisiana)
claimed that actual emissions from sources in their State had no
impact on downwind ozone nonattainment.  In 1995, the Monroe
plant was included in the State's emissions inventory and was
still included in that inventory as having zero emissions when
the ultimate transport analysis was concluded in 1997.  OTAG used
this inventory data to project emissions contributions and
nonattainment problems throughout the 37-State region through
2007.  During this modeled period, emissions from the Monroe
plant were assumed to be zero.  Based in large part upon OTAG's
modeling results, EPA declined to require Louisiana to revise its
SIP as part of the recent "NOx SIP Call."[22]  EPA concluded that
the weight of evidence did not support a finding that Louisiana
made a significant contribution to downwind nonattainment.  See,
62 Fed. Reg. 60318, 60340 (Nov. 7, 1997), 63 Fed. Reg. 57356,
57398 (Oct. 27, 1998).[23]

_____

     [22]  The Court of Appeals for the D.C. Circuit has stayed the
SIP Call pending further order by the court.  State of Michigan
v. EPA, No. 98-1497 (D.C. Cir. Order filed May 25, 1999).

     [23]  EPA conducted subsequent modeling efforts to evaluate
the costs and air quality impacts associated with the proposed
NOx SIP Call controls.  This modeling did not rely on state
inventory data.  Instead, the approach looked at Energy
Information Administration data regarding available power plants,
and projected emissions based on future demand and likely order
of dispatch (considering factors such as the plant's age and fuel
type).  This approach predicted future NOx emissions from Unit 12
of the Monroe plant of 148 tons per year.  This amount of
emissions corresponds to approximately 550 hours of full-load
operation per year at Unit 12.  Such minimal operations do not

EPA believes restart of the Monroe plant will constitute a change in the method of operation that is not otherwise exempted by the PSD regulations.  The only possible exemption, the "increase in hours" exemption, simply was not intended to cover this kind of change.  As a result, EPA must next consider whether the change in the method of operation will result in a significant net emissions increase, thereby triggering PSD applicability as a major modification.

4.    Calculating Net Emissions Increase

Restart of the Monroe plant will result in emissions of NOx, SO2, CO, PM10 and VOC. As discussed previously, the emissions baseline for long-dormant sources such as the Monroe plant are generally considered to be zero.  EPA believes the zero emissions baseline is representative of normal source operations at the Monroe plant, which has had no emissions for the last eleven years.

The following table lists the significance levels, see 40 CFR § 51.166(b)(23)(i) and L.A.C. 33:III.509(B), in tons per year for each of the pollutants that could be emitted upon restart of the Monroe plant.  In addition, the table lists Entergy's potential to emit (assuming full-time operation, as is reflected in the proposed operating permit) for these same pollutants.  The potential to emit is assumed to be the source's "actual emissions" following the change in the method of operation.  See note 16, supra.

| POLLUTANT | SIGNIFICANCE LEVEL (TPY) | POTENTIAL TO EMIT (TPY) |
|---|---|---|
| NOx | 40 | 4,972.65 |
| SO2 | 40 | 679.84 |
| CO | 100 | 361.65 |
| PM10 | 15 | 32.46 |
| VOC | 40 | 12.74 |

With the exception of VOC, restart of the Monroe plant will result in a significant emissions increase over its current zero emissions baseline for each of the listed pollutants.

The regulations define the contemporaneous period as ex-

---

alter EPA's conclusions.  No emissions were projected for any of the other units at the plant.

tending back five years from the physical or operational change.
No changes in emissions at the Monroe plant have been made during
last 5 years because it has been shut down during this entire
period.  As a result there have been no increases or decreases in
emissions that are contemporaneous with the change.  <u>See</u> 40 CFR
§ 51.166(b)(3)(ii); L.A.C. 33:III.509(B).  Therefore, the net
emissions increases from start-up of the Monroe plant would be
approximately those stated in the chart above.  Hence, EPA agrees
with Petitioner that the title V permit for the Monroe plant
should be revised to assure compliance with the Louisiana SIP PSD
requirements because start-up of the plant would be subject to
PSD as a major modification under the Clean Air Act, 40 CFR
§ 51.166, and L.A.C. 33:III.509(B).

