IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| Plaintiff | * | |
| vs. | * | CIVIL ACTION NO. MJG-00-2602 |
| WESTVACO CORPORATION | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER RE BASELINE EMISSIONS

The Court has before it Westvaco Corporation's Motion for Determination of Baseline Emissions [Document 234], the United States' Opening Brief Regarding the Proper Standard for Measuring "Pre-Change" or "Baseline" Emissions [Document 236], and the materials relating thereto. The Court has held a hearing and has had the benefit of the arguments of counsel.

I.   PERTINENT BACKGROUND[1]

In this case, the Government seeks to have the Court impose pollution control obligations upon Defendant Westvaco Corporation ("Westvaco"), operator of a kraft pulp and paper production facility located in western Maryland along the Maryland-West Virginia border (the "Luke Mill"). Specifically, the Government

---

[1]   Only the facts relevant to the baseline emissions issue are described herein.  For more detail, see Memorandum of Decision Re: First Phase [Document 230].

contends that construction at the Luke Mill during the Digester Expansion Project ("DEP") triggered compliance with the Clean Air Act's Prevention of Significant Deterioration ("PSD") program regulations. See 42 U.S.C. § 7070-7492; 40 C.F.R. § 51.166 (1987).[2]

The Luke Mill is predominantly powered by two power boilers that emit, among other things, sulfur dioxide ("$SO_2$"), a pollutant regulated by the Clean Air Act. The PSD regulations require existing major stationary sources of air pollutants, such as the Luke Mill,[3] to meet pre-construction permitting and pollution control regulations before undergoing a "major modification."[4] 40 C.F.R § 51.166(b)(2)(i) (1987).

The instant case is proceeding to resolution in phases. In the First Phase, the Court found that Westvaco made physical and

---

[2] All citations to the PSD regulations, 40 C.F.R. § 51.166 and 52.21, are to the PSD regulations promulgated August 7, 1980. These regulations were in effect at the time Westvaco began making changes to the Luke Mill as part of the DEP. The 1980 regulations, 45 Fed. Reg. 52676, were recodified in the 1987 Code of Federal Regulations.

[3] Kraft pulp mills are subject to regulation under the Clean Air Act. See 40 C.F.R. § 60.

[4] Defined as "any physical change or change in the method of operation that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.166(b)(2)(i).

operational changes to the Luke Mill's power boilers during the DEP.  The Second Phase presents the question whether those changes resulted in a "significant net emissions increase."  40 C.F.R § 52.21(b)(2)(i).

The Court now has before it the determination of the pre-change net emissions to be compared to post-change net emissions.

II.   LEGAL STANDARD

Under the 1980 Prevention of Significant Deterioration ("PSD") regulations, the term "net emissions increase" is defined as:

> [T]he amount by which the sum of the following exceeds zero:
>
> (a)   Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and
>
> (b)   Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

40 C.F.R. §52.21(b)(3)(i).

The regulations define "actual emissions" as:

> the actual rate of emissions of a pollutant from an emissions unit, as determined in accordance with [the following subparagraphs:]

3

    (ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted pollutants during a two-year period which precedes the particular date and which is representative of normal source operation.  The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.  Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

    (iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

    (iv) For any emissions unit which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

40 C.F.R. § 52.21(b)(21).

## III. DISCUSSION

A daily continuous monitoring system has measured emissions from the power boilers at the Luke Mill since the 1970s. (Hr'g Tr. 3:21-4:5, Feb. 17 2010.)  In 1977, the Luke Mill began operating under a 49 ton per day emissions limit on $SO_2$, imposed by the State of Maryland. (Def.'s Mem. in Supp. of Mot. For Determination of Baseline Emissions [Document 235] at 7.)  The DEP began in 1981.  (Id. at 2.)

4

### A.  Pre-change Emissions Period

The Government contends that the two-year period immediately prior to the DEP is a period representative of normal source operation such that the determination of actual emissions must be made with respect to that period.  Westvaco contends that the two-year period immediately prior to the DEP is not a period representative of normal source operation.  Westvaco asserts that the Court should find "normal operations" of the Luke Mill to mean its operations prior to the imposition of the emissions limit.

