# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CASE NO. MJG 00-CV-2602 |
| WESTVACO CORPORATION | |
| Defendant. | |

## DEFENDANT WESTVACO CORPORATION'S RESPONSE TO THE UNITED STATES' BRIEF REGARDING THE PROPER BASELINE PERIOD AND THE PROPER STANDARD FOR MEASURING POST-CHANGE EMISSIONS

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

Andrea Bear Field
*afield@hunton.com*
Maida O. Lerner
*mlerner@hunton.com*
James D. Elliott
*jelliott@hunton.com*
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C.  20006-1109
(202) 955-1500 (voice)
(202) 778-2201 (facsimile)

*Counsel for Defendant Westvaco Corporation*

Defendant Westvaco Corporation ("Westvaco") hereby respectfully submits this brief in response to the United States' Brief Regarding the Proper Baseline Period and the Proper Standard for Measuring Post-Change Emissions.

## I.     Introduction

For the government to establish a violation of the Clean Air Act's Prevention of Significant Deterioration (PSD) program in this case, it must prove that at the time the Digester Expansion Project (DEP) commenced at the Luke Mill, the mill should have concluded that it would experience a "significant net emissions increase" in a regulated pollutant as a result of the DEP.  Although the parties agree that emissions changes are calculated based on "actual emissions," as that term is defined in the 1980 PSD regulations, and require a comparison of "baseline emissions" prior to the DEP with an estimate of emissions after the DEP, the parties dispute the appropriate methodology for making that comparison.

This Court has determined that pre-DEP baseline emissions should be calculated using the standard in 40 C.F.R. § 52.21(b)(21)(ii), which equates "actual emissions" with "the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation."  The parties disagree about whether the 1980 PSD regulations require the Court to consider data only from the two years immediately prior to the DEP, and they dispute whether those two years represent "normal source operation" at the Luke Mill.  In fact, the regulatory language does not mandate that data from the immediately preceding two years be used and, in this case, operations during the two year period immediately preceding the DEP were impacted by a temporary 49 ton per day emissions cap that required the mill to make adjustments in the way it operated.  As

Maryland specifically concluded in 1983, the Luke Mill's operations while under a series of temporary emissions caps were not "representative of normal source operations."  Accordingly, under 40 C.F.R. § 52.21(b)(21)(ii), pre-DEP baseline emissions should be calculated using data from two years prior to imposition of the temporary emissions caps.

The parties also dispute the methodology that should be used to calculate post-DEP emissions.  The government would have this Court apply a test known as the "potential to emit" test in 40 C.F.R. § 52.21(b)(21)(iv), which is intended to apply to "any emissions unit which has not begun normal operations on the particular date."  The emissions unit at issue here—a "multi-part emissions unit" consisting of the digesters and the Number 25 Power Boiler—had begun normal operations at the time of the DEP.  It had an operational history, based on the constraints of the 49 ton per day sulfur dioxide emissions cap and the margin of safety Westvaco used to ensure compliance with that cap, which could be used to project future emissions and which precludes application of 40 C.F.R. § 52.21(b)(21)(iv).  *See Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir.1990) ("WEPCO").

Moreover, the government would have this Court assume that after the DEP the mill would emit exactly 49 tons of sulfur dioxide per day, every day, 365 days per year, even though the mill was never operated in that manner.  *See* March 26, 2010 Memorandum and Order Re: Baseline Emissions at 7 n.7 [Doc. # 247] ("Westvaco operated well below the 49 ton per day emissions rate in order to have a margin of error to avoid a violation.").  The Clean Air Act does not allow EPA to assume this type of counter-factual, worst-case scenario in determining post-change emissions. *Alabama Power Co. v. Costle*, 636 F.2d 323, 379 (D.C. Cir. 1979).  Instead,

post-change actual emissions must take into account how the emissions unit—in this case the

"multi-part emissions unit" containing the digesters and power boiler—is normally operated.

