UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

UNITED STATES OF AMERICA,       :
                            :
        *Plaintiff,*        :
                            :
        v.               :     Civil Action No. MJG 00-CV-2602
                            :

WESTVACO CORPORATION,       :
                            :
        *Defendant.*      :
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UNITED STATES' REPLY BRIEF REGARDING THE PROPER BASELINE PERIOD
AND THE PROPER STANDARD FOR MEASURING POST-CHANGE EMISSIONS**

ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (PHONE)

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

MARK C. ELMER
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
1961 Stout Street, 8th Floor
Denver, CO 80294
(303) 312-7311 (PHONE)

OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

*Attorneys for the United States of America*

I.      **INTRODUCTION**

Under the 1980 PSD rules, EPA calculates emissions increases by comparing "baseline emissions" with post-change emissions.  Baseline emissions equal the average actual annual emissions during the "baseline period" — a two-year period before a change "which is representative of normal source operation."  *See* 40 C.F.R. § 52.21(b)(21)(ii).  This brief addresses two issues raised by Westvaco related to measuring emissions increases under the 1980 rules: (1) what is the proper baseline period and (2) what is the proper measure of post-change emissions?[1]

As concerns the baseline period issue, the regulations require the use of the two years immediately preceding a change unless EPA determines that some other period (referred to here as an "alternative baseline period") is more representative of normal source operation.  Westvaco challenges the use of the two years immediately preceding the Digester Expansion Project ("DEP") on the grounds that those years were not "representative of normal source operation" due to an emissions limit restricting the amount of $SO_2$ pollution the mill's power boilers were allowed to emit.  Westvaco claims this limit — which was 49 tons per day at the time of the DEP — was "temporary" and "artificially" restricted emissions and thus operations.

This argument should be rejected because (1) Westvaco did not obtain an EPA determination before the DEP approving the use of an alternative baseline period as EPA's regulations require and (2) even if Westvaco could still seek such a determination today, it would be denied as the 49 tpd limit was not abnormal or temporary and did not significantly disrupt the

---

[1] The Court has already found that baseline emissions are determined using the mill's actual (rather than allowable) emissions from a two-year period "which is representative of normal source operation."  Memorandum And Order Re Baseline Emissions (Doc. No. 247) at 7.

Mill's operations.  As a result, the proper baseline period is the two years immediately preceding the DEP.

As concerns the post-change emissions issue, the regulations require that post-change emissions from new and modified emissions units be calculated using the units' "potential to emit."  This is commonly called the "actual to potential" test.  Westvaco challenges the use of the actual to potential test under the circumstances of this case, arguing that this test only applies to new (not modified) units.  Westvaco instead urges the Court to use the "actual to projected actual" test to measure emissions increases associated with the DEP.  Alternatively, Westvaco contends that "potential to emit" must account for the actual operations of the unit.

These arguments too should be rejected.  The DEP involved the construction of two *new* digester emissions units.  As even Westvaco concedes, post-change emissions from new units equal the units' "potential to emit."  Even if the DEP involved the construction of modified (rather than new) units, the regulations (as consistently and reasonably interpreted by EPA) require the use of the actual to potential test.  And even if the potential to emit test did not apply automatically to all "modified" units, the changes associated with the DEP are "sufficiently significant to support a finding that normal operations had not begun before the [changes]." *Sierra Club v. Morgan*, 2007 WL 3287850, *18 (W.D. Wis. 2007) (*quoting United States v. Murphy Oil USA, Inc.*, 143 F.Supp.2d 1054, 1104 (W.D. Wis. 2001).  Finally, Westvaco's alternative argument that "potential to emit" must account for actual operations is directly contrary to the plain language of the regulations and defies the common meaning of the word "potential."

II.     **ARGUMENT**

   A.     **Westvaco's After-The-Fact Attempt At Using An Alternative Baseline Period Should Be Rejected.**

Under the 1980 PSD rules — the rules applicable to this case — baseline emissions are determined using actual emissions from a two-year period "which is representative of normal source operation."  Memorandum And Order Re Baseline Emissions (Doc. No. 247) at 7. Westvaco now claims that the two years immediately preceding the DEP were not representative of normal source operation because the Luke Mill was operating under (in Westvaco's words) a "temporary" emissions limit.  According to Westvaco, this "temporary" limit "artificially depressed emissions" and therefore "artificially restricted the operations of the Luke Mill."  *See* Westvaco Brief Concerning The Proper Standard For Measuring "Post-Change" Emissions And Normal Source Operations (Doc. No. 245-1) at 9 (hereinafter "Westvaco's Opening Baseline Period/Post-Change Emissions Brief").  This argument should be rejected because (1) Westvaco failed to obtain a determination from EPA before construction that the two years immediately preceding the DEP were not representative of normal source operation and (2) even if Westvaco could seek such a determination now — at this late stage of an enforcement action — it would be denied.

       1.     **Westvaco Failed To Obtain An EPA Determination Before Beginning Construction That The Two Years Immediately Preceding The DEP Were Not Representative Of Normal Source Operation.**

An agency's interpretation of its own regulations is entitled to deference unless plainly erroneous or inconsistent with the regulations.  *See Humanoids Group v. Rogan*, 375 F.3d 301, 305 (4th Cir. 2004); *United States v. Deaton*, 332 F.3d 698, 709 (4th Cir. 2003).  Yet Westvaco's

argument for using an alternative baseline period[2] completely ignores EPA's interpretation of 40 C.F.R. § 52.21(b)(21)(ii) — the provision of the regulations that identifies how the baseline period should be selected.  EPA has repeatedly and consistently interpreted this provision as requiring the use of the two years immediately before a project unless *EPA* determines that some other two-year period is more representative of normal source operation.  *See* United States' Brief Regarding The Proper Baseline Period And The Proper Standard For Measuring Post-Change Emissions (Doc. No. 246) (hereinafter United States' Opening Baseline Period/Post-Change Emissions  Brief) at 5-7 (citing litany of EPA policy, guidance, and applicability determinations explaining that EPA interprets its regulations to require EPA approval to use an alternative baseline period).

