```
          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA         *

          Plaintiff              *

     vs.                         *    CIVIL ACTION NO. MJG-00-2602

WESTVACO CORPORATION             *

          Defendant              *

*    *    *    *    *    *    *    *    *
```

SECOND PHASE DECISION RE: BASELINE PERIOD
AND POST-CHANGE EMISSIONS DETERMINATION

The Court has before it Westvaco Corporation's Motion for Determination on the Proper Standard for Measuring "Post-Change" Emissions and Normal Source Operation [Document 245], the United States' Brief Regarding the Proper Baseline Period and the Proper Standard for Measuring Post-Change Emissions [Document 246], and the materials relating thereto. The Court has held a hearing and has had the benefit of the arguments of counsel.

I.   BACKGROUND

In this case, the Government seeks to have the Court impose pollution control obligations upon Defendant Westvaco Corporation ("Westvaco[1]"), operator of a kraft pulp and paper

---

[1] Reference to "Westvaco" herein is intended to include all predecessors and successors in interest to Westvaco Corporation in regard to the operation of the Luke Mill.

production facility located in western Maryland along the Maryland-West Virginia border (the "Luke Mill"). Specifically, the Government contends that construction at the Luke Mill during the Digester Expansion Project ("DEP") triggered an obligation on the part of Westvaco to utilize the "best available [pollution] control technology" ("BACT") in compliance with the Clean Air Act's Prevention of Significant Deterioration ("PSD") program regulations. See 42 U.S.C. §§ 7070-7492; 40 C.F.R. § 51.166 (1987).[2]

The Luke Mill is predominantly powered by two power boilers that emit, among other things, sulfur dioxide ("$SO_2$"), a pollutant regulated by the Clean Air Act. The PSD regulations require existing major stationary sources of air pollutants, such as the Luke Mill,[3] to meet pre-construction permitting and pollution control regulations before undergoing a "major modification."[4]  40 C.F.R. § 51.166(b)(2)(i) (1987).

---

[2]   All citations to the PSD regulations, 40 C.F.R. § 51.166 and 52.21, are to the PSD regulations promulgated August 7, 1980.  These regulations were in effect at the time Westvaco began making changes to the Luke Mill as part of the DEP.  The 1980 regulations, 45 Fed. Reg. 52676, were recodified in the 1987 Code of Federal Regulations.

[3]   Kraft pulp mills are subject to regulation under the Clean Air Act.  See 40 C.F.R. § 60.

[4]   Defined as "any physical change in or change in the method of operation [] that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 51.166(b)(2)(i).

2

The instant case is proceeding to resolution in phases.  In the First Phase, the Court found that Westvaco made physical and operational changes to the Luke Mill's power boilers during the DEP.

In the Second Phase, the Court must determine whether the changes made during the DEP resulted in a significant net emissions increase.  In the instant decision, the Court is deciding:

1. Which two year period constitutes the baseline period for the determination of pre-change actual emissions; and

2. How to determine the post-change emissions to be compared to the pre-change actual emissions.


II.  REGULATORY FRAMEWORK

Under the applicable 1980 PSD regulations ("the Regulations") the term "net emissions increase" is defined as:

> [T]he amount by which the sum of the following exceeds zero:
>
> (a)  Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and
>
> (b)  Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

40 C.F.R. §52.21(b)(3)(i).  The Regulations define "actual emissions" as:

>  the actual rate of emissions of a pollutant from an emissions unit, as determined in accordance with [the following subparagraphs:]
>
>  (ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation.  The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.  Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.
>
>  (iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.
>
>  (iv) For any emissions unit which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

40 C.F.R. § 52.21(b)(21).

III. DISCUSSION

   A. The Proper Baseline Period

To decide whether there has been an increase in "actual emissions" resulting from the DEP, it is necessary to compare pre-DEP and post-DEP "actual emissions" as the term is utilized in the Regulations.

The Regulations provide that, in general, pre-change [pre-DEP] actual emissions "shall equal the average rate, in tons per

4

year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. § 52.21(b)(21)(ii).  Accordingly, the rate of "actual emissions" of the Luke Mill as of the commencement of the DEP (February 1981) is equal to the tons per year of $SO_2$ "actually emitted [ ] during a two year period which precedes [February 1981] and which is representative of normal source operation."  Id.

As stated in the Regulations:  "The two-year period of concern should generally be the two years preceding the date as of which increment consumption is being calculated, provided that the two-year period is representative of normal source operation."  45 Fed. Reg. 52,676, 52,718 (col. 2) (Aug. 7, 1980).[5]  If this two-year period were not representative of normal operations, the Court would utilize that two-year period of normal source operation closest in time to the February 1981 commencement of the DEP.  Therefore, the baseline period for determining the pre-DEP rate of emissions shall be the two years from March 1979 to February 1981 if that is a period representative of normal source operations for the Luke Mill.

