# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CASE NO. MJG 00-CV-2602 |
| WESTVACO CORPORATION | |
| Defendant. | |

## DEFENDANT WESTVACO CORPORATION'S BRIEF IN SUPPORT OF PROPOSED SCHEDULING ORDER FOR SECOND PHASE TRIAL

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

Defendant Westvaco Corporation ("Westvaco") hereby respectfully submits this brief in support of its proposed Scheduling Order for Second Phase Trial.

I.      **Introduction**

Pursuant to this Court's Order of September 30, 2010, Westvaco is submitting its proposed schedule for further proceedings in this case.  Westvaco's proposed schedule continues the sensible approach this Court has adopted to phase this litigation.  Discovery and adjudication concerning the issue of remedy have been deferred until after the question of liability for a violation of the New Source Review provisions of the Clean Air Act is resolved.  The question of liability has similarly been split into discrete phases, each phase being potentially dispositive and serving as the foundation for the next.

After the First Phase trial, there remain two questions concerning liability to be resolved.  The first question is whether there was a significant net increase in emissions of sulfur dioxide ("SO2") from the Luke Mill's power boilers when comparing the pre-change period with the post-change period.  The second question is, in the event that there was a significant net emissions increase of SO2, did that increase "result" from the Digester Expansion Project ("DEP") at issue here.  If the answer to either of these questions is "no," then Westvaco cannot be found liable, and there is no need for this Court to delve into the complex question of what the proper remedy for a violation of New Source Review would be.  Accordingly, Westvaco's proposed scheduling order seeks to resolve these liability questions first.  The schedule proposed by Westvaco would have these questions trial-ready in approximately nine months, which is

entirely reasonable considering the amount of time it took to conduct discovery and prepare for the First Phase Trial.[1]

In the event that the Court finds in the Second Phase that the changes made during the DEP resulted in a significant net emissions increase of SO2, then the case should proceed to the issue of remedy.  The question of remedy raises technical and equitable issues that are entirely separate from the remaining liability questions, and that have not yet been the subject of discovery.  Resolving those issues will require a level fact and expert discovery comparable to that undertaken in connection with the First Phase trial.  Because the Court may never need to reach these questions if liability is not established, it would be much more efficient to continue the current approach of deferring the question of remedy until after liability is resolved.

## II.    Significant Issues Concerning Liability Remain To Be Decided In The Second Phase

Pursuant to prior orders of this Court, the issue of Westvaco's liability for alleged violations of the New Source Review provisions of the Clean Air Act currently is being decided before the parties address the question of remedy.  In the First Phase, this Court found that the DEP entailed modifications to Power Boilers 25 and 26, and to the multi-part emissions unit consisting of the digesters, the evaporators, the lime kiln and Power Boiler 25.  *See* Memorandum of Decision Re: First Phase (Doc. 230) at 26-27, 33-34.  The Court further held

---

[1] Westvaco initially proposed a shorter schedule for this phase of the case, but adjusted it to accommodate issues and timing concerns raised during conversations with the Government to try and agree on a joint schedule.

that the pollution control project exclusion found in the New Source Performance Standards does not apply to these modifications.  *Id.* at 36.[2]

The question remaining after the First Phase is "whether the changes made during the DEP resulted in a significant net emissions increase" of SO2.  *See* Second Phase Decision Re: Baseline Period and Post-Change Emissions Determination (Doc. 252) at 3.  There are two issues imbedded in this question.  First, was there a significant net emissions increase when comparing the pre-change period to the post-change period?  Second, if there was a significant net emissions increase of SO2, did that increase "result" from the DEP?  40 C.F.R. § 51.166(b)(2)(i); *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 568 (2007).

