UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA, :
:
    *Plaintiff*, :
:
    v. :    Civil Action No. MJG 00-CV-2602
:
WESTVACO CORPORATION, :
:
    *Defendant*. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**UNITED STATES' OPENING BRIEF REGARDING THE POST-CHANGE
POTENTIAL TO EMIT OF THE LUKE MILL POWER BOILERS**

| | |
|---|---|
| ROD J. ROSENSTEIN<br>United States Attorney | IGNACIA S. MORENO<br>Assistant Attorney General<br>Environment and Natural Resources Division |
| MICHAEL DIPIETRO<br>Assistant United States Attorney<br>36 South Charles Street<br>Fourth Floor<br>Baltimore, MD 21201<br>(410) 209-4800 (PHONE) | MARK C. ELMER<br>Trial Attorney<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>Environmental Enforcement Section<br>999 Eighteenth Street, South Terrace, Suite 370<br>Denver, CO 80202<br>(303) 844-1352 (PHONE) |

OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

*Attorneys for the United States of America*

**I.     INTRODUCTION**

The 1980 PSD regulations require the use of the "actual to potential" test to determine the change in emissions from the Luke Mill power boilers as a result of the Digester Expansion Project ("DEP"). *See* Second Phase Decision Re: Baseline Period and Post-Change Emissions Determination (Doc. No. 252) (hereinafter "Second Phase Decision") at 12. Under this test, actual emissions from the power boilers before the DEP are compared with the "potential to emit" of the power boilers after the DEP. Actual emissions before the DEP are known. This brief addresses how the power boilers' "potential to emit" should be measured.[1]

While finding that the actual to potential test applies, the Court left open the precise meaning of the term potential to emit, noting that it could mean:

1. The absolute legal maximum, that is 365 times the daily cap of 49 tons of $SO_2$, i.e. 17,885 tons per year.

2. The physical potential to emit. This would, no doubt, yield an emissions rate well above 17,885 tons per year.

3. A maximum anticipated physical actual rate, possibly based upon a daily rate sufficiently below 49 tons of $SO_2$ to insure there was no inadvertent violation of the cap. This approach could result in a result below 17,885 tons per year.

---

[1] The focus thus far has been on the DEP's impact on $SO_2$ pollution from the power boilers. Indeed, there should be no need to consider increases in pollution from other emissions units at the Luke Mill because the increase in pollution from the power boilers alone is orders of magnitude greater than the 40-ton-per-year PSD significance threshold. The power boilers, however, are not the only source of $SO_2$ pollution from the Luke Mill. For example, the Mill also emits hundreds of tons of $SO_2$ from the recovery boilers. If emissions increases from the power boilers alone are deemed insignificant, emissions increases from other units (like the recovery boilers) must be considered in determining whether the DEP would result in a significant emissions increase.

Second Phase Decision at 12.  The United States urges the Court to find that the power boilers' potential to emit equals 17,885 tons per year – the power boilers' 49-ton-per-day limit annualized (option 1) – as this accurately implements the requirements of the plain language of the 1980 PSD regulations and is consistent with EPA's long-standing interpretation of these regulations.

The term "potential to emit" is defined in regulations promulgated by EPA.  Generally speaking, a source's potential to emit equals (a) the source's maximum physical capacity to emit (option 2) or (b) its maximum legal emissions (option 1), whichever is less.  There is no doubt that the maximum physical capacity of the Luke Mill power boilers exceeds (and exceeded at the time of the DEP) the boilers' allowable emissions of 49 tons per day.  Because the boilers' allowable emissions are legally and practically enforceable and less than the boilers' maximum physical capacity to pollute, the power boilers' potential to emit equals the boilers' allowable emissions.  And because this is well above the power boilers' baseline emissions of 12,228.7 tons per year, the DEP resulted in a significant emissions increase within the meaning of the regulations.

