# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **CASE NO. MJG 00-CV-2602** |
| **WESTVACO CORPORATION** | |
| **Defendant.** | |

## DEFENDANT WESTVACO CORPORATION'S BRIEF CONCERNING THE PROPER STANDARD FOR DETERMINING POST-CHANGE "POTENTIAL TO EMIT"

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

Pursuant to this Court's November 30, 2010 Order, Defendant Westvaco Corporation ("Westvaco") hereby respectfully submits this brief concerning the method to use to determine post-change "potential to emit."

## I.      Introduction

In this case, the Government asserts that Westvaco's Digester Expansion Project ("DEP") in 1981 constituted a "major modification" that was subject to the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act, and that Westvaco violated the Act in failing to obtain a preconstruction permit for the DEP.  In order to establish liability, the government must show that at the time the DEP was undertaken Westvaco reasonably should have concluded that it was a "physical change … that would result in a significant net emissions increase of any pollutant subject to regulation under the Act."  40 C.F.R. § 52.21(b)(2)(i).

The issue presented in this briefing concerns how the Court should measure the post-change potential to emit sulfur dioxide ("$SO_2$") from the Luke Mill's power boilers for the purpose of determining whether the DEP would result in a significant net emissions increase.  In its Second Phase Decision Re: Baseline Period and Post-Change Emissions Determination (Doc. 252), the Court determined that there appear to be at least three possible measures for determining the Luke Mill's post-change potential to emit: (i) the absolute legal maximum $SO_2$ emissions under the Luke Mill's 49 ton-per-day $SO_2$ cap (49 tons per day times 365 days, which equals 17,885 tons per year); (ii) the maximum physical potential to emit $SO_2$ without accounting for the Luke Mill's $SO_2$ cap; and (iii) a maximum anticipated physical actual rate of $SO_2$ emissions (possibly based upon a daily rate sufficiently below 49 tons of $SO_2$ to insure that there was no inadvertent violation of the cap).

Neither Westvaco nor the government contends that option (ii)—the maximum physical potential to emit SO2 without accounting for the cap—is the appropriate measure for determining post-change potential to emit here.  The government asserts that the proper measure is the absolute legal maximum.  *See, e.g.,* Hearing Transcript at 29:5-8 (Feb. 17, 2010) (arguing that for post-change emissions "you would look at the source's potential to emit as limited by the 49 ton per day cap after the change.")  It is Westvaco's position, however, that because the government must show that the DEP "would result in a significant net emissions increase" under the 1980 PSD Regulations and *Alabama Power Co. v. Castle*, 636 F.2d 323 (D.C. Cir. 1979), the Court must compare the pre-change actual emissions against the maximum annual SO2 emissions that Westvaco anticipated would result from the DEP.[1]  Applying this measure of "potential to emit" is consistent with the PSD Regulations' definition of that term, and properly accounts for the requirement that there be a causal link between the project at issue and a significant net emissions increase.

## II.    Argument

The 1980 PSD Regulations governing this action "require a pre-construction evaluation of whether the change [at issue] 'would result in a significant net emissions increase of any pollutant subject to regulation under the Act.'"  *United States v. Ohio Edison Co.*, 276 F.Supp.2d 829, 863 (S.D.Ohio.2003) (quoting 40 C.F.R. § 52.21(b)(2)(i)).  Accordingly, the inquiry here is

---

[1]  Westvaco continues to believe that the proper measure of the Luke Mill's pre-change and post-change "actual emissions" should be the mill's 49 ton-per-day SO2 emission cap under 40 C.F.R. § 52.21(b)(21)(iii), however, in its prior orders, the Court disagreed.  Nothing in this brief should be viewed as a waiver of that argument.

whether Westvaco's determination that the DEP would not result in a significant net increase in SO2 emissions, and that a PSD permit was therefore not required, "was 'reasonable' under the circumstances existing before the projects." *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.,* 618 F.Supp.2d 815, 831 (E.D. Tenn. 2009) (quoting *Commonwealth of Pennsylvania v. Allegheny Energy*, No. 2:05cv0885, 2008 WL 4960090, *7 (W.D. Pa. Nov. 18, 2008).  Given the unique circumstances of the Luke Mill, which have been outlined in prior briefing, Westvaco's determination was reasonable.

