

LEXSEE 2010 OHIO. APP. LEXIS 5381

**State of Ohio ex rel. Ohio Attorney General, Plaintiff-Appellant, v. The Shelly Holding Co. et al., Defendants-Appellees.**

**No. 09AP-938**

**COURT OF APPEALS OF OHIO, TENTH APPELLATE DISTRICT, FRANKLIN COUNTY**

*2010 Ohio 6526*; *2010 Ohio App. LEXIS 5381*

**December 30, 2010, Rendered**

**PRIOR HISTORY:** [**1]
 APPEAL from the Franklin County Court of Common Pleas. (C.P.C. No. 07CVH07-9702).

**DISPOSITION:**  Motion denied; judgment affirmed in part and reversed in part; cause remanded.

**COUNSEL:** Richard Cordray, Attorney General, Gregg H. Bachmann and Gary L. Pasheilich, for appellant.

Bott Law Group, LLC, April R. Bott and Sarah H. Herbert; Chester, Willcox & Saxbe LLP, and Sarah Morrison, for appellees.

**JUDGES:** BRYANT, J. BROWN and CONNOR, JJ., concur.

**OPINION BY:** BRYANT

**OPINION**

(REGULAR CALENDAR)

DECISION

BRYANT, J.

   [*P1] Plaintiff-appellant, State of Ohio, through its Attorney General, appeals from a judgment of the Franklin County Court of Common Pleas concluding, in four specific instances, that defendants-appellees did not violate provisions of Ohio's environmental laws and regulations, defendants were exempt from the relevant law, or defendants' violations were limited to the day of testing. Because the evidence and applicable law do not support the trial court's determinations in those four instances, we reverse in part.

**I. Facts and Procedural History**

   [*P2] At the request of the Director of Environmental Protection, the State of Ohio, through its Attorney General, filed an action pursuant to *R.C. 3704.06(B)* and *3734.13(C)* seeking injunctive relief and civil [**2] penalties against defendants-appellees, The Shelly Holding Company, The Shelly Company, Shelly Material, Inc., Allied Corporation, Inc., and Stoneco, Inc., for violations of Ohio's air quality standards. The trial court dismissed The Shelly Holding Company and The Shelly Company as defendants; remaining as defendants are Shelly Materials, Inc., Allied Corporation and Stoneco, Inc. (collectively, "Shelly").

   [*P3] Shelly operates businesses in approximately 75 of Ohio's 88 counties; its operations include limestone, concrete production, rail and water sites, as well as 44 facilities for hot mix asphalt. The state alleged Shelly violated Ohio's environmental laws as described in the complaint's 20 separate counts directed to 27 asphalt plants, 30 portable generators, and one liquid asphalt

terminal, all of which Shelly owned, operated, or both. Shelly stipulated to liability on 32 of the claims in 12 counts of the complaint. After a bench trial, the trial court found Shelly liable on 13 of the 20 counts and assessed a civil penalty in the amount of $ 350,123.52 against Shelly. The state appeals.

## II. Assignments of Error

[*P4] The scope of the action in the trial court was voluminous, including 2,100 [**3] pages of trial transcript. Of the myriad of issues determined in the trial court, Shelly assigns no error; the state assigns only four errors:

> [1]. THE TRIAL COURT ERRED BY INTERPRETING "POTENTIAL TO EMIT" IN A MANNER THAT FAILS TO REFLECT APPLICABLE LAW, WHICH, IN THE ABSENCE OF A FEDERALLY ENFORCEABLE PERMIT, REQUIRES A STATIONARY SOURCE'S POTENTIAL EMISSIONS BE CALCULATED BASED ON THE SOURCE'S MAXIMUM CAPACITY TO GENERATE EMISSIONS.
>
> [2]. THE TRIAL COURT ERRED IN FINDING THAT FUGITIVE EMISSION SOURCES OF AIR POLLUTION AT PLANT # 24 WERE EXEMPT FROM PERMIT TO INSTALL REQUIREMENTS EVEN THOUGH THOSE SOURCES WERE INSTALLED AT A TIME WHEN THEY DID NOT QUALIFY FOR AN EXEMPTION.
>
> [3]. THE TRIAL COURT ERRED IN FINDING THAT DEFENDANTS DID NOT VIOLATE OHIO'S PERMIT TO INSTALL RULES EVEN THOUGH THE DEFENDANTS WERE "OPERATORS" OF THE FUGITIVE EMISSIONS SOURCES AT PLANT # 40 AS DEFINED BY *OHIO ADM.CODE 3745-15*-01.
>
> [4]. THE TRIAL COURT ERRED BY LIMITING EMISSIONS VIOLATIONS TO THE DATE OF THE NONCONFORMING EMISSIONS TEST RESULTS.

## III. Standard of Review

[*P5] The state contends more than one standard of review is involved on appeal, including error as a matter of law in some of the trial court's rulings and, [**4] in other instances, issues invoking a manifest weight of the evidence standard. Shelly similarly acknowledges the issues involved are matters of fact and law. Accordingly, after determining the applicable law, we must assess whether the evidence before the trial court supports the trial court's decision under that law. In examining the facts, we determine whether some competent, credible evidence going to all the essential elements of the case supports the trial court's decision. If so, we will not reverse the trial court's judgment as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578*, syllabus.

## IV. First Assignment of Error -- Potential to Emit

[*P6] The state's first assignment of error contends the trial court erred when it interpreted "potential to emit" in a manner that fails to reflect applicable law. The state's first assignment of error thus concerns the method of calculating an air pollution source's potential emissions, a calculation that forms part of the permitting process.

