```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA        *

          Plaintiff             *

          vs.                   *    CIVIL ACTION NO. MJG-00-2602

WESTVACO CORPORATION            *

          Defendant             *

*    *    *    *    *    *    *    *    *
```

MEMORANDUM AND ORDER RE: POST-CHANGE POTENTIAL TO EMIT

The Court has before it the United States' Opening Brief Regarding the Post-Change Potential to Emit of the Luke Mill Power Boilers [Document 265], Defendant Westvaco Corporation's Brief Concerning the Proper Standard for Determining Post-Change "Potential to Emit" [Document 266], and the materials relating thereto.  The Court has held a hearing and has had the benefit of the arguments of counsel.

I.   PERTINENT BACKGROUND[1]

In this case, the Government seeks to have the Court impose pollution control obligations upon Defendant Westvaco

---

[1] Only the facts relevant to the determination of post-change potential to emit are described herein.  For a detailed background on this case, see Memorandum of Decision Re: First Phase [Document 230].

Corporation ("Westvaco"),[2] operator of a kraft pulp and paper production facility located in western Maryland along the Maryland-West Virginia border (the "Luke Mill"). Specifically, the Government contends that construction at the Luke Mill during the Digester Expansion Project ("DEP") triggered compliance with the Clean Air Act's Prevention of Significant Deterioration ("PSD") program regulations. See 42 U.S.C. § 7070-7492; 40 C.F.R. § 51.166 (1987).[3]

The Luke Mill is predominantly powered by two power boilers that emit, among other things, sulfur dioxide ("$SO_2$"), a pollutant regulated by the Clean Air Act. The PSD regulations require existing major stationary sources of air pollutants, such as the Luke Mill,[4] to meet pre-construction permitting and pollution control regulations before undergoing a "major modification."[5] 40 C.F.R § 51.166(b)(2)(i) (1987).

---

[2] Reference to "Westvaco" herein is intended to include all predecessors and successors in interest to Westvaco Corporation in regard to the operation of the Luke Mill.
[3] All citations to the PSD regulations, 40 C.F.R. § 51.166 and 52.21, are to the PSD regulations promulgated August 7, 1980. These regulations were in effect at the time Westvaco began making changes to the Luke Mill as part of the DEP. The 1980 regulations, 45 Fed. Reg. 52676, were recodified in the 1987 Code of Federal Regulations.
[4] Kraft pulp mills are subject to regulation under the Clean Air Act. See 40 C.F.R. § 60.
[5] Defined as "any physical change in or change in the method of operation [] that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 51.166(b)(2)(i).

2

The instant case has been proceeding to resolution in phases herein.

The Court first found:[6]

- That the digesters and power boilers are parts of a multi-part emissions unit that was physically changed and had its method of operation changed during the DEP.

- That Power Boilers 25 and 26 were physically changed during the DEP.

- That it cannot impose BACT (best available control technology) requirements with regard to Power Boilers 25 and 26 by virtue of the Mill-Wide Expansion Program.

The Court then found:[7]

- That prior to the DEP, the Luke Mill's baseline "actual emissions" of sulfur dioxide ("$SO_2$"), as defined in the 1980 version of 40 C.F.R. § 52.21(b)(21), are equivalent to the average annual emissions rate, calculated using the emissions monitoring data or other records from the Luke Mill, over a two-year period which is representative of normal source operation.

The Court then found:[8]

- That the baseline period for the determination of pre-change "actual emissions" is the two-year period from March 1979 to February 1981.

- That the pre-change rate of "actual emissions" shall be determined by reference to the actual physical emissions of $SO_2$ during the baseline period. This

---

[6] See Memorandum of Decision Re: First Phase [Document 230].
[7] See Memorandum and Order Re Baseline Emissions [Document 247].
[8] See Second Phase Decision Re: Baseline Period and Post-Change Emissions Determination [Document 252].

> resulted in a pre-change rate of "actual emissions" of 12,228.7 tons per year.[9]

- That post-change rate of "actual emissions" shall be determined by reference to the post-change "potential to emit."

The Court now has before it the determination of the post-change "potential to emit." Three possible measures were considered:

1. The absolute legal maximum, that is 365 times the daily cap of 49 tons of $SO_2$, i.e. 17,885 tons per year, an amount in excess of the pre-change rate of actual emissions (12,228.7 tons per year).

