UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CASE NO. MJG 00-CV-2602 |
| WESTVACO CORPORATION | |
| Defendant. | |

## DEFENDANT WESTVACO CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE UNAVAILABILITY OF THE GOVERNMENT'S PROPOSED EQUITABLE RELIEF

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
Justin A. Torres (*pro hac vice*)
*jtorres@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................... 4

III. STANDARD OF REVIEW .................................................................................. 7

IV. ARGUMENT ....................................................................................................... 8

    A.    Any Continuing Harm Caused By Westvaco's Operation Of The Luke
        Mill Ceased In 2005 And Any Injunction Against Westvaco Would
        Therefore Be Improper As A Matter Of Law. ..........................................9

        1.    There are no continuing, present adverse effects of excess
                emissions from the Luke Mill attributable to Westvaco. ...........................9

        2.    The Government is not entitled to a scrubber on Unit No. 24 as
                mitigation for past emissions because there has been no violation
                with respect to that unit. ...........................................................................12

    B.    Even If An Injunction Could Be Issued In This Case, The Government's
        Requested Injunction Is Impossible To Perform And Unenforceable As A
        Matter Of Law. .........................................................................................13

        1.    There is no obligation to install BACT outside of the PSD
                permitting process, and Westvaco has no standing to seek a permit
                on LPC's behalf. ......................................................................................14

        2.    Westvaco has no authority to effectuate any emission reduction
                that may be required by an injunction in this case because it no
                longer owns or operates the Luke Mill. ....................................................16

        3.    An injunction against LPC requiring it to install and operate SO2
                scrubbers would be improper because LPC is not alleged to have
                violated the Clean Air Act. .......................................................................20

        4.    An injunction ordering Westvaco to compensate LPC for the
                installation and operation of SO2 scrubbers would amount to an
                impermissible order to pay money damages. ............................................22

V. CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)     7, 8

*Biller v. Toyota Motor Corp.*, 668 F.3d 655 (9th Cir. 2012)     22

*Ciba–Geigy Corp. v. Bolar Pharma. Co.*, 747 F.2d 844 (3d Cir. 1984)     24

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)     9

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977)     13

*Drewitt v. Pratt*, 999 F.2d 774 (4th Cir. 1993)     7

*Freeman v. Pitts*, 503 U.S. 467 (1992)     13

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)     26, 27

*Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008)     22

*Hartford–Empire Co. v. United States*, 323 U.S. 386 (1945)     12

*In re Apex Express Corp.*, 190 F.3d 624 (4th Cir. 1999)     8

*In Re Diet Drugs*, 369 F.3d 293 (3d Cir. 2004)     15

*Jaffee v. United States*, 592 F.2d 712 (3d Cir. 1979)     26

*Kyocera Corp. v. Prudential–Bache Trade Servs., Inc.*, 341 F.3d 987 (9th Cir. 2003)     22

*Lemon v. Kurtzman*, 411 U.S. 192 (1973)     25

*Lewis v. Casey*, 518 U.S. 343 (1996)     13

*Marsh v. Sch. Bd. of Roanoke Cnty., Va.*, 305 F.2d 94 (4th Cir. 1962)     14, 15, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)     8

*Milliken v. Bradley*, 433 U.S. 267 (1977)     13

*Missouri v. Jenkins*, 515 U.S. 70 (1995)     13

*Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007)     16

*New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*, No. 07-5298,
    2009 WL 3234438 (E.D. Pa. Sept. 30, 2009)      19, 20, 27

*New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003)      24

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001)      15

*Porter v. Block*, 156 F.2d 264 (4th Cir. 1946)      9

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260 (4th Cir. 2001)      14

*Ricci v. DeStefano*, 557 U.S. 557 (2009)      7

*Scott v. Harris*, 550 U.S. 372 (2007)      7

*Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010)      16

*Sierra Club v. Portland Gen. Elec. Co.*, 663 F. Supp. 2d 983 (D. Or. 2009)      23

*Steel Co. v. Citizens For A Better Env't.*, 523 U.S. 83 (1998)      2, 9, 12

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971)      13

*United States v. Brotech Corp.*, No. 00-2428, 2000 WL 1368023 (E.D. Pa. Sept. 19,
    2000)      23

*United States v. Campbell Soup Co.*, No. 95-1854, 1997 WL 258894 (E.D. Cal. Mar. 11,
    1997)      23

*United States v. Cinergy Corp.*, 618 F. Supp. 2d 942 (S.D. Ind. 2009), *clarified by* 2009
    WL 6327415, *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010)      13

*United States v. EME Homer City Generation, LP*,
    823 F. Supp. 2d 274 (W.D. Pa. 2011)      19, 20, 21, 24

*United States v. Ill. Power Co.*, 245 F. Supp. 2d 951 (S.D. Ill. 2003)      23

*United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999 (N.D. Ill. 2010)      24

*United States v. Midwest Generation, LLC*, 781 F. Supp. 2d 677 (N.D. Ill. 2011)      16, 19, 20, 27

*United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054 (W.D. Wis. 2001)      23

*United States v. So. Ind. Gas & Elec. Co.*, No. 99-1692, 2002 WL 1760752 (S.D. Ind.
    July 26, 2002)      23

*United States v. St. Bernard Parish*, 756 F.2d 1116 (5th Cir. 1985)      15

*Wal-Mart Stores, Inc. v. Wells*, 213 F.3d 398 (7th Cir. 2000)      27

*Williams v. Doyle*, 494 F. Supp. 2d 1019 (W.D. Wis. 2007)                    15

**Statutes**

42 U.S.C. § 7413(b) ................................................................................... 26

42 U.S.C. § 7475(a) .................................................................................... 24

42 U.S.C. § 7475(a)(3) ............................................................................... 17

42 U.S.C. § 7475(a)(4) ............................................................................... 16

42 U.S.C. § 7475(a)(7) ............................................................................... 17

42 U.S.C. § 7491 ......................................................................................... 6

42 U.S.C. § 7492 ......................................................................................... 6

**Other Authorities**

Fed. R. Civ. P. 56(a) .................................................................................... 7

**Rules**

40 C.F.R. § 51.166(j)(3) .............................................................................. 16

40 C.F.R. § 51.301 ....................................................................................... 7

**Regulations**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2942
(2d ed. 1995) ........................................................................................ 12

13 Richard A. Lord, *Williston on Contracts* § 37:7 (4th ed. 2012) ............................................. 22

7A Michie's *Jurisprudence* § 7 (Bruce Tucker et al. eds., 2006 ed.) ......................................... 15

Approval and Promulgation of Air Quality Implementation Plans, 77 Fed. Reg. 11,827
(proposed Feb. 28, 2012) ........................................................................ 7

Defendant, Westvaco Corporation ("Westvaco"), hereby submits the following memorandum in support of its Motion for Summary Judgment on the impossibility of the Government's proposed equitable relief.

