### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
**Northern Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **CASE NO. MJG 00-CV-2602** |
| **WESTVACO CORPORATION** | |
| **Defendant.** | |

### DEFENDANT WESTVACO CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT BASED ON THE INAPPLICABILITY OF BACT TO THE DIGESTER EXPANSION PROJECT

Raymond B. Ludwiszewski (Bar No. 14905)
*rludwiszewski@gibsondunn.com*
Charles H. Haake (*pro hac vice*)
*chaake@gibsondunn.com*
Justin A. Torres (*pro hac vice*)
*jtorres@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     ARGUMENT ....................................................................................................... 2

     A.      The Government Must Show Irreparable Harm Resulting From The
        Alleged Violation Of The Clean Air Act In Order To Be Entitled To
        Injunctive Relief............................................................................................... 2

     B.      The Government's Only Evidence Of Irreparable Harm Stems From Its
        Argument That SO2 Emissions From The Luke Mill Would Have Been
        Lower Had BACT Been Applied To The No. 25 Power Boiler. .......................... 4

     C.      The Government Cannot Show An Increase In Emissions Because The
        DEP Would Not Have Resulted In The Imposition Of BACT At The
        Time. ................................................................................................................. 6

          1.      BACT would not have been required for the DEP because of the
              application of 40 C.F.R. §52.21(i)(4)(v).................................................. 8

              a.      The DEP did not entail a major modification to the No.
                   25 Power Boiler. .................................................................. 8

              b.      The timing prerequisites found in 40 C.F.R.
                   52.21(i)(4)(v) are also met here. .................................................. 12

          2.      Alternatively, BACT would not have been required for the DEP
              because of the application of 40 C.F.R. §52.21(i)(9)............................. 15

IV.     CONCLUSION .................................................................................................. 17

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Beale v. Hardy,*
  769 F.2d 213 (4th Cir. 1985) ................................................................ 10

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .................................................................... 2, 3

*Envtl. Def. Fund, Inc. v. Lamphier,*
  714 F.2d 331 (4th Cir. 1983) ................................................................ 3

*Othentec Ltd. v. Phelan,*
  526 F.3d 135 (4th Cir. 2008) ................................................................ 10

*United States v. Alisal Water Corp.,*
  326 F. Supp. 2d 1010 (N.D. Cal. 2002) ................................................ 3

*United States v. Cinergy Corp.,*
  618 F.Supp.2d 942 (S.D. Ind. 2009) .................................................... 3

*United States v. Oakland Cannabis Buyers' Coop.,*
  532 U.S. 483 (2001) ............................................................................... 3

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ............................................................................... 2

## Regulations

40 C.F.R. § 52.21(b)(2) (1978) .............................................................. 10

40 C.F.R. § 52.21(j)(3) (1978) ................................................................ 7

40 C.F.R. § 52.21(j)(3) (1980) ................................................................ 7

40 C.F.R. § 52.21(n)(2) (1978) ............................................................... 9

43 Fed. Reg. at 26,404 (40 C.F.R. § 52.21(b)(3) (1978)) ..................... 9

43 Fed. Reg. at 26,404 (40 C.F.R. § 52.21(b)(5) (1978)) ..................... 7

43 Fed. Reg. at 26,407 (40 C.F.R. § 52.21(m)(2) (1978)) .................... 9

Defendant, Westvaco Corporation ("Westvaco"), hereby submits the following reply in support of its Motion for Summary Judgment Based on the Inapplicability of BACT to the Digester Expansion Project (the "BACT Motion") and its Memorandum in support thereof (Doc. No. 303 and attachments thereto), and in response to the Government's opposition thereto (the "BACT Opp.") (Doc. No. 309).

## I.     INTRODUCTION

The Government's BACT Opposition fails to show that there is a genuine dispute of fact concerning whether the BACT exception found either in Section 52.21(i)(4)(v) or in Section 52.21(i)(9) of the 1980 PSD Regulations applies to the Digester Expansion Project ("DEP").  As Westvaco demonstrated in its Motion, one of these exemptions governs the requirement to install BACT because of the timing of when Westvaco received its state permit for the DEP and undertook construction on that project, and because the allowable emissions of SO2 from the Luke Mill power boilers did not increase.  The difference between the two exemptions concerns whether the DEP would have been subject to the 1978 PSD Regulations that were in effect prior to August 7, 1980.  In or before May on 1980, Westvaco determined that the DEP did not trigger the 1978 PSD Regulations and submitted a state application for a permit to construct reflecting that determination.   If that determination was correct and the DEP *was not* subject to the 1978 Regulations, then the exemption found in 40 C.F.R § 52.21(i)(4)(v) applies because the timing requirements of that provision are met.  If, on the other hand, the DEP *was* subject to the 1978 Regulations, then the exemption found in 40 C.F.R § 52.21(i)(9) applies because the DEP did not result in an increase in allowable SO2 emissions from the power boilers.