## V.  <u>NSPS APPLICABILITY</u>

Petitioner claims that the maximum capacity of the affected
facilities at the Monroe plant may have been increased by some
unknown method at some time between 1976 and the time of the
title V application without being subject to NSPS review.
Petitioner points to differences in reported emission capacities
that suggest a modification has occurred at the Monroe plant.  In
the April 27, 1976 compliance report from the City of Monroe to
the Louisiana Air Control Commission, the total capacity of the
Monroe plant was reported as 1365 MMBtu/hr.  In the September 18,
1996 title V permit application, however, Entergy reports the
Monroe plant's capacity as 1961 MMBtu/hr.  While EPA believes
that Entergy has adequately explained this discrepancy in
reported capacities (see below), EPA nonetheless evaluates in
this section whether the changes to the Monroe plant might
otherwise be subject to NSPS.

Section 111 of the Clean Air Act requires EPA to adopt
standards of performance for stationary sources constructed or
modified after the date the standards are proposed.  CAA
§§ 111(a)(2),(3) and (b)(1); <u>see also</u> 40 CFR § 60.1.[24]  Unlike
the PSD program, reactivation of long-dormant facilities is not
considered construction of a <u>new</u> source.  <u>See</u> Memo from Edward E.
Reich, Dir., Div. Of Stationary Source Enf., to Sandra S.
Gardebring, Dir., Region V Enf. Div. (Oct. 30, 1980).
Installation of Units 10, 11 and 12 occurred prior to adoption of

---

[24]  Louisiana has adopted the federal NSPS regulations by
reference.  <u>See</u> L.A.C. 33:III.3003(A).  For purposes of this
section, only the federal regulations are cited.

all NSPS regulations.[25]  Thus, to determine NSPS applicability
for restart of the Monroe plant, EPA need only consider whether
the affected facilities have been modified or reconstructed.  See
40 CFR §§ 60.14 and 60.15.

A "modification" for purposes of NSPS applicability is
defined as:

> [A]ny physical change in, or change in the method of
> operation of, an existing facility which increases the
> amount of any air pollutant (to which a standard
> applies) emitted into the atmosphere by that facility
> or which results in the emission of any air pollutant
> (to which a standard applies) into the atmosphere not
> previously emitted.

40 CFR § 60.1.  As with PSD, the analysis of whether an activity
constitutes a modification is a two-part test.  The first step --
identifying a physical or operation change -- is similar to the
first step for finding a PSD modification.  The second step of
the NSPS analysis -- finding an emissions increase -- differs
from the emission netting step of PSD.

To find an increase in emissions, EPA compares the hourly
emissions capacity of an affected facility before and after the
change.  See 40 CFR § 60.14; see also WEPCO, 893 F.2d at 913.
The changes at the Monroe plant do not appear to be of the type
that would increase the hourly emissions capacity of the affected
facilities.  As described above, the major work being performed
at the Monroe plant appears to involve upgrading certain
controls, replacing PCB-containing transformers and some repairs
and maintenance of the boilers and associated auxiliary
equipment.  Based on the information currently before it, EPA
believes the affected facilities could operate at the projected
capacities with or without the changes that have occurred at the
source.  If, after further investigation, EPA finds that changes
to the facility in fact will increase the emissions capacity of
the affected facilities, EPA will revisit the question of NSPS
applicability.

In response to Petitioner's claims that reported emissions
capacities had increased, Entergy explained that values derived
from fuel consumption in 1975 were erroneously reported as

---

[25]  The first NSPS for fossil-fuel-fired steam generators
applied to sources for which construction was commenced after
August 17, 1971.  40 CFR, Part 60, subpart D.

maximum heat input values and appeared to be less than those
stated in the permit application.  Entergy's explanation appears
to be confirmed by reference to specification sheets for the
boilers.  Because the manufacturer's specification sheets for the
boilers reflect the same heat input values as represented in the
permit application, EPA concludes that, standing alone, the
differences in the reported emissions capacities, do not
demonstrate a change in the emissions capacity of the affected
facilities.