The Scheduling Order calls for the parties to provide further briefing, and perhaps further contentions, regarding the baseline period.  Accordingly, the Court will defer ruling on the baseline period but will assume, for present purposes, that the proper baseline period is the two-year period prior to the DEP, as contended by the Government

### B.  Actual Emissions

As noted above, "in general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted pollutants during a two-year period [of normal operations]."  40 C.F.R. § 52.21(b)(21).

5

However, "the [EPA] may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit." Id.

The Government contends that the Court should find the baseline [pre-change net emissions] to be the average rate (in tons per year) of emissions at the Luke Mill during the two years prior to the DEP. (Pl.'s Opening Br. [Document 236] at 2.) It appears that this amount is readily determinable.[5]

Westvaco contends that, if the Court were to utilize the two years prior to the DEP as the baseline period, it should find the actual emissions to be the "source-specific allowable emissions" of the Luke Mill power boilers at the time. Thus, under 40 C.F.R. § 52.21(b)(21)(iii), the baseline emissions level should be equivalent to the 49 ton per day emissions cap.

The Court agrees with the Government and disagrees with Westvaco.

While the EPA has the authority to presume that source-specific allowable emissions for a unit are equivalent to the

---

[5] Westvaco has actual data from the daily continuous monitoring system that establishes the average rate of pollution, in tons per year, emitted during the "baseline" period. The Government's position is that this data should be used to calculate the baseline emissions level. (Hr'g Tr. 3:8-16.)

actual emissions of the unit, it is not required to do so.  The EPA has not made the presumption.  Moreover, it would be manifestly inappropriate to compute the tons per year[6] of actual emissions utilizing the 49 ton per day maximum allowable emissions.  Annualization based on the daily limit would grossly overestimate emissions because, as Westvaco admits, the Luke Mill never operated at or near that cap.[7]

Accordingly, the Court finds that baseline "actual emissions" to be utilized herein shall be the average annual emissions rate, calculated with regard to the actual amounts of pollutants emitted over a two-year period representative of normal Luke Mill operations, assumed for the present to be the two years prior to the DEP.

---

[6]   Section 52.21(b)(21)(ii) defines "actual emissions" in terms of "tons per year" and provides that they must be "representative of normal source operation."  See 40 C.F.R. § 52.21 (b)(21)(ii).  The Supreme Court has noted that although "the definition in [§51.166(b)(2)(i) of] the PSD regulations [defining a 'major modification'] specifies no rate at all, hourly or annual. . . when a rate is mentioned, as in the definitions of the terms, 'significant' and 'net emissions increase,' the rate is annual, not hourly."  Environmental Defense v. Duke Energy Corp., 549 U.S. 561, 577, 127 S. Ct. 1423, 1434 (2007).

[7]   Westvaco operated well below the 49 ton per day emissions rate in order to have a margin of error to avoid a violation.  (Hr'g Tr. 37:11-20.)  Accordingly, the daily maximum allowable

IV. **FURTHER PROCEEDINGS**

In view of the Court's finding herein, the case must proceed further. Matters remaining to be resolved include the question of whether the two-year period immediately prior to the DEP (the "baseline period") is representative of normal source operation, the determination of post-change emissions, how to deal with contemporaneous creditable decreases in emissions (referred to as the "Netting Issue") and whether the physical and operational changes to the power boilers caused any net emissions increase (the "Causation Issue").

V. **CONCLUSION**

For the foregoing reasons:

1. The Court finds that prior to the Digester Expansion Project, the Luke Mill's baseline "actual emissions" of sulfur dioxide, as defined in the 1980 version of 40 C.F.R. § 52.21(b)(21), are equivalent to the average annual emissions rate, calculated using the emissions monitoring data or other records from the Luke Mill, over a two-year period which is representative of normal source operation.

2. Briefing of the baseline period and post-change emissions issues shall proceed in accordance with the Revised Scheduling Order [Document 244].

---

emissions level would be greater than the actual emissions.

3. The Netting Issue and Causation Issue shall be resolved, if necessary, pursuant to further scheduling.

SO ORDERED, on **Friday, March 26, 2010**.

                                                /s/_____
                                             Marvin J. Garbis
                                    United States District Judge