## II.    Argument

**A.    The Two Year Period Prior To Imposition Of The Emissions Caps At The Luke Mill Should Be Used To Calculate Baseline Emissions Because That Period Is More Representative Of Normal Source Operations Than The Two Years Immediately Preceding The DEP.**

The 1980 PSD Regulations do not require Westvaco to use the two years immediately

preceding the DEP as its baseline, nor do they provide that EPA must approve the use of a

different time period.  EPA, in contexts other than this litigation, has conceded as much.  Here,

Westvaco concluded that the two years immediately preceding the DEP do not represent normal

source operations because the Luke Mill's emissions were artificially depressed by a temporary

49 ton per day sulfur dioxide emissions cap—a conclusion that was echoed by its Maryland

regulators.  The government has failed to show that that determination is unreasonable.

**1.    Neither The 1980 PSD Regulations Nor The Clean Air Act Mandate The Use Of Data From The Two Years Immediately Prior To The DEP To Calculate Baseline Emissions.**

The government's primary argument regarding baseline emissions is premised on a

misstatement of the 1980 PSD Regulations.  According to the government, "under the 1980

Rules, the two years immediately preceding a project <u>must</u> be used unless EPA determines that a

different two year period is more representative of normal source operation."  Gov't March 19

Brief at 4 [Doc. # 246] (emphasis added).  But outside this litigation, EPA has itself conceded

that the use of the two years immediately preceding the proposed change is "<u>not required</u> by the

regulations."  *See* Requirements for Preparation, Adoption and Submittal of Implementation

Plans; Approval and Promulgation of Implementation Plans; Standards for Performance of New

Stationary Sources, 57 Fed. Reg. 32,314, 32,323 (July 21, 1992) (emphasis added).  Rather, EPA has developed a practice of using the two years prior to the change, as the government describes at length, *see* Gov't March 19 Brief at 5-7, Ex. 2-4 [Doc. # 246].  But that practice does not change the plain text of the 1980 PSD Regulations, which does not require the use of any specific two year period prior to the change.  40 C.F.R. §52.21(b)(21)(ii) ("emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant ***during a two-year period*** which precedes the particular date and which is representative of normal source operation" (emphasis added)).

The government's suggestion that using a period other than the immediately preceding two years is somehow inconsistent with the Clean Air Act, *see* Gov't March 19 Brief at 7 [Doc. # 246], also ignores EPA rulemaking during the past twenty years.  The government argues that "[i]f a stale baseline were used, historic periods of high emissions could distort the impact of the project (making it appear that the project did not have an impact on emissions) and lead to a degradation of air quality—precisely the problem the PSD program was intended to prevent." *Id.*  However, EPA amended the PSD regulations in 1992 for electric utilities to specifically allow the use of any two consecutive years during the five years prior to the change as the baseline, and did not consider that change inconsistent with the Clean Air Act.  *See* 57 Fed. Reg. 32,314, 32,323 (July 21, 1992).  EPA in 2002 imposed a limit of ten years prior to the change to establish a baseline for all other sources, again without voicing any concern that a ten-year "lookback" was inconsistent with the Clean Air Act.  *See* Prevention of Significant (PSD) and Nonattainment New Source Review (NSR): Baseline Emissions Determination, Actual-to-Future-Actual Methodology, Plantwide Applicability Limitations, Clean Units, Pollution Control

4

Projects, 67 Fed. Reg. 80,186, 80,278 (Dec. 31, 2002).  Contrary to the government's arguments here, neither the Clean Air Act nor EPA's PSD Regulations require the use of data from the two years immediately preceding the DEP.

      **2.**        **The 1980 PSD Regulations Do Not Require That EPA Make the Determination That A Different Two Year Period Is More Representative Of Normal Source Operation.**

The government next argues that in order for a period other than the immediately preceding two years to be used as the baseline, "EPA must make a 'determination' that it is more representative of normal source operation."  Gov't March 19 Brief at 4 [Doc. # 246].  But as Westvaco pointed out in its March 19 Brief, the text of the 1980 PSD Regulations does not provide that this determination may be made only by EPA.  *See* Westvaco March 19 Brief at 5 [Doc. # 245].  Rather, the regulations provide that "[t]he Administrator shall allow the use of a different time period ***upon a determination*** that it is more representative of normal source operation."  40 C.F.R. § 52.21(b)(21)(ii) (emphasis added).  The language in this section stands in stark contrast to other sections in the regulations which specify that a particular determination must be made by "the Administrator."  For example, on the question of what constitutes "best available control technology," the regulations provide that "***[i]f the Administrator determines*** that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology." 40 C.F.R. § 52.21(b)(12) (emphasis added); *see also id.* § 52.21(m)(1)(v)(b) ("***If the Administrator determines*** that a complete and adequate analysis can be accomplished with

monitoring data over a shorter period (not to be less than four months), the data that paragraph (m)(1)(iii) requires shall have been gathered over at least that shorter period.") (emphasis added). Here, the regulations do not provide that the Administrator must determine that use of different time period is appropriate.