Yet Westvaco never sought (let alone received) a determination from EPA that the two years immediately before the DEP were not representative of normal source operation.[3]  On this

───────────────

[2] The term "alternative baseline period" refers to a period other than the two years immediately preceding a change.

[3] Citing *National Parks Conservation Ass'n v. TVA*, 618 F.Supp.2d 815, 828-29 (E.D. Tenn. 2009), Westvaco suggests that it can unilaterally make its own after-the-fact determination that the two years immediately before the DEP were not representative of normal source operation (as long as that determination is reasonable).  *See* Westvaco Opening Baseline Period/Post-Change Emissions Brief at 5.  But *National Parks* only found that under the facts of that case the baseline period could not be determined on summary judgment because there were "genuine issues of material fact."  *Id.* at 829.  That is not the case here, as Westvaco's only argument for using an alternative baseline period is the 49 tpd emissions limit and undisputed facts show that the 49 tpd limit did not disrupt the Luke Mill's "normal source operation."

Moreover, Westvaco's suggestion that it can unilaterally make its own determination about what the baseline period should be raises a legal issue not directly decided in *National Parks*.  With respect to this legal issue, Westvaco's suggestion should be rejected.  First, the regulations clearly contemplate that EPA will determine the proper baseline period.  *See* 40 C.F.R. § 52.21(b)(21)(ii) (which provides that EPA "shall allow the use of a different time period upon a determination that it is more representative of normal source operation").  Second,

basis alone, Westvaco's litigation position should be rejected.  It is not enough that Westvaco

now claims that an alternative baseline period should be used.  As Westvaco itself

acknowledges, the PSD program imposes *preconstruction* requirements.[4]  Thus, Westvaco

should have sought — before beginning the DEP — a determination that the years immediately

preceding the DEP were not representative of normal source operation and obtained EPA's

explicit approval to calculate baseline emissions using an alternative baseline period.  *See United

States v. Ohio Edison Co.*, 276 F.Supp.2d 829, 865 (S.D. Ohio 2003) (holding that PSD program

requires a source to determine whether a project would cause a significant net emissions increase

before it begins construction).  To allow otherwise would reward those sources that fail to

properly determine PSD applicability before making a potential "major modification," a result

that other courts have rejected.  *Id.  See also United States v. Southern Indiana Gas & Elec. Co.*,

2002 WL 1629817, *2-3 (S.D. Ind. July 18, 2002) (holding that PSD program requires source to

determine whether a permit is required *before* beginning construction).

## 2.      Even If Westvaco Could Seek Such A Determination Now — Well After Completing The DEP — It Would Be Denied.

---

Westvaco's reading of the regulation is inconsistent with EPA's role in overseeing compliance
with the Clean Air Act generally and the PSD program specifically.  *See, e.g.*, 42 U.S.C. §
7413(b); 42 U.S.C. § 7477; *Alaska Dept. Of Envt'l Conservation v. EPA*, 540 U.S. 461 (2004)
(recognizing EPA's authority to oversee compliance with the Clean Air Act).  Finally,
Westvaco's reading ignores EPA's interpretation of its regulations — which does require that
EPA approve the use of an alternative baseline period.  *See* United States' Opening Baseline
Period/Post-Change Emissions Brief at 5-7 (citing numerous EPA interpretations explaining that
regulations require EPA approval to use an alternative baseline period).

  [4] *See* Westvaco's Opening Baseline Period/Post-Change Emissions Brief at 1 (noting that the
"PSD program requires a source to determine, *pre-construction*, whether a proposed
modification will cause a significant net increase in emissions of a regulated pollutant")
(emphasis added).

Westvaco now claims, using information not available at the beginning of the DEP, that the years from 1975 to 1985 (including the two years immediately preceding the DEP) were not representative of normal source operation.  Westvaco's sole argument is that the Luke Mill was operating under a "temporary" 49 ton per day ("tpd") emissions limit during this *ten*-year period.[5]  Westvaco claims the 49 tpd limit "artificially restricted" emissions and operations.  Assuming arguendo that Westvaco still could — at this late stage of the enforcement action — seek an EPA determination that these years were not representative of the Luke Mill's normal source operation due to the 49 tpd limit, it would be denied.[6]

<blockquote>

a. **Westvaco, As The Party Seeking The Benefit Of An Alternative Baseline Period, Has The Burden Of Proving That The Two Years Immediately Preceding The DEP Were Not Representative Of Normal Source Operation.**

</blockquote>

Under the 1980 PSD rules, the use of an alternative baseline period is an exception to the general rule requiring the use of the two years immediately preceding a change.  It is well settled that a party seeking to avail itself of an exclusion in the law has the burden of demonstrating that it qualifies for that exclusion.  *See, e.g., NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (noting "that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits"); *United*

---

[5] The limit was initially 58 tons per day ("tpd").  In 1977, it was reduced to 49 tpd and in 1984 (effective in 1985) it was increased to 66 tpd.  The United States refers to the limit in effect from 1975 through 1985 as the "49 tpd limit."

[6] Westvaco argues that a position paper submitted to EPA by the State of Maryland in 1983 contains a "determination" that the years immediately before the DEP were not representative of normal source operation.  *See* Westvaco's Opening Baseline Period/Post-Change Emissions Brief at 7-8.  This argument was fully addressed in the United States' Opening Baseline Period/Post-Change Emissions Brief at pages 11 through 13.