---

5    See also, 57 Fed. Reg. 32,314, 32,317 (col. 1) (July 21, 1992) ("The EPA has typically used the 2 years immediately preceding the physical or operational change to establish the baseline.")

Westvaco contends that Luke Mill operations during the two-year period immediately preceding the February 1981 commencement of the DEP were not representative of normal source operations. Westvaco relies upon the fact that in May 1975, the Luke Mill became subject to a 49 ton per day $SO_2$ emissions cap imposed by the State of Maryland and approved by EPA. (See Def.'s Mot. [Document 245] at 1.) To comply with the cap, the Luke Mill "was forced to burn a different fuel," was "forced to operate the boilers differently," and was "forced to shift power production from one piece of equipment to another piece of equipment." (Hr'g Tr. 5:25-6:3.) Nevertheless, while operating under the cap, the Luke Mill continued to produce paper without a substantial change in the overall production method or in the rate of production. In essence, the method of post-cap operation became normal source operations that continued for some six years until the commencement of the DEP and would have continued for the indefinite future.

Certainly, it is appropriate to use a pre-change baseline period earlier than the two years immediately prior to a change when some circumstance temporarily reduces[6] the rate of emissions. Such circumstances would include, for example, a strike, major industrial accident, or other catastrophic

---

6 And, presumably, there could be cases in which a circumstance causes a temporary increase in the rate of emissions that would render a period not representative of normal operations.

occurrence that reduced capacity or, perhaps, some catastrophe that required a plant temporarily to increase production of a needed product to an extraordinary degree.  See e.g., Wisconsin Elec. Power Co. v. Reilly (WEPCO), 893 F.2d 901, 916 (7th Cir. 1990) (using a different two-year baseline period because cracks in the plant's rear steam drums resulted in a "source curtailment" during the two-year period immediately prior to the major modification at issue); NSR Workshop Manual Draft (Oct. 1990) at A39 (Pl.'s Br. [Document 246] at 8, Ex. 1) ("Normal source operations may be affected by strikes, retooling, major industrial accidents and other catastrophic occurrences."); PSD Applicability Determination for Cyprus Northshore Mining Corporation at § B.2 (Pl.'s Br. [Document 246] at 8, Ex. 4) (finding that general economic conditions that forced the plant to be idle did not amount to catastrophic or other extraordinary circumstances that would justify using a different two-year baseline).

The Court finds it neither factually appropriate, nor consistent with the pertinent statutory and regulatory purpose, to find that Westvaco was, somehow, entitled to utilize as the baseline, a rate of emissions that had been reduced for some six years prior to the DEP.  It is far more sound for the Court to find, as it does find, that, as of February 1981, "normal source operations" for the Luke Mill was, had been for almost six years

7

prior thereto, and would have continued for the indefinite future, the mode of operations conducted from March 1979 to February 1981.

Accordingly, the Court finds that the baseline period for the determination of pre-change "actual emissions" is the two year period from March 1979 to February 1981.

### B.   Emissions Rate Comparison

#### 1.   Pre-DEP Emissions Rate

In the Memorandum and Order Re: Baseline Emissions dated March 26, 2010 [Document 247], the Court rejected Westvaco's contention that pre-DEP "actual emissions" should be computed as equal to the maximum emissions of $SO_2$ permissible pursuant to the cap under which the Luke Mill operated.  If the Court had accepted Westvaco's contention, pre-DEP "actual emissions" would be computed as 365 times the daily cap maximum of 49 tons per day, yielding an annual rate of 17,885 tons. The Court found, however, that prior to the DEP, the Luke Mill's baseline "actual emissions" of sulfur dioxide, as defined in the 1980 version of 40 C.F.R. § 52.21(b)(21), is to be computed on the basis of the average annual emissions of $SO_2$ physically emitted.

As discussed above, the Court finds that the baseline period is the two years from March 1979 to February 1981.  It appears that there are records from which the rate of actual

physical emissions of $SO_2$ can be determined. In the event the parties cannot agree as to the amount, it would be necessary to receive evidence and make a factual finding as to the amount. For the present, it suffices to note that the parties appear to agree that the computation would yield an emissions rate substantially lower than 17,885 tons[7] per year of $SO_2$.