The parties have briefed certain threshold legal issues concerning the question of increased emissions, and this Court has made three determinations.  First, the Court found that the baseline, or pre-change, "actual emissions" would be the average annual emissions rate, calculated using the emissions monitoring data or other records from the Luke Mill, over a two-year period which is representative of normal source operation.  *See*  Memorandum and Order Re: Baseline Emissions (Doc. 247) at 7.  Second, the Court found that the baseline period for the determination of pre-change "actual emissions" is the two-year period from March 1979 to February 1981.  *See* Second Phase Decision Re: Baseline Period and Post-Change Emissions Determination (Doc. 252) at 8.  Finally, the Court held that the post-change rate of "actual

---

[2]  The Court also found that it cannot impose "best available control technology" ("BACT") requirements with regard to Power Boilers 24, 25 and 26 by virtue of the separate Mill Wide Expansion Project, which took place between 1986 and 1991.  Memorandum of Decision Re: First Phase (Doc. 230) at 38.

emissions" shall be determined by reference to the post-change "potential to emit."  The Court, however, did not decide how the "potential to emit" should be determined, but found that there appear to be at least three possible measures for post-change "potential to emit:"

(i)   The absolute legal maximum SO2 emissions under the Luke Mill's SO2 cap (i.e., 365 times the daily cap of 49 tons of SO2, or 17,885 tons per year);

(ii)  The physical potential to emit SO2 without accounting for the Luke Mill's SO2 cap; and

(iii) A maximum anticipated physical actual rate of SO2 emissions (possibly based upon a daily rate sufficiently below 49 tons of SO2 to insure that there was no inadvertent violation of the cap).

*Id.* at 12.

There are therefore three discrete questions that remain to be decided in this Second Phase before liability may be established:

1.   The actual emission of SO2 from Luke Mill's power boilers during the two years from March 1979 to February 1981;

2.   The amount of the post-change "potential to emit" SO2 from the Luke Mill's power boilers; and

3.   Whether any significant net emissions increase of SO2 between the pre-change and post-change periods resulted from the DEP.

As reflected in its draft scheduling order, Westvaco believes that the parties can agree concerning the actual emission of SO2 from Luke Mill's power boilers during the two years from March 1979 to February 1981.  However, the parties do not agree on the remaining

questions.  Deciding how to measure the post-change "potential to emit" and what the "potential

to emit" from the Luke Mill's power boiler was after the DEP will require additional fact and

expert discovery.

In the event that the Court were to find that there was a significant net increase in

emissions, the government would still have to prove that that increase was caused by the projects

constituting the DEP.  In other words, there must be a "causal link between the proposed change

and any post-change increase in emissions."  *See* Requirements for Preparation, Adoption and

Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans;

Standards for Performance of New Stationary Sources, 57 Fed. Reg. 32,314, 32,326 (July 21,

1992).  The Government may not dispense with this element of its claim, nor may this Court

simply presume causation.  *See, e.g., Commonwealth of Pennsylvania v. Allegheny Energy*, No.

2:05cv0885, 2008 WL 4960090, *6 (W.D. Pa. Nov. 18, 2008) ("[b]ecause the definition of

'major modification' contains a causation element, [a source] may exclude from their emissions

projection that portion of the increased rate of utilization, if any, due to factors unrelated to the

physical or operational change") (quotations omitted).  Indeed, the Court recognized that

causation is an issue yet to be decided in this Second Phase.  *See* Memorandum and Order Re:

Baseline Emissions (Doc. 247) at 9 ("[t]he Netting Issue and Causation Issue shall be resolved, if

necessary, pursuant to further scheduling.").  Whether any increase in SO2 emissions was caused

by the DEP will be contested between the parties, and will require additional fact and expert

discovery.

Westvaco has proposed a schedule that would tee both of these remaining liability issues

up for trial in approximately nine months.  The schedule provides for limited written discovery

pertaining to just these issues and a period for deposition of fact witnesses.  Expert discovery

should take roughly three-and-a-half months, and any *Daubert* and/or dispositive motions would

be briefed in June and July of 2011, after which the matter should be trial ready.  Westvaco

estimates that three days of trial time may be needed.  Westvaco's proposal is entirely reasonable

when one considers that discovery for the First Phase Trial took over two years to complete—

including a period of expert disclosures and discovery that lasted 18 months—and the trial

consumed eight court days.  Of course, to the extent that the Government believes that it may

establish that the DEP resulted in a significant net increase of SO2 emissions without the need

for further discovery or a trial, Westvaco's proposed schedule allows it to bring a motion for

summary judgment as early as it wishes.