Westvaco argues that the power boilers' potential to emit can be less than the boilers' allowable emissions, on the theory that it operated the boilers with a "margin of safety" to ensure no violation of the legal limit and that this "margin of safety" can legally restrict "potential to emit" (option 3).  The Court should reject this argument.  The plain language of the regulations only allows a source to reduce its potential to emit to account for enforceable limitations on its capacity to emit.  The regulations do not allow a source to base its potential to emit on an imprecise and unenforceable margin of safety.  To the extent there is any doubt about the meaning of the regulations, EPA's interpretation – that potential to emit is strictly based on a

source's legally and practicably enforceable limitations – is entitled to deference.  This interpretation is consistent with the language of the regulations and best furthers the purposes of the Clean Air Act to protect and preserve air quality.  Moreover, the interpretation provides a bright line for determining regulatory applicability, creating certainty and predictability, which benefits both permitting authorities and regulated parties.

Westvaco is also sure to argue that even if there was a significant emissions increase under the actual to potential test, the United States must still prove that this increase was "caused" by the DEP.  Westvaco claims that this imposes an additional element of proof, above and beyond what the United States must otherwise prove to establish an emissions increase.  This is simply not true.  The actual to potential test only applies where there will be (or has been) construction of a new emissions unit or a non-exempt physical or operational change to an existing unit.  Under these circumstances, the test *presumes* that these emissions units will be operated at their full capacity and that any resulting emissions increases are attributable to (i.e. caused by) the construction.  Generally, the only way to rebut this presumption is for a source to obtain legally and practicably enforceable limitations that restrict the source's legal ability to pollute.  The only legally and practicably enforceable limitation on the power boilers' legal ability to pollute is the daily limit, which when the DEP began was 49 tons per day.  Compliance with this limit has been determined using a continuous emissions monitor or "CEM."  It is this limit that defines the power boilers' potential to emit.

Under any reasonable interpretation of the regulations, the United States has demonstrated that the DEP was a "major modification" of the Luke Mill and has, thus, established that Westvaco violated the PSD regulations by undertaking the DEP without complying with the requirements of the PSD program.  The only remaining issue involves

remedy: what should Westvaco (and the Luke Paper Company, as the current owner and operator of the Luke Mill) be required to do to remedy this violation?

## II.   ARGUMENT

### A. The PSD Regulations Require That The Power Boilers' Potential To Emit Equal The Boilers' Allowable Emissions.

The term "potential to emit" is defined in the 1980 PSD regulations as:

> the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.

40 C.F.R. § 52.21(b)(4).[2] This plain language requires that a source's potential to emit be based on its "maximum capacity" to pollute, restricted only by <u>enforceable</u> limitations on that capacity. In the case of the Luke Mill, the maximum physical capacity of the power boilers exceeds the boilers' allowable emissions of 49 tons per day. This point cannot reasonably be disputed, as the power boilers have (both before and after the DEP) regularly emitted more than 49 tons a day.[3] *See* Exhibit A to Declaration of Robert H. Dickinson in Support of Defendant Westvaco Corporation's Brief Concerning the Proper Standard for Measuring "Post-Change" Emissions

---

[2] Unless otherwise indicated, all citations to 40 C.F.R. § 52.21 are to the 1980 PSD regulations, which govern the claims at issue in this case.

[3] A source's maximum physical capacity to pollute could define its potential to emit, for example where the source does not have legally and practically enforceable limits or where its "limits" do not actually restrict the source's maximum physical capacity. That is not the case here, as the power boilers are subject to a legally and practically enforceable limit that does in fact restrict their maximum physical capacity to pollute. To streamline the argument, this brief assumes that the power boilers' potential to emit is defined by some measure of the boilers' allowable emissions (rather than their maximum physical capacity to pollute) and focuses on whether Westvaco can reduce the boilers' potential to emit <u>below</u> the boilers' allowable emissions.

and Normal Source Operations (Doc. No. 245-6) (asserting that in early 1970s average emissions exceeded 49 tons per day); Luke Mill Continuous Monitoring Report for the period January 1 through March 31, 1990 (attached as Exhibit 1) at WVCO_0043-0452 (indicating that average emissions for the quarter exceeded 49 tons per day).