Before the commencement of the DEP, the Luke Mill's SO2 emissions were restricted by a federally-enforceable 49 ton-per-day emissions cap.  That cap was extremely valuable to the mill because it allowed it the flexibility to purchase local coal for use in its power boilers, and the mill therefore maintained a margin of safety below the cap to ensure that it was never violated.  *See* Memorandum of Points and Authorities in Support of Defendant Westvaco Corporation's Motion for Determination of Baseline Emissions (Doc. 235) at 11-12.  The DEP did not have any impact on the mill's emission cap, nor did it alter Westvaco's need to maintain a margin of safety below the cap.  Westvaco therefore reasonably concluded that the DEP would not "result in a significant net emissions increase of" SO2 so as to require PSD permitting.

Despite these facts, the government contends that the DEP required a PSD permit because it believes that an increase in SO2 emissions between the pre-change period and the post-change period should have been anticipated.  The government asserts that the measure of post-change emissions should be the absolute legal maximum the Luke Mill could emit SO2 under the 49 ton-per-day cap (17,885 tons per year)—even though the mill had never operated in that fashion before the DEP, and even though it would not have been expected to operate in that

fashion after the DEP.  Accordingly, because the pre-change actual emissions were more than 40

tons per year lower than this absolute legal maximum, according to the government, a significant

net increase in SO2 emissions should have been a foregone conclusion.

The government's position is incorrect because it is based on an improper construction of

the term "potential to emit," and because its measure for post-change emissions ignores the

causation requirement in the PSD Regulations.  The potential to emit of a source cannot be based

on an unrealistic hypothesized worst-case emissions scenario when the source's history of

operations demonstrates that the source would never be operated in that manner.  *Wisconsin*

*Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"); *Alabama Power Co. v.*

*Costle*, 636 F.2d 323 (D.C. Cir. 1979).  "Rather, the concept [of 'potential to emit'] contemplates

the maximum emissions that can be generated while operating the source ***as it is intended to be***

***operated and as it is normally operated.***"  *WEPCO,* 893 F.2d. at 918 (emphasis added).  Moreover,

measuring post-change potential to emit based on the maximum anticipated actual post-change

emissions gives effect to the requirement in the PSD Regulations that there be a "causal link"

between the modification at issue and the increase in emissions.  *New York v. EPA*, 413 F.3d 3,

32-33 (D.C. Cir. 2005).  Simply comparing the pre-change actual emissions with the Luke Mill's

legal maximum would ignore this causation requirement, because the difference between those

two figures did not result from the DEP.

**A.**      **The Luke Mill's Post-Change Potential To Emit Must Take Into Account**
            **The Mill's Normal Operations, And May Not Assume That Its Emissions**
            **Would Be Equal To Its SO2 Limit.**

The government contends that the measure of the Luke Mill's post-change potential to

emit SO2 should be based on the counter-factual assumption that the mill could and would

operate so as to emit 49 tons of SO2 per day, 365 days per year.  This reading of the 1980 PSD

Regulations, however, was flatly rejected in  *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d

901, 917 (7th Cir. 1990) (WEPCO).  That case held that the term "potential to emit" cannot be

based on an unrealistic hypothesized worst-case emissions scenario, but rather "contemplates the

maximum emissions that can be generated while operating the source as it is intended to be

operated and as it is normally operated." *Id.* at 918.

The government has argued that *WEPCO* held only that the so-called "actual to potential"

test should not be used to calculate emissions increases from a "like kind replacement" project at

an electric utility.  *See* United States' Reply Brief Regarding the Proper Baseline Period and the

Proper Standard for Measuring Post-Change Emissions (Doc. 249) at 25.  Because the DEP was

not a "like kind replacement" at an electric utility, the government argues, *WEPCO* is

inapplicable here.  The government's reading of *WEPCO*, however, is entirely too narrow and

ignores the portion of that court's ruling where it relied on the seminal case of *Alabama Power v.

Costle* to construe the term "potential to emit" in the 1980 PSD Regulations.

The Seventh Circuit in *WEPCO* made two separate and independent holding.  First, the

court held that EPA erred by applying 40 C.F.R. § 52.21(b)(21)(iv)'s "potential to emit" test to

the "like kind replacements" at WEPCO's Port Washington power plant, finding that its

reasoning in doing so was "circular."  *WEPCO*, 893 F.2d at 917.[2]  But in addition to that

---

[2] The court found this reasoning "circular" because "in order to demonstrate that the Port
Washington like-kind replacement project constitutes a modification, the EPA applies the
potential to emit concept (to show an increase in emissions). And in order to apply the
potential to emit concept to like-kind replacement, the EPA assumes that the plant is a

[Footnote continued on next page]

holding, the *WEPCO* court separately found that EPA's construction of the term "potential to

emit" was erroneous in any event.  The court stated:

> ***We are <u>also</u> troubled by the EPA's assumption of continuous operations in calculating <u>potential to emit</u> at the Port Washington plant.***  Although we agree that the EPA cannot reasonably rely on a utility's own unenforceable estimates of its annual emissions, we find no support in the regulations for the EPA's decision wholly to disregard past operating conditions at the plant.