### A. The Law

[*P7] The primary purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote [**5] the public health and welfare and the productive capacity of its population." *42 U.S.C. 7401(b)(1)*. To achieve these goals, Congress instructed the United States Environmental Protection Agency ("USEPA") to develop limits on various pollutants, known as National Ambient Air Quality Standards ("air quality standards"). *42 U.S.C. 7409*. The Clean Air Act requires states to create plans, known as "state implementation plans," ("state plan") to implement, maintain and enhance the air quality standards. *42 U.S.C. 7410(a)(1)*. A state plan is charged with bringing areas into attainment with the air quality standards. (Tr. 63.) Once the USEPA has approved a state's plan, the state is authorized to administer it. (Tr. 61-64.) The USEPA approves a state plan if it is both adopted after reasonable

notice and hearing and is substantively adequate to attain and maintain air quality standards. *42 U.S.C. 7410(a)(2).*

**B. Types of Permits**

[*P8] In accord with federal parameters, *R.C. 3704.03(E)* creates a system where regulated entities may apply for a permit to discharge air pollutants. Once a permit is received, the owners or operators of the air pollution source are required to self-report on a regular schedule [**6] pursuant to the permit terms. Although the pertinent law changed beginning June 30, 2008, the law applicable to the facts here separated permits for air emissions sources into two categories. One category requires an installation permit, referred to as a permit to install or "PTI," before construction of an air pollution source begins. A PTI contains emission restrictions based on a source's potential to emit. The other is an operating permit, either a Title V permit for larger sources or a permit to operate or "PTO" for smaller sources, that allows operation of a source on a ongoing basis. A Title V permit covers an entire facility and all the air pollution sources at the facility, while a PTO is needed for each individual air pollution source. (Tr. 77-78.)

**C. The Trial Court's Decision**

[*P9] The state alleged Shelly violated applicable law when its facilities emitted air contaminants without Shelly's first obtaining the necessary PTIs. The trial court recognized the central issue in resolving the state's contentions and determining the appropriate fine was how to define the term "potential to emit." The court noted *Ohio Adm.Code 3745-31-01(VVVV)* defines it as "the *maximum capacity* of an [**7] emission unit or stationary source to emit an air pollutant under its physical and operational design." (Emphasis added.) (Decision at 24.) The trial court, however, aptly recognized a plant may have "physical or operational limitation[s] on the capacity of the emissions unit or stationary source to emit an air pollutant, * * * including air pollution control equipment and *restrictions on hours of operation* or on the type or amount of material combusted, stored or processed * * *." (Emphasis added.) (Decision at 24.)

[*P10] As the trial court noted, "[t]he State focuses on the language 'maximum capacity,'" calculating the "emissions from a source by assuming that the source is being operated 24 hours a day, 365 days a year." (Decision at 24.) "Conversely," the court stated, "Shelly makes the same calculation by using the number of hours that source is operating. These restrictions on hours of operation are included in the various permit applications, the purpose of which is to avoid the Title V threshold." (Decision at 24.) The trial court acknowledged the state would respond "that until the operating permit with the restricted hours of operation is approved, the [potential to emit] must [**8] be calculated assuming operation is 24 hours per day, 365 days a year." (Decision at 24.) The trial court decided that "[i]f the State's conclusion regarding the formula for calculating [potential to emit] is correct, then by definition, most if not all of the Fifth Claim must be decided for the State." (Decision at 24.)

[*P11] Determining the definition of potential to emit in *40 C.F.R. 52.21(b)(4)* is the same as Ohio law, the trial court applied it to this case, noting both parties utilized the same formula to calculate potential to emit. As the court recognized, resolution of the parties' differences lies in whether limitation in operations may be incorporated into the PTI formula or whether, absent limits that are only federally enforceable, potential to emit must be calculated at worst case conditions, which is operating at 24 hours per day, 365 days per year or 8,760 hours per year.

[*P12] Relying on *Alabama Power Co. v. Costle (C.A.D.C.,1979), 636 F.2d 323, 204 U.S. App. D.C. 51*, and *United States v. Louisiana-Pacific Corp. (D.Colo.,1988), 682 F.Supp. 1141*, to interpret the phrase "potential to emit" under the Clean Air Act, the trial court determined potential to emit contemplates the maximum emission that can [**9] be generated operating the source as it was intended to be operated. The trial court concluded the state's assumption that Shelly operated any of its plants or generators 24 hours a day, 365 days per year defied common sense.

[*P13] In *Alabama Power*, industry groups disputed the USEPA's 1978 regulations that targeted Prevention of Significant Deterioration of air quality in "clean air areas," challenging the USEPA's interpretation of "potential to emit." At that time, the USEPA defined "potential to emit" as "the projected emissions of a source when operating at full capacity, with the projection increased by hypothesizing the absence of air pollution control equipment designed into the source." *Alabama Power at 353*. After examining the statutory language and the legislative history of *section 169* of the Clean Air Act, the court determined the USEPA should calculate

potential to emit using a facility's design capacity, which includes a facility's maximum productive capacity and takes into account the anticipated functioning of the air pollution control equipment designed into the facility.

[*P14] In *Louisiana-Pacific*, the USEPA filed a civil enforcement action for violations of regulations dealing [**10] with Prevention of Significant Deterioration in air quality standards. The defendant responded with a summary judgment motion that argued the conditions in the state permits should be considered in determining the potential to emit. According to the defendant, the plants at issue could not be classified as major stationary sources because the conditions set forth in the state permits limited each plant's output to levels well below the threshold levels of a major stationary source. The issue resolved to whether the conditions in the state permit were federally enforceable and should be considered a design limitation for purposes of determining the potential to emit.

[*P15] The district court concluded the state permits did not exist at the time of the alleged violations because, even though a Prevention of Significant Deterioration permit had to be applied for and obtained prior to construction of a stationary source, the defendant commenced construction before the permits were issued. The district court also determined the definition of potential to emit in *40 C.F.R. 52.21(b)(4)*, at that time, was "the maximum capacity of a stationary source to emit a pollutant under its physical and operational [**11] design." In denying summary judgment, the district court determined any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment, restrictions on hours of operation, or on the type or amount of material combusted, stored, or processed, would be treated as part of its design if the limitation or the effect it would have on emissions were federally enforceable, but not to include a blanket restriction on actual emissions. See *United States v. Louisiana-Pacific (D.Colo.,1987), 682 F.Supp. 1122*.

[*P16] After a trial, the district court reiterated that restrictions the state imposed in or pursuant to its state plan were federally enforceable. See *Union Elec. Co. v. E.P.A. (C.A.8, 1975), 515 F.2d 206, 211*, affirmed, *427 U.S. 246, 96 S. Ct. 2518, 49 L. Ed. 2d 474*; *Friends of the Earth v. Carey (C.A.N.Y.1976), 535 F.2d 165, 171, n.6*, cert. denied, *434 U.S. 902, 98 S. Ct. 296, 54 L. Ed. 2d 188*; *Friends of the Earth v. Potomac Elec. Power Co. (D.C.D.C.1976), 419 F.Supp. 528, 533*. With that premise, the district court held restrictions contained in state permits which limit specific types and amounts of actual emissions are not properly considered in determining a source's potential to emit, but [**12] federally enforceable permit provisions that restrict hours of operation or amounts of material combusted or produced are properly included in the calculation.