2. The physical potential to emit. This would, no doubt, yield an emissions rate well above the pre-change rate of actual emissions (12,228.7 tons per year).

---

[9] Calculated as the average of annual actual emissions in the two-year baseline period, i.e. 11,003.7 (from March 1979 to February 1980) and 13,453.7 (from March 1980 to February 1981). See United States Opening Br. Ex. 6, ECF No. 265. From the same set of data, annual emissions for years following the baseline period are:
  Mar. 1981 – Feb. 1982: 14420.5
  Mar. 1982 – Feb. 1983: 15066.6
  Mar. 1983 – Feb. 1984: 14055.6
  Mar. 1984 – Feb. 1985: 13267.3
Id.
  Annual $SO_2$ emissions for the years 1973 – 1978, prior to the baseline period, were approximately:
  1973 – 18,834
  1974 – 18,907
  1975 – 16,571
  1976 – 14,083
  1977 – 14,636
  1978 – 11,023
Ltr. From Gov't Counsel, Mar. 11, 2011 (derived from Def.'s Mot. For Determination on the Proper Standard for Measuring "Post-Change" Emissions and Normal Source Operations Ex. 6, ECF. No. 245-6).

4

3.  A maximum anticipated physical actual rate, possibly based upon a daily rate sufficiently below 49 tons of $SO_2$ to insure there was no inadvertent violation of the cap. This approach would require a factual determination of whether the result was above or below the pre-change rate of actual emissions (12,228.7 tons per year).

## II. REGULATORY FRAMEWORK

Under the applicable 1980 PSD regulations, the term "net emissions increase" is defined as:

> [T]he amount by which the sum of the following exceeds zero:
>
> (a) Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source; and
>
> (b) Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

40 C.F.R. § 52.21(b)(3)(i).

The PSD regulations define "actual emissions" as:

> the actual rate of emissions of a pollutant from an emissions unit, as determined in accordance with [the following subparagraphs:]
>
> (ii) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted pollutants during a two-year period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates,

> and types of materials processed, stored, or combusted during the selected time period.
>
> (iii) The Administrator may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.
>
> (iv) For any emissions unit which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

40 C.F.R. § 52.21(b)(21).

III. DISCUSSION

The instant inquiry arises in the context of legislation enacted to reduce emission of pollutants by paper mills and other stationery sources by requiring the use of the Best Available Control Technology ("BACT"). Instead of requiring immediate compliance, the Clean Air Act allows existing facilities to delay installation of BACT because of the expense of retrofitting pollution-control equipment. Wisconsin Electric Power Co. v. Reilly (WEPCO), 893 F.2d 901, 909-10 (7th Cir. 1990). Existing plants were not permanently exempted from the requirements and become subject to the Clean Air Act programs when making modifications. Id. at 909. "The purpose of the 'modification' rule is to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction." Id. (citations omitted).

In this context, there is logic and constructive purpose to what Westvaco contends is an illogical comparison between actual pre-change emissions rates and potential post-change emissions rates.

A.   Post-Change Potential To Emit

The question of how to measure post-change "potential to emit" has been a source of discussion and contention between the industry and the Environmental Protection Agency ("EPA").  The definition of the term has evolved over the years as a result of various court decisions.[10]

The EPA's original definition of post-change "potential to emit" ignored installed pollution control equipment. However, the Alabama Power court rejected that definition and directed the EPA to consider the facility's design capacity, which was to take into account "the anticipated functioning of the air pollution control equipment designed into the facility." Alabama Power, 636 F.2d at 353. EPA made the definitional change to conform to the court's decision.  45 Fed. Reg. 50,087 (1980).

---

[10] See, e.g., Alabama Power Co. v. Costle, 636 F.2d 323 (D.C. Cir. 1979) (rejecting EPA's original definition that ignored installed pollution control equipment); WEPCO, 893 F.2d 901 (noting that the EPA should not wholly disregard past operating conditions at a plant).