## I.
## INTRODUCTION

The Government seeks equitable relief in the form of a mandatory injunction ordering Westvaco to obtain a Prevention of Significant Deterioration ("PSD") permit for the Digester Expansion Project which would contain a limit on sulfur dioxide ("SO2") emissions from the No. 25 Power Boiler based on Best Available Control Technology ("BACT").  *See* April 17, 2012 Letter from M. Elmer to Judge Garbis re: Luke Paper Company Bankruptcy, Exh. A hereto. The Government's expert in this case opines that this emission limit would be met by installing a scrubber on the power boiler to control SO2 emissions and operating it over its useful life at 95% removal efficiency.  The Government also seeks an order requiring Westvaco to mitigate past excess SO2 emissions from the No. 25 Power Boiler.  *Id.*  The Government's expert opines that this mitigation would be achieved by installing and operating a scrubber on the Luke Mill No. 24 Power Boiler.  The Government's claims for equitable relief in this case are ripe for summary judgment because, on the undisputed facts before this Court, each aspect of the requested injunction would be impossible to perform and unenforceable as a matter of law, because Westvaco no longer owns or operates the Luke Mill.

First, an injunction in any form against Westvaco would be improper because any alleged harm to the environment caused by Westvaco's operation of the Luke Mill ceased when it sold the mill to Luke Paper Company ("LPC") in 2005.  When a plaintiff alleges "only past infractions of [a statute], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury." *Steel Co. v. Citizens For A Better Env't.*, 523 U.S.

83, 109 (1998).  Here, Westvaco has not emitted any SO2 from the Luke Mill since it sold the facility seven years ago, and an injunction against Westvaco would do nothing to prevent any ongoing or future harm.  There is likewise no legal basis for the Government's request that Westvaco reduce emissions from the Luke Mill No. 24 Power Boiler, as there is no allegation that Westvaco violated the Clean Air Act with respect to that emission unit.  Consequently, there is no form of injunctive relief that would be proper in this case.

Second, even if an injunction in this case were proper in theory, the injunctive relief requested by the Government would be unworkable and unenforceable in practice.  A PSD permit may be sought and obtained only by the owner or operator of the facility to which the permit would apply.  Westvaco has no standing to seek a PSD permit applicable to the Luke Mill because it does not own or operate the mill.  Similarly, Westvaco has no ability to ensure that the Luke Mill will be operated on a going-forward basis so as to comply with the emission limitations requested by the Government.  This responsibility would fall entirely on LPC, the current owner of the mill, which would have to ensure that the appropriate pollution control devices are installed and operated.

There is, however, no legal basis for requiring LPC to do anything to comply with an injunction issued in this case because LPC is not alleged to have violated the Clean Air Act. This Court has already held that the continued operation of the Luke Mill without a PSD permit does not constitute an ongoing violation of the Act.  *See* April 23, 2001 Mem. and Order on Mot. to Dismiss (Doc. No. 15) ("Civil Penalties Order").  Because LPC has not violated the Act, any injunction against it would be improper.  But without an order requiring LPC to install and continuously operate SO2 scrubbers on the power boilers, there is no legal mechanism for mandating the emission reductions from the Luke Mill requested by the Government.

Third, even if the court could issue an injunction against LPC requiring it to take steps to reduce emissions from the Luke Mill, it would lack the authority in equity to require Westvaco to compensate LPC for the costs of doing so.  Because Westvaco is not causing any continuing harm to the environment, any order requiring Westvaco to compensate LPC for complying with an injunction issued in this case would be entirely retrospective, and would amount to an order to pay money damages in the guise of injunctive relief.  As such, it is impermissible and outside the scope of the Court's equitable powers.

The fact that intervening circumstances have deprived the Government of a remedy in this case is a direct result of the Government's failure to timely prosecute this action. Construction on the project that this Court has determined violated the PSD provisions of the Clean Air Act commenced in 1981.  The Government did not pursue any action related to that project until 1999, *or 18 years later*.  The sale of the Luke Mill did not take place until 2005, or nearly 25 years after the alleged violation of the Clean Air Act.  Had the Government acted promptly to assert its claim that the modifications at the Luke Mill violated the Clean Air Act, it would have been able to seek both civil penalties and injunctive relief against Westvaco.  Having sat on its hands for almost 20 years, the Government cannot now complain that it is left without a remedy for the violation it alleges.  Moreover, any harm caused by SO2 emissions from the No. 25 Power Boiler will be addressed in any event, since the Maryland State Implementation Plan ("SIP") is in the process of being revised to account for new regulations concerning regional haze, which will likely require LPC to install a scrubber on the No. 25 Power Boiler, completely independent of this litigation.

**II.**
**STATEMENT OF FACTS**

This case traces its roots back to a Notice of Violation issued on April 19, 1999 by the

United States Environmental Protection Agency ("EPA") against Westvaco. That notice claimed

that a number of projects undertaken at the Luke Mill dating as far back as 1980 constituted

major modifications that required permits under the PSD provisions of the Clean Air Act, and

that Westvaco violated the Act by commencing construction on those projects without PSD

permits.  On August 28, 2000, the Government filed this action under the Clean Air Act, seeking

an injunction and civil penalties for these alleged violations.  Westvaco moved to dismiss several

counts on the ground that they were barred by the five-year statute of limitations.  The Court

agreed, rejecting the Government's contention that failure to obtain a preconstruction permit

constitutes a "continuing wrong" even after the construction is completed.  *See* Civil Penalties

Order at 9-10.  Accordingly, the Court dismissed the Government's claims for civil penalties as

to any count that accrued before 1995, although the claims for injunctive relief survived.  *Id.* at

11 n.2.  Other orders of this Court further narrowed the claims at issue.  In an order dated

December 3, 2009, for instance, the Court held that a group of projects in the late 1980s, which

the Government referred to collectively as the "Mill-wide Expansion Program," did not trigger

PSD review.  *See* Mem. of Decision Re: First Phase (Doc. No. 230) at 38-39.