The Government's efforts to avoid the application of these exemptions fail as a matter of law.  Contrary to its argument, the Government must show irreparable harm in order to be entitled to injunctive relief, and its evidence of such harm relies entirely on the assumption that

BACT would categorically have been required for the DEP in light of the Court's finding that it was a "major modification" under the 1980 PSD Regulations.  But because the DEP was commenced at a time when the PSD Regulations were transitioning from the 1978 version to the 1980 version, the question of BACT is more complicated than the Government presumes, and requires the application of Section 52.21(i) of the 1980 Regulations.  Two of the exemptions found in that provision are potentially applicable to the DEP, and under either one or the other of the exemptions the DEP would not have resulted in the application of BACT in 1981.  And if BACT would not have been required, there have been no "excess" SO2 emissions from the mill and no resulting irreparable harm to the environment.  Summary judgment must be granted in Westvaco's favor.

## II.    ARGUMENT

**A.    The Government Must Show Irreparable Harm Resulting From The Alleged Violation Of The Clean Air Act In Order To Be Entitled To Injunctive Relief.**

As an initial matter, the Government's opposition is based on the faulty premise that it is entitled to injunctive relief even if it cannot demonstrate that Westvaco's alleged violation of the PSD provisions of the Clean Air Act have resulted in increased emissions of sulfur dioxide from the Luke Mill.  BACT Opp. at 26-28.  This is not correct.  In order to be entitled to injunctive relief, the Government must show irreparable harm, and its only evidence of irreparable harm stems from the notion that the Luke Mill has emitted more SO2 than would have been allowed had it applied for and obtained a PSD permit.  If, contrary to the government's argument, Westvaco would not have been required install BACT on account of the DEP even if that project amounted to a major modification under the 1980 PSD Regulations, then the Government cannot show irreparable harm and is therefore not entitled to injunctive relief.

It is hornbook law that a showing of irreparable harm is necessary for injunctive relief. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."). In fact, the case upon which the Government relies most heavily in its three opposition briefs, *United States v. Cinergy Corp.*, 618 F.Supp.2d 942, 959 (S.D. Ind. 2009), held that "traditional principles of equity" applied to the court's "consideration of the appropriate injunctive relief" for the PSD violations previously found by the jury, including the requirement of irreparable harm. Therefore, the court concluded,

> to determine the appropriate relief for Cinergy's violations of the CAA … the Court will consider (1) whether Plaintiffs have suffered an irreparable injury; (2) whether there are inadequate remedies available at law to compensate for the injury; (3) whether, considering the balance of hardships between Plaintiffs and Cinergy, a remedy in equity is warranted; and (4) whether a permanent injunction would not disserve the public interest.

*Id.* at 960 (citing *eBay Inc.,* 547 U.S. at 391); *see also id.* at 959-60 (rejecting the argument "that the Jury's finding of a violation automatically entitled Plaintiffs to injunctive relief."). In *Cinergy*, as here, the Government's claim of irreparable harm was based on increased emissions from the modified source and the resulting harm to the environment. *Id.* at 947.[1]

The other cases cited by the government are inapposite; in those cases, the Government sought to enjoin ongoing violations of the law, not to remedy a wholly past violation. *See, e.g., United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (seeking an injunction against the continued manufacturing and distribution of medical marijuana in

---

[1] The modifications at issue in *Cinergy* took place between 1989 and 1992, and the exemptions in 40 C.F.R. § 52.21(i) therefore did not come in play.  *Cinergy*, 618 F. Supp. 2d at 944.

violation of federal law); *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 335 (4th Cir. 1983) (defendant was continually violating the law by storing hazardous wastes without a permit); *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) (equitable relief was awarded where "even after numerous citations and orders were issued to defendants by state and local authorities, and even after this Court granted summary judgment with respect to more than 200 violations of the Act, significant violations of the Act continued.")