     NSPS may also be triggered, irrespective of changes in
emission capacities, if the changes to the affected facility
amount to reconstruction of the facility. 40 CFR § 60.15(b).  A
facility is considered to be reconstructed when the represented
fixed capital costs of new replacement components to reactivate
the facility exceed 50% of the fixed capital costs required to
construct a comparable new facility.  40 CFR § 60.15(b).  Here,
Entergy has projected the <u>total</u> cost (capital and O&M) to restart
all affected facilities at the Monroe plant will be approximately
$5.3 million.  Entergy estimates approximately $1.4 million of
these costs will be capital expenditures.  Of these capital
expenditures, it appears that at least half relate to replacement
of PCB-containing transformers and thus do not relate to changes
to the affected facilities.  Given the small capital costs
associated with reactivation of the affected facilities, it does
not appear that the restart activities at the Monroe plant would
trigger NSPS based upon a reconstruction analysis.

## VI.   <u>RCRA DISPOSAL REQUIREMENTS</u>

     Entergy's permit application contains reference to two
different procedures to remove iron oxide and copper from the
boilers.  One procedure involves using up to 30,000 pounds of
ethylenediaminetetraacetic acid ("EDTA").  Spent boiler cleaning
solutions containing this chemical and scavenged metals are
injected into the boiler for combustion.  The Petitioner claims
that Entergy's permit application does not contain sufficient
information concerning the analysis of typical spent boiler
cleaning solutions nor citation to any regulatory provision that
would exempt boiler cleaning solutions from RCRA disposal
regulations.  The Petitioner further asserts that if the spent
boiler cleaning solutions exhibit RCRA hazardous waste
characteristics, disposal would be prohibited unless the facility
obtains a RCRA permit, became regulated under EPA's Boiler and
Industrial Furnace regulations, or otherwise demonstrated that
the spent boiler cleaning solution complied with EPA's
"comparable fuels" specification.

To justify exercise of an objection by EPA to a title V permit pursuant to section 505(b)(2) of the Act, the Petitioner must demonstrate that the permit is not in compliance with the requirements of the Clean Air Act, including the requirements of the Louisiana SIP.  RCRA requirements are not applicable requirements of the Act.  See 40 CFR § 70.2.  Therefore, this issue cannot be addressed as part of the petition process.  However, the emissions themselves would be regulated under Louisiana's Air Quality regulations and federal/state hazardous waste requirements.

Under Louisiana Air Permit General Condition XVII, Entergy must submit any small emissions (generally less than 5 tpy in total) resulting from routine operations that are predictable, expected, periodic, and quantifiable to the Louisiana Air Quality Division for approval as authorized emissions.  If the emissions are considered non-routine, Entergy must apply for a variance under L.A.C. 33.III.917.  Thus, the emissions from the combustion of the spent boiler cleaning solutions are regulated under Louisiana's air quality regulations.  In addition, if the spent boiler cleaning solution were to exhibit RCRA hazardous waste characteristics, Entergy would be required to comply with all applicable federal and state hazardous waste management requirements.

**VII.   CONCLUSION**

For the reasons set forth above, I find that the proposed title V permit fails to assure compliance with applicable PSD requirements set forth in the Louisiana SIP.  As a result, I partially grant the February 9, 1999 petition requesting that the Agency object to the proposed Entergy permit, and I hereby object to issuance of the proposed Entergy Permit.  I deny the remainder of the February 9, 1999 petition.  Pursuant to section 505(b) of the Act and 40 CFR § 70.8(d), LDEQ shall not issue the permit unless it is revised in accordance with this Order.

Date: _____                    _____
                                         Carol M. Browner
                                         Administrator

27