Consistent with this reading of 40 C.F.R. § 52.21(b)(21)(ii), *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 828-29 (E.D. Tenn. 2009), found that a determination by EPA is not necessary before a two year time period other than the immediately preceding two years can be used for the baseline.  There, the court noted that "no determination was made by permitting officials to use a different, more representative period" for the baseline. The court nevertheless held that that fact was not dispositive of the question of which baseline period should be used:

> When the facts are construed in a light most favorable to Defendant, another period prior to the 1988 projects may be more "representative." As a result, this issue could be resolved in favor of either party and raises a genuine issue of material fact on summary judgment.

*Id.* at 829.  That court concluded that the question of what time period is more representative of "normal source operations" is simply a fact question, unburdened by any question of prior EPA determination.

Accordingly, the fact that EPA has not made a determination that a different two year period would better represent normal source operations is inconsequential.  As long as a different period is more representative of normal source operation, the 1980 PSD Regulations mandate that EPA "shall allow the use of" that different period.  40 C.F.R. § 52.21(b)(21)(ii).

### 3. Westvaco May Reasonably Rely On A Different Two Year Period To Determine Baseline Emissions.

The government's final argument is that the imposition of a temporary emissions cap is not the sort of circumstance that would justify using a different period to determine baseline emissions. Gov't March 19 Brief at 7-10 [Doc. # 246]. According to the government, use of a different period is only appropriate where normal operations have been interrupted by "strikes, retooling, major industrial accidents and other catastrophic occurrences." *Id.* at 8 (citing 1990 NSR Workshop Manual). This statement from the 1990 Draft NSR Workshop Manual, upon which the government now relies, is not based on any interpretive guidance contemporaneous with the DEP. Rather, this restrictive view of the phrase "normal source operations" appears to post-date the DEP by a number of years. *See, e.g.,* Gov't March 19 Brief, Ex. 4 [Doc. # 246-4] (1992 applicability determination).

More tellingly, the government's contention that only "strikes," "major industrial accidents," or other "catastrophic occurrences" would justify use of a different period for the baseline is belied by its own application of that provision. As discussed in Westvaco's March 19 Brief, EPA has routinely allowed the use of different periods where operations were impacted by non-catastrophic circumstances. In *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir.1990) ("WEPCO"), for instance, the development of cracks in the steam drums in the steam generating units was sufficient grounds to use a period other than the immediately preceding two years because the cracks "led to a more recent 'source curtailment,'" not because the cracks were viewed as being "catastrophic." *WEPCO*, 893 F.2d at 916. Similarly, in 2002 EPA agreed with Anheuser-Busch's determination that the fact that its new turbines did not achieve the availability warranted by the manufacturer meant that the two years immediately prior to its

replacement of those turbines did not represent normal source operations.  Letter from Steven C. Riva, EPA, to Iclal Atay, N.J. Dep't of Envtl. Protection (July 11, 2002) (attached as Ex. A to March 19 Seley Declaration [Doc. # 245-4]).  Again, there was no "major industrial accident" or "catastrophic occurrence" at the Anheuser-Busch facility.

In the present case, imposition of the cap indisputably resulted in changes at the Luke Mill.  It required the mill to curtail its use of the power boilers or to purchase and burn different fuel than it otherwise would in order to generate steam.  The mill still operated and produced paper (at times very successfully), but the changes in operations—particularly as to the power boiler at issue in the present case—are reflected in the drastic changes in emissions as a result of the cap.  *See* Westvaco March 19 Brief at 6-7 [Doc. # 245] (describing how lowering the cap caused SO2 emissions to go from 43.34 tons per day to 31.32 tons per day).[1]  As Maryland found in 1983, "Westvaco should not have to suffer a 'penalty' for cooperating with State and EPA officials in past Consent Orders" by assuming that its temporary and artificially depressed sulfur dioxide emissions constituted emissions during a period representing "normal source operations" for the purpose of PSD applicability.  Jan. 15, 2010 Seley Decl. Ex. L at 8 [Doc. #235-13].