*States v. Maryland Bank & Trust Co.*, 632 F. Supp. 573, 578 (D. Md. 1986) (finding that party who seeks benefits of exemption bears burden of proof demonstrating that it is entitled to that exemption).  Thus, Westvaco, as the party seeking to use an alternative baseline period, has the burden to prove that the two years immediately preceding the DEP were not representative of "normal source operation."[7]

> **b.**      **The Term "Normal Source Operation" Is Defined By What It Is *Not*: An Aberrant Event, Of Relatively Short Duration, Which Significantly Disrupts Source Operations (Such As A Strike, Major Industrial Accident, Or Other Catastrophic Occurrence).**

Before deciding whether the 49 tpd limit justifies the use of an alternative baseline period, the Court must first determine what "normal source operation" means.  The term is not specifically defined in the regulations (and Westvaco offers little argument of its own about what it means).[8]  EPA has interpreted the term, however, by defining what normal source operation is

---

[7] Imposing the burden of proof on the source also makes common sense.  The source obviously has better access (at least initially) to the information needed to make this determination.  Realistically, how would EPA know that the two years immediately before a change were not representative if the source did not tell it?  This does not mean, however, that the source can unilaterally decide what baseline period to use.  As discussed in footnote 2 above, if the source believes the two years immediately preceding a change are not representative of normal source operation, it must obtain a determination from EPA before it can use an alternative baseline period.

[8] It takes a careful reader to find Westvaco's only argument about the meaning of "normal source operation."  On page 8 of its Opening Baseline Period/Post-Change Emissions Brief, Westvaco states that an alternative baseline period may be used where "factors unrelated to the source's business caused its operations and resulting emissions to be artificially depressed."  By basing its argument on its characterization of two EPA applicability determinations, Westvaco effectively acknowledges that EPA's interpretation of the term is entitled to deference and, thus, controlling.

not.[9]  According to EPA, normal source operations do not include aberrant events, of relatively

short duration, which significantly disrupt source operations (such as strikes, major industrial

accidents or other catastrophic occurrences).  *See* NSR Workshop Manual (attached as Ex. 1 to

United States' Opening Baseline Period/Post-Change Emissions Brief) at p. A.39 (explaining

that "normal source operations may be affected by strikes, retooling, major industrial accidents

and other catastrophic occurrences"); PSD Applicability Determination for Cyprus Northshore

Mining Corporation (attached as Ex. 4 to United States' Opening Baseline Period/Post-Change

Emissions Brief) at § B.2 (explaining that provision applies "to catastrophic occurrences such as

strikes and major industrial accidents").  As this interpretation is not plainly erroneous or

inconsistent with the regulations, it is entitled to deference.  *See Humanoids*, 375 F.3d at 305;

*Deaton*, 332 F.3d at 709.

> **c.      Westvaco's After-The-Fact Assertion That The 49 TPD Limit
> Justifies The Use Of An Alternative Baseline Period Should Be
> Rejected.**

First, the only thing supporting Westvaco's claim that the 49 tpd limit "artificially

restricted the operations of the Luke Mill" is a handwritten note indicating that emissions were

higher before the 49 tpd limit than after.[10]  But this tells us relatively little (if anything) about the

---

[9] Of course, given the number of different types of sources covered by the PSD regulations
and the nearly limitless ways a source could operate normally it would be difficult to
meaningfully define the term by referring to what normal source operations is.

[10] *See* Ex. A to Declaration of Robert H. Dickinson (attached as Ex. C to Westvaco's Opening
Baseline Period/Post-Change Emissions Brief).  The United States does not believe this
document was produced in discovery.  The United States is attempting to confirm this with
Westvaco and to get an explanation why it was not produced.  Pending receipt of this
information, the United States reserves the right to move to strike this document on the grounds
that it was not previously disclosed and/or compel Westvaco to supplement its document
production.  *See, e.g.,* Fed. R. Civ. P. 37(c)(1); *Contech Stormwater Solutions, Inc. v. Baysaver*

*operations* of the mill during the years immediately preceding the DEP.  The baseline period is selected based on whether it is representative of normal source *operations*.  Using emissions to select the baseline period would be inconsistent with the plain language of the regulations (which focus on source operations) and would make little sense as it would use the very factor (normal source emissions) sought to be determined (representative baseline emissions).

To the extent Westvaco contends that emissions are a proper proxy for operations, Westvaco is wrong.  Just because emissions change does not mean that a source is operating abnormally.  Emissions can change for many reasons.  Production could increase or decrease due to changes in demand or other economic reasons.  Equipment could be down for maintenance or routine repair.  Even changes in the weather might affect emissions.  While any one of these factors might exist at a particular source, affecting the annual amount of pollution the source emits, the existence of these factors does not mean that the source is not operating normally.  Thus, a change in emissions does not necessarily signal a change in normal operations and is not an appropriate proxy for operations.

<u>Second</u>, even if emissions were an appropriate proxy for operations, Westvaco's claim that the 49 tpd limit "artificially" restricted emissions is demonstrably untrue.  Using Westvaco's own data, actual $SO_2$ emissions from the power boilers during the period 1978 through 1984 (the six full years the Luke Mill operated under the 49 tpd limit) ranged from 10,987 tons (in 1979) to 15,036 tons (in 1982).[11]  Thus, *actual emissions varied by more than 4,000 tons per year during*

---

*Technologies, Inc.*, 534 F.Supp.2d 616, 622-26 (D. Md. 2008).

[11] *See* Ex. A to Declaration of Robert H. Dickinson (attached as Ex. C to Westvaco's Opening Baseline Period/Post-Change Emissions Brief) and $SO_2$ and NOx Emissions table (Ex. 14) (see the bottom of this footnote for a note regarding exhibit numbering).  The United States used Ex.