### 2. Post-DEP Emissions Rate

Westvaco takes the position that the Court, if using actual physical emissions to compute the pre-DEP emissions rate, should compute the post-DEP emissions rate in the same manner.  There is, of course, a degree of "logic" to this position inasmuch as it would be possible to make a comparison of post-DEP and pre-DEP physical actual emissions of $SO_2$ from the Luke Mill. However, in the instant context, the Court finds a pre-change and post-change physical emissions comparison inappropriate.

The question of whether the DEP triggered a BACT obligation arises in the context of a pre-construction regulatory system designed to apply pollution controls to sources "grandfathered" in under the Clean Air Act of 1970.  It requires a determination about applicability before construction begins.  See United States v. Ohio Edison Co., 276 F. Supp. 2d 829, 865 (S.D. Ohio

---

7 It presently appears that the emissions rate so computed would be in the range of 10,000 to 13,000 tons per year.

2003)(applying pre-construction analysis to physical changes undertaken by an electric utility even though data existed as to the emissions resulting from the changes).

The Regulations provide that, when determining the post-change emissions rate:

> For any emissions unit which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

40 C.F.R. § 52.21(b)(21)(iv).  In a preamble to the 1980 regulations, EPA also noted that "when calculating whether a physical change will bring about a significant net increase in emissions, 'the source owner must [first] quantify the amount of the proposed emissions increase.  This amount will generally be the <u>potential to emit</u> of the new or modified unit.'"  <u>Puerto Rican Cement Co. v. EPA</u>, 889 F.2d 292, 297 (1st Cir. 1989) (citing 45 Fed. Reg. 52,676, 52,677 (col. 2) (Aug. 7, 1980)).

In <u>Puerto Rican Cement</u>, two kilns were combined, and one was converted from a "wet" to a "dry" cement-making process. <u>Id.</u> at 293. The EPA compared the physical actual amount of emissions from the two kilns prior to the project with the emissions that the converted kiln would be capable of producing after the project.  <u>Id.</u> at 296.  The First Circuit found "nothing arbitrary or irrational" about EPA's application of the PSD requirements to compare the pre-change physical actual

10

emissions rate with a post-change potential to emit rate. Id. at 298.

Westvaco seeks to rely upon the decision in WEPCO, 893 F.2d 901, for the proposition that the "actual to potential" test has been rejected. (Def.'s Br. [Document 245] at 12-13.)  However, that "rejection" was limited to cases involving like-kind replacements.  It may well be appropriate to eschew a physical actual to potential comparison to justify imposing BACT obligations where there has been, in effect, a replacement of the original source.  However, the instant case does not present this type of circumstance.

In United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054 (W.D. Wis. 2001), the court distinguished WEPCO and found that an "actual to potential" comparison test was appropriate where there had been physical changes that went beyond replacing old parts with equivalent new ones.  143 F. Supp. 2d at 1104 (citing WEPCO, 893 F.2d 901).  As stated in Murphy Oil: "Although the 'actual-to-potential' test may not be the fairest measure of emissions increases, defendant has failed to cite any legal authority that would support a different test in this case." Id. at 1105.

The Court concludes that it should compute the post-DEP emission rate based upon the source's post-DEP potential to emit.  This leaves, however, the question of how to determine

11

the potential to emit.  There appear to be at least three possible measures:

1. The absolute legal maximum, that is 365 times the daily cap of 49 tons of $SO_2$, i.e. 17,885 tons per year.

2. The physical potential to emit.  This would, no doubt, yield an emissions rate well above 17,885 tons per year.

3. A maximum anticipated physical actual rate, possibly based upon a daily rate sufficiently below 49 tons of $SO_2$ to insure that there was no inadvertent violation of the cap.  This approach could result in a result below 17,885 tons per year.

The method for determining the measure of post change "potential to emit" shall be addressed in future proceedings herein.

IV.  CONCLUSION

For the foregoing reasons:

1.  The Court finds that, with respect to the pre-DEP and post-DEP emissions rate comparison:

   a.  The baseline period for the determination of pre-change "actual emissions" is the two-year period from March 1979 to February 1981.

   b.  The pre-change rate of "actual emissions" shall be determined by reference to the actual physical emissions of $SO_2$ during the baseline period.

   c.  The post-change rate of "actual emissions" shall be determined by reference to the post-change "potential to emit."

      d.    There remain issues regarding the method of determining the post-change potential to emit.

2.    By September 30, 2010, Plaintiff shall arrange a telephone conference to discuss further proceedings, or alternatively, shall advise the Court that the parties request a deferral of the conference.

SO ORDERED, on <u>Wednesday, September 01, 2010</u>.

                                                           /s/\
                                              Marvin J. Garbis\
                                  United States District Judge