III.    **Determining The Proper Remedy Will Require Significant Discovery And
        Pre-Trial Procedure**

        Should the Court find in the Second Phase that the changes made during the DEP resulted

in a significant net emissions increase of SO2, then the case would proceed to the issue of

remedy.  The question of the appropriate remedy for a violation of the Clean Air Act rests in the

broad discretion of the Court based on the balance of the equities.  42 U.S.C. § 7413(b); *U.S. v.
Cinergy Corp.*, No. 1:99-cv-1693-LJM-JMS, 2009 WL 94515 (S.D. Ind. 2009).  It is therefore a

case-specific and fact-intensive question.

        Determining the proper remedy will entail a number of technical and equitable issues that

will require extensive fact and expert discovery.  For instance, the Government will likely

contend that BACT should be imposed on Power Boilers 25 and 26.  Not only will the parties

dispute whether the imposition of BACT is an appropriate remedy here, but they will also

disagree concerning what constitutes BACT under these circumstances.  BACT does not require

the installation of any particular control device, but rather is defined in the 1980 PSD

Regulations as

> an emissions limitation . . . based on the maximum degree of reduction for each
> pollutant subject to regulation under the Act which would be emitted from any
> proposed major stationary source or major modification which the reviewing
> authority, on a case-by-case basis, taking into account energy, environmental, and
> economic impacts and other costs, determines is achievable for such source or
> modification through application of production processes or available methods,
> systems, and techniques, including fuel cleaning or treatment or innovative fuel
> combination techniques for control of such pollutant.

40 C.F.R. § 52.21(b)(12).  As this definition makes clear, determining what constitutes BACT in a

particular circumstance is a highly technical and fact-intensive inquiry that requires both fact and

expert testimony about the availability of technology as well as energy and economic impacts on the

mill.

Similarly, the Government has indicated that it will seek an order requiring Westvaco to

mitigate any environmental harm attributable to its alleged violations of the Clean Air Act.  This

too will be a complex and fact-intensive inquiry.  Deciding (a) whether the Luke Mill's

emissions of SO2 have in fact caused any environmental harm, (b) if so, the extent of such harm,

and (c) the appropriate means for mitigating that harm, will require extensive expert testimony.

In the First Phase trial, this court considered the analogous question of whether the incineration

of TRS compounds in Power Boiler 25 was more environmentally beneficial then incinerating

them in the lime kiln.  That question entailed expert discovery that spanned six months, that

included close to a dozen experts on both sides, and that consumed a substantial portion of the

eight-day trial.  Deciding how Westvaco should mitigate any environmental harm caused by its

alleged violation of the New Source Review provisions, if at all, will present equally complex

and broader-ranging scientific questions.

The Court need not, however, delve into these complex remedy questions if the Government fails to establish liability in the first place.  Accordingly, the issue of the appropriate equitable remedy for any violations of the Clean Air Act should be deferred until after all elements of liability have been established.

## IV.    Conclusion

Westvaco's proposed scheduling order is simple, streamlined, and will enable the Court to determine the remaining liability questions quickly and efficiently.  It also preserves this Court's phased approach, and defers the complex questions of remedy—which this Court may never need to address if the Government fails to establish liability—until a later phase. Westvaco therefore requests that this Court adopt its Proposed Scheduling Order For Second Phase Trial.

Respectfully submitted,

_____/s/_____

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

Andrea Bear Field
*afield@hunton.com*
Maida O. Lerner
*mlerner@hunton.com*
James D. Elliott
*jelliott@hunton.com*
HUNTON & WILLIAMS
1900 K Street, N.W.
Washington, D.C.  20006-1109

                        (202) 955-1500 (voice)
                        (202) 778-2201 (facsimile)

Dated: October 29, 2010                   *Counsel for Defendant Westvaco Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2010, a true and correct copy of the foregoing

DEFENDANT WESTVACO CORPORATION'S BRIEF IN SUPPORT OF PROPOSED

SCHEDULING ORDER FOR SECOND PHASE TRIAL was filed using the Court's electronic

case filing system, which results in service on all counsel of record registered on the case

management/electronic filing ("CM/ECF") system.


_____/s/_____
Charles H. Haake