A source's potential to emit, however, is not necessarily equal to its maximum physical capacity to pollute. The regulations allow a source to limit its potential to emit to something less than its maximum physical capacity, but only under certain circumstances. The regulations effectively create a two-step process for determining potential to emit. In the first step, which tracks with the first sentence of the potential to emit definition, the "maximum capacity" of a source to pollute is determined. *See* 40 C.F.R. § 52.21(b)(4). In the second step, which tracks with the second sentence of the definition, a source may limit its maximum legal capacity to emit (and thus its "potential to emit") – for example by installing air pollution control equipment or restricting hours of operation – <u>but only to the extent the limit is enforceable</u>. *Id.* In the case of the Luke Mill, Westvaco was subject to a legally and practically enforceable limit, which restricted $SO_2$ pollution from the power boilers to 49 tons per day. This 49-ton-per-day limit reduces the power boilers' maximum legal emissions to 49 tons per day. Because any further reductions on the power boilers' emissions were not enforceable, however, the regulations' plain language prohibits the power boilers' "potential to emit" from being less than 49 tons per day (17,885 tons per year).

**B.  EPA's Interpretation Of Its Regulations Is Entitled To Deference**.

To the extent the regulatory language itself leaves any doubt about whether a source like Westvaco can reduce its potential to emit below its allowable emissions, long-standing principles

of administrative law require deference to EPA's interpretation of its regulations.[4] Deference to an agency's reasonable interpretation is required because "Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *United States v. Deaton*, 332 F.3d 698, 711 (4th Cir. 2003) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41 (1996)). To defer to an agency's interpretation as reasonable, a court "need not find that [the interpretation] is the only permissible construction . . . but only that [the agency's] understanding of this . . . statute is a sufficiently rational one to preclude a court from substituting its judgment for [the agency's]." *Deaton*, 332 F.3d at 711 (alterations in original) (quoting *Chem. Mfrs. Ass'n v. Natural Res. Def. Council Inc.*, 470 U.S. 116, 125 (1985)).

Since the day the 1980 PSD regulations were promulgated, EPA has consistently interpreted the regulatory term "potential to emit" to mean a source's maximum physical capacity to pollute or its maximum legal emissions, whichever is less. For example, in the preamble to the 1980 PSD regulations EPA stated that "[p]otential to emit is the maximum design capacity of [a] source, except as constrained by federally enforceable permit conditions." 45 Fed. Reg. 52676, 52680 (col. 2) (Aug. 7, 1980) (relevant excerpts attached as Exhibit 2) (hereinafter referenced as the "1980 Preamble"). The preamble goes on to make clear that a

---

[4] An agency's interpretation of its own regulations is entitled to deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The agency's interpretation is controlling unless unreasoned, plainly erroneous or inconsistent with the regulations. *Stinson v. United States*, 508 U.S. 36, 45 (1993) (agency's interpretation of its regulations must be given controlling weight unless it is plainly erroneous); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413-14 (1945); *Humanoids Group v. Rogan*, 375 F.3d 301, 306 (4th Cir. 2004) (deferring to agency's interpretation that was neither plainly erroneous nor inconsistent with the agency's regulations)*; United States v. Deaton*, 332 F.3d 698, 709 (4th Cir. 2003), *cert. denied*, 541 U.S. 972 (2004).

source's potential to emit cannot be less than its enforceable limits: "a company may receive credit for the application of control equipment *only to the extent that the resulting reduction in emissions is federally enforceable*." 1980 Preamble (Exhibit 2) at 52688 (col. 1) (emphasis added). In other words, "a source installing control equipment that would reduce emissions more than that required by generally applicable emissions limitations *cannot receive credit for the additional increment of pollution reduction, unless it is federally enforceable*." *Id.* (col. 2) (emphasis added).