*Id.* (emphasis added).

In *WEPCO*, the government argued that the "potential to emit" test allowed it to calculate

emissions based on the assumption that the WEPCO facility would operate at its full capacity, 24

hours per day, 365 days per year after the modification.  *WEPCO*, 893 F.2d at 916.  The facility

had never operated in this manner before the modification, and the evidence in the record

demonstrated that it would not operate in that fashion after the modification since the changes at

issue were not designed to increase the productivity at the plant.  *Id.*  The Seventh Circuit held

that assuming such a worst-case scenario in determining a source's potential to emit is foreclosed

by both the 1980 PSD Regulations and the D.C. Circuit's decision in *Alabama Power Co. v.*

*Castle*, 636 F.2d 323 (D.C. Cir. 1979).  *Id.* at 917.

> The broad holding of *Alabama Power* is that potential to emit does not refer to the maximum emissions that can be generated by a source hypothesizing the worst conceivable operation.  Rather, the concept contemplates the maximum emissions that can be generated while operating the source as it is intended to be operated and as it is normally operated.

---

[Footnote continued from previous page]
"modified" unit."  *WEPCO*, 893 F.2d at 917.  The government makes a similar circular argument here.

*Id.* at 918 (emphasis added) (quoting *United States v. Louisiana-Pacific Corp.*, 682 F.Supp. 1141, 1158 (D.Colo.1988)); see also *id.* ("*Alabama Power* stands for the proposition that hypothesizing the worst possible emissions from the worst possible operation is the wrong way to calculate potential to emit.").

The *WEPCO* court's reliance on *Alabama Power* is telling because that case did not concern a "like kind replacement" project at an electric utility.  Rather, *Alabama Power* addressed the broad question of EPA's interpretation of the term "potential to emit" in the Clean Air Act.  It is therefore clear that this part of the Seventh Circuit's holding in *WEPCO* is not restricted to only "like kind replacement" projects at an electric utility.  It addresses the broader question of how the term "potential to emit" in the 1980 PSD Regulations should be construed and applied.  There is simply no basis in either the Clean Air Act or the 1980 PSD Regulations for a conclusion that "potential to emit" means one thing for electric utilities and something else for all other sources.

Westvaco is not aware of any case supporting the government's position that "potential to emit" assumes a worst-case scenario where there exists an operational history showing that the source would never be operated in the manner assumed.  None of the cases the government has relied on in the past, *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292 (1st Cir.1989), *States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054 (W.D. Wis. 2001), and *Sierra Club v. Morgan*, 2007 WL 3287850 (W.D. Wisc. 2007), address a circumstance where evidence showed that the source would not operate at its maximum capacity.  Rather, each of those cases concerned modifications that were made at a source to expand its capacity, and there was nothing restricting the plant's ability to increase its emissions of regulated pollutants.  In *Puerto Rican Cement*, for example,

the First Circuit found that EPA could make a reasonable presumption that the introduction of "new, more efficient machinery may lead the firm to decide to increase the level of production, with the result that…overall emissions will increase." *Puerto Rican Cement,* 889 F.2d at 297 (emphasis added).  Similarly, one of the projects at issue in *Sierra Club v. Morgan* was intended to "increase boiler efficiency and decrease the amount of time the boiler needed repair," and thereby "allow the boiler to operate at maximum capacity." *Sierra Club*, 2007 WL 3287850 at *15.

Here, in contrast, the facts demonstrate that the DEP was not anticipated to have any impact on the ability of the Luke Mill's power boilers to emit SO2.  At the time of the DEP, the Luke Mill's SO2 emissions were legally limited by its 49 ton-per-day emissions cap.  The mill did not operate at its absolute legal maximum of 49 tons per day because of its need to maintain a sufficient level of safety below its cap.  Because the Luke Mill reasonably concluded at the time of the DEP that it was operating as close to the SO2 emissions cap as it prudently could, the DEP was not anticipated to result in a net increase in SO2 emissions.[3]  The government cannot ignore these facts and base its determination of post-change potential to emit on the entirely unrealistic assumption that the mill would operate right at its emissions cap every day of the year.  *See, e.g., United States v. Louisiana-Pacific Corp*., 682 F.Supp. 1141, 1158 (D. Colo. 1988) ("it serves no legitimate purpose to test the emissions from a source when that source is

---

[3] As discussed in its prior briefings, personnel from the Luke Mill have testified that the SO2 cap acted as an effective limit on the mill's emissions, and that the mill constantly monitored its SO2 emissions and made real-time adjustments to its operating parameters to ensure that the cap was never in danger of being violated. *See, e.g.,* Hearing Transcript at 1552:1-1553:2 (Aug. 24, 2005) (attached as Exhibit D to January 15, 2010 Declaration of Peter E. Seley (Doc. 235-1)).

being operated in a way it would never be operated in actual practice," even though "it is theoretically possible to operate" in the manner assumed.).  Accordingly, the proper measure of the Luke Mill's potential to emit SO2 after the DEP is the maximum anticipated actual post-change emissions.