**D. The Appeal**

[*P17] The state on appeal argues the trial court misapplied both *Alabama Power* and *Louisiana-Pacific*. *Alabama Power* found fault with the USEPA's regulations that based potential to emit on "uncontrolled emissions," because the regulations at that time completely discounted the impact air pollution control equipment would have on a source's emissions. After that decision, the state notes, the concept of potential to emit evolved to include pollution control equipment, on which Ohio's EPA based its potential to emit analysis. Similarly, the state argues the trial court incorrectly applied the facts of *Louisiana-Pacific* to the maximum capacity of an emissions source under the potential to emit definition in *Ohio Adm.Code 3745-31-01(VVVV)*, since the *Louisiana-Pacific* potential to emit calculations involved emissions sources that were operated outside of the design specifications. Shelly asserts the court properly applied the cases, both of which validate limitations imposed on the equipment at issue and thus define maximum [**13] capacity.

[*P18] Both parties' arguments are correct to some extent. Both appropriately agree the potential to emit is based on maximum capacity; both appropriately agree limitations on the potential to emit may be considered in determining potential to emit. They, however, disagree about the nature of the limitations properly considered in determining potential to emit.

[*P19] As the trial court properly recognized, potential to emit is defined in *Ohio Adm.Code 3745-31-01(VVVV)* as "the maximum capacity of an emissions unit or stationary source to emit an air pollutant under its physical and operational design." According to the rule, "[a]ny physical or operational limitation on the capacity of the emissions unit or stationary source to emit an air pollutant, * * * including air pollution control equipment and restrictions on hours of operation or on the type or amount of material

combusted, stored or processed, shall be treated as part of its design" when "the limitation or the effect it would have on emissions is federally enforceable or legally and practicably enforceable by the state. Secondary emissions do not count in determining the potential to emit of a stationary source." See also *Ohio Adm.Code 3745-77-01(BB)* [**14] (defining potential to emit to be substantially similar to *Ohio Adm.Code 3745-31-01(VVVV)*). An examination of the USEPA's and the courts' struggle over the years to define potential to emit is instructive in resolving the parties' dispute and interpreting Ohio's definition of potential to emit.

[*P20] The USEPA initially defined potential to emit to exclude even emissions-reducing equipment; *Alabama Power* rejected that definition. The USEPA then proposed to define potential to emit to take into account air pollution control equipment, but not operational restraints. When the final version of the regulation was issued in 1980, it provided operational restraints could limit potential to emit, but only if they were federally enforceable or the Administrator could enforce them. *45 Fed.Reg. 52,737*.

[*P21] In describing "physical or operational limitation," the regulation refered to (1) air pollution control equipment, (2) restrictions on hours of operation, and (3) restrictions on the type or amount of material combusted, stored, or processed. Id. The USEPA provided guidance regarding the regulation, explaining "potential to emit for all sources means the ability at maximum design capacity to emit air [**15] pollution, taking into account any *in-place* control equipment." *(Emphasis sic.) 45 Fed.Reg. 52688*. The USEPA also noted the new definition provided that "specific permit conditions" resulting in "infrequent operation" properly were considered in determining potential to emit. *45 Fed.Reg. 52688*-89.

[*P22] The requirement of federal enforceability was deemed necessary to ensure sources "will perform the proper operation and maintenance for the control equipment." *45 Fed.Reg. 52688*. Following litigation challenging the rule and subsequent amendments, the final rule, issued in 1989, defined "federal enforceability" limitations as those the administrator could enforce, including state constraints imposed under federally approved plans. See *54 Fed.Reg. 27,274, 27,285-6*. As a result of 1990 amendments to the Clean Air Act, the USEPA interpreted potential to emit to require limitations be federally enforceable, meaning "all limitations that are enforceable by the Administrator and citizens under the Act or that are enforceable under other statutes administered by the Administrator." *Natl. Mining Assn. v. United States E.P.A. (C.A.D.C., 1995), 59 F.3d 1351, 313 U.S. App. D.C. 363*, quoting *54 Fed.Reg. 12, 433*.

[*P23] While the USEPA [**16] worked to define potential to emit, the courts considered various versions of the applicable rules. In 1983, the D.C. Circuit Court of Appeals addressed section 120 of the Clean Air Act, as amended in 1977, and the definition of potential to emit in the USEPA's regulations as it relates to major stationary sources. See *40 C.F.R. 66.3(j)*; *Duquesne Light Co. v. E.P.A. (C.A.D.C.1983), 698 F.2d 456, 225 U.S. App. D.C. 290*. At that time, the regulations defined potential to emit as "the capability at maximum design capacity to emit a pollutant after the application of air pollution control equipment." According to the regulation, annual potential would "be based on the larger of the maximum annual rated capacity of the stationary source assuming continuous operation, or on a projection of actual annual emission." The rule allowed "[e]nforceable permit conditions on the type of materials combusted or processed" to "be used in determining the annual potential." *40 C.F.R. 66.3(k)*. In *Duquesne*, the court upheld the USEPA's definition of potential to emit, concluding determinations of whether a source is major are not based upon actual emissions from day-to-day operations, but on a source's maximum design capacity.

[*P24] [**17] The Seventh Circuit Court of Appeals addressed a related issue in 1990 when the Wisconsin Electric Power Company ("WEPCO") filed suit challenging the USEPA's application of the Clean Air Act and related standards to WEPCO's Port Washington electric power plant. Based upon the increase in emissions, the USEPA concluded WEPCO's proposed renovations to the electric power plant would subject the plant to such standards. WEPCO contended the proposed renovations constituted routine maintenance, repair, and replacement, rendering the standards inapplicable. In determining whether emissions would increase, the USEPA calculated potential to emit assuming continuous operations, because the plant could potentially operate continuously even though it had not done so in the past. The court agreed the USEPA could not reasonably rely on a utility's unenforceable estimates of its annual emissions, but also concluded the USEPA could not ignore past operating conditions and assume continuous

operations when calculating potential to emit. The court ultimately set aside the USEPA's determination that WEPCO's renovations constituted a modification for purposes of Prevention of Significant Deterioration [**18] in air quality standards. See *Wisconsin Elec. Power Co. v. Reilly (C.A.7, 1990), 893 F.2d 901*.