At the time the DEP was undertaken, in February 1981, the EPA's definition of post-change "potential to emit" was expressed as "based on the larger of the maximum annual rated capacity of the stationary source assuming continuous operation, or on a projection of actual annual emissions. Enforceable permit conditions on the type of materials combusted or processed may be used in determining the annual potential." 45 Fed. Reg. 50,111, § 66.3(j) (1980). This definition, as it related to a major stationary source, was affirmed by the D.C. Circuit Court of Appeals. Duquesne Light Co. v. E.P.A, 698 F.2d 456, 474 (D.C. Cir. 1983).

The definition of a federally "enforceable permit condition" started with the EPA's stating that federal enforceability required limitations that the Administrator could enforce. See 45 Fed. Reg. 52,737 (1980). In 1995, a Guidance Memorandum was issued to clarify what constituted a federally enforceable limitation: (1) the EPA must have a direct right to enforce restrictions and limitations imposed on a source; and (2) limitations must be enforceable as a practical matter, which meant both legally and practically enforceable. This can include state controls such as operating permits, but voluntary controls are considered inadequate. See Nat'l Mining Assn. v. E.P.A., 59 F.3d 1351, 1362 (D.C. Cir. 1995); see also WEPCO, 893

F.2d at 917 (stating that a company's own unenforceable estimates of its annual emissions cannot be reasonably relied on); State ex rel. Ohio Atty. Gen. v. Shelly Holding Co., 946 N.E.2d 295, 306 (Ohio Ct. App. 2010) (stating that voluntary restrictions may not be used to determine potential to emit).

Accordingly, a stationery source's post-change potential to emit is not based on the maximum amount that a source is capable of physically emitting, nor is it based on a source's own expected or estimated emissions limited by voluntary restrictions.  Rather, it refers to the maximum capacity of a source to emit under its physical and operational design as limited by controls that are legally enforceable.

In the instant case, then, the Luke Mill's post-change potential to emit is 17,885 tons per year, that is the legal maximum under the then existing enforceable cap of 49 tons of $SO_2$ per day.

Finally, the Court must note that the post-change actual rate of actual emissions at the Luke Mill was, for each of the four years following the DEP,[11] well above the pre-change rate of actual emissions (12,228.7 tons per year).  In addition, during

---

[11] Mar. 1981 – Feb. 1982: 14420.5
   Mar. 1982 – Feb. 1983: 15066.6
   Mar. 1983 – Feb. 1984: 14055.6
   Mar. 1984 – Feb. 1985: 13267.3
See United States Opening Br. Ex. 6, ECF No. 265.

9

the baseline period itself, the actual rate of emissions was 11,003.7 tons (from March 1979 to February 1980) and 13,453.7 tons (from March 1980 to February 1981).  Therefore, even in the baseline period, the rate of emissions for one of the two years was well in excess of the pre-change rate of actual emissions (12,228.7 tons per year).[12]

B. Causation

When an emissions unit is new, the baseline pre-change rate of actual emissions is zero, and the post-change rate of potential emissions will, necessarily, be greater.  Therefore, necessarily, the increase in emissions will be caused by the construction of the new unit.  Therefore, a PSD permit and BACT will be required.

Westvaco contends that the Court's determination of post-change potential to emit as "maximum legal capacity" is erroneous.  Westvaco contends that the Court is ignoring the causation requirement in the PSD regulations.

According to Westvaco, the Court must find that the physical change in question actually caused an increase in emissions.  Westvaco posits a hypothetical in which it would add

---

[12] In addition, as noted above, the annual rate of emissions for five of the six years prior to the baseline period was well above the pre-change rate of actual emissions (12,228.7 tons per year).

flashing lights to the top of its power boilers to serve as a warning beacon to low-flying aircraft, a physical change that would not at all affect emissions increase.[13] Westvaco asserts that in the instant case, the DEP was effectively the same as adding the hypothetical flashing light because it did not cause or enable the Luke Mill to emit any more $SO_2$ than it could emit before the DEP.

However, the Court finds that the nature of the post-change potential to pre-change actual emissions rate comparison renders unnecessary a causation test as proposed by Westvaco. As discussed above, the pertinent statutory purpose is to allow a stationery source to delay utilizing BACT until the time of new or modified construction. It is at that time that the actual and potential comparison (undoubtedly "biased" in favor of requiring BACT) is made.