The only claim remaining in this case concerns the Luke Mill's addition of two new

digesters in the early 1980s.  This Court has held that the addition of the digesters constituted a

major modification to the No. 25 Power Boiler, and that that modification triggered the PSD

provisions of the Clean Air Act.  *See* Mem. and Order Re: Post-Change Potential to Emit (Doc.

No. 282).  Westvaco completed a final "Authorization for Expenditure" for the addition of one of

these new digesters on April 28, 1980.  Exh. B hereto.  This project was later expanded to

include the addition of another new digester.  Exh. C hereto.[1]  On May 9, 1980, Westvaco

submitted an application to the State of Maryland for a permit to construct the new digesters,

Exh. D hereto, and a permit to construct was issued on June 6, 1980, Exh. E hereto.  This Court

has held that construction of the digesters commenced in February 1981.  *See* Mem. and Order

Re: Post-Change Potential to Emit (Doc. No. 282) at 8.

In 2005—nearly 25 years after the DEP commenced—Westvaco sold the Luke Mill to

LPC, a subsidiary of NewPage Corporation ("NewPage").  In a schedule to the Asset Purchase

Agreement between the two parties, Westvaco agreed to "retain the defense and resolution" of

this litigation "including, without limitation, the design, installation, and construction of any

pollution control equipment required as a result of any resolution thereof."  Asset Purchase

Agreement Schedule 11.2(a)(viii) ¶ 1 ("Schedule 11.2(a)(viii)"), Exh. F hereto.  Westvaco also

agreed to pay operating costs of any ordered new control technology that exceeded $2 million

per year for the first five years.  *Id.* ¶ 1.B.  Significantly, this transaction was an asset purchase,

and this Court has held that LPC did not agree to assume any liability to the Government for any

violation of the Clean Air Act Westvaco may have committed.  *See* Mem. and Order Re: Mot. to

Join (Doc. No. 279) ("Of course, LPC had no involvement whatsoever with the matters that were

the subject of resolution heretofore.").  Since 2005, LPC has operated the Luke Mill without any

involvement or oversight by Westvaco.

On May 11, 2011, the Government and LPC filed a stipulation requesting "that the Court

join LPC as an 'Intervenor' to the instant action, without designation of LPC as a defendant."

Stipulation and Order on Mot. for Joinder (Doc. No. 280).  The Court signed the Order joining

LPC that same day.  *See* Order (Doc. No. 281).

---

[1]  The addition of the new digesters and the related construction have been referred to in this
case collectively as the Digester Expansion Project ("DEP").

Recently, LPC filed for bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware.  *See* Notice of Bankruptcy (Doc. No. 286).   To date, LPC has not availed itself of the automatic bankruptcy stay protections of 11 U.S.C. § 362(a).  *Id*. at 3-4 (noting that LPC reserves its rights under the stay).  The Government maintains that the bankruptcy stay is not applicable to LPC because this case falls under the police powers and regulatory actions exception to the stay at § 362(b)(4).  *See* Order (Doc. No. 300).  As of this writing, the Government has been ordered to file a petition in the bankruptcy court seeking a determination as to whether the automatic stay applies to this action, and, if so, an order lifting the stay.  *Id.*

As a remedy for the violation found by the Court, the Government seeks an injunction requiring Westvaco to obtain a PSD permit with a BACT limit on the No. 25 Power Boiler and to mitigate alleged harm caused by alleged excess SO2 and mercury emissions from the No. 25 Power Boiler.  Exh. A hereto.  The Government has offered an expert, Dr. James E. Staudt, who opines that the PSD permit on the No. 25 Power Boiler would require the Luke Mill to install an SO2 scrubber and operate it at 95 percent removal efficiency.  Expert Report of Dr. James E. Staudt, Exh. G hereto, at 51-53.  Dr. Staudt also opines that mitigation of past SO2 emissions could be accomplished by installing a separate SO2 scrubber on the No. 24 Power Boiler and operating it at 95% removal efficiency over its useful life.  *Id.* at 60.

In the midst of this litigation, the State of Maryland has submitted a proposed revision to its SIP to implement the Regional Haze provisions of the Clean Air Act.  42 U.S.C.  §§ 7491 and 7492.  That proposed SIP revision contains a Best Available Retrofit Technology ("BART") analysis for the Luke Mill.  Under the BART provisions of the Clean Air Act—which are independent of this litigation—the SIP would require installation of a scrubber on the No. 25 Power Boiler to control emissions that contribute to regional haze.  *See* 40 C.F.R. § 51.301.  EPA

has issued a notice in the Federal Register proposing to approve Maryland's SIP revision.

Approval and Promulgation of Air Quality Implementation Plans, 77 Fed. Reg. 11,827, 11,838

(proposed Feb. 28, 2012) (to be codified at 40 C.F.R. pt. 52) (proposed revision to the Maryland

SIP noting that BART for the No. 25 unit would be "the addition of spray dryer absorber or a

circulating dry scrubber for SO2").  Promulgation of a final SIP is expected this month.

### III.
### STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact

is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In

considering a motion for summary judgment, a judge's function is limited to determining

whether sufficient evidence exists on a claimed factual dispute to warrant submission of the

matter to the fact-finder for resolution at trial.  *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable

inferences in the light most favorable to the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557

(2009); *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its

affirmative obligation to prevent factually unsupported claims and defenses from going to trial.

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).  If the evidence presented by the

nonmoving party is merely colorable, or is not significantly probative, summary judgment must

be granted.  *Anderson*, 477 U.S. at 249–50.  On the other hand, a party opposing summary

judgment must "do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

*see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

## IV.
## ARGUMENT

The violation alleged in this case took place in 1981, but Westvaco sold the Luke Mill in

2005.  Given these undisputed facts, there is no basis for this Court to issue an injunction against

Westvaco.  First and most fundamentally, an injunction is only proper where it is necessary to

prevent ongoing or likely future violations of law or ongoing harm.  This Court has already held

that there is no ongoing violation in this case; clearly, there is no danger that Westvaco will

commit any future violation of the Act because it no longer owns the Luke Mill.  Further, there

are no present or ongoing adverse effects of the 1981 violation attributable to Westvaco, since

Westvaco has not owned or operated the Luke Mill since 2005 and therefore has not caused any

emission of SO2 from the mill since that time.