Here, in contrast, the only violation of the Clean Air Act took place over 30 years ago when construction on the DEP commenced without a PSD permit.  *See* April 23, 2001 Mem. and Order on Mot. to Dismiss at 13 n.3 (Doc. No. 15) ("Civil Penalties Order").  There is no ongoing violation and no danger of repeated violation by Westvaco.  Consequently, if the Government can secure injunctive relief at all, it can do so only if it can show that as a result of that violation 30 years ago, Westvaco is causing continued irreparable harm.[2]

**B.      The Government's Only Evidence Of Irreparable Harm Stems From Its Argument That BACT Was Required For The No. 25 Power Boiler And SO2 Emissions From The Luke Mill Would Have Been Lower Had BACT Been Applied.**

As explained in greater detail in Westvaco's Motion for Summary Judgment on Lack of Evidence of Irreparable Harm (Doc. No. 303), the Government's only claim to irreparable injury in this case stems from an argument that if Westvaco had obtained a PSD permit for the DEP, the permit would have included a BACT limit on SO2 emissions from the No. 25 Power Boiler requiring the installation of an SO2 scrubber.  *See* Expert Report of Dr. James Staudt (attached as Exhibit B to Westvaco's Motion for Summary Judgment on Lack of Evidence of Irreparable

---

[2]  As explained in Westvaco's Motion for Summary Judgment on the Unavailability of Equitable Relief, any harm to the environment Westvaco may have caused on account of the DEP (and there has been none) ceased in 2005 when it sold the Mill to NewPage.

Harm (hereinafter the "Irreparable Harm Motion") (Doc. No. 303-3).  Dr. Staudt then estimates what SO2 emissions would have been if BACT had been applied to the No. 25 Power Boiler and compares those figures to estimated actual emission levels, the difference between the two being the alleged "excess emissions" from the boiler.  *Id*. at 57.

Based entirely on Dr. Staudt's estimates concerning excess emissions, another expert, Mr. Lyle Chinkin, performed air dispersion modeling to estimate how much ambient concentrations of PM2.5, and mercury and sulfate deposition purportedly increased in the region surrounding the Luke Mill because of these excess emissions.  *See* Expert Report of Lyle Chinkin at 3-22 (attached as Exhibit C to Westvaco's Irreparable Harm Motion).  The results of Mr. Chinkin's modeling were then given to three other experts, James "Rick" Webb, Dr. Charles Driscoll, and Dr. Leland Deck, who used the modeling to describe alleged impacts from the increased deposition in the region surrounding the Luke Mill.  *See* Expert Report of James "Rick" Webb at 39-41 (attached as Exhibit E to Westvaco's Irreparable Harm Motion); Expert Report of Dr. Charles Driscoll at 25-26 (attached as Exhibit F to Westvaco's Irreparable Harm Motion); Expert Report of Dr. Leland Deck 3-4 (attached as Exhibit G to Westvaco's Irreparable Harm Motion).

Consequently, the lynchpin of the Government's claim for equitable relief is the assumption that BACT would have been required for the DEP and would have resulted in the installation of a scrubber to control SO2 emissions from the No. 25 Power Boiler.  If BACT would not have applied, there would have been no excess emissions, and without any excess emissions there would be no harm to the environment.  Westvaco's BACT Motion, therefore, does not present an "irrelevant" or "hypothetical exercise of what Westvaco might have done more than thirty years ago," as the Government falsely contends.  BACT Opp. at 10.  Rather, it

addresses a question that is the sole foundation for the Government's claim for injunctive relief: Even if the DEP amounted to a "major modification" under the 1980 PSD Regulations and even if Westvaco had applied for a PSD permit prior to commencing construction on the DEP, would that have resulted in the obligation to impose BACT under the applicable PSD Regulations? Because either Section 52.21(i)(4)(v) or Section 52.21(i)(9) of the 1980 PSD Regulations would have exempted the project from BACT, the Government cannot prove irreparable harm.