---

[1] The question presented by the phrase "normal source operation" is not whether the source could successfully operate at all, but whether the source was operating the same way that it otherwise would in the absence of the limitation.  In this case, there is no question that the Luke Mill would have burned different fuel and would have used a different mix of equipment to manage its steam load if it were not constrained by the limitations of the cap.

**B.      The Luke Mill's Post-Change Emissions Must Take Into Account The Mill's Normal Operations, And May Not Assume That Its Emissions Would Be Equal To Its SO2 Limit.**

The government argues, with regard to post-DEP emissions, that this Court must apply the "potential to emit" test found in 40 C.F.R. § 52.21(b)(21)(iv).  The government contends that post-change emissions are governed by 40 C.F.R. § 52.21(b)(21)(iv) because the two new digesters that were installed as part of the DEP are new emissions units and they therefore had "not begun normal operations" as of the commencement of the DEP.  This argument, however, ignores the government's own prior arguments and this Court's prior rulings that the digesters are part of a single "multi-part emissions unit" consisting of both the Number 25 Power Boiler and the digesters.  Because this "multi-part emissions unit" had begun normal operations before the DEP, 40 C.F.R. § 52.21(b)(21)(iv) simply does not apply.

Even if it were applicable, the government suggests that the "potential to emit" test found in 40 C.F.R. § 52.21(b)(21)(iv) allows it to presume that the Luke Mill will emit the maximum amount of SO2 allowed under its cap.  This argument, however, was flatly rejected in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 917 (7th Cir. 1990), and is inconsistent with *Alabama Power Co. v. Costle*, 636 F.2d 323, 379 (D.C. Cir. 1979), both of which held that a source's potential to emit cannot be based on an unrealistic hypothesized worst-case emissions scenario.

**1.      The Multi-Part Emissions Unit At Issue Here Had Begun Normal Operations Prior To The DEP And 40 C.F.R. § 52.21(b)(21)(iv) Is Therefore Inapplicable.**

The government is inconsistent when describing the "emissions unit(s)" at issue in this litigation.  Previously, the government argued—to this Court's satisfaction—that the digesters

were part of a single "multi-part emissions unit" that includes the digesters and the Number 25 Power Boiler in an effort to establish that the power boiler was "modified" by the addition of new digesters to the mill. *See* August 27, 2004 Memorandum and Order at 16 [Doc. # 149] ("the Government contends that Power Boiler 25 should be considered, in the context of the DEP, to be part of a multi-part emissions unit that included the digesters and related machinery."). Now, the government argues that the DEP "involved the construction and installation of two, new digesters. Along with the No. 25 power boiler, these two digesters constituted *new* emissions units." Gov't March 19 Brief at 13 [Doc. # 246]. The government makes the argument that the new digesters each constitute a new emissions unit in order to justify application of the "potential to emit" test in 40 C.F.R. § 52.21(b)(21)(iv), which only applies to emissions units without an operational history that would allow future emissions estimates. *See Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 917 (7th Cir.1990)("*WEPCO*"), (rejecting the government argument that subsection (iv) can apply to existing modified units); *United States v. Ohio Edison Co.*, 276 F.Supp.2d 829, 877 (S.D.Ohio.2003) ("It is clear that Sammis was operational at the time the activities were proposed. Thus, any use of the actual to potential to emit test is not legally supportable."). If the DEP is treated as a modification of a single "multi-part emissions unit"— as the government and this Court have characterized it in the past—there is no question that the multi-part emissions unit at issue was in operation prior to the DEP, and was changed during the DEP. Because that "multi-part emissions unit" had an operational history under the cap, and that cap would not change as a result of the DEP, 40 C.F.R. § 52.21(b)(21)(iv)'s "potential to emit" test simply does not apply.