*the years that the 49 tpd limit was in effect.*  This conclusively demonstrates that factors other

than the emissions limit drove annual emissions.  If the 49 tpd limit had really "artificially"

restricted annual emissions,[12] actual emissions would have been roughly the same year to year

and would have been reasonably close to the limit.  Emissions certainly would not have

fluctuated 4,000 tons per year.[13]

In addition, Westvaco's claim that the 49 tpd limit artificially restricted emissions is

disproved by the daily emissions data submitted by Westvaco to the State of Maryland in

"continuous monitoring reports."  These reports list the total $SO_2$ emissions from the power

boilers for each day.  They show that, at times, the Mill operated at (or very near) the 49 tpd

limit.  *See, e.g.*, Continuous Monitoring Report ("CMR") for the period October 1 through

December 31, 1980 (Ex. 15) at 2 (demonstrating that Mill regularly emitted 46, 47, 48 tons per

day).  They show that, at other times, the Mill operated significantly under the limit.  *See, e.g.*,

CMR for the period July 1 through September 30, 1983 (Ex. 16) (reporting daily emissions

---

A to the Dickinson Declaration for emissions data for 1978 through 1981 (to get annual
emissions, the United States multiplied the annual average tons per day by 365).  Because Ex. A
does not include complete data beyond 1981, the United States used the $SO_2$ and NOx Emissions
table for emissions data for 1982 through 1984.

The United States has used arabic numerals to number its exhibits.  The United States' Opening
Baseline Period/Post-Change Emissions Brief references 13 exhibits.  To avoid confusion from
having multiple exhibits with the same exhibit number, the first exhibit referenced in this reply
starts with the number "14."

[12] The PSD program is triggered by changes in annual emissions.  *See, e.g.*, *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 569 (2007); *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 915 (7th Cir. 1990).

[13] 4,000 tons per year is a tremendous amount of pollution.  To put it in perspective, 4,000 tons is the equivalent of 40 new "major sources" or 100 new "major modifications."  If the 4,000 tons were considered a separate source, it would be one of the largest single sources of $SO_2$ pollution in the entire State of Maryland.

substantially less than 49 tons per day).  The fact that the Mill was capable of operating at the 49

tpd limit but regularly operated well below it demonstrates that the limit was not the only factor

affecting even its daily emissions.  Notably, the Mill continued to routinely operate below 49

tons per day even after the limit was increased to 66 tons per day in early 1985.  *See, e.g.*, CMR

for period April 1 through June 30, 1986 (Ex. 17) (reporting emissions well below 49 tons per

day more than a year after limit increased).  If the 49 tpd limit had in fact — as Westvaco now

claims — "artificially restricted" emissions, actual emissions after the limit was raised should

rarely have been less than 49 tpd.

     Westvaco's related assertion that it operated the Luke Mill with a 30% (or *15 tons per

day*) "safety factor" is also demonstrably untrue.  *See, e.g.*, Westvaco's Opening Baseline

Period/Baseline Emissions Brief at 16 (claiming that in order to meet the limit Westvaco had to

operate the Mill with a 30% (or 15 tpd) "safety factor").  This defies common sense and is

inconsistent with the mill's actual emissions data.  *See, e.g.,* CMR for the period October 1

through December 31, 1980 (Ex. 15) at 2 (demonstrating that Mill could regularly emit 46, 47,

48 tons per day without violating the limit).  The fact that the Mill was capable of operating near

the limit, without violating it, shows that it did not need a 15 tpd safety factor.

     Not only is the argument discredited by the undisputed facts, but the logic used by

Westvaco is obviously flawed.  Westvaco's bases its claim that it operated with a 30% safety

factor on a comparison of actual *annual* emissions with the annualized *daily* limit.  The fact that

the limit is expressed in tons per *day* means that Westvaco can pollute another 49 tons every day.

What happens one day has absolutely no bearing on Westvaco's ability to pollute during another

day.  As a result, Westvaco's assertion does nothing more than assume what it seeks to prove.

12

Third, Westvaco has not only failed to meet its burden of proving that the two years immediately before the DEP were not representative of normal source operation, but the undisputed facts affirmatively show that these years were representative of "normal source operation."  As noted above, a period is not representative if it includes an aberrant event, of relatively short duration, which significantly disrupts source operation (such as a strike, major industrial accident or other catastrophic occurrence).  The 49 tpd limit does not meet this definition because it was not aberrant or temporary, and it did not significantly disrupt source operation (or, in Westvaco's words, cause source operations "to be artificially depressed").[14]

Westvaco's own production data, which Westvaco conspicuously fails to reference, demonstrate that the 49 tpd limit did not adversely affect the Luke Mill's normal source operation.  In fact, production *increased* during the two years immediately preceding the DEP (as compared to production during the two years immediately preceding June 1975 when the daily emissions limit first took effect).  According to Westvaco operating reports, the gross production rate for the period June 1973 to May 1975 (when Westvaco claims Luke Mill operations were normal) was roughly 1240 tons per day.  *See* Excerpt from Luke Mill Operations Report (Ex. 18).  The gross production rate during the period February 1979 through January 1981 (which the United States asserts is representative of normal source operation) was roughly 1325 tons per day, an *increase* of 85 tons per day (more than 31,000 tons per year).  *See* excerpt from Luke Mill Operations Reports (attached as Ex. 19).  If the 49 tpd limit had actually disrupted the mill's "normal source operation" production would not have (as it did) increased.

Fourth, yet another indication that the two-year period immediately preceding the DEP

---

[14] *See* Westvaco's Opening Baseline Period/Post-Change Emissions Brief at 8.

was representative of normal source operation is the fact that the Luke Mill was enjoying record profits and production during this period.  For example, in August 1979 (*three years after the 49 tpd limit took effect*), the Luke Mill made a monthly profit of more than $6 million (about $18 million in today's terms) "breaking the previous mark of $5,275,000 set just last month in July." *See* August 1979 Flash Report (Ex. 20) at 1.  Westvaco attributed the record profit to "outstanding production" and noted that "several new production records were set." *Id.*  These results were typical of the two-year period immediately preceding the DEP.  *See, e.g.*, May 1979 Flash Report (Ex. 21) at 1 (noting that the Luke Mill earned $4,740,000 in the month of May 1979 due to "outstanding production" and "13 new production records"); October 1979 Flash Report (Ex. 22) at 1 (noting "banner performance for the month" due to "excellent production" and a monthly profit of $5,687,000); January 1980 Flash Report (Ex. 23) at 1 (noting monthly profit exceeding $5 million due to "banner production, above-forecast shipments and record nets"); April 1980 Flash Report (Ex. 24) at 1 (noting monthly profit of $3,362,000 due to "record-breaking production"); November 1980 Flash Report (Ex. 25) at 1 (noting "record breaking production performance whereby twenty-two new paper production levels were reached" and profit of more than $4 million); January 1981 Flash Report (Ex. 26) at 1 (noting monthly profit of $4,586,000 due to "near record production").  Westvaco argues that the 49 tpd limit "artificially" restricted emissions and, thus, operations.  But if the 49 tpd limit had really restricted operations, the Luke Mill would not have enjoyed record profits and production — which it in fact was — during the two years immediately preceding the DEP.