The Preamble's rejection of Westvaco's "margin of safety" argument is echoed in EPA's 1980 PSD Workshop Manual. In this manual, EPA confirms that a source's potential to emit cannot be less than its allowable emissions:

> Potential to emit . . . is defined as the capability at maximum design capacity to emit a pollutant after air pollution control equipment has been applied, considering all federally enforceable permit restrictions that limit the design capacity utilization, hours of operation, or type or amount of material processed or stored. In the absence of federally enforceable limits, the potential to emit is based on full capacity and year-round continuous operation. Control equipment is incorporated into the potential to emit *only to the degree that resulting emission reductions are federally enforceable*.

PSD Workshop Manual (October 1980) at I-A-3 (emphasis added) (relevant portions attached as Exhibit 3). Indeed, this guidance provides that the potential to emit of a new emissions unit equals the unit's allowable emissions and identifies "federally enforceable allowable emissions limits" as a way of determining post-change potential to emit. *Id.* The guidance cautions that "[t]he only time maximum capacity operation should not be used in potential emissions estimates is if there are enforceable restrictions on a source's ability to emit a pollutant." *Id.* at II-A-10. *See also* 1980 PSD Workshop Manual (Exhibit 3) at II-A-5 (reminding permit writers to verify that a source's potential to emit is based on maximum capacity unless the source has demonstrated that it is subject to enforceable restrictions).

This interpretation has been repeatedly and consistently affirmed by EPA. For example, in a 1989 guidance document EPA was asked whether "the approach of comparing new, allowable emissions to old, actual emissions [was] still appropriate for determining PSD applicability?" *See* Memorandum from John Calcagni to William B. Hathaway, dated Sept. 18, 1989, regarding Request for Clarification of Policy Regarding the "Net Emissions Increase" at p. 3 (attached as Exhibit 4). EPA confirmed that the actual to potential test was the correct method for measuring emissions increases and that post-change potential to emit equals allowable emissions:

> Where the change will affect the normal operations of an existing emissions unit (as in the case of a change which could result in increased use of the unit), "actual emissions" after the change must be assumed to be equal to "potential to emit." . . . . Where "allowable emissions" are the same or less than the [maximum physical capacity to emit] for an emissions unit, "allowable emissions" may be used to define the "actual emissions" of that unit after the change. Consequently, for determining PSD applicability, the comparison of prior "actual" versus new "potential" emissions (or "allowable" where appropriate) is the correct methodology to use.

*Id.*

This interpretation furthers the goals of the Clean Air Act "to protect and enhance an invaluable national resource, our clean air," *Alabama Power Co. v. Costle*, 636 F.2d 323, 344 (D.C. Cir. 1980). The "potential to emit" concept is the cornerstone of many programs under the Clean Air Act, including the PSD program at issue in this case. The term is used to define which sources are subject to the Act's most rigorous requirements and is used (as here) to define which construction projects require pre-construction review and permitting. To define potential to emit as something less than a source's allowable emissions could result in increased air pollution that avoids review and regulation, potentially impairing that priceless public resource, "our clean air." Defining potential to emit as equal to a source's allowable emissions (where the allowable

emissions limit is legally and practicably enforceable) ensures that the full measure of a source's "potential" emissions is accounted for.

Moreover, the interpretation is grounded in sound public policy. Most prudent sources would undoubtedly say that they cannot operate at the very edge of their enforceable limits without running a risk of violating those limits. This just makes common sense. How close a source can operate to its limit, however, varies depending on factors like the stringency of the limit, the cost of complying with the limit, the consequences of non-compliance, the likelihood that a violation will be discovered, and the source's tolerance for risk. In other words, determining a source's "prudent limit"[5] is an imprecise science. A source's legally and practicably enforceable limit (assuming it has one), however, provides a clear, bright line, which can readily be compared to regulatory thresholds and significance levels, bringing certainty and predictability, which benefits both permitting authorities and the regulated community. Using an imprecise and unenforceable "prudent limit" to define potential to emit is not only unsupported by the language of the regulations and directly contrary to EPA's long-standing interpretation of its regulations, but it would add unnecessary complication to the process, increase burden on permitting authorities and the regulated community, and create needless uncertainty.