**B.     Basing Post-Change Potential To Emit On the Luke Mill's SO2 Limit Would Ignore The Causation Requirement In The PSD Regulations**

Despite the clear direction from *Alabama Power* and *WEPCO* concerning the proper construction of the term "potential to emit" in the Clean Air Act and the 1980 PSD Regulations, the government contends that the Luke Mill's post-change potential to emit must be based on the absolute legal maximum that SO2 could have been emitted from the power boilers per year—in this case 365 times the daily cap of 49 tons of SO2, or 17,885 tons per year.  In essence, the government argues that once it has established that there was any physical change to the Luke Mill's power boilers, then so long as the pre-change actual SO2 emissions were at least 40 tons per year lower than the absolute legal maximum, a PSD permit is required.

The fundamental legal flaw in the government's liability construct is that it writes the causation element out of the Clean Air Act and the PSD Regulations.  Both require that there be "a causal link between the proposed change and any post-change increase in emissions." *New York v. EPA*, 413 F.3d 3, 32-33 (D.C. Cir. 2005) (quoting Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NSR), 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002))  "This 'causal link' is provided by the [Clean Air Act's] statutory definition of 'modification,'" *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 830-31 (E.D. Tenn. 2009).  The Clean Air Act states:

> The term "modification" means any physical change in, or change in the method
> of operation of, a stationary source *which increases* the amount of any air
> pollutant emitted by such source *or which results* in the emission of any air
> pollutant not previously emitted.

42 U.S.C. § 7411(a)(4) (emphasis added).  EPA has consistently conceded that it must establish

that there is a causal link between the physical change at issue and the alleged increase in

emissions.

> The [New Source Review] regulatory provisions require that the physical or
> operational change "result in" an increase in actual emissions in order to consider
> that change to be a modification (see e.g., 40 C.F.R 52.21(2)(i)).  In other words,
> NSR will not apply unless EPA finds that there is a causal link between the
> proposed change and any post-change increase in emissions.

Requirements for Preparation, Adoption and Submittal of Implementation Plans; Approval and

Promulgation of Implementation Plans; Standards for Performance of New Stationary Sources,

57 Fed. Reg. 32,314, 32,326 (July 21, 1992).

Here, the government would have this Court simply presume causation.  Under its theory,

because the mill maintained a level of headspace beneath its SO2 emissions cap that was greater

than the 40 ton-per-year significance threshold, a violation of the PSD Regulations would

become a foregone conclusion once it is determined that there was *__any__* physical change to the

Luke Mill's power boilers—even if the physical change was not anticipated to "result in" any

emissions increase at all.

The flaw in the government's position can be demonstrated by the following

hypothetical.  Assume that in 1981, the Luke Mill installed, for the first time, bright flashing

lights at the top of its power boilers to serve as a warning beacon to low flying aircraft.  This

would be a "physical change" to the boilers, and because it was a one-of-a-time modification it

would likely not fall under the "routine maintenance, repair and replacement" exception to the

10

PSD Regulations.  40 C.F.R § 52.21(b)(2)(iii).  Under the government's theory, one would simply compare the actual emissions from the boilers before the lights were installed to the "potential" 49 ton-per-day (17,885 ton-per-year) emissions after the lights were installed.  Using that test, the installation of the lights would qualify as a "major modification" of the boilers under the PSD Regulations and require the installation of Best Available Control Technology.  This cannot be the correct outcome under the PSD Regulations because it would write the causation element out of Section 111(a)(4) of the Clean Air Act, 42 U.S.C. § 7411(a)(4), and out of 40 C.F.R. § 52.21(b)(2)(i).  The installation of warning lights on the boilers would not "***result in*** a significant net emissions increase" of SO2, and it therefore would have been entirely reasonable for Westvaco to conclude in this hypothetical that the change would not require a PSD permit.