[*P25] In an effort to more clearly define potential to emit, the USEPA issued a Guidance Memorandum on January 25, 1995 to clarify what constitutes a federally enforceable constraint on a source's potential to emit ("Seitz Memorandum"). The Seitz Memorandum outlined options a state could employ to allow sources to avoid classification as a major source under Title V and *section 112* of the Clean Air Act, but recognized constraints used to limit a source's potential to emit as valid only if the constraint were federally and practicably enforceable. (Seitz Memo at 2.)

[*P26] According to the Seitz Memorandum, "two separate fundamental elements that must be present in all limitations on a source's potential to emit. First, EPA must have a direct right to enforce restrictions and limitations imposed on a source to limit its exposure to Act programs." The "requirement is based both on EPA's general interest in having the power to enforce 'all relevant features of [state plans] that are necessary for attainment and maintenance of [air quality standards] and [Prevention of Significant Deterioration] increments' [**19] (see *54 FR 27275*, citing *48 FR 38748*, August 25, 1983)" and on "the specific goal of using national enforcement to ensure that the requirements of the Act are uniformly implemented throughout the nation (see *54 FR 27277*). Second, limitations must be enforceable as a practical matter." (Seitz Memo at 2.) Under the Seitz Memorandum, the USEPA considered a state operating permit federally enforceable if the program were approved into the state plan, imposed legal obligations to conform to the permit limitations, provided for review and an opportunity for the public's and the USEPA's comment, and ensured no relaxation of otherwise applicable federal requirements. (Seitz Memo at 3.)

[*P27] Meanwhile, the General Electric Company, the National Mining Association and other trade associations challenged the USEPA's 1990 Clean Air Act amendments directed to identifying major sources of hazardous air emissions and subjecting them to stricter emissions controls. *Natl. Mining*. One issue questioned whether the USEPA exceeded its authority in considering only federally enforceable emission controls to calculate the site's potential to emit for purposes of determining whether the site was a major source. [**20] *Natl. Mining* held "effective" controls should be taken into account in assessing a source's potential to emit, even if the controls are not federally enforceable, but stated the "EPA clearly is not obliged to take into account controls that are only chimeras and do not really restrain an operator from emitting pollution." *Id. at 1362*. Rather, the controls need to be "demonstrably effective" to be a properly considered limit. *Id. at 1364*. As the court explained, the controls must stem from state or local or federal governmental regulations, not merely "operational restrictions that an owner might voluntarily adopt." *Id. at 1362*. See also *Ogden Projects, Inc. v. New Morgan Landfill Co., Inc. (E.D.Pa.,1996), 911 F.Supp. 863*. See also *Natl. Mining Assn. v. EPA*, No. 95-1006 (D.C.Cir. Jan. 2, 1996) (unpublished order) (denying a motion to enforce a mandate to vacate the USEPA's definition of potential to emit since the *Natl. Mining* court had not vacated the rule).

[*P28] In 1995, the plaintiffs in *Chemical Mfrs. Assn. v. E.P.A. (C.A.D.C.,1995), 70 F.3d 637, 315 U.S. App. D.C. 76* directly challenged the definition of "potential to emit" in the USEPA regulations, where the USEPA defined "potential to emit" to exclude controls [**21] and limitations on a source's maximum emissions capacity unless those controls were federally enforceable. *Chemical Mfrs.* vacated the regulations and remanded the case to the USEPA for reconsideration in light of *Natl. Mining*.

[*P29] In response to *Natl. Mining* and *Chemical Mfrs.*, the USEPA in its Interim Policy of Federal Enforceability, effective January 22, 1996, planned to propose rulemaking amendments in the spring of 1996. The USEPA's final rule, issued on December 31, 2002, revised federal regulations governing the New Source Review programs mandated under parts C and D of title I of the Clean Air Act, and while it still included federal enforceability, it also encompassed "legally enforceable."

[*P30] In addressing enforceability, the USEPA stated "[a] requirement is 'legally enforceable' if some authority has the right to enforce the restriction." (EPA Final rule, Dec. 31, 2002, 11-12, *67 FR 80186*-01, footnotes omitted.) "Practical enforceability for a source-specific permit will be achieved if the permit's provisions specify: (1) [a] technically-accurate limitation

and the portions of the source subject to the limitation; (2) the time period for the limitation (hourly, daily, monthly, [**22] and annual limits such as rolling annual limits); and (3) the method to determine compliance, including appropriate monitoring, recordkeeping, and reporting." Id. "For rules and general permits that apply to categories of sources, practicably enforceability additionally requires that the provisions: (1) [i]dentify the types or categories of sources that are covered by the rule; (2) where coverage is optional, provide for notice to the permitting authority of the source's election to be covered by the rule; and (3) specify the enforcement consequences relevant to the rule." Id. " 'Enforceable as a practical matter' will be achieved if a requirement is both legally and practically enforceable." Id.

[*P31] By contrast, the USEPA defined federal enforceability to mean "that not only is a requirement practically enforceable, as described above, but in addition, 'EPA must have a direct right to enforce restrictions and limitations imposed on a source to limit its exposure to [Clean Air] Act programs.'" Id. The USEPA, however, acknowledged "that, for [**23] computing baseline actual emissions for use in determining major [New Source Review] applicability or for establishing a [plantwide applicability limitation]," the requirements of "legally enforceable" must be considered. Id.

[*P32] "Federally enforceable" is also defined in *Ohio Adm.Code 3745-31-01(QQ)* and "means all limitations and conditions" the administrator of the USEPA can enforce, "including those requirements developed pursuant to 40 CFR Parts 60, 61 and 63, requirements within the [state] plan that implements the requirements of the Clean Air Act," as well as "any permit requirements designated as federally enforceable established pursuant to *40 CFR 52.21* or under regulations approved pursuant to 40 CFR Part 51, Subpart I." Among those included in the latter category are "operating permit requirements designated as federally enforceable issued under an United States environmental protection agency-approved program that is incorporated into the [state] plan and expressly requires adherence to any permit issued under such program."

[*P33] In light of the history of attempts to define potential to emit, coupled with the definition of potential to emit in the Ohio Administrative Code, the [**24] state's contention that any limitations must be federally enforceable is not correct; the administrative code provisions include both "federally enforceable" or "legally and practicably enforceable by the state." See *Ohio Adm.Code 3745-77-01(DD) and 3745-77-01(BB)*. The remaining issue is whether a source owner's self-imposed limits, placed in a permit application, are acceptable limits for determining potential to emit.