There is a presumption that following a proposed change, the source will operate at maximum capacity. New York v. E.P.A., 413 F.3d 3, 34 (D.C. Cir. 2005). For example, in Puerto Rican Cement Co. v. E.P.A., 889 F.2d 292 (1st Cir. 1989), the First

---

[13] The Government notes that the "flashing lights" as described would likely be deemed exempt from the modification test, and that if the warning lights could allow the plant to operate at night, it would result in a change in operations that could increase emissions. However, the Court sees no reason to debate the details of the hypothetical.

Circuit affirmed the use of the actual-to-potential test for the proposed construction of a new cement kiln. In that case, old cement kilns that operated 60% of the time were replaced with a new kiln that would emit fewer pollutants per hour. Puerto Rican Cement, 889 F.2d at 296-99. If the company continued to operate as it had, emissions would actually decrease.  But the court recognized the presumption that the source would operate at full capacity, which would result in an increase in emissions caused by the proposed change. Id.  It determined that under the actual-to-potential test, the new kiln was capable of emitting more pollutants, so a permit was required. Id.

It may seem unfair (if viewed without regard to the context) that Westvaco's proposed change would be deemed to cause an increase in emissions even though it intended to continue to operate within the permit's margin of safety in order to avoid an actual increase in emissions.  However, like the court realized in Puerto Rican Cement, the test is necessarily comparing past actual to future potential emissions after the change.  In 1980, when Westvaco was considering the DEP as a proposed change, it had to determine if the potential to emit would be greater than the baseline emissions, and if so, apply for a PSD permit.

Since the Luke Mill could potentially emit up to the daily cap of 49 tons per day, Westvaco should have known there could be an increase in emissions post-change. In fact, Westvaco knew from its actual history that there was potential actually to emit at least 13,453.7 tons per year, because the Mill emitted that amount for one of the two years during the baseline period. Moreover, from 1973 to 1978, the actual emissions were in excess of the baseline period average by more than 40 tons per year in five of the six years.[14]

Perhaps Westvaco could have lowered its post-change potential by imposing on itself an enforceable emissions cap at, or below, the baseline average.[15] It did not do so. Indeed, Westvaco knew, or certainly should have known, that it would be emitting pollutants well above the baseline average in some, if not most, post-change years of operation.

---

[14] Significance threshold for $SO_2$ is 40 or more tons per year. 40 C.F.R. § 52.21(b)(23).

[15] See New York v. E.P.A., 413 F.3d 3, 34 (D.C. Cir. 2005)("Prior to 2002, sources other than utilities evaluated post-change emissions under the more onerous actual-to-potential test, which presumed that sources would operate at their maximum post-change potential to emit. Given that assumption, sources' actual post-change emissions could not, by definition, exceed their potential-to-emit . . . . Moreover, to avoid NSR, which is easily triggered under the actual-to-potential test, sources could opt to establish an enforceable emissions cap based on projected post-change actual emissions. Thus, under the pre-2002 regime, non-utilities either accepted the rigors of the actual-to-potential test . . . or subjected their actual emissions to monitoring by state permitting authorities.").

Accordingly, if the maximum capacity of the Luke Mill to emit, under its physical and operational design as limited by controls that are legally enforceable, would result in more potential emissions than the baseline measure of average actual annual, then the proposed change is deemed to cause an increase in emissions.  A PSD permit was required unless there were contemporaneous changes that would also decrease emissions, providing an opportunity to "net" out the differences.[16]

IV.  CONCLUSION

For the foregoing reasons:

1. The Court finds that the Luke Mill's rate of post-change potential to emit is its maximum capacity to emit under its physical and operational design as limited by controls that are legally enforceable, that is 17,885 tons per year.
2. The Luke Mill's post-change potential to emit exceeds its pre-change rate of actual emissions (12,228.7 tons per year) by more than 40 tons per year.

---

[16] See 40 C.F.R. § 52.21(b)(3)(i) (defining "net emissions increase.").

3. Plaintiff shall arrange a telephone conference to be held by July 31, 2011, to discuss further proceedings that may be necessary in regard to "netting" issues.

4. The remedy phase shall proceed in accordance with the Remedy Phase Scheduling Order issued herewith.

SO ORDERED, on Tuesday, June 7, 2011.

/s/_____<br>
Marvin J. Garbis<br>
United States District Judge