Second, the injunction requested by the Government in this case is not within the power

of this Court to grant because it would be impossible to perform and unenforceable.  Practically

speaking, the injunction would have to include the following requirements in order to provide the

future reductions of SO2 emissions from the Luke Mill requested by the Government:

- Westvaco would be required to apply for and obtain a PSD permit for the Digester Expansion Project which would contain a BACT limit on the No. 25 power boiler;

- LPC would be required to install an SO2 scrubber on the No. 25 power boiler so as to allow the boiler to comply with the BACT limit;

- LPC would be required to install an SO2 scrubber on the No. 24 power boiler so that past SO2 emissions could be mitigated;

- LPC would be required to operate the scrubbers on both of the power boilers over their useful life; and

- Westvaco would be required to compensate LPC for the costs incurred for the installation and operation of the scrubbers.

8

Each of these elements of injunctive relief suffers from fatal legal and practical flaws that render the proposed remedy unenforceable as a matter of law.

**A.      Any Continuing Harm Caused By Westvaco's Operation Of The Luke Mill Ceased In 2005 And Any Injunction Against Westvaco Would Therefore Be Improper As A Matter Of Law.**

Because there is neither a continuing or likely future violation of the PSD permitting requirements, nor continuing harm attributable to Westvaco after it sold the Luke Mill in 2005, injunctive relief in any form is improper as a matter of law.  When a plaintiff alleges "only past infractions of [a statute], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury." *Steel Co.*, 523 U.S. at 109; s*ee also Porter v. Block*, 156 F.2d 264, 271 n.1 (4th Cir. 1946) ("[A] suit for a prohibitory injunction deals primarily not with past violations but with threatened future ones. . . . [S]uch an injunction may not be employed to punish past violations or simply to establish that violations have occurred.  We think that these statements are equally true with reference to a mandatory injunction.") (citation omitted).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (alterations and quotations omitted).  This Court has held that there is no continuing violation of the PSD permitting requirements after construction commences, *see* Civil Penalties Order at 9-10, and Westvaco cannot possibly commit a future violation of these requirements because it does not own the mill.  Accordingly, injunctive relief will not redress the injury alleged by the Government.

**1.      There are no continuing, present adverse effects of excess emissions from the Luke Mill attributable to Westvaco.**

Injunctive relief against Westvaco is improper here because this case presents neither a threat of ongoing or future violations of law, nor continuing harm caused by Westvaco.  To

obtain an injunction the government must show an ongoing or likely future violation, or

"continuing, present adverse effects of a past violation."  *Steel Co.*, 523 U.S. 109.  Westvaco has

not been responsible for any SO2 emissions from the Luke Mill since it sold the facility in 2005.

Nor does the Government have any evidence that pre-2005 emissions of SO2 are causing any

*present-day* effects or ongoing harm.

In fact, the Government has offered no evidence of any present-day impacts to the

environment caused by SO2 or mercury emissions—no matter who they might be attributable

to—that can be traced specifically to the Luke Mill.  Not one of the Government's several

experts was able to identify present-day environmental impacts caused by the mill; several

admitted that this analysis is impossible to perform. For example, stream water and aquatic

biology expert James "Rick" Webb testified:

> Q      Have you made any attempt to quantify the impact of sulfur deposition
> caused by any increase in emissions of SO2 from the Luke Mill?
>
> A      No.
>
> Q      What about an attempt to quantify the impact of sulfur concentration in
> any particular stream caused by emissions from the Luke Mill?
>
> A      No.
>
> Q      What about [acid neutralizing capacity] decrease in any particular stream
> caused by the emissions from the Luke Mill—SO2 emissions from the Luke Mill?
>
> A      Well, the answer is no. . . .
>
> Q      Okay. Could such a calculation be done? . . .
>
> A      . . . [T]here would be too much variability in—in the analysis—in the
> output of the analysis to allow us to isolate the—the degree of harm associated
> with a single source like that.

Deposition of James Webb at 181:21-182:21, relevant portions excerpted as Exh. H hereto.

Similarly, the Government's expert on mercury impacts, Charles Driscoll, testified that none of

the fish advisories he cited in his report were attributable to the Luke Mill, or indeed to any

specific source.  Deposition of Charles Driscoll at 102: 21-25, relevant portions excerpted as

Exh. I hereto.  In fact, Driscoll went further and agreed that the conclusions drawn in his report would "potentially apply to every mercury-emitting source in the world."  *Id.* at 149:17-22. Ellen Porter, an expert in SO2 impacts in the Shenandoah National Park, agreed that "[i]t is impossible to link the emissions from any particular source to precise effects on the ground." Deposition of Ellen Porter at 52:10-18, relevant portions excerpted as Exh. J hereto.  Forest Service soil and air quality experts Stephanie Connolly and Edward Huffman both admitted that they had made no effort to specify the particular impact of the Luke Mill on soil and air resources in the Monongahela National Forest.  Deposition of Stephanie Connolly at 165:5-8, relevant portions excerpted as Exh. K hereto; Deposition of Edward Huffman at 86:3-11, relevant portions excerpted as Exh. L hereto.  And Shenandoah National Park director Martha Bogle had no information about particular impacts on scenic resources in the Park attributable to the mill.  Deposition of Martha Bogle at 100:6-8, relevant portions excerpted as Exh. M hereto.

Similarly, the Government cannot show any present-day or ongoing health effects attributable to the Luke Mill.  Dr. Leland Deck, the Government's expert on alleged health effects from the mill, does not opine that emissions from the Mill that pre-date the sale are having continuing effects *today*.  The only opinion offered by Dr. Deck concern alleged health impacts in 2005 resulting from mill emissions in 2005.  *See* Expert Report of Dr. Leland Deck at 3, relevant portions excerpted as Exh. N hereto.  He has no opinion concerning present-day or ongoing health effects, let alone that any such health effects could be caused by Mill emissions prior to 2005.

In sum, there is simply no evidence that emissions from the Luke Mill attributable specifically to Westvaco prior to its sale of the mill are causing continuing, present adverse effects.  And without such evidence, there is no equitable relief that can be fashioned to remedy

11

such alleged harm.  Injunctive relief would merely punish Westvaco for Plaintiff's "[p]ast

exposure to illegal conduct." *Steel Co.*, 523 U.S. at 109 (internal quotation marks omitted).  *See*

*also Hartford–Empire Co. v. United States*, 323 U.S. 386, 409 (1945) (a court may not "not

impose penalties in the guise of" remediating continuing harms or preventing future violations);

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2942 (2d ed.