**C.   The Government Cannot Show An Increase In Emissions Because The DEP Would Not Have Resulted In The Imposition Of BACT At The Time.**

The Government begins its discussion of these BACT exemptions by arguing that they should not be applied to DEP under any circumstances.  *See* BACT Opp. at 7-12.  First, the Government points to the prior history of this case in which certain determinations were made with reference to the 1980 PSD Regulations, and claims that "[a]t no time prior to seeking permission to file the instant motion has Westvaco offered any indication that it believes that the 1978 PSD Rule, rather than the 1980 Rule, governed any portion of this case."  BACT Opp. at 7. Not only is this not true—Westvaco's expert, Colin Campbell, explained in his February 21, 2012 expert report that these exemptions would apply to the DEP, *see* Expert Report of Colin Campbell at 7-12 (relevant excerpts are attached hereto as Exhibit A hereto)[3]—but it is immaterial because the application of Section 52.21(i) of the 1980 PSD Regulations was not required for any of the issues decided thus far in the litigation.  There is nothing in any of the

---

[3]  Consequently, this Court should reject the Government's argument that it "has not focused its discovery efforts" on certain facts relevant to the applicability of these exemptions "because until seeking permission to file the instant motion, Westvaco has not indicated its position that the 1978 PSD Rule was relevant," and that it has been therefore been prejudiced.  BACT Opp. at 19.  The Government was aware of Westvaco's position no later than February 21, 2012, and had abundant time to conduct discovery concerning it.

prior briefings by the parties or decisions of this Court preventing Westvaco from relying on that provision at this stage in the litigation, and the Government has cited this Court to no authority for the proposition that there is.[4]

Second, the Government argues that applying the 40 C.F.R. 52.21(i) exemptions to the DEP is inconsistent with the purpose of those exemptions.  *See* BACT Opp. at 11-12.  The Government states that EPA structured these exemptions "in part to ensure that BACT would apply to a pollutant for which the project would be 'major' under the 1978 Rules, but 'minor' under the 1980 PSD Rule," *see* BACT Opp. at 12.  However, the Government ignores the fact that the converse is also true.  The purpose of these provisions was also to exempt from the BACT requirement any project that would have been "minor" under the 1978 PSD Rules but "major" under the 1980 Rules.  As Westvaco explained in its BACT Memorandum, that is precisely the case here, and the Court must therefore look to the exemptions found in 40 C.F.R. §§ 52.21(i)(4)(v) and/or (i)(9) to determine whether BACT would have applied to the DEP.

---

[4] The government suggests that Westvaco's current position is somehow inconsistent with its earlier argument that the power boilers, recovery furnaces and lime kiln were not "emissions units" that were "modified" so as to trigger BACT because then Westvaco was relying on the 1980 PSD Regulations.  *See* BACT Opp. at 8.  But at the time, Westvaco was addressing allegations in the First Amended Complaint that covered projects dating from 1981 through 1991, *see* First Amended Complaint ¶¶ 44, 64, and therefore only referred to the 1980 Regulations.  Moreover, the Government's suggestion that the outcome of that determination may have been different under the 1978 Rule because it "did not contain the concept of an 'emissions unit' and the 1978 provision parallel to the 1980 regulation cited by Westvaco refers to 'new or modified facilities.' 40 C.F.R. § 52.21(j)(3) (1978)," BACT Opp. at 8, is not correct.  The 1978 PSD Regulations defined "facility" as "an identifiable piece of process equipment." 43 Fed. Reg. at 26,404 (40 C.F.R. § 52.21(b)(5) (1978)).  The 1980 version of 40 C.F.R. § 52.21(j)(3) reaches the same result using slightly different language, referring instead to an "emissions unit."  There is no functional difference between the "emissions unit" referred to in the 1980 PSD Regulations and an "an identifiable piece of process equipment" referred to in the 1978 PSD Regulations.

1.      **BACT would not have been required for the DEP because of the application of 40 C.F.R. §52.21(i)(4)(v).**

In its BACT Memorandum, Westvaco demonstrated that the DEP is completely exempt from the BACT requirements of the 1980 PSD Regulations because all of the prerequisites of 40 C.F.R. § 52.21(i)(4)(v) have been met.  The Government's efforts to avoid this conclusion are without merit.

a.      **The DEP did not entail a major modification to the No. 25 Power Boiler.**

The sole claim remaining from the Government's complaint is that the DEP amounted to a major modification of an emission unit including the No. 25 Power Boiler, requiring the imposition of BACT limiting SO2 emissions from the boiler.  Pursuant to Section 52.21(i)(4)(v) of the 1980 PSD Regulations, BACT would not have been required for that modification if it "was not subject to 40 C.F.R. 52.21 as in effect on June 19, 1978," and if the timing prerequisites in that exemption are met.  As Westvaco explained in its BACT Memorandum, the DEP was not a "major modification" to the No. 25 Power Boiler under the 1978 PSD Regulations because it did not "increases the potential emission rate" of SO2 from that unit.  *See* Westvaco's BACT Memorandum at 15.  Under the 1978 PSD Regulations, the potential emission rate of a unit can be based on any "[e]nforceable permit conditions on the type or amount of materials combusted or processed" applicable to the unit.  *Id.*  The 49 ton-per-day emission cap was such a permit condition because it was effectively a limit on the type and amount of sulfur containing fuel that could be burned in the boiler.  *Id.*