**2.   The Government's Construction Of The "Potential To Emit" Test Was Rejected In *WEPCO* And In Subsequent EPA Rulemaking.**

Not only does the government err in arguing that 40 C.F.R. § 52.21(b)(21)(iv) applies to the DEP, but it also advances a construction of the "potential to emit" test that has been rejected by the Seventh Circuit and ultimately by EPA itself.  During the February 17, 2010, hearing on the baseline issue, the government suggested that post-change "potential to emit" should be equal to the Luke Mill's 49 ton per day SO2 emissions cap, and that this Court should assume that the mill would emit 49 tons per day, 365 days per year.  *See* February 17, 2010 Transcript of Motions Hearings at 10:24-12:10 [Doc. #242]; *see also* Gov't March 19 Brief at 14 [Doc. # 246] (post-change emissions are based on the assumption that "that the units will operate at their maximum design capacity following the change") (quoting *In re Monroe Electric Generating Plant* at 15 n.15.).

This construction of 40 C.F.R. § 52.21(b)(21)(iv) was flatly rejected in *WEPCO*, 893 F.2d at 917, and is inconsistent with *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979).  As discussed in Westvaco's March 19 Brief, *WEPCO* held that there is "no support in the regulations for the EPA's decision wholly to disregard past operating conditions at the plant [in determining post-change emissions].  Indeed, *Alabama Power Co*…, which contributes importantly to the EPA's current PSD program, suggests otherwise."  *WEPCO*, 893 F.2d at 917.

The government attempts to brush off *WEPCO*, arguing that its holding merely "created an exception to the actual to potential test for 'like kind replacements' undertaken at electric utilities."  Gov't March 19 Brief at 15 n.14 [Doc. # 246].  The government misreads that decision.  The *WEPCO* court's construction of the term "potential to emit" is neither restricted to like kind replacements, nor applicable only to electric utilities.

First, the fact that the project at issue in *WEPCO* was a "like kind replacement" bears only on the question of whether 40 C.F.R. § 52.21(b)(21)(iv) applies to determine post-change emissions in the first place.  The *WEPCO* court held that it did not because such a unit already has begun "normal operations":

> [T]he PSD regulations state that the EPA may rely upon a facility's potential to emit if the unit "has not begun normal operations on the particular date." 40 C.F.R. § 52.21(b)(21)(iv) (1988) (emphasis supplied).  WEPCO argues that this phrase should be interpreted to include only those units that have never been in operation, while the EPA urges that the phrase can be applied to both new and modified units.
>
> * * *
>
> ***The EPA argues that it has always interpreted this phrase to include modified units; it asserts that its formulae for determining emissions increases have consistently assumed that "new or modified units" would be deemed to operate at maximum physical or federally enforceable levels.  But the EPA's analysis here seems circular***: in order to demonstrate that the Port Washington like-kind replacement project constitutes a modification, the EPA applies the potential to emit concept (to show an increase in emissions).  And in order to apply the potential to emit concept to like-kind replacement, the EPA assumes that the plant is a "modified" unit.

*WEPCO*, 893 F.2d at 917 (emphasis added) (internal citation omitted).[2]

But in addition to determining that subsection (vi) would not apply to like kind replacements, the *WEPCO* court <u>separately</u> held that EPA was misconstruing the term "potential to emit" in the 1980 PSD Regulations and in the Clean Air Act.  The court stated that "[w]e are <u>also</u> troubled by the EPA's assumption of continuous operations in calculating potential to emit

---

[2]  *WEPCO* did not state that "like kind replacements" are the only type of modification that would fall outside of subsection (iv).  *See* 57 Fed. Reg. at 32,317 (*WEPCO* did not "specif[y] the threshold for when a unit has 'begun normal operations.'").

at the Port Washington plant." *Id.* (emphasis added).  The court held that in determining a unit's

"potential to emit," EPA could not "wholly…disregard past operating conditions at the plant."

*Id.*  Relying on *Alabama Power*, the *WEPCO* court rejected EPA's assumption that the facility

would conduct "round-the-clock operations (24 hours per day, 365 days per year) because

WEPCO could potentially operate its facility continuously, despite the fact that WEPCO has

never done so in the past." *Id.* at 916.