Finally, Westvaco's argument amounts to a backdoor attempt at using an allowable emissions baseline, which this Court has already rejected.  Most (if not all) major sources of

pollution have emissions limits.  Before the limits are imposed, the sources' actual emissions are

typically higher than their allowable emissions will be with the limits.  After all, the purpose of

an emissions limit is to limit emissions.  If the imposition of an emissions limit meant that source

operations were no longer "normal," then a source could point to some period — years earlier

when its emissions were higher because they were not impacted by the limit — to avoid PSD.

This is contrary to the intent of Congress in enacting the PSD program.[15]

> ### 4. The Two EPA Applicability Determinations Cited By Westvaco Do Not Support Its Argument.

Westvaco cites two EPA applicability determinations relating to the baseline period

issue.  Neither supports Westvaco's claim that the 49 tpd limit rendered the Luke Mill's

operations abnormal.  The first determination was made for a coal-fired power plant owned and

operated by Wisconsin Electric Power Company (the WEPCO determination).  This

determination has limited precedential value, as the baseline period was not in dispute.  *See*

Revised WEPCO Applicability Determination (Ex. 27) at p. 5 (noting that "the parties and the

court agreed that 1983-84 (prior to the discovery of steam drum cracks) should be the baseline

years").  As a result, the determination contains limited factual background about the baseline

period issue, making it difficult to ascertain the entire basis for EPA's determination that the two

years immediately preceding the project were not representative of normal source operation.

Nevertheless, the determination in fact supports the United States' position that the 49 tpd limit

---

[15] *See, e.g.*, *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (noting that "[i]mplementation of the statute's definition of 'modification' will undoubtedly prove inconvenient and costly to affected industries; but the clear language of the statute unavoidably imposes these costs except for de minimis increases.  The statutory scheme intends to 'grandfather' existing sources; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program").

did not disrupt the mill's "normal source operation."  First, the determination validates EPA's interpretation of its own regulations as requiring EPA approval — before construction — to use an alternative baseline period.  Second, the determination validates EPA's interpretation that the event disrupting normal source operation must be unusual and must result in a temporary and significant disruption to source operations.  In the WEPCO determination, there were cracks in the steam drums, limiting utilization to 29%.  EPA agreed with the source that the period where the primary unit at the facility was limited to 29% utilization due to a temporary, significant, and non-routine equipment failure was not representative of normal source operation.  Unlike WEPCO, the Luke Mill emissions limit was not temporary or unusual and did not significantly affect source operation.  Thus, the 49 tpd limit does not support a determination that the two years immediately before the DEP were not representative of normal source operation.

The second determination was for an Anheusher-Busch brewery in New Jersey.  This determination also confirms that EPA interprets its regulations as requiring the use of the two years immediately preceding a change unless EPA determines that some other period is more representative of normal source operation.  *See* Anheusher-Busch Determination (attached as Ex. A to Westvaco's Opening Baseline Period/Post-Change Emissions Brief) at 2 (noting that "EPA has historically used the 2 years *immediately* preceding the proposed change to establish the baseline for actual emissions") (emphasis added).  In addition, the determination is consistent with EPA's interpretation that the event disrupting normal source operation must be atypical and must result in a temporary and significant disruption to source operations.  In the Anheusher-Busch case, design defects in two gas turbines significantly disrupted brewery operations.  These defects resulted in "bearing failure, oil pump failure, excess vibration, oil seal failure, engine

clutch failure, inner duct failure, generator failure, etc." *Id.* at 1. The defects limited the availability (i.e. operation) of the turbines, and were ultimately deemed so significant that the turbines had to be replaced. The Luke Mill emissions limit — which was not temporary or unusual and did not adversely affect operations — simply does not provide a legitimate basis for using an alternative baseline period.

**B.      If The Court Determines That An Alternative Baseline Period Can Be Used To Measure Emissions Increases, Pre- And Post-Change Emissions Must Be Determined As Of A Common Date.**

In effect, Westvaco seeks to determine its baseline emissions as of 1984 (when the Luke Mill emissions limit was increased to 66 tpd) and its post-change emissions as of 1981 (before it began construction of the DEP). In 1981, there was no basis to argue that the 49 tpd limit was "temporary." At that time, neither Westvaco nor EPA knew if the limit would change (or how it might change). *See* Letter from Thomas R. Long to Ann Marie De Biase (March 12, 1983) (Ex. 28) at 5 (acknowledging that "emission limitation could go up or down from 49 tons depending on the results of the study"). It was not until 1984, when the decision to change the limit was made, that Westvaco learned that it would increase. Thus, Westvaco wants to use information that was not known until 1984 (i.e. that the limit increased) to justify the use of an alternative baseline period yet ignore this same information for purposes of determining post-change emissions. Westvaco cannot have it both ways.

To accept Westvaco's argument for an alternative baseline period, the Court would have to find that the 49 tpd limit was "temporary" and "artificially restricted" emissions and operations to such a degree that *operations* under the 49 tpd limit were not "normal." The only way to conclude that the limit was "temporary" is to use hindsight because, as pointed out above,

at the time of the DEP neither Westvaco nor EPA knew whether the specific numerical amount

of the limit would change (or how it might change).  It would be inconsistent and unfair to give

Westvaco the benefit of a baseline period years earlier than the DEP (when Westvaco claims it

was emitting more pollution) based on an after-the-fact determination that the 49 tpd was

"temporary" and "artificially" restricted emissions and operations, only to turn around and use

that same "temporary" and "artificially restrictive" limit to calculate post-change emissions.