---

[5] The term "prudent limit" is not used in the PSD program (or any other program designed to protect, preserve, or improve air quality). The United States uses the term as shorthand for Westvaco's argument regarding potential to emit, to mean a source's allowable emissions less some reasonable margin of safety (i.e. a daily rate sufficiently below 49 tons per day to insure no inadvertent violation of the legally enforceable limit).

**C. Even If The Regulations Allowed A Source To Base Its Potential To Emit On Some Notion Of A "Prudent Limit," The Power Boilers' Post-Change Potential To Emit Was Significantly Greater Than The Boilers' Pre-Change Actual Emissions.**

Even if the Court finds the regulations ambiguous, declines to defer to EPA's long-standing interpretation, and instead finds that the power boilers' potential to emit can be based on an imprecise, non-binding "prudent limit," the power boilers' potential to emit was significantly greater (indeed thousands of tons per year greater) than the boilers' actual emissions before the DEP.

Westvaco admits that the power boilers' actual $SO_2$ emissions before the DEP were 12,228.7 tons per year.[6] *See* Responses of Westvaco Corporation to the United States' Third Set of Requests for Admission, No. 17 (relevant portions attached as Exhibit 6) (admitting actual $SO_2$ emissions from power boilers for each month during the baseline period). *See also* Defendant Westvaco Corporation's Answer to Amended Complaint (Doc. No. 16) at ¶ 56 (relevant pages attached as Exhibit 7) (admitting "that in the 24-month period prior to February 1981 [just one month different than the DEP baseline period], actual emissions of sulfur dioxide from the tall stack at the Luke Mill averaged approximately 12,159 tons per year"). This works out to roughly 33 tons per day. At the beginning of the DEP, there was a legally and practically enforceable limit that restricted the amount of $SO_2$ pollution from the power boilers to 49 tons per day. Compliance with this limit has been determined using a CEM. As discussed above, it is this limit that defines the power boilers' potential to emit (as a matter of law and regulatory

---

[6] 1980, which is within the baseline period, was a leap year. According to Westvaco's Continuous Monitoring Reports, on February 29, 1980, Westvaco emitted 38.5 tons of $SO_2$ from the power boilers. *See* Continuous Monitoring Report for January 1 – March 31, 1980 (attached as Exhibit 5) at WVCO_0118-0299. That effectively increased the power boilers' baseline emissions by 19.25 tons (½ of 38.5 tons, since baseline emissions are determined as an annual average over a two-year period), relative to a baseline period that does not include a leap year.

interpretation). But even accepting Westvaco's argument that, as a practical matter, it could not actually emit the full 49 tons per day without risking a violation of the limit itself, there can be no reasonable dispute that there was a significant increase in $SO_2$ pollution following the DEP.

Westvaco argues that while it could legally emit 49 tons per day, it chose to operate with a margin of safety to ensure it did not violate the legal limit. It argues that this margin of safety should be taken into account in determining its potential to emit. Indeed, Westvaco is likely to argue that its "prudent limit" was what it actually emitted before the DEP (i.e. roughly 33 tons per day). This argument, however, is demonstrably untrue. During the baseline period, the power boilers routinely emitted more than 40 tons per day. *See, e.g.,* Continuous Monitoring Report for the period October 1 through December 31, 1980 (attached as Exhibit 8) at WVCO_0110-0298 (reflecting daily emissions as high as 48.6 tons on both October 27 and November 19). While potential to emit is calculated in terms of annual emissions,[7] the limit applicable to the Luke Mill power boilers is a daily limit. Thus, what happens in any given day has no bearing on what might happen in another day. Taken together, this proves that a true "prudent limit" cannot be determined simply by dividing the boilers' total actual annual emissions by 365 days, which is what Westvaco appears to do. That will give you average daily emissions for the year but tells you little about the boilers' true limits. The uncontroverted emissions data shows that the Mill was capable of operating close to the limit, certainly above 40 tons per day, without violating the limit. *Id.* Thus, even under Westvaco's erroneous view of the