The same is true in the case of the DEP, because the cap that was in place and approved by EPA prevented that project from resulting in a significant net SO2 emissions increase.  The Luke Mill's legal maximum potential to emit SO2 was unchanged by the DEP, and the mill had the same incentive to maintain a safety factor both before and after the DEP.  Before the DEP, the Mill could, in theory, emit 17,885 tons per year of SO2.  However, during the two years prior to the DEP, the Luke Mill never emitted SO2 at this level because it expended significant effort and resources to ensure that there was an adequate margin of safety between the cap and the actual SO2 emitted.  *See* Memorandum of Points and Authorities In Support Of Defendant Westvaco Corporation's Motion For Determination Of Baseline Emissions (Doc. 235) at 11-12.  The DEP had no impact on the manner in which the mill managed its SO2 emissions cap.  PSD permitting, therefore, was not required because Westvaco correctly concluded that the DEP

would not result in anticipated actual SO2 emissions that were 40 tons per year more than the Luke Mill's actual emissions during the two years prior to the DEP.

Measuring post-change potential to emit by reference to the operational history of the mill is entirely consistent with the cases the government has relied upon in its prior briefings, such as *Puerto Rican Cement* and *Sierra Club v. Morgan*.  In each of those cases, there was a direct causal link between the project at issue and the anticipated increase in emissions.  In *Puerto Rican Cement*, for example, the defendant sought to replace older kilns that could only be operated at 60% capacity with a new more efficient kiln that would emit lower levels of pollutants per hour but could be operated at 100% capacity.  The company argued that PSD permitting was not required because its new kiln would emit pollutants at a lower rate than the old kiln, and because the emissions increase calculated by EPA was only from an increase in production rate that is expressly exempt from PSD permitting under 40 C.F.R. § 52.21(b)(2)(iii)(f).[4]  *Puerto Rican Cement*, 889 F.2d at 296-98.  The court disagreed, drawing a distinction between an increase in production that was unrelated to the physical change, and an increase in production that was *caused by* the physical change.  The court found that "there is no logical contradiction in rules that, on the one hand, permit firms using existing capacity simply to increase their output and, on the other, use the potential output of new capacity as a basis for

---

[4] The PSD Regulations provide that "a physical change or change in the method of operation shall not include ... an increase in the hours of operation or in the production rate."  40 C.F.R. § 52.21(b)(2)(iii)(f).

calculating an increase in emissions levels." *Id.* at 298.[5]  Similarly, the court in *Sierra Club v. Morgan* found a PSD violation because the heating plant at issue could not have increased its operations, and thereby increase its emissions, "but for" the physical changes at issue.  *Sierra Club*, 2007 WL 3287850 at *17 n.7.  *See also United States v. Cinergy Corp.*, 458 F.3d 705, 708 (7th Cir. 2006) ("If … a physical change enables the plant to increase its output, then, according to the EPA's interpretation, the exclusion for merely operating the plant for longer hours is inapplicable.").  Here, the DEP did not enable the Luke Mill to emit any more SO2 than it could before that project.

The measure for "potential to emit" that the government seeks impose here would dispense with this causation requirement entirely because it would make a significant net emissions increase of SO2 a foregone conclusion once any physical change is made to the mill. But establishing that PSD applies requires more than simply showing that there was a physical change to the Luke Mill's power boilers and that there was a 40 ton-per-year difference between the pre-change actual emissions and the absolute legal maximum the mill could emit SO2. Rather, the government must show that at the time of its commencement, the DEP "would result in a significant net emissions increase" of SO2.  This requires a comparison between the pre-change actual emissions with the maximum anticipated actual post-change emissions.

---

[5]  In fact, *Puerto Rican Cement* recognized that "a firm introducing such machinery can escape PSD review simply by promising that it will ensure its actual emissions do not in fact increase (that is, by promising that it will not run the machinery at such a rate as to create an actual increase in emissions levels)."  *Id.* at 297.  In effect, the *Puerto Rican Cement* court was noting that an emission limit like the Luke Mill's SO2 cap would result in no need for PSD review.

### III.    Conclusion

For the reasons set forth above, this Court should determine that the proper measure for the Luke Mill's post-change potential to emit is the maximum anticipated actual post-change emissions resulting from the DEP.

Dated: December 22, 2010

Respectfully submitted,

_____/s/_____

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Peter E. Seley (Bar No. 013542)
*pseley@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2010, a true and correct copy of the foregoing

DEFENDANT WESTVACO CORPORATION'S BRIEF CONCERNING THE PROPER

STANDARD FOR DETERMINING POST-CHANGE "POTENTIAL TO EMIT" was filed

using the Court's electronic case filing system, which results in service on all counsel of record

registered on the case management/electronic filing ("CM/ECF") system.


_____/s/_____
Charles H. Haake