[*P34] Although the limits do not have to be federally enforceable, the limits must stem from a state, local or federal governmental regulation and not merely "operational restrictions that an owner might voluntarily adopt." *Natl. Mining, 59 F.3d at 1362* (noting the limitations cannot be "chimeras"). *WEPCO, supra* (stating the USEPA cannot reasonably rely on a company's own unenforceable estimates of its annual emissions). Similarly, *Louisiana-Pacific* does not dictate the source to be tested as it would be used. Rather, *Louisiana-Pacific* held the potential to emit regulations require a source to be tested and operated as it was designed to be operated, with its air pollution control equipment, at maximum capacity throughout the test.

[*P35] If limits on a potential to emit are not [**25] federally enforceable, the administrative code provisions require the state to be able to legally and practicably enforce the limits. Accordingly, the limitation must be one an authority has the right to enforce, must be technically accurate, and must specify a time period and compliance method. The administrative definition of potential to emit and the court interpretations of it require an element of agency enforceability; an owner's voluntary restriction is insufficient. Even if the potential to emit can be calculated based on past operating conditions for a PTO, as in *WEPCO*, no past operating conditions exist for a PTI because the permit is applied for before construction of a source begins. In that case, maximum capacity must be 8,760 hours because no enforceable limits are yet in place, unless the source has air pollution control that may be treated as part of the design. See *Alabama Power*; *Ohio Adm.Code 3745-31-01(VVVV)*.

[*P36] In light of the historical underpinnings in defining potential to emit, Shelly's argument to some extent mixes the concepts of actual emissions with that of potential to emit, or at least potential actual emissions. While PTIs address the potential to emit and [**26] control operation of the source, a PTO addresses actual operation of the source. Shelly presented evidence it applied for PTOs that the Ohio EPA failed to either grant

or deny.

[*P37] According to *Ohio Adm.Code 3745-31-06* and *R.C. 3704.034*, the Ohio EPA must issue or deny a PTI or PTO within 180 days after determining that an application is complete. The Ohio EPA has not always acted timely upon the applications. Robert Hodanbosi, the chief of Ohio EPA's Division of Air Pollution Control testified that for a long period of time, the PTO program was a "low priority" for the Ohio EPA and the Ohio EPA was "backlogged" with permit applications for years. (Tr. 1597-98.) For example, the parties stipulated that Shelly applied for a PTO for Plant 24 on March 17, 2004, within months of its PTI being issued, and the Ohio EPA has never acted upon the application. See Stip. 24aa and 24cc. The fact that the Ohio EPA has not acted upon applications should not be held against an owner or operator. After the 180-day deadline has passed, the burden falls upon the Ohio EPA to perform its obligation under law; an owner cannot be penalized for the Ohio EPA's failure. Nonetheless, evidence before the trial court [**27] suggested sources do not aggressively pursue PTOs because PTIs set the boundaries of legal operation of the source. Indeed, 2008 amendments to the environmental laws eliminated PTOs.

[*P38] In any event, the state sued Shelly for violations of Ohio's permit statutes and regulations. Although Shelly raised the issue of PTOs in the trial court, it did not argue the requested PTOs would vary the terms of its PTI applications on which the state premises its complaint, possibly explaining Shelly's decision not to pursue more vigorously issuance of the requested PTOs. Nor does Shelly point to statute, regulations or case law that suggests a PTI does not set continuing required limitations for operating a source in compliance with environmental law. While the Ohio EPA's delays on Shelly's requested PTOs cannot be condoned, Shelly failed to present a basis to conclude the delay prejudiced it.

[*P39] In the final analysis, a source's potential to emit must be based on maximum design capacity in accord with *Ohio Adm.Code 3745-31-01(VVVV)*. See *Alabama Power* (noting an emitting facility is "major" within the meaning of *section 169*, only if it either (1) actually emits the specified annual tonnage of any air [**28] pollutant, or (2) has the potential, when operating at full design capacity, to emit that statutory amount). *Id. at 353*; *Duquesne at 474* (stating, "[t]he very term itself-'potential to emit'-is clear indication that Congress did not intend determinations of whether a source is 'major' to be based on actual emissions in day-to-day operations"). See also CDR 7-1000-1112 (specifying " 'Potential to Emit' means the maximum capacity of a stationary source to emit nitrogen oxides under its physical and operational design and maximum operating hours (8760 hours/year) before add-on controls" so that "[a]ny physical or operational limitation on the capacity of the source to emit nitrogen oxides before add-on controls, such as restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design, if the limitation or effect it would have on emissions is state and federally enforceable"); N.J.A.C. 7:27-16.1.

[*P40] Accordingly, the state errs to the extent it suggests any design limitation on the potential to emit must be federally enforceable. *Ohio Adm.Code 3745-31-01(VVVV)* permits other terms of enforceability. Similarly, Shelly [**29] errs to the extent it contends the potential to emit may be determined based on voluntary restrictions a source owner places on the source's hours of operation that fall outside the design capacity as defined in *Ohio Adm.Code 3745-31-01(VVVV)*. Because the trial court, in adopting Shelly's argument, allowed Shelly to use limits to determine its potential to emit that were not federally enforceable or legally and practicably enforceable by the state, we sustain the state's first assignment of error to the extent indicated and remand this matter to the trial court to recalculate potential to emit and reconsider, consistent with *R.C. 3704.06*, the fourth, fifth, and sixth claims for relief regarding liability and civil penalties.

**V. Second Assignment of Error -- Fugitive Emissions**

[*P41] The state's second assignment of error contends the trial court erred in concluding the sources of the fugitive emissions from Shelly's Plant 24 were installed at a time that exempted them from complying with *Ohio Adm.Code 3745-31-02(A)*'s requirement for a PTI.