1995) ("[S]ince the purpose of an injunction is remedial, not punitive, if the effect of granting

relief is to penalize defendants . . . it may be denied.") (footnotes omitted).  An injunction under

these circumstances would plainly exceed the scope of the Court's equitable powers.

> **2.      The Government is not entitled to a scrubber on Unit No. 24 as mitigation for past emissions because there has been no violation with respect to that unit.**

The second half of the Government's proposed remedy—that Westvaco install a scrubber

on the No. 24 Power Boiler as mitigation for past excess emissions—is outside the scope of the

Court's equitable powers for the additional and independent reason that there has been no

violation with respect to No. 24.  A particular equitable remedy is justifiable only to the extent it

is "tailor[ed] . . . to fit the nature and extent" of the violation.  *Dayton Bd. of Educ. v. Brinkman*,

433 U.S. 406, 420 (1977).  In "any equity case, the nature of the violation determines the scope

of the remedy." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971) (internal

quotation marks omitted).  This "means simply that federal-court decrees must directly address

and relate to the . . . violation itself." *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) (quoting

*Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977)); *see also Lewis v. Casey*, 518 U.S. 343, 357

(1996).  Thus, "[a] remedy is justifiable only insofar as it advances the ultimate objective of

alleviating the initial . . . violation." *Freeman v. Pitts*, 503 U.S. 467, 489 (1992).  A scrubber on

Power Boiler No. 24 does not "address and relate to" the violation of the PSD permitting

regulations with respect to the No. 25 Power Boiler, nor does it remedy any alleged harm caused

by Westvaco's alleged excess SO2 emissions prior to 2005.  Like the retrospective mandatory

injunction the Government seeks as to Power Boiler No. 25, ordering Westvaco to install a

scrubber on a unit not in violation is simply punitive.

In *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 967 (S.D. Ind. 2009), *clarified by*

2009 WL 6327415, *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010), for example, the court

had previously found that the defendant electric utility had violated the PSD provisions with

respect to modifications made at certain specific emission units (numbered units 2, 3 and 5), but

not others.  As part of its remedy, the plaintiffs sought an order requiring Cinergy to install

pollution controls on two units that had not been modified, units 4 and 6.  The court rejected this

request, finding that the proposed remedy "does not bear an equitable relationship to the degree

and kind of harm it is intended to remedy."  *Id.*  Specifically, the court held:

> Plaintiffs have not proven that Cinergy violated any CAA provisions with respect
> to units 4 and 6.  Therefore, it is the Court's view that imposition of such a
> remedy is punitive in nature and the Court has already determined that such
> remedy is not available to Plaintiffs for Cinergy's violations of the NSR for the
> projects at Wabash River units 2, 3, and 5.

*Id.*  There is no allegation that Westvaco made any modification to the No. 24 Power Boiler in

violation of the Clean Air Act.  Therefore, an injunction requiring the installation and operation

of an SO2 scrubber on that boiler would be punitive and improper.

**B.    Even If An Injunction Could Be Issued In This Case, The Government's Requested
Injunction Is Impossible To Perform And Unenforceable As A Matter Of Law.**

Even if Westvaco's sale of the Luke Mill did not render injunctive relief against it

entirely inappropriate as a matter of law, the injunction requested by the Government in this case

would be impossible to perform and unenforceable.  A bedrock principle of equity is that it "does

not require the doing of a vain thing as a condition of relief."  *Marsh v. Sch. Bd. of Roanoke

Cnty., Va.*, 305 F.2d 94, 99 (4th Cir. 1962); *see also Potomac Elec. Power Co. v. Elec. Motor &*

*Supply, Inc.*, 262 F.3d 260, 267–68 (4th Cir. 2001) (recognizing that equitable remedies cannot

be granted where the defendant is without power to perform them); 7A Michie's *Jurisprudence*

§ 7 (Bruce Tucker et al. eds., 2006 ed.).  "[I]njunctions must be enforceable, workable, and

capable of court supervision."  *In Re Diet Drugs*, 369 F.3d 293, 315 (3d Cir. 2004); *see also*

*Marsh*, 305 F.2d at 99; *United States v. St. Bernard Parish*, 756 F.2d 1116, 1123 (5th Cir. 1985)

("It is black letter law that an injunction will not issue when it would be ineffectual.").  The bar

is even higher for issuance of mandatory injunctions requiring the performance of a specific act,

which are generally disfavored; by their nature, such injunctions cannot be entered against one

who lacks the authority to perform the required act.  *See, e.g.*, *Okpalobi v. Foster*, 244 F.3d 405,

416-18 (5th Cir. 2001); *Williams v. Doyle*, 494 F. Supp. 2d 1019, 1024 (W.D. Wis. 2007).  Here,

each element of the injunction requested by the Government would be unenforceable.

> **1.      There is no obligation to install BACT outside of the PSD permitting process,
>           and Westvaco has no standing to seek a permit on LPC's behalf.**

The Government seeks an injunction ordering Westvaco to apply for a PSD permit for the

DEP.  That PSD permit would include a BACT limit on the No. 25 Power Boiler, and that limit

would be expressed in terms of pounds of $SO_2$ emitted per million BTU heat input.  The

Government's BACT expert, Dr. James Staudt, opines that if the Luke Mill were to obtain a PSD

permit for the DEP today, the BACT limit applicable to the No. 25 Power Boiler would be 0.175

lbs/MMBtu, and that that limit would be met by installing a circulating dry scrubber operating at

95 percent removal efficiency.  *See* Staudt Report, relevant portions excerpted as Exh. G hereto,

at 53.

Implicit in the Government's requested relief is a recognition that the requirement to

impose BACT on a source springs directly from the PSD permitting process.  *See* 42 U.S.C.

§ 7475(a)(4) (setting forth the BACT requirement in the PSD provisions of the Clean Air Act);

*see also* 40 C.F.R. § 51.166(j)(3) (providing that "[a] major modification shall apply best available control technology for each regulated NSR pollutant for which it would be a significant net emissions increase at the source."). The BACT requirement, in fact, is "inextricably linked to the permitting process. . . . The duty to obtain a PSD permit and the duty to apply BACT are most sensibly construed as going hand in hand." *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1017 (8th Cir. 2010). *See also Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1324 (11th Cir. 2007) (rejecting the Government's contention that there is "an ongoing obligation to apply Best Available Control Technology" outside of the permitting process); *United States v. Midwest Generation, LLC*, 781 F. Supp. 2d 677, 690 (N.D. Ill. 2011) ("BACT limits are imposed through the preconstruction-permit process. In the absence of such a permit, they do not exist.").