The Government does not present any evidence or argument to dispute the fact that the 49 ton-per-day emission cap meant that the DEP did not increase the No. 25 Power Boiler's "potential emission rate" of SO2.  Instead, the Government claims that the 1978 PSD Regulations provide only that the cap "*may* be used in determining the potential emission rate"

8

of the boiler, and that EPA may have elected not to do so.  *See* BACT Opp. at 20-21.  But there

is nothing in the 1978 PSD Regulations suggesting that the decision to use a permit condition to

determine potential to emit rests solely with EPA.  The Regulations merely provide:

"Enforceable permit conditions on the type or amount of materials combusted or processed may

be used in determining the potential emission rate of a source."  43 Fed. Reg. at 26,404 (40

C.F.R. § 52.21(b)(3) (1978)).  Indeed, where the 1978 PSD Regulations gave the Administrator

the sole authority to make a determination, they stated so clearly.  *See e.g.* 43 Fed. Reg. at 26,407

(40 C.F.R. § 52.21(m)(2) (1978)) ("[w]ritten approval of the Administrator must be obtained for

any modification or substitution" of an air quality impact model); *id.* (40 C.F.R. § 52.21(n)(2)

(1978)) (air quality monitoring data "shall relate to, and shall have been gathered over, the year

preceding receipt of the complete [PSD] application, unless the owner or operator demonstrates

to the Administrator's satisfaction that such data gathered over a portion or portions of that year

or another representative year would be adequate to determine that the source or modification

would not cause or contribute to a violation of a national ambient air quality standard").  Given

that the source is responsible for making the PSD applicability determination in the first instance,

the regulations clearly allow the source to use a permit condition in determining potential to

emit.  Here, the potential of the No. 25 Power Boiler to emit SO2 remained unchanged after the

DEP; therefore, the project would not have been considered a "modification" to the No. 25

Power Boiler under the 1978 PSD Regulations.

The Government also argues that the determination of a major modification under the

1978 PSD Regulations "'tak[es] into account all accumulated increases in potential emissions

occurring at the source since August 7, 1977,'" BACT Opp. at 19 (quoting 40 C.F.R.

§ 52.21(b)(2) (1978)), and speculates that there may have been other increases in SO2 emissions

it has not discovered.  Of course, summary judgment cannot be defeated by offering speculation that there may be a disputed issue of fact.  *See Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) ("The nonmoving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985))).

Finally, the Government argues that even if the DEP would not have been a major modification with respect to SO2 emissions from the No. 25 Power Boiler, it may have been a major modification with respect to SO2 emissions from the recovery boilers and/or with respect to TRS emissions from the digesters.  *See* BACT Opp. at 19 and 25.  Because the 49 ton-per-day SO2 emission cap applied only to the power boilers and not these other units, the Government argues, BACT would have applied to the DEP notwithstanding the cap.  *Id.*  But this argument does not help the Government because it would not have resulted in an obligation to install BACT *on the No. 25 Power Boiler*, which is the remedy it seeks here.

As discussed above, both the 1978 and the 1980 PSD Regulations limited BACT to the emission unit that was modified and to the pollutant that was increased.  *See* 43 Fed. Reg. at 26,407 (40 C.F.R. § 52.21(j) (1978)); 40 C.F.R. § 52.21(j) (1980).  The Government does not suggest that the Luke Mill's recovery boilers were modified as part of the DEP, so the BACT requirements would not apply to those pieces of process equipment.

If the BACT requirements were to be triggered on account of increased TRS emissions from the digesters, then BACT would be required to control TRS emissions from the digesters, and not to control SO2 emissions from the No. 25 Power Boiler.  However, as the Government recognizes, TRS emissions from the Luke Mill digesters have been controlled since 1985 when the mill started incinerating those gasses in the lime kiln and later the power boiler.  *See* BACT

Opp. at 6-7.  The Government has never contended that BACT for digester TRS gasses would have been anything different.