> The broad holding of *Alabama Power* is that potential to emit does not refer to the
> maximum emissions that can be generated by a source hypothesizing the worst
> conceivable operation.  ***Rather, the concept contemplates the maximum
> emissions that can be generated while operating the source as it is intended to
> be operated and as it is normally operated***.…Alabama Power stands for the
> proposition that hypothesizing the worst possible emissions from the worst
> possible operation is the wrong way to calculate potential to emit.

*WEPCO*, 636 F.2d at 353, 918 (quoting *United States v. Louisiana-Pacific Corp.*, 682 F.Supp.

1141, 1158 (D. Colo. 1988)) (emphasis added).  The *WEPCO* court held that the proper test for

PSD applicability is to determine "whether the renovated plant would cause a significant net

emissions increase if it were operated under present hours and conditions." *Id.* at 918 n.14.[3]

That holding is not restricted to "like kind replacements" nor to electric utilities.  There is simply

no basis in either the Clean Air Act or the 1980 PSD Regulations for a conclusion that "potential

to emit" means one thing for electric utilities and something else for all other sources.

----

[3] Some courts have commented that the practical impact of *WEPCO* was to wholly invalidate
40 C.F.R. § 52.21(b)(21)(iv), even though the court was technically prevented from
entertaining a facial challenge to the rule.  *See WEPCO*, 893 F.2d at 914 n.6.  As noted in
*U.S. v. Alabama Power Co.*, No. 2:01-cv-00152-VEH, 2008 WL 7351188, *13 (N.D. Al.
July 24, 2008), "the D.C. Circuit [in *New York v. EPA*, 413 F.3d 3, 15-16 (D.C.Cir.2005)]
appears to tacitly acknowledge that WEPCO did invalidate a national emissions rule."

Accordingly, if this Court were to apply the "potential to emit" test of 40 C.F.R. § 52.21(b)(21)(iv) to the DEP, it must take into account the past operating conditions at the Luke Mill. The single most significant operating condition at the mill is the existence of the sulfur dioxide emissions cap. This Court has already acknowledged that "Westvaco operated well below the 49 ton per day emissions rate in order to have a margin of error to avoid a violation." March 26, 2010 Memorandum and Order Re: Baseline Emissions at 7 n.7 [Doc. # 247]. Because there is no reason to conclude that the Luke Mill would compromise that margin of error or treat its sulfur dioxide emissions cap any differently after the DEP, post-change emissions must reflect both the Mill's sulfur dioxide emissions cap and the margin of safety Westvaco maintained to ensure compliance. Any other construction of the "potential to emit" test would run afoul of *Alabama Power* and *WEPCO*.

### III.    Conclusion

For the reasons discussed above and in Westvaco's March 19 Brief, this Court should conclude that the two year time period prior to the imposition of emission caps on the Luke Mill are more representative of normal source operations than the two years immediately preceding the DEP. This Court also should find that the "potential to emit" test in 40 C.F.R. § 52.21(b)(21)(iv) does not apply at all to the DEP, because the "multi-part emissions unit" at issue had an operational history that could be used to estimate future emissions. And even if the "potential to emit" test were to apply, post-change emissions cannot be estimated on the assumption that the mill would operate at its 49 ton per day emissions cap, 365 days per year, but rather must take into account Westvaco's historical operations prior to the DEP, including the

mill's sulfur dioxide emissions limit and the margin of safety the mill used to avoid a violation of that limit.

Respectfully submitted,

_____/s/_____

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

Andrea Bear Field
*afield@hunton.com*
Maida O. Lerner
*mlerner@hunton.com*
James D. Elliott
*jelliott@hunton.com*
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C.  20006-1109
(202) 955-1500 (voice)
(202) 778-2201 (facsimile)

Dated: April 12, 2010

*Counsel for Defendant Westvaco Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2010, a true and correct copy of the foregoing

Defendant Westvaco Corporation's Response To The United States' Brief Regarding The Proper

Baseline Period And The Proper Standard For Measuring Post-Change Emissions was filed using

the Court's electronic case filing system, which results in service on all counsel of record

registered on the case management/electronic filing ("CM/ECF") system.


_____/s/_____
Charles H. Haake