Thus, if the Court allows Westvaco to use an alternative baseline period, the Court should use

the specific numerical limit eventually imposed upon the Luke Mill (i.e. 66 tons per day) to

measure post-change emissions.

> **C.      The Plain Language — And EPA's Long-Standing Interpretation — Of The
> 1980 PSD Rules Requires That Post-Change Emissions Be Determined Using
> The New Digester Units' "Potential To Emit."**

In its opening brief, the United States explained that the "actual to potential" test should

be used to determine whether the DEP would result in a significant emissions increase.  The use

of this test is directly supported by EPA regulation 40 C.F.R. § 52.21(b)(21)(iv), which provides:

"For any emissions unit which has not begun normal operations on the particular date, actual

emissions shall equal the potential to emit of the unit on that date."  This test applies because the

DEP involved the construction of two *new* digester emissions units.  As the Court has already

found, the construction of these units constituted non-exempt physical and/or operational

changes.  Because the units had obviously not begun "normal operations" at the time of

construction (when PSD determinations must be made), the units' post-change emissions under

the 1980 PSD rules equal the units' "potential to emit."  By definition, potential to emit equals a

source's maximum capacity to emit a pollutant under its physical and operational design, taking

18

into account any physical or operational limitations on the source that are enforceable as a practical matter. *See* 40 C.F.R § 52.21(b)(4). Unless the Court allows Westvaco to use an alternative baseline period, post-change emissions equal the power boilers' federally enforceable emissions limitation of 49 tons per day.[16]

In its opening brief, Westvaco essentially makes two arguments concerning the proper measure of post-change emissions. First, Westvaco argues that the potential to emit test does not apply and instead the proper test for determining whether the DEP would result in a significant emissions increase is the "actual to projected actual" test.[17] Second, alternatively, Westvaco claims that if the actual to potential test applies, the test must take into account the actual operation of the Luke Mill.

> **1. The Actual To Potential Test Should Be Used To Determine Whether The DEP Would Result In A Significant Emissions Increase.**

In support of its argument on the post-change emissions issue, Westvaco relies on the Seventh Circuit's decision in *WEPCO* and a 1983 EPA applicability determination. In addition, Westvaco claims that the reasoning employed by EPA to justify the use of the actual to potential test is circular. As an initial matter, even Westvaco concedes that the actual to potential test applies to *new* emissions units. Thus, if the Court determines that the DEP involved the construction of new units — as the United States contends — the arguments made by Westvaco

---

[16] As noted in Section II.B above, if the Court allows Westvaco to use an alternative baseline period (based on a determination that the 49 tpd limit was "temporary" and "artificially" restricted emissions), post-change emissions should be based on the 66 tpd limit.

[17] In its opening brief, Westvaco also argued for an "allowable to allowable" test. Since then, the Court has decided that baseline emissions are equivalent to the actual emissions at the Luke Mill. *See* Memorandum and Order Re Baseline Emissions (Doc. No. 247) at 7. Accordingly, the Court need only address Westvaco's contentions relating to the actual to projected actual test.

and addressed in this section are moot.  This section becomes relevant only if the Court

determines that the DEP involved *modified* units (i.e. existing units undergoing non-exempt

physical or operational changes).  EPA interprets the phrase "has not begun normal operations"

in 40 C.F.R. § 52.21(b)(21)(iv) as applying to both new and modified units, whereas Westvaco

argues that it applies only to new units.  According to Westvaco, emissions increases involving

modified units must be determined using the actual to projected actual test.

Westvaco's reliance on *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th

Cir.1990) ("*WEPCO*"), turns on a flawed reading of the decision.  Westvaco argues that the

Seventh Circuit universally rejected the use of the actual to potential test.  Not true.  The

*WEPCO* court only addressed the use of the actual to potential test to "like-kind replacements"[18]

at Electric Steam Generating Units ("EGUs").  *Id.* at 907.  Because these like-kind replacements

did not "change or alter the design of the facility," *id.* at 908 (internal quotations omitted), the

court found the use of the actual to potential test unwarranted.  *Id.* at 918.  The court did not,

however, prohibit EPA from using the actual to potential test in other types of cases.

EPA's subsequent rulemaking implemented this reading of *WEPCO*.  In 1992, EPA

revised its regulations to apply the actual to projected actual test to all physical or operational

changes at existing *electric utility steam generating units*.  *See* 57 Fed. Reg. 32,314 (July 21,

1992) (the 1992 regulations are often referred to as the "WEPCO rule").  As Westvaco concedes,

this rulemaking only applied to electric utilities.  In fact, courts within the Seventh Circuit have

continued to use the actual to potential test for all other sources.  *See e.g., United States v.*

---

[18] A "like-kind replacement" project is a project involving "the replacement of old parts with new parts that do not change the design of the equipment."  *Sierra Club v. Morgan*, 2007 WL 3287850, * 18 (W.D. Wis. 2007).  The DEP was not a like-kind replacement project.