---

[7] *See Environmental Defense v. Duke Energy*, 549 U.S. 561, 569 (2007) (noting that 1980 PSD regulations apply to changes that "would increase the actual annual emission of a pollutant above the actual average for the two prior years").

regulations the "prudent limit" on the Luke Mill boilers was significantly greater than the power boilers' actual emissions before the DEP.[8]

Comparing the PSD significance threshold with the power boilers actual emissions before the DEP and allowable emissions afterwards helps illustrate the frivolity of Westvaco's argument. To establish a PSD violation, the United States need only show that annual emissions would increase by 40 or more tons *per year*. *See* 40 C.F.R. § 52.21(b)(23) (defining significance threshold for $SO_2$ as 40 tons per year). That is a tiny fraction of the power boilers' pre-change actual emissions and post-change allowable emissions. Indeed, before the DEP the Mill often emitted more than 40 tons of pollution *in a single day*. *See* Exhibit 8 (Continuous Monitoring Report for the period October 1 through December 31, 1980) at WVCO_0110-0298. The power boilers' potential to emit would only have to increase 0.1 tons per day (approximately 220 pounds) relative to their actual pre-change emissions to exceed 40 tons over the course of a year. That is an increase of less than ⅓ of one percent (0.003). The following bar graph shows how small the PSD significance threshold is relative to the power boilers' baseline actual emissions and post-change allowable emissions.

[8] For the sake of argument, if one generously assumed Westvaco should operate with a 10% margin of safety (in other words aimed to emit no more than 44 tons per day), the power boilers annual emissions would be 16,060 tons per year. This is 3,831.3 tons per year greater than the boilers' pre-change actual emissions. The PSD significance threshold is only 40 tons per year. Literally, one would have to assume that Westvaco could not operate the boilers more than 0.11 tons per day (roughly 220 pounds) more than it actually operated the boilers before the DEP to conclude that there was no significant emissions increase.



To say that the power boilers did not have the "potential to emit" 40 tons more per year than the power boilers actually emitted before the DEP is, simply, not credible.

### D. There Is No Separate And Independent Causation Element That Is Not A Part Of The Actual To Potential Test Itself.

Westvaco will surely argue that even if the United States can show that emissions increased using the actual to potential test that is not enough to show that Westvaco triggered the requirements of the PSD program. Westvaco will argue that in addition to showing an increase, the United States must also show that the increase was "caused" by the DEP. The United States does not dispute that the increase must "result from" the project. Indeed, that's precisely what the regulations say. *See* 40 C.F.R. § 52.21(b)(2)(i) (defining "major modification"). But the United States does not agree that this is a separate, additional requirement. To the contrary, this so-called "causation" requirement is an inherent part of the actual to potential test itself. In other words, the actual to potential test presumes that any emissions increases "result from" the project. *See, e.g.*, Memorandum from John Calcagni to David Kee, dated Aug. 11, 1992, regarding Proposed Netting for Modifications at Cyprus Northshore Mining Corp., Silver Bay,

14

Minnesota at p. 3 (copy attached as Exhibit 9) (explaining that the actual to potential test "in effect, presumes that following the change the source will operate at 100 percent of its physical capacity" unless source obtains enforceable limitations on its maximum physical capacity to emit). To find otherwise would eviscerate the actual to potential test.