[*P42] *R.C. 3704.05(A)* provides that no person shall cause, permit, or allow emission of an air contaminant in violation of any rule the director of environmental [**30] protection adopts. *Ohio Adm.Code 3745-31-02(A)* provides "no person shall cause, permit, or allow the installation of a new source of air pollutant without first applying for and obtaining a Permit to Install

from Ohio EPA" unless an exemption pursuant to *Ohio Adm.Code 3745-31-03* applies. Although Plant 24 had 11 emissions sources, at issue are only the fugitive emissions. *Ohio Adm.Code 3745-31-01(SS)* defines "fugitive emissions" as "those emissions that cannot reasonably pass through a stack, chimney, vent or other functionally equivalent opening." The specific operations, property, or equipment constituting the fugitive emissions units ("F-sources") at Plant 24 were (1) F004, material unloading, (2) F005, stone crushing, (3) F006, crushed stone screenings, (4) F007, conveying and handling crushed stone, (5) F008, storage pile load-in and load-out, and (6) F009, material loading. (State's Ex. 347.)

[*P43]  *Ohio Adm.Code 3745-31-01(UUU)* declared an effective date of January 1, 1974 for Ohio's PTI program. Sources installed and operating before that date are called existing sources and are exempt from the required PTI, unless the sources were modified; an existing source would need only a PTO. [**31]  The parties stipulated Shelly operated Plant 24, a hot mix asphalt plant, but not the F-sources, pursuant to a July 10, 1981 PTI and renewal PTOs issued beginning in 1987. Shelly first applied for a PTI for the F-sources at the quarry on June 22, 2000.

[*P44]  The complaint alleges that because Shelly installed the F-sources on April 1, 1997 and the PTI was issued on September 21, 2000, Shelly operated those sources of air pollutants without the required PTIs during the interim. The state on appeal contends that since the parties stipulated Plant 24's F-sources began their operation in 1974, a date necessarily after the January 1, 1974 effective date of the PTI rules, the record does not support the trial court's factual determination that the F-sources are exempt.

[*P45]  Shelly submitted a PTI modification application form on June 22, 2000 identifying "commence construction date (month/year)" as "1974." (State's Ex. 348; Stip. 24q.) Shelly's vice president, Larry Shively, testified Plant 24's F-sources existed and were constructed "probably back in the 1970s" but the Ohio EPA did not tell Shelly a PTI was necessary. According to Shively, Shelly applied for the F-source PTI in 2000, despite the pre-existing [**32]  F-sources, because the F-sources were a "gray area." (Tr. 1676.) Shively explained that, although "the asphalt plant uses the roadways and uses the stockpiles to manufacture the hot mix asphalt * * * they're part of the aggregate operation.

So how and when it actually becomes the asphalt plant's responsibility has somewhat been a little bit confusing for the industry. So we felt to be safe and to cover all bases that we would file it with our plant." (Tr. 1676.)

[*P46]  Shively's testimony does not support the trial court's finding. Although Shively stated the F-sources came into being "probably back in the 1970's," his testimony lacks sufficient specificity to establish a start-up date before January 1, 1974. *Buckeye Forest Council v. Div. of Mineral Resources Mgt., 7th Dist. No. 01 BA 18, 2002 Ohio 3010, P11,* citing *State ex rel. Natl. Broadcasting Co., Inc. v. Cleveland (1988), 38 Ohio St.3d 79, 83, 526 N.E.2d 786* (noting "[t]he general rule is that the party asserting a statutory exemption is required to prove the facts warranting application of the exception"). Indeed, due to the ambiguity of his testimony, speculation would be required to ascertain a pre-1974 startup date, especially in light of the [**33]  remaining evidence that includes Shelly's application form to which the parties stipulated. See State's Ex. 348; Stip. 24q, r. (stating the "commence construction date" was "1974" and the "Initial Startup Date" was "1974," not December 31, 1973). Because the only evidence, apart from Shively's testimony, indicates the F-sources were installed and operating in 1974, after the effective date of the PTI requirements, the trial court erred in concluding the F-sources were exempt from PTI requirements.

[*P47]  The evidence regarding modifications between 1974 and 2000 is less than clear, but suggests a possible modification date of 1996. See 2000 PTI Application (noting a "Most Recent Modification Date of 1996 for new plt"). The 2000 application does not identify any further modifications, and the trial court concluded any modifications were to the plant, not the F-sources. Given the uncertainty of the evidence, we cannot say those findings are against the manifest weight of the evidence.

[*P48]  Accordingly, Shelly was required to have a PTI for the F-sources at Plant 24 because it was not exempt as existing prior to the PTI requirements. The Ohio EPA issued a PTI for the F-sources at Plant 24 on September [**34]  21, 2000. Stip. 24u; State's Ex. 347. The complaint, at paragraph 179, states the F-sources were installed on April 1, 1997, even though no evidence supports such an installation date. Nonetheless, because the trial court advised it would not allow the complaint to be amended to conform to the evidence, the state may not

seek penalties back to 1974 but are limited to the installation date alleged in the complaint. As a result, even though the state demonstrated Shelly operated the six F-sources in violation of *Ohio Adm.Code 3745-31-02(A)* by operating without a PTI from 1974, the state's complaint, coupled with the trial court's ruling on complaint amendments, means the date for computation of damages begins with the installation date set forth in the complaint and runs until September 21, 2000, the date a PTI was issued. Accordingly, we remand this matter to the trial court with instructions to enter judgment in the state's favor and award civil penalties for the number of days that each of the six F-sources violated *Ohio Adm.Code 3745-31-02(A)* from April 1, 1997 to September 21, 2000. The state's second assignment of error is sustained.

## VI. Third Assignment of Error -- Operation of [**35] Plant 40

[*P49] The state's third assignment of error contends the trial court erred in determining Shelly did not violate Ohio's PTI rules at Plant 40, since Shelly was an "operator" of the fugitive emissions sources at that plant. See *Ohio Adm.Code 3745-15-01*(defining "operator").

[*P50] Plant 40, located in Greenfield, Ohio in Highland County, just northeast of Cincinnati, was a 250-ton per hour hot mix asphalt plant. (Stip. 40a and 40b; Tr. 989-990.) The state alleged Shelly operated a source of air contaminants without a PTI for four emissions sources consisting of P901, a 250-ton per hour asphalt plant and three F-sources of particulate matter: F001, roadways and parking areas, F002, storage piles, and F003, raw material handling. At issue on appeal are the F-sources. As in the second assignment of error, the state alleged Shelly operated the F-sources from installation until July 1, 2003 without a PTI, in violation of Ohio's PTI statutes and regulations. See *R.C. 3704.05(A)* (providing no person shall cause, permit, or allow emission of an air contaminant in violation of any rule the director of environmental protection adopts) and *Ohio Adm.Code 3745-31-02(A)* (providing "no person shall cause, [**36] permit, or allow the installation of a new source of air pollutant without first applying for and obtaining a Permit to Install from Ohio EPA").