A PSD permit is therefore a necessary prerequisite to the imposition of BACT on a source; the permit is the trigger for BACT. Thus, in order for a BACT determination to be made, Westvaco must first be required to apply for a PSD permit for the Luke Mill. Westvaco, however, has no power to apply for a PSD permit and seek a BACT determination for a mill it does not own. The regulations prescribing the PSD permitting process are written entirely in terms of the duty of the current or prospective owner or operator to meet certain prerequisites before a permit and final BACT determination will issue. *See, e.g.*, 42 U.S.C. § 7475(a)(3) (a permit will be issued only if "*the owner or operator of such facility* demonstrates . . . that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess" of applicable standards) (emphasis added); *id.* § 7475(a)(7) (requiring "the person *who owns or operates, or proposes to own or operate, a major emitting facility* . . . to

conduct such monitoring as may be necessary" to determine the effect of the source's emissions) (emphasis added).

Maryland's regulations implementing the Act echo this exclusive focus on owners and operators.  For example, COMAR 26.11.02.12 provides that "the owner or operator of a source shall comply with the procedures in this regulation when applying for" a PSD permit, and further provides that "[t]he owner or operator of a source subject to this [PSD] regulation shall submit a complete application on forms provided by the Department."  A PSD application, like all applications for permits from the Maryland Department of the Environment, must contain a certification "by a responsible official" of the owner or operator "as to truth, accuracy, and completeness" of the application.  *Id.* at 26.11.02.02.F.

There is no mechanism in either the Clean Air Act or the Maryland regulations implementing the PSD provisions of the Act by which someone other than an owner or operator of a source can seek a PSD permit for that source.[2]  Because Westvaco no longer owns or operates the Luke Mill, it has no authority to seek a PSD permit for the mill.  Consequently, an injunction ordering Westvaco to apply for and obtain a PSD permit containing a BACT limit for the DEP is precisely the kind of "vain thing" that equity will not require.  *Marsh*, 305 F.2d at 99.

**2.      Westvaco has no authority to effectuate any emission reduction that may be required by an injunction in this case because it no longer owns or operates the Luke Mill.**

The essence of the remedy requested by the Government is the reduction of future $SO_2$ emissions from the Luke Mill power boilers.  In addition to requiring Westvaco to obtain a PSD permit with a BACT limit applicable to the No. 25 Power Boiler, the Government also seeks an injunction ordering Westvaco to mitigate past emissions of $SO_2$ by reducing future $SO_2$

---

[2]  If any party could apply for a PSD permit for a source it does not own or operate, then there is presumably nothing preventing the Government from obtaining a PSD permit for the Luke Mill itself.  Of course, the Government has no authority to do so, and neither does Westvaco.

emissions from the No. 24 Power Boiler.  The Government's expert, Dr. James Staudt, opines that the emissions reductions from both power boilers would be achieved by installing SO2 scrubbers on each power boiler and operating them at removal efficiency of 95 percent over their useful life.  *See* Staudt Report at 53, 60.

The only party that can effectuate this relief is LPC.  Any scrubbers that may be required as a result of an injunction in this case would have to be installed by LPC, on property owned by LPC, and would have to be operated continuously by LPC.  Because Westvaco no longer owns or operates the Luke Mill, there is nothing it can do in response to an injunction that would reduce SO2 emissions from the Luke Mill.

Three recent cases presented circumstances similar to this case, where a former owner of a facility was alleged to have made a major modification without first obtaining a PSD permit, and then subsequently sold the facility to a third party.  *See United States v. EME Homer City Generation, LP*, 823 F. Supp. 2d 274, 290 (W.D. Pa. 2011); *Midwest Generation*, 781 F. Supp. 2d 677 at 685; *New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*, No. 07-5298, 2009 WL 3234438, at *17 (E.D. Pa. Sept. 30, 2009).  In each case, the court held as a matter of law that injunctive relief was unavailable because the former owner lacked the capacity to comply with the requested injunction.

In the earliest case, *Reliant Energy*, the Government's complaint made no distinction between Reliant, the current owner of the plant, and Met Ed, the former owner that had undertaken the modifications at issue.  Met Ed made certain modifications to the plant between 1983 and 1989, and then sold the entire plant to another third party in 1999, which sold it to Reliant in 2001.  2009 WL 3234438, at *4.  Met Ed moved to dismiss the complaint on the ground that injunctive relief against it was impossible and impractical because it no longer

owned the plant.  *Id.* at 17.  At oral argument, the plaintiffs "conceded that Met Ed would not be able to comply with a court order directing it to install pollution control measures, because it no longer controls the Plant."  *Id.*  But they argued that the court could craft an injunction to order Met Ed to pay the current owners to install and operate BACT.  The court rejected that argument, finding that because "the only 'injunctive relief' with which Met Ed could comply, would be the payment of money, I conclude that they are essentially seeking a legal remedy, and not injunctive relief."  *Id.*

The Government tried a somewhat different tack in *Midwest Generation*.  In that case, the court dismissed claims against the current owner of the plant on the ground that, because the units were modified by a former owner and a violation of the PSD permitting regulations is not a continuing violation, the current owner could not be held liable.  781 F. Supp. 2d at 679-80.  The Government then amended the complaint to add the former owner, ComEd, and sought injunctive relief against it "to remedy [its] past violations by, among other things, requiring [ComEd] to install and/or operate the best available control technology," and to force ComEd to mitigate past emissions by purchasing and retiring SO2 emission credits under the federal cap-and-trade program.  *Id.* at 684.  The court rejected this claim as well, finding that the Government had "offered no persuasive authority for such a broad exercise of judicial authority" as to require a former owner to modify plants it no longer owned.  *Id.* at 685.  The court also dismissed the claim for mitigation through surrender of emissions credits, since that order "could not reasonably be characterized as an injunction to remedy the failure to obtain a permit; it would be a penalty."  *Id.*

Finally, in *EME Homer City*, the Government sought injunctive relief requiring the installation of BACT against former owners who had modified units in 1991 to 1995 and then

sold the plant in question in 2001.  823 F. Supp. 2d at 276-78.  The court there concluded that the "facts alleged in the Complaint[] fall far short of those necessary to render a claim for injunctive relief plausible," *id.* at 289, because there was no "cognizable danger of recurrent violation" since the former owner no longer owned the plant, *id.* at 290.  The court also rejected the Government's request for an injunction ordering the former owners to mitigate past emissions, because there was no evidence of an ongoing or likely future violation of the statute.  *Id.*  Taken together, these cases are on all fours with the present case, where the Government has brought an enforcement action 18 years after the modification alleged to have violated the Clean Air Act occurred and where the facility has changed hands.  In each case, the court has held as a matter of law that injunctive relief against a former owner to install BACT and mitigate past emissions is not available.