These facts explain the conclusions made by Westvaco in its May 9, 1980 application to the State of Maryland for the permit to construct the new digesters.  *See* Exhibit C to Westvaco's BACT Motion.  Concerning the emission of TRS gasses from the digesters, Westvaco concluded that the project met the New Source Performance Standards because "[n]oncondensable gases containing TRS will be collected and incinerated in an existing odor control system."  *Id.* at Bates No. WVCO_0418-0561.  Concerning SO2 emissions from the power boilers, Westvaco concluded:

> PSD requirements are met because the SO2 formed from the incineration of the TRS containing gases will be discharged through an existing 600 foot stack servicing the mill's power boilers.  The SO2 emissions from the stack is [sic] limited to a maximum of 49 tons/day.  The addition of the SO2 to the stack from the TRS incineration will not raise the allowable emission of SO2 from the stack.

*Id.*  This PSD applicability determination was made by Westvaco no later than May 9, 1980, and was therefore made under the 1978 PSD Regulations in effect at the time.  In fact, Mr. Robert Dickinson testified in his recent deposition that, prior to submitting the May 9, 1980 permit application, he conducted a PSD applicability determination under the 1978 PSD Regulations and determined that PSD was not triggered with respect to SO2 emissions from the power boilers, and that applicability determination formed the basis for the conclusions in the state permit application.  *See* Deposition of Robert Dickinson (April 17, 2012) at 70:3-71:14; 73:15-

23 (relevant portions attached hereto as Exhibit B hereto).  The Government has not shown that under those regulations, that PSD non-applicability decision was incorrect.[5]

### b.    The timing prerequisites found in 40 C.F.R. 52.21(i)(4)(v) are also met here.

There are four timing requirements under 40 C.F.R. 52.21(i)(4)(v):  (1) all preconstruction permits must have been obtained before August 7, 1980; (2) construction must have commenced within 18 months from August 7, 1980; (3) construction must not have discontinued for 18 months or more; and (4) construction must have been completed within a reasonable time.  The Government does not dispute that the second and third conditions have been met, but contends that there are disputed issues of fact as to whether the first and the fourth are satisfied.  There are not.

Even though Westvaco obtained a state permit to construct the two new digesters on June 6, 1980, the Government argues that Westvaco had not obtained all preconstruction permits prior to August 7, 1980 because "the DEP was part of a continuous set of improvements to a multipart emission unit" and there were aspects of the DEP in addition to the addition of the new digesters. *See* BACT Opp. at 22-23 ("The United States contends that construction *of the DEP* was a 'major modification' to the Luke Mill.").  But however the scope of the "Digester Expansion Project" is defined, this Court has held that construction on that project commenced in February

---

[5]  The Government might argue—but never has—that Westvaco should not have made that PSD non-applicability determination under the 1978 PSD Regulations because construction on the DEP began in 1981—after the 1980 PSD Regulations came into effect.  Indeed, the very purpose of the exemption found in Section 52.21(i)(4)(v) is to protect sources in such a circumstance.  Because Westvaco correctly determined that the DEP did not trigger PSD under the 1978 Regulations, and because (as discussed in Westvaco's BACT Motion) the timing requirements in that exemption have been met, BACT was not required under the 1980 PSD Regulations, even if the DEP constituted a major modification under the 1980 Regulations.

1981.  *See* Memorandum and Order Re: First Phase (Doc. No. 230) at 22 ("The Luke Mill Report from the fall of 1981 indicates that construction related to the DEP commenced with the actual installation of the digesters in spring of 1981."); *see also* Second Phase Decision re: Baseline Period and Post-Change Emissions Determination at 5 (determining "the rate of 'actual emissions' of the Luke Mill as of the commencement of the DEP (February 1981).") (Doc. No. 252).  And as Westvaco pointed out in its BACT Memorandum, that determination necessarily establishes that all preconstruction permits for the DEP were obtained prior to that date.  *See* BACT Memorandum at 16-17.[6]

The Government's claim that there is a genuine dispute of material fact as to whether Westvaco completed construction on the DEP in a reasonable time is likewise unavailing.  The only evidence offered by the Government on this point is a single page of Mr. McCubbin's Rebuttal Report where he states that he "do[es] not believe that construction [on the DEP] was completed within a reasonable time."  *See* Rebuttal Report of Neil McCubbin (April 9, 2012) at 13 (attached as Exhibit N to Westvaco's BACT Motion) (Doc. No. 304-15).  But in his deposition, Mr. McCubbin conceded facts that demonstrate that there is no genuine issue of material fact concerning whether the DEP was completed in a reasonable time.