*Murphy Oil USA, Inc.*, 143 F.Supp.2d 1054, 1105 (W.D. Wis. 2001) (applying actual to potential

test to a sulfur recovery unit); *Sierra Club v. Morgan*, 2007 WL 3287850, * 18 (W.D. Wis. 2007)

(applying actual to potential test to a coal-fired industrial boiler).  Thus, contrary to Westvaco's

assertions, the *WEPCO* holding should not be extended beyond the specific facts of that case (i.e.

a like-kind replacement project at an electric utility).  Since the DEP was not a like-kind

replacement project and did not involve an electric utility, the WEPCO holding does not apply in

this case.[19]

Westvaco's reading of *WEPCO* is also contrary to EPA's consistent interpretation of the

regulations.  Pursuant to 40 C.F.R. § 52.21(b)(21)(iv), the actual to potential test applies when a

source has not "begun normal operations."  EPA has provided clear guidance on this point:

> In brief, under the current regulations, changes to a unit at a major stationary
> source that are non-routine or not subject to one of the other major source NSR
> exemptions are deemed to be of such significance that pre-change emissions for
> the affected units should not be relied on in projecting post-change emissions.
> For such units, "normal operations" are deemed not to have begun following the
> change, and are treated like new units.  Put another way, the regulatory provision
> for units which have "not begun normal operations" reflects an initial
> presumption that a unit that has undergone a non-routine physical or operational
> change will operate at its full capacity year-round.  A source owner or operator
> may rebut the presumption that the unit will operate at its full potential by

---

[19] As Westvaco notes, in 2002 EPA revised its regulations to allow the use of the actual to
projected actual test for modifications to *existing* units at all sources.  67 *Fed. Reg.* 80,186 (Dec.
31, 2002).  Westvaco fails to mention, however, that in this same rule EPA reaffirmed the use of
the actual to potential test for *new* units:

> In contrast, sources adding "new" units that do not qualify as replacement units
> must project that the future emissions of the new unit equal its PTE, effectively
> applying the "actual-to-potential" test because there is no relevant historical data
> that could be used to establish an actual emissions baseline or projection of future
> actual emissions for such new units.

67 Fed. Reg. 80186, 80194 (col. 3) (Dec. 31, 2002).

agreeing to limit its PTE through enforceable restrictions that limit the units'
ability to emit more than their pre-modification actual emissions (plus an amount
that is less than significant).

63 *Fed. Reg.* 39857, 39858 (July 24, 1998)[20]  Put simply, units undergoing non-exempt changes

are treated like new units, subject to the actual to potential test.  Because this Court should defer

to EPA's interpretation of the regulations, it should determine that the actual to potential test

applies to both new and modified units.  *See Humanoids*, 375 F.3d at 305 (citing *Auer v.*

*Robbins*, 519 U.S. 452 (1997)); *Deaton*, 332 F.3d at 709 (citing *Bowles v. Seminole Rock & Sand*

*Co.*, 325 U.S. 410 (1945) (granting substantial deference to an agency's reasonable interpretation

of its regulations).

Assuming *arguendo* that the DEP resulted in a modified (rather than new) unit and that

EPA's interpretation of its regulations was not entitled to deference, the actual to potential test

would still apply.  That is because, under the circumstances of the case, the DEP was sufficiently

significant to warrant EPA's finding that the units' "normal operations" had not begun at the

time of construction.  This determination is firmly grounded in three cases — two of which were

decided after *WEPCO*.  First, in *Sierra Club v. Morgan*, 2007 WL 3287850 (W.D. Wis. 2007),

the court applied the actual to potential test to four non-exempt modifications to a heating plant.

Similarly, in *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989), the court concluded

---

[20] Similar language can be found in other federal register notices, as well as EPA policy and
guidance.  *See e.g.,* 56 *Fed. Reg.* 27,630, 27,633 (June 14, 1991) (explaining that the use of
potential emissions is appropriate because the pollution source's future emissions are "difficult to
predict"); 63 *Fed. Reg.* 39857, 39859 n.4 (July 24, 1998) (post-change emissions of unit
following non-routine change is potential to emit).  *See also* United States' Opening Baseline
Period/Post-Change Emissions Brief at 14-15 (citing numerous EPA applicability determinations
explaining that EPA interprets the phrase "has not begun normal operations" in 40 C.F.R. §
52.21(b)(21)(iv) to apply to modified units (i.e. units that will undergo a non-exempt physical or
operational change)).

that the conversion of a cement kiln from a "wet" to "dry" process was sufficiently significant to justify a determination that normal source operations had not begun.  Finally, in *Murphy Oil USA, Inc.*, 143 F.Supp.2d at 1105, the court applied the actual to potential test to non-routine changes to a sulfur recovery unit.  Here, the Court has already concluded that the DEP resulted in non-exempt physical or operational changes to the digesters and Power Boilers 25 and 26. *See United States v. Westvaco Corp.*, 2009 WL 4738072, * 14 (D.Md. Dec. 3, 2009).  If anything, the DEP — which cost millions of dollars, substantially increased the mill's capacity, and altered its design — was more significant than the projects at issue in *Morgan*, *Puerto Rican Cement* and *Murhphy Oil*.  Thus, the actual to potential test should apply to the DEP regardless of whether the new digesters are considered new or modified units and regardless of whether EPA's interpretation of its regulations is entitled to deference.

Westvaco's reliance on a 1983 EPA applicability determination is also misplaced.  In the 1983 determination (attached as Ex. B to Westvaco's Opening Baseline Period/Post-Change Emissions Brief), a pulp and paper mill was proposing to install a bleaching plant and a larger digester.  As a result of these changes, emissions would increase from the recovery boiler.  The determination discussed generally whether these changes would constitute a major modification and specifically how emissions increases from the *recovery boiler* should be calculated.

Quoting a single sentence from the determination — "[s]ince this source has been in operation for some time, subparagraph (iv) [which contains the potential to emit provision] does not apply" — Westvaco argues that the Court should not use the actual to potential test to determine emissions increases attributable to the DEP.  This misconstrues the 1983 determination.  In the 1983 case, the source was *not* modifying the recovery boiler (the recovery

boiler was only going to be operated more as a result of the larger digester).  In discussing how to measure emissions increases from the recovery boiler, EPA indicated that the actual to potential test would not apply.  This is entirely consistent with EPA's longstanding interpretation of its rules, requiring the use of the actual to potential test for units undergoing non-exempt physical or operational changes.  Because the recovery boiler was neither new nor undergoing a non-exempt physical or operational change, the actual to potential test did not apply.  That, of course, is not the case here.  The new emissions units, which include the power boilers, did undergo non-exempt physical and/or operational changes.  Thus, these units had not begun normal operations and — per the plain language of 40 C.F.R. § 52.21(b)(21)(iv) — the units' post-change emissions equal their potential to emit.