The First Circuit's decision in *Puerto Rican Cement* supports the fact that the actual to potential test presumes causation. *See Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir. 1989). In that case, the First Circuit affirmed EPA's use of the actual to potential test to the proposed construction of a new cement kiln. Because the new kiln was more efficient than the older kilns it would replace, the Court found that the new kiln might give the source the economic incentive to increase production. As the Court noted, "this seems the very type of case for which the regulations [requiring the use of the actual to potential test] were written." *Puerto Rican Cement*, 889 F.2d at 298. In other words, the very decision to use the actual to potential test is a recognition that the change at issue is itself significant enough to justify a presumption that the source will use the full capacity of the unit in the future and that the corresponding change in emissions is causally related to the change.

## III.   CONCLUSION

The term "potential to emit" is defined by EPA regulations as a source's "maximum capacity" to pollute as restricted only by <u>enforceable</u> limitations. Under the regulations' plain language, and consistent with EPA's long-standing interpretation, unenforceable reductions in emissions (such as the "margin of safety" argument made by Westvaco here) cannot be used to limit potential to emit.

The Luke Mill power boilers are physically capable of emitting more than 49 tons per day of $SO_2$ pollution. The only legally and practically enforceable limit on $SO_2$ pollution was a

15

then-applicable 49-ton-per-day limit. Thus, as a matter of law, the power boilers' potential to emit equals 49 tons per day – the equivalent of 17,885 tons per year. This is significantly greater than the 12,228.7 tons per year the power boilers actually emitted before the DEP.

But even if potential to emit could be limited by some form of "prudent limit," which would ensure no inadvertent violation of the legal, enforceable limit, the indisputable evidence demonstrates that there was a significant increase in emissions, as Westvaco cannot credibly argue that its "prudent limit" was less than 12,268.7 tons per year (the power boilers' actual emissions before the DEP plus the 40-ton-per-year PSD significance threshold).

Finally, the actual to potential test presumes causation and, thus, under any reasonable interpretation of the term "potential to emit," the United States has established that the DEP was a "major modification" subject to PSD permitting requirements. The only issue remaining is remedy: having shown that Westvaco violated PSD requirements in connection with the DEP, what should Westvaco (and the current owner/operator, the Luke Paper Company) be required to do to remedy this violation?

Respectfully submitted,

ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (PHONE)
Michael.DiPietro@usdoj.gov (EMAIL)

        IGNACIA S. MORENO
        Assistant Attorney General
        Environment and Natural Resources Division


        /s/ Mark C. Elmer
        MARK C. ELMER
        U.S. Department of Justice
        Environment and Natural Resources Division
        Environmental Enforcement Section
        1961 Stout Street, 8th Floor
        Denver, CO 80294
        (303) 844-1352 (PHONE)
        (303) 844-1350 (FAX)
        Mark.Elmer@usdoj.gov (EMAIL)

OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

        *Attorneys for the United States of America*

CERTIFICATE OF SERVICE

      I hereby certify that I electronically filed the foregoing Opening Brief Regarding The Post-Change Potential To Emit Of The Luke Mill Power Boilers on December 22, 2010, using the court's CM/ECF system which sent notification of such filing to:

Charles Harry Haake
Peter Eric Seley
Raymond B. Ludwiszewski
GIBSON DUNN AND CRUTCHER LLP
1050 Connecticut Ave NW
Washington, DC 20036
chaake@gibsondunn.com
pseley@gibsondunn.com

John Jay Range
Mark B. Bierbower
HUNTON AND WILLIAMS LLP
1900 K St NW Ste 1200
Washington, DC 20006
jrange@hunton.com
mbierbower@hunton.com

Howard B. Epstein
Mark Kieran Dowd
Sami B. Groff
SCHULTE ROTH AND ZABEL LLP
919 Third Ave
New York, NY 10022
howard.epstein@srz.com
mark.dowd@srz.com
sami.groff@srz.com

                                              s/ Mark C. Elmer
                                              Mark C. Elmer