[*P51] For purposes of *R.C. 3704.05(A)* and *Ohio Adm.Code 3745-31-02(A)*, a "person" is defined in *Ohio Adm.Code 3745-15-01(V)* as "the state or any agency thereof, any political subdivision, or any agency thereof, public or private corporation, individual, partnership, or other entity." A "new source" is defined in *Ohio Adm.Code 3745-31-01(UUU)* as "any air contaminant source for which an *owner or operator* undertakes a continuing program of installation or modification or enters into a binding contractual obligation to undertake and complete, within a reasonable time, a continuing program of installation or modification, after January 1, 1974 and that at the time of installation or modification, would have otherwise been subject to the provisions of this chapter." (Emphasis added.) The trial court concluded Shelly did not maintain the F-sources at the limestone quarry where Plant 40 was located, but instead Martin Marietta owned the quarry and the F-sources, including the roadways and parking areas, storage piles, and raw material handling. With that [**37] determination, the trial court ruled in Shelly's favor regarding the F-sources at Plant 40.

[*P52] The state asserts the trial court erred in so ruling because Shelly applied for a PTI for the F-sources on August 18, 2000. (State Ex. 330; Stip. 40g; Tr. 370.) In that application, Shelly represented that it owned, leased, controlled, operated or supervised those air contaminant sources. According to the state, such admissions identify Shelly as an "owner" or "operator," render it bound to comply with the air pollution laws, including *Ohio Adm.Code 3745-31-02(A)*, and make Shelly's operation of the Plant without a PTI a violation of *Ohio Adm.Code 3745-31-02(A)* and *R.C. 3704.05*. Shelly responds no evidence reflects it is an owner of the air contaminant sources.

[*P53] The evidence demonstrated Martin Marietta Company owned and operated the limestone quarry; Shelly did not own the quarry. (Tr. 1680.) Shively testified the stockpiles of F-sources "technically did not belong to [Shelly] until [Shelly] actually went into them and used them in the plant. But again, to be safe, and possibly in case of where the quarry may close, that those piles may have become our property, our material. So we decided to [**38] go ahead to be safe and permit them as F sources." (Tr. 1681.) When Shively was asked about the existing roadways at Martin Marietta's quarries and why Shelly applied for a permit for them, he replied, "It was the same thing. It was the one way leading into this site which was shared by the quarry. We felt it was prudent for us to go ahead and submit that. In the event that something would change, it was easier to pull the

permit or have it disabled than try to get it later." (Tr. 1681.) Plant 40 no longer is in operation because the aggregate supplier closed the quarry. (Tr. 992.) A PTI was issued July 1, 2003 (Tr. 366, 372; Stip. 40i; State's Ex. 334).

[*P54] The trial court correctly found Shelly was not the owner of the F-sources; Martin Marietta was the owner. Shelly, however, was an operator of the F-sources and applied for a PTI to protect its interests in the event the quarry was closed or some other unforeseen event occurred. Indeed, in its application for a PTI, Shelly represented itself as the owner or operator on August 18, 2000. In any event, Shively's testimony indicated Shelly took ownership of the stockpiles once they were used in the plant and used the other F-source, the [**39] road, because it was the only way leading to the site. Shelly at a minimum was an operator with respect to the F-sources and, as an operator, it violated the applicable PTI rule because it operated the F-sources without a permit. The state's third assignment of error is sustained.

**VII. Fourth Assignment of Error -- Emissions Test Results**

[*P55] The state's fourth assignment of error contends the trial court erred by limiting emissions violations and resulting penalties to the date of the nonconforming emissions test results. The state alleged Shelly exceeded the air pollution emission limitations as set forth in the PTIs at hot mix asphalt Plants 62, 73, 90, 91, and 95. With the exception of Plant 62, the violations were based upon stack test results that demonstrated the plants emitted air pollutants outside of the allowable permit terms.

[*P56] A stack test is conducted to determine whether a facility is complying with its permit. During a stack test, the source is operated at maximum capacity in order to allow a direct estimation of the amount and types of air pollutants being released. In the event of a failed stack test, a facility must conduct another stack test that meets the emissions standards [**40] in order to demonstrate compliance. The overall purpose of the air permitting rules is to maintain clean air, and the penalty is designed to encourage compliance in a timely manner. Although Plant 62 did not involve a stack test, the parties agreed the plant violated the PTI on two days. (Decision at 45.) As to the other four plants, Shelly stipulated only that the specific emission limits were exceeded during the three hours during which the particular stack tests were performed. (See Stip. 73f; 90bb; 90mm; 91q; 91s.)

[*P57] The trial court found the emissions at the five plants exceeded the allowable limits set forth in the respective permits and thus violated the permit terms and Ohio law. Because Shelly did not dispute that evidence in the trial court, the trial court proceeded to determine both the number of days Shelly should be fined for the violations and the amount of the fines.

[*P58] In that regard, Shelly argued the stack test is a snap test and does not relate to day-to-day operations, so that only the day of the stack test should constitute a violation and warrant a fine. The state, by contrast, asserted the violation continued until another stack test demonstrated Shelly was complying [**41] with the PTI terms. The trial court concluded the stack test does not represent normal operating conditions, considered only the stack test to demonstrate excess emissions, and assessed a fine only for the day of the test, presuming the facility was in compliance on any other day.

[*P59] To determine the penalty amount, the trial court employed the three-step process articulated in *State ex rel. Petro v. Maurer Mobile Home Court, Inc., 6th Dist. No. WD-06-053, 2007 Ohio 2262, P55-61*, citing *State ex rel. Brown v. Dayton Malleable, Inc. (Apr. 21, 1981), 2d Dist. No. 6722, 1981 Ohio App. LEXIS 12103*, where the trial court followed the civil penalty policy from the USEPA, BNA Environmental Reporter, April 21, 1978, at pages 2011 et seq. According to the policy, Step 1 involves considering all the factors comprising the penalty. Step 1 of the policy requires the assessor to determine and add together the sum appropriate "to redress the harm or risk of harm to public health or the environment" and "to remove the economic benefit gained or to be gained from delayed compliance." *Dayton Malleable*, quoting USEPA BNA Environmental Reporter at 2014. It also includes the sum imposed "as a penalty for violator's degree of recalcitrance, [**42] defiance, or indifference to requirements of the law," as well as "the sum appropriate to recover unusual or extraordinary enforcement costs thrust upon the public."