The Government may rely on the Asset Purchase Agreement between Westvaco and LPC to argue that Westvaco has the contractual authority to modify the Luke Mill if required to do so by this Court.  That agreement, however, only allocates potential future liabilities as between the two parties and creates certain rights and duties in the parties *as to the counterparty*.  The agreement also preserves flexibility for Westvaco in defending this action and in crafting any possible settlement with the Government that might require the cooperation of the present mill owner.  *See* Schedule 11.2(a)(viii) ¶ 1.B (noting that LPC must cooperate in resolution of this litigation, including by settlement).  In this way, the agreement simply represents the prudent decision of two arms-length parties.

What the agreement does *not* do is expand the scope of the remedies that might be available to a Government plaintiff who is not a party to the agreement.  *C.f.* 13 Richard A. Lord, *Williston on Contracts* § 37:7 (4th ed. 2012) ("[N]ot everyone who may benefit from the

performance of a contract between two other persons[,] or who may suffer from its

nonperformance . . . is permitted to enforce the contract by court action.").  Nor does the

agreement purport to increase this Court's equitable powers.  Indeed, it could not, since parties

cannot expand the scope of a federal statute by private agreement.  *See, e.g.*, *Hall St. Assocs.,*

*LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (private contract cannot expand scope of judicial

review under federal statute); *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 663 (9th Cir. 2012)

(private contract cannot expand the scope of a court's power to "vacate, modify, or correct an

arbitration award" under federal arbitration statutes).  *C.f. Kyocera Corp. v. Prudential–Bache*

*Trade Servs., Inc.*, 341 F.3d 987, 998 n.16 (9th Cir. 2003) (*en banc*) (noting, in dicta, that "the

decision to contract for a narrower standard of review than the courts generally apply in the

absence of a statutory command is a decision that may be less troublesome than the attempt to

contract for a broader standard of review") (emphases omitted).  At most, the Agreement merely

provides that if LPC were to be required to install and/or operate pollution control equipment as

a result of this litigation, Westvaco would be financially responsible under the Agreement.  As

discussed below, however, ordering such a result is beyond the power of this Court in equity.

**3.     An injunction against LPC requiring it to install and operate SO2 scrubbers
       would be improper because LPC is not alleged to have violated the Clean Air
       Act.**

As discussed above, the ultimate relief requested by the Government in this case is the

reduction of future SO2 emissions from the Luke Mill's power boilers.  That relief would require

LPC to install SO2 scrubbers on the boilers and to continuously operate those scrubbers.  There

is, however, no basis for issuing an injunction against LPC requiring it to install or to operate

these SO2 scrubbers because LPC is not alleged to have violated the Clean Air Act in any

respect.

This Court has held that operating a facility after a major modification was undertaken without a PSD permit does not constitute a "continuing violation" of the PSD provisions of the Clean Air Act.  *See* Civil Penalties Order at 9-10.  This decision is in accord with the great weight of authority to have considered the question.  *See, e,g.*, *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 957 (S.D. Ill. 2003) ("[A] violation of the Clean Air Act's preconstruction permit requirements . . . occurs at the time of the construction or modification and is not continuing in nature"); *United States v. So. Ind. Gas & Elec. Co.*, No. 99-1692, 2002 WL 1760752, at *4 (S.D. Ind. July 26, 2002) ("[F]ailure to obtain a preconstruction permit is a discrete violation that occurs at the time of construction").[3]

An inescapable corollary of that decision is that the current owner of a facility cannot be held liable for unpermitted modifications that occurred prior to its ownership.  *See, e.g.*, *United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1008 (N.D. Ill. 2010) ("[B]ecause a violation of [of the permitting process] occurs at the time of construction and no later, Midwest Generation cannot be liable for any construction that occurred prior to Midwest Generation's ownership of the relevant sources."); *see also EME Homer City*, 823 F. Supp. 2d at 283; *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 668 (W.D.N.Y. 2003) ("By its plain terms, 42 U.S.C. § 7475(a) does not impose liability on any person other than the one who fails to comply with its requirements.").  Accordingly, though nominally a party to this case,

---

[3]  *See also Sierra Club v. Portland Gen. Elec. Co.*, 663 F. Supp. 2d 983, 991–92 (D. Or. 2009) (recognizing majority rule and collecting cases); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1083–84 (W.D. Wis. 2001) ("the statute of limitations for a violation of the preconstruction permit requirements . . . begins to run at the time of construction and does not continue through the operational life of the modified source"); *United States v. Brotech Corp.*, No. 00-2428, 2000 WL 1368023, at *3 (E.D. Pa. Sept. 19, 2000) ("[v]iolations of the various requirements to obtain construction permits or plan approvals occur at the time of the construction, modification, or installation of the equipment or facility"); *United States v. Campbell Soup Co.*, No. 95-1854, 1997 WL 258894, at *2 (E.D. Cal. Mar. 11, 1997) ("the regulation cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine still exists or is operated").

LPC is not in violation of the Act and has no liability under it.  *See also* Mem. and Order Re: Motion to Join (Doc. No. 279) ("Of course, LPC had no involvement whatsoever with the matters that were the subject of resolution heretofore.").

Because the Government has no claim against LPC, it cannot obtain injunctive relief against it.  It is axiomatic that, to obtain injunctive relief, a plaintiff must first establish a successful claim on the merits against the party to be enjoined.  *See, e.g.*, *Ciba–Geigy Corp. v. Bolar Pharma. Co.*, 747 F.2d 844, 850 (3d Cir. 1984) (before issuing permanent injunction, "the court must determine if the plaintiff has actually succeeded on the merits").  The Government's requested relief in this case, however, would necessarily require the Court to order LPC to permit the installation of SO2 scrubbers at its facility.  Furthermore, for any injunction to be "necessary" and "workable," *see Lemon v. Kurtzman*, 411 U.S. 192, 200-01 (1973), in terms of reducing SO2 emissions from the Luke Mill power boilers, the Court must necessarily order LPC to continuously operate the scrubbers on an ongoing basis.  Because the Government has no claim against LPC, any such order would be beyond the power of the Court.