---

[6] The Government suggests that "the facts would justify revisiting this Court's conclusion" that construction on the DEP commenced (as that term is defined in the PSD Regulations) in February 1981 and the resulting conclusion that "all necessary preconstruction approvals or permits" had been obtained.  *See* BACT Opp. at 22.  But revisiting that determination would necessitate reopening the question of what the pre-change baseline period is, and whether the DEP resulted in a net increase in emissions related to that period.  *See* Second Phase Decision re: Baseline Period and Post-Change Emissions Determination (Doc. No. 252) (finding that "the rate of 'actual emissions' of the Luke Mill as of the commencement of the DEP (February 1981) is equal to the tons per year of SO2 'actually emitted [] during a two year period which precedes [February 1981] and which is representative of normal source operation.'") (citation omitted).

Specifically, Mr. McCubbin is not saying that the *physical construction* of both the new digesters and the attendant NCG control system took an unreasonable amount of time to complete.  *See* McCubbin Depo. at 287:4-14 ("[Q:]  I think you indicated that there was an 18-month period between when construction started in February of 1981 and when the digesters were up and running in mid-1982.  Is that an unreasonable time to get two new digesters constructed and operational?   A: Not to get that part of the work done.  That's a reasonable time, yes.  But the job wasn't finished."); 318:2-10 ("Q:  But in your opinion, is taking 30 months after the approval of the plan an unreasonable amount of time to get the NCG system up and running?   A: It's a bit long, but it's not ridiculous.").  40 C.F.R § 52.21(i)(4)(v)(c) merely requires that the source "complete *construction* within a reasonable time," which, according to Mr. McCubbin, was accomplished.  Nor does Mr. McCubbin claim that it was unreasonable for Westvaco to adhere to the schedule for the completion of the NCG control system it had agreed to with the state.  *Id.* at 314:8-12; 318:2-319:14.  The only thing identified by the Government in its Opposition that Mr. McCubbin found to be unreasonable about the time it took to complete the NCG control system is his testimony that "I wouldn't give them that long."  McCubbin Depo. at 318:16-19 (cited in BACT Opp. at 24).  But, the Maryland regulators did and Mr. McCubbin's personal views certainly do not rise to a genuine dispute of a material fact.

There is, therefore, no genuine dispute of material fact as to whether the timing prerequisites found in 40 C.F.R. § 52.21(i)(4)(v) have been satisfied in this case.  This, coupled with the fact that the DEP would not have been considered to be a major modification to the No. 25 Power Boiler, leads to the inescapable conclusion that BACT limiting SO2 from the No. 25 Power Boiler would not have been required.

**2.     Alternatively, BACT would not have been required for the DEP
because of the application of 40 C.F.R. §52.21(i)(9).**

As an alternative, Westvaco demonstrated that even if the complete exemption found in

40 C.F.R. § 52.21(i)(4)(v) did not apply, then 40 C.F.R. §52.21(i)(9) governs. The Government

argues that because 40 C.F.R. §52.21(i)(9) applies "if the owner or operator of the source or

modification submitted an application for a permit under [the 1978] regulations before August 7,

1980," 40 C.F.R. § 52.21(i)(9), and because Westvaco did not submit an application, the

exemption does not apply.  BACT Opp. at 13-14.  The Government's argument fails to address

the point made in Westvaco's Motion.   The Government's claim for injunctive relief rests on the

argument that Westvaco should have applied for a PSD permit prior to commencing construction

on the DEP and the *assumption* that that permit would have necessarily included a BACT limit

on the No. 25 Power Boiler.  Westvaco's BACT Motion points out the flaw in the Government's

assumption:  If Westvaco had applied for a PSD permit prior to commencing construction on the

DEP (as the Government claims it should have) that permit application would not have resulted

in the requirement to impose BACT on the No. 25 Power Boiler, because it would have been

submitted prior to August 7, 1980.

The Government tries to avoid this conclusion by arguing that Westvaco could not have

submitted a complete PSD application prior to August 7, 1980 even if it wanted to since (the

Government contends) a "complete application for a PSD permit for the DEP would have been

much more lengthy and complex than a state construction permit for construction of the two new

digesters."  BACT Opp. at 14.  According to the Government, the application would have needed

to include an "air quality review" under 40 C.F.R. § 52.21(l) (1978), "continuous air quality

monitoring" under § 52.21(n), and an "an analysis of the impairment to visibility, soils and

vegetation" under § 52.21(p).  *Id.* at 15.  Thus, the Government argues, "[a] fact finder could

draw a reasonable inference that Westvaco would have needed several additional months to compile this more detailed application." *Id.* at 16.