Westvaco's last argument is that EPA's justification for using the actual to potential test is circular.  This is not the case.  EPA has employed a two-step linear process in determining whether the DEP was a major modification subject to PSD review.  The first step involved proving that the DEP constituted a non-exempt "physical or operational change" to the digesters and the power boilers.  EPA succeeded on this step.  *See Westvaco Corp.*, 2009 WL 4738072, * 14.  Therefore, EPA has not assumed, but rather proved, that the DEP resulted in a new or modified unit.  The second step is to apply the actual to potential test to determine if there was a significant net emissions increase from the new or modified units.  That is the issue currently before the court.  Thus, the reasoning is linear, not circular.

## 2. Westvaco's Attempt At Redefining The Meaning Of Potential To Emit Is Inconsistent With The Plain Language Of The Regulations And Should Be Rejected.

Westvaco argues that if the actual to potential test applies it must account for the actual

operation of the Luke Mill (which Westvaco contends includes the use of a "safety factor").  In

effect, Westvaco urges the Court to interpret the term potential to emit to mean actual emissions.

This, of course, is directly contrary to EPA's regulations, which define "potential to emit" as the

maximum operating capacity of the source taking into consideration practicably enforceable

limits.[21]  *See* 40 C.F.R. § 52.21(b)(4).  It is undisputed that Westvaco's "safety factor" was not

enforceable but rather discretionary.  The only enforceable limit on $SO_2$ emissions from the

power boilers was the 49 tpd limit.  Therefore, before the DEP the power boilers' "potential to

emit" was equal to the $SO_2$ limit of 49 tons per day.

Westvaco's only support for its argument is its strained reading of the *WEPCO* decision.

Westvaco claims that the *WEPCO* court found that the term potential to emit must take into

account how the source is normally operated.  *See* Westvaco's Opening Baseline Period/Post-

Change Emissions Brief at 14-15.  This reads way too much into the decision.  The issue in

*WEPCO* was whether the actual to potential test should be used to calculate emissions increases

from a "like kind replacement" project at an electric utility.  The issue was not the meaning of

the regulatory term "potential to emit."  Indeed, if the WEPCO court had found that the concept

of "potential to emit" already accounted for how the source was normally run then it presumably

would not have rejected the use of the actual to potential test in that case.  The very problem

identified by the Seventh Circuit was that the actual to potential test presumes that a unit will

---

[21] Because voluntary limits cannot be enforced, they cannot be considered in calculating potential to emit.  Indeed, the Seventh Circuit in *WEPCO* "agree[d] that the EPA cannot reasonably rely on a utility's own unenforceable estimates of its annual emissions."  *WEPCO* 893 F.2d at 917.  Here, EPA's definition of potential to emit provides a bright line, allowing both the regulators and sources to readily determine obligations under the rules.  This bright line also helps guarantee protection of human health and the environment by focusing solely on enforceable limitations — namely the 49 tpd limit.

operate at its maximum capacity 24 hours per day, 365 days per year. The court found that the test (and this presumption) was unreasonable as applied to like kind replacements at electric utilities. If potential to emit already accounted for the way a source normally ran, it would not presume continuous operation at maximum capacity, and the basis for the Seventh Circuit's decision would not exist.

Underlying the Seventh Circuit's decision that use of the actual to potential test for like-kind replacements at electric utilities was unreasonable was the fact that the WEPCO plant had never run at full capacity, and there was no reason to believe it would after the modification. That is not the case here. The Luke Mill routinely ran at its capacity (at least in terms of its emissions limit) before the DEP, and there was every reason to believe that it would run at an even higher rate after the DEP. Indeed, the reason Westvaco added the new digesters, which significantly increased pulping capacity, was to make more pulp and paper and, in turn, more pollution. Because the mill had routinely run at its capacity, and there were reasons to expect that it would run at an even higher rate after the DEP, it is entirely reasonable to assume that the units "had not begun normal operation" before the DEP.

## III.   CONCLUSION

This Court should confirm — consistent with the plain language of the 1980 PSD regulations and EPA's long-standing interpretations of those regulations — that emissions increases attributable to the new digester emissions units are calculated using the units' average actual annual emissions from the two years immediately preceding the DEP and the units' "potential to emit" after the DEP.

Respectfully submitted,


ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (PHONE)
Michael.DiPietro@usdoj.gov (EMAIL)


IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division


    /s/ Mark C. Elmer
MARK C. ELMER
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
1961 Stout Street, 8th Floor
Denver, CO 80294
(303) 844-1352 (PHONE)
(303) 844-1352 (FAX)
Mark.Elmer@usdoj.gov (EMAIL)


OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103


*Attorneys for the United States of America*

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that I electronically filed the foregoing Reply Brief Regarding The Proper Baseline Period And The Proper Standard For Measuring Post-Change Emissions on April 12, 2010, using the court's CM/ECF system which sent notification of such filing to:

Charles Harry Haake
Peter Eric Seley
Raymond B. Ludwiszewski
GIBSON DUNN AND CRUTCHER LLP
1050 Connecticut Ave NW
Washington , DC 20036
chaake@gibsondunn.com
pseley@gibsondunn.com

John Jay Range
Mark B. Bierbower
HUNTON AND WILLIAMS LLP
1900 K St NW Ste 1200
Washington , DC 20006
jrange@hunton.com
mbierbower@hunton.com

Howard B. Epstein
Mark Kieran Dowd
Sami B. Groff
SCHULTE ROTH AND ZABEL LLP
919 Third Ave
New York , NY 10022
howard.epstein@srz.com
mark.dowd@srz.com
sami.groff@srz.com

                           <u>s/ Mark C. Elmer</u>
                           Mark C. Elmer