[*P60] Under Step 2, addressing reductions for mitigating factors, the assessor must "[d]etermine and add together sums appropriate for mitigating factors," such as "the sum, if any, to reflect any part of the noncompliance attributable to the government itself," as well as "the sum appropriate to reflect any part of the non-compliance caused by factors completely beyond

violator's control (floods, fires, etc.)." Id. Step 3, where penalty factors and mitigating reductions are aggregated, requires the assessor to "[s]ubtract the total reductions of Step 2 from the total penalty of Step 1," the difference being "the minimum civil penalty." Id.

[*P61] In determining the penalty, the trial court here determined the violations involved in this claim were more serious than other permit violations because Shelly operated outside the scope of the terms of the permit and released potentially harmful emissions. Accordingly, in the first step the trial court found only the need to determine an amount appropriate to redress the harm or risk of [**43] harm to the environment. The trial court concluded no mitigating factors in Step 2 applied. As a result of its considerations, the court applied a fine of $ 500 per day. Because Shelly took corrective action, subsequent stack tests demonstrated compliance, and the number of violations was limited, the trial court did not find necessary an additional penalty to deter future violations.

[*P62] The state on appeal argues the trial court's conclusion is inconsistent with the purpose of the emission testing and the statutory scheme under which civil penalties are imposed in environmental cases. To support its argument, the states points out that emissions testing is designed to demonstrate a facility's compliance or, in the event of a failed stack test, noncompliance. After a failed stack test, a facility must demonstrate compliance by conducting another stack test that meets the emissions standards.

[*P63] "Civil penalties can be used as a tool to implement a regulatory program." *State ex rel. Brown v. Howard (1981), 3 Ohio App.3d 189, 191, 3 Ohio B. 216, 444 N.E.2d 469*, citing *United States ex rel. Marcus v. Hess (1943), 317 U.S. 537, 63 S.Ct. 379, 87 L. Ed. 443, Oceanic Steam Navigation Co. v. Stranahan (1909), 214 U.S. 320, 29 S.Ct. 671, 53 L. Ed. 1013*, affirmed, [**44] *214 U.S. 344, 29 S. Ct. 678, 53 L. Ed. 1024*. Substantial penalties are used as a mechanism to deter conduct contrary to the regulatory program. Id., citing *United States v. ITT Continental Baking Co. (1975), 420 U.S. 223, 231-32, 95 S.Ct. 926, 43 L. Ed. 2d 148; United States v. Atlantic Richfield Co. (E.D.Pa.1977), 429 F.Supp. 830*, affirmed, *573 F.2d 1303; State ex rel. Brown v. Dayton Malleable, Inc. (1982), 1 Ohio St.3d 151, 1 Ohio B. 185, 438 N.E.2d 120*. In order to be an effective deterrent to violations, civil penalties should be large enough to hurt the offender but not cause bankruptcy. *Howard, supra; Dayton Malleable, supra.* Several factors which should be considered in assessing a penalty to deter future violations include such items as the offender's good or bad faith, the financial gain which accrued to the offender and the environmental harm. *Howard, supra* (citations omitted); *State ex rel. Celebrezze v. Thermal--Tron, Inc. (1992), 71 Ohio App. 3d 11, 592 N.E.2d 912*.

[*P64] The Ohio Attorney General sued Thermal-Tron and its president for operating two infectious waste incinerators in violation of Ohio EPA emission standards and the company's PTIs. The PTIs required Thermal-Tron to demonstrate compliance with the given permit emission limits through stack tests. After receiving [**45] its PTIs, Thermal-Tron began stack tests. The first was conducted on November 30, 1987; Thermal-Tron failed to demonstrate compliance with the emission limits. Two more stack tests on June 29 and October 12, 1988 also failed to demonstrate compliance. In August 1989, Thermal-Tron successfully completed a stack test. Coupled with the remainder of the Attorney General's trial evidence, the evidence in the aggregate demonstrated Thermal-Tron operated from September 1987 through March 1988 and from September 1988 through February 7, 1989, despite a conditional PTO and three failed stack tests.

[*P65] The court found competent, credible evidence Thermal-Tron was operating in violation of *R.C. 3704.05* for an 11-month period and profited $ 41,060 in fiscal years 1987 and 1988. As a component of a total $ 41,300 fine, the court assessed a penalty of $ 19,000, representing the economic benefit realized as a result of an 11-month period of delayed compliance with the regulations. The appellate court reviewing the trial court's penalty found no error. See also *United States v. Hoge Lumber Co. (N.D.Ohio, May 7, 1997), 1997 U.S. Dist. LEXIS 22359* (applying *42 U.S.C. 7413(e)(2)* and concluding "an air pollution [**46] plaintiff makes a prima facie showing that the conduct or events giving rise to the violation are likely to have continued or recurred past the date of notice," so that the number of "days of violation shall be presumed to include the date of such notice and each and every day thereafter until the violator establishes that continuous compliance has been achieved," unless "the violator can prove by a preponderance of the evidence that there were intervening days during which no violation occurred or

that the violation was not continuing in nature").

[*P66] Here, the trial court did not err in assessing the factors in each step. Nonetheless, in determining the number of days each violation existed, the trial court should have concluded the violation continued until the subsequent stack test determined the plant no longer was violating the permit limitations. Indeed, to hold otherwise would allow a violator to continue the harmful conduct at least until the next stack test, knowing no penalty will be imposed for the interim violations. Consistent with the few cases addressing the issue, we conclude the trial court must calculate again, in accordance with this decision, the number of days Shelly [**47] violated the applicable PTI and then impose the fine, in its discretion, as it deems appropriate. The state's fourth assignment of error is sustained.

[*P67] Finally, Shelly filed in this court a motion to strike portions of the state's brief and documents because the state included three new documents and argument not presented during the trial. Because we found the documents as part of our legal research and independently of the state's brief, we deny Shelly's motion.

[*P68] For the foregoing reasons, the state's four assignments of error are sustained to the extent indicated, Shelly's motion to strike is denied, the judgment of the trial court is affirmed in part and reversed in part. This cause is remanded to that court for further proceedings in accordance with law and consistent with this decision.

*Motion denied; judgment affirmed in part and reversed in part; cause remanded.*

BROWN and CONNOR, JJ., concur.