**4.     An injunction ordering Westvaco to compensate LPC for the installation and operation of SO2 scrubbers would amount to an impermissible order to pay money damages.**

Not only would the Government's requested remedy improperly require LPC to install SO2 scrubbers on the Luke Mill power boilers and to operate them on an ongoing basis, but it would also require Westvaco to compensate LPC for having to take these actions.  For example, operating SO2 scrubbers entails ongoing costs, such as the cost of the reagent used to scrub the SO2 from the flue gas and the power to operate the scrubber.  The Government's expert has opined that it would cost roughly $2.7 million per year to operate each of the SO2 scrubbers that would be installed at the Luke Mill.  *See* Staudt Report at 65.  Ostensibly, the injunction in this

case would require LPC to incur the costs of operating these scrubbers and to send periodic invoices to Westvaco; Westvaco, then, would be required to pay those invoices.

Any order requiring Westvaco to compensate LPC for the costs of installing and operating the SO2 scrubbers would, in effect, constitute an order to pay money damages to LPC. However, the Clean Air Act does not authorize the payment of money as a form of relief for a statutory violation.  *See* 42 U.S.C. § 7413(b) (authorizing the EPA to seek only "a permanent or temporary injunction" and "a civil penalty" based on the number of days of violations).

Lawsuits seeking an order to compel the defendant to pay a sum of money to the plaintiff "are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (internal quotation marks omitted) (ellipse in original).  An order in equity "to pay" is generally limited to restitution orders where the action seeks to "restore to the plaintiff particular funds or property in the defendant's possession," and "not to impose personal liability on the defendant." *Id.* at 214.  Otherwise, no matter how a plaintiff chooses to characterize the claim, if it seeks compensation for loss, the claim is one for money damages, and "[m]oney damages are, of course, the classic form of *legal* relief." *Id.* (italics in original).  A plaintiff therefore "cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979).

For this reason, all three PSD enforcement actions seeking injunctive relief against former owners, which were discussed above, have rejected the argument that the former owner can be required to pay the costs incurred by the current owner to reduce emissions from the facility.  *Midwest Generation*, for example, presents facts very similar to this case.  There, the

former owner, ComEd, was alleged to have made unpermitted modifications to a facility it

subsequently sold to Midwest Generation's predecessor.  In support of their request for

injunctive relief, the plaintiffs argued that the court could "simply enter an injunction that would

force ComEd to pay for Plaintiffs' requested modification to Midwest Generation's plants."

*Midwest Generation*, 781 F. Supp. 2d at 685-86.  The court rejected that argument and held that

injunctive relief was unavailable against ComEd.  *Id.*  The court in *Reliant Energy* rejected a

similar argument, holding:

> The states have offered no legal authority, and this court is aware of none, in
> support of their position that the payment of money by Met Ed [the former owner]
> for the purpose of installing BACT at the Plant would constitute injunctive relief.
> On the contrary, injunctive relief is considered an extraordinary remedy which is
> available only when legal remedies (*e.g.*, money damages) do not suffice. [¶]
> Because the states concede that the only "injunctive relief" with which Met Ed
> could comply, would be the payment of money, I conclude that they are
> essentially seeking a legal remedy, and not injunctive relief.  Accordingly, I
> dismiss the complaints to the extent they seek injunctive relief against Met Ed.

*Reliant Energy*, 2009 WL 3234438, at *17 (internal citation omitted).  Here, the only

conceivable remedy against Westvaco would entail the payment of money to LPC as

compensation for LPC's costs to comply with the injunction requested by the Government.

The terms of the Asset Purchase Agreement between Westvaco and LPC's predecessor,

NewPage, do not alter this conclusion for two separate and independent reasons.  First, requiring

a party to make payments to another party pursuant to a written contract is not a form of

equitable relief; rather, it is a claim at law.  *Great-West Life*, 534 U.S. at 210 ("'A claim for

money due and owing under a contract is 'quintessentially an action at law.'") (quoting *Wal-*

*Mart Stores, Inc. v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000) (Posner, J.)).  Second, the

respective rights and obligations of Westvaco and LPC pursuant to the Asset Purchase

Agreement is not an issue before this Court.  There is, for example, no cross-claim pending

between Westvaco and LPC seeking to enforce that agreement.  Consequently, whether LPC has

24

a contractual right to require Westvaco to compensate it for costs incurred in complying with an injunction entered in this case is immaterial to the scope of the equitable relief available to the Government.

\*   \*   \*

The fact that Westvaco no longer owns or operates the Luke Mill presents intractable legal and practical barriers to the imposition of injunctive relief in this case.  A PSD permit for the Luke Mill with a BACT limit on the No. 25 Power Boiler is the cornerstone of the relief requested by the government, but Westvaco does not have the authority to apply for a permit because it does not own the Luke Mill.  And any actual reductions in $SO_2$ emission from the mill would have to be achieved by LPC, but that company cannot be subject to injunctive relief because it has not violated the Clean Air Act.  Consequently, the injunctive relief requested by the Government here would be improper as a matter of law.

## V.
## CONCLUSION

Because Westvaco no longer owns or operates the Luke Mill, equitable relief is not available to the Government as a matter of law.  This Court should therefore enter summary judgment in Westvaco's favor.


DATE: June 15, 2012                                  Respectfully submitted,




                                             _____/s/_____
                                             Raymond B. Ludwiszewski (Bar No. 14905)
                                             *rludwiszewski@gibsondunn.com*
                                             Charles H. Haake (*pro hac vice*)
                                             *chaake@gibsondunn.com*
                                             Justin A. Torres (*pro hac vice*)
                                             *jtorres@gibsondunn.com*

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2012, a true and correct copy of the foregoing

DEFENDANT WESTVACO CORPORATION'S MEMORANDUM IN SUPPORT OF ITS

MOTION FOR SUMMARY JUDGMENT ON THE UNAVAILABILITY OF THE

GOVERNMENT'S PROPOSED EQUITABLE RELIEF was filed using the Court's electronic

case filing system, which results in service on all counsel of record registered on the case

management/electronic filing ("CM/ECF") system.



/s/

Charles H. Haake