This entire argument is based on the faulty premise that the PSD permit application would have required these additional elements.  In fact, it would not, because the 1978 PSD Regulations provide an exemption from these requirements where the proposed modification will not result in an increase in allowable emissions.  Specifically, 40 C.F.R. § 52.21(k)(1) provides that "[t]he requirements of paragraphs (l) , (n) and (p) shall not apply to a major stationary source or major modification with respect to a particular pollutant, if . . . (ii) The increase in allowable emissions of that pollutant from the source or modification would be less than 50 tons per year, 1000 pounds per day or 100 pounds per hour, whichever is more restrictive." *See* 43 Fed. Reg. at 26,407 (40 C.F.R. § 52.21(k)(1) (1978)).  Thus, for the same reason BACT would not have been required under the 1978 rules, neither would have the impact analysis the Government claims Westvaco could not have compiled prior to August 7, 1980.  As explained by Westvaco's expert Colin Campbell in his deposition, because the DEP would not result in an increase in allowable emissions, "most of the substantive requirements [of the 1978 PSD Regulations] would not have applied, and this would have been a nearly empty PSD permit, and an abbreviated PSD permit application." *See* Deposition of Colin Campbell (March 8, 2012) 404:18-21 (attached hereto as Exhibit C).   There would therefore have been nothing to prevent Westvaco from submitting a complete PSD permit application prior to August 7, 1980.[7]

---

[7] The Government also argues that one of the prerequisites to the application of 40 C.F.R. § 52.21(i)(9) is that the project "is 'subject to' the 1978 version of 40 C.F.R. § 52.21, *i.e.*, that it is a 'major modification' under those rules." BACT Opp. at 13.  The Government suggests that because Westvaco argued that Section 52.21(i)(4)(v) applies since the DEP was not subject to the 1978 PSD Regulations, it is somehow estopped from relying on Section

[Footnote continued on next page]

The Government, therefore, has failed to show that there is a genuine issue of material fact as to whether Westvaco would have submitted a complete PSD application for the DEP prior to August 7, 1980 if it were to have been required to do so.  Because Westvaco clearly would have, and because the DEP did not result in an increase in allowable SO2 emissions from the No. 25 Power Boiler, 40 C.F.R. § 52.21(i)(9) would have applied and BACT would not have been required for the No. 25 Power Boiler.

## IV.    CONCLUSION

The Government's entitlement to injunctive relief rests on its claim that Westvaco should have applied for a PSD permit for the DEP and on the assumption that that permit would have required the imposition of BACT on the No. 25 Power Boiler.  As explained in Westvaco's BACT Memorandum and in this Reply, that assumption is not correct.  Under either 40 C.F.R. § 52.21(i)(4)(v) or 40 C.F.R. § 52.21(i)(9) the DEP would have been exempt from BACT even if it resulted in a major modification to the No. 25 Power Boiler.  Consequently, the Government cannot show that Westvaco's failure to obtain a PSD permit for the DEP caused any increase in SO2 emissions or any resulting irreparable harm.

DATED: July 25, 2012                          Respectfully submitted,

                                        _____/s/_____
                                        Raymond B. Ludwiszewski (Bar No. 14905)
                                        *rludwiszewski@gibsondunn.com*
                                        Charles H. Haake (*pro hac vice*)
                                        *chaake@gibsondunn.com*

---

[Footnote continued from previous page]
52.21(i)(9).  But as discussed above, Westvaco is relying on Section 52.21(i)(9) in the alternative in the event that the DEP were to have been a modification under the 1978 PSD Regulations.

Justin A. Torres (*pro hac vice*)
*jtorres@gibsondunn.com*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-8500
(202) 955-8500 (voice)
(202) 467-0539 (facsimile)

*Counsel for Defendant Westvaco Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2012, a true and correct copy of the foregoing

DEFENDANT WESTVACO CORPORATION'S REPLY IN SUPPORT OF ITS MOTION

FOR SUMMARY JUDGMENT BASED ON THE INAPPLICABILITY OF BACT TO THE

DIGESTER EXPANSION PROJECT was filed using the Court's electronic case filing system,

which results in service on all counsel of record registered on the case management/electronic

filing ("CM/ECF") system.

_____/s/_____
Charles H. Haake