IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>WESTVACO CORPORATION,<br><br>　　　　　Defendant. | Case No. MJG-00-2602 |

### EXPERT REPORT OF COLIN CAMPBELL

Colin M. Campbell

RTP Environmental Associates, Inc.

February 21, 2012

Source owners had less incentive to pursue the PSD avoidance approach because it was less likely that the PSD permitting approach would involve significant incremental costs.

The BACT requirement and other substantive requirements of the preconstruction PSD permitting program throughout my career have been interpreted and implemented by most permitting authorities in a manner that is burdensome and costly to source owners. In addition, source owners choosing the PSD permitting approach face significant uncertainty due to factors such as permit appeals by non-governmental organizations and differences in interpretation applied under different political administrations. Owners of existing stationary sources now have significant incentive to ensure and document non-applicability of the preconstruction PSD permitting program, and they do so much more commonly than they submit PSD permit applications. Based on my extensive experience in working with PSD permitting authorities and industry trade groups, I believe this PSD avoidance approach is used much more commonly than the PSD permitting approach across all industry sectors and across the United States.

### 4. Applicability of PSD under the 1978 PSD Rule, the January 1980 Stay, and the Grandfathering Provisions in the 1980 PSD Rule

The PSD program was added to the Clean Air Act via amendments enacted in 1977. The U.S. EPA responded, in June 1978, by promulgating the 1978 PSD rule. In this rule, applicability of the preconstruction permitting requirement to proposed new stationary sources applied more broadly than in subsequent rules because air pollution control equipment was not considered in determining "potential to emit," even where the operation of that equipment was enforceable.

Substantial portions of the 1978 PSD rule were rejected by the D.C. Circuit in *Alabama Power Co. v. Costle*, first in a *per curiam* opinion in June 1979 (606 F.2d 1068, D.C. Cir. 1979) and in a final opinion in December 1979 (606 F.2d 1068, D.C. Cir. 1979). One of the provisions that the court rejected was the lack of consideration of air pollution control equipment and the effect this had on overbroad applicability determinations.[11] Importantly, however, the court did not vacate the 1978 PSD rule, but rather left it in place while remanding certain aspects to U.S. EPA for further rulemaking.

Following the *per curiam* opinion in *Alabama Power*, U.S. EPA in September 1979 proposed revisions to its PSD regulations.[12] These proposed revisions would narrow the applicability of the preconstruction PSD permitting requirements as they apply to proposed new stationary sources by including control equipment, under certain circumstances, in the determination of the source's potential to emit.

---

1989, internal U.S. EPA memorandum, "Transmittal of Background Statement on 'Top-Down' Best Available Control Technology (BACT)," at p. 2, indicating that under then-current EPA guidance applicants typically would propose BACT emissions limitations "at or near an applicable [NSPS]" and that "States typically would accept these determinations." See, also, the expert report of my colleague, Jack Burke, in this matter.

[11] See, *Alabama Power* (636 F.2d 323) at pp. 355-356, stating that U.S. EPA in the 1978 PSD rule had "swept in too many facilities, in our view, by its interpretation of 'potential to emit.'"

[12] See, 44 *Fed. Reg.* 51924, September 5, 1979.

7                                                                                        February 21, 2012

Following the court's final opinion in *Alabama Power*, the U.S. EPA Administrator, D.M. Costle, in January 1980 issued an administrative order (the "January 1980 stay") significantly narrowing the applicability of the 1978 PSD rule:

> I hereby stay the application of the 1978 PSD regulations as to any major stationary source or major modification as defined in those regulations which either (1) would not be a major stationary source or major modification under the amendments to the PSD regulations as proposed at 44 FR 51924 (September 5, 1979), or (2) would be located in [a nonattainment area].  Thus, a source or modification would not be subject to PSD review if either the 1978 PSD regulations would not apply to it or this stay applies to it.
>
> \*      \*      \*
>
> I intend that all additional substantive requirements relating to best available control technology, monitoring, and source applicability in the upcoming final regulation shall not be applied retroactively to any source or modification which has commenced construction or submitted a completed permit application prior to the effective date of those final regulations, unless otherwise ordered by a court.
>
> This stay applies immediately.[13]

The "upcoming final regulation" promised by Administrator Costle in the January 1980 stay is the 1980 PSD rule, which was promulgated and became effective on August 7, 1980.  In this rule, U.S. EPA included significant grandfathering provisions in order to provide for an orderly transition to the revised rule.  Two of these grandfathering provisions are important to my opinions in this matter.  For reasons that are discussed below, although the 1980 PSD rule was in effect at the time the DEP commenced, these grandfathering provisions maintained effectiveness of certain aspects of the 1978 PSD rule and the January 1980 stay for projects such as the DEP.

### a. The DEP Was Not a Major Modification under the 1978 PSD Rule

In the 1978 PSD rule, the determination of whether a project was a "major modification" was based on potential to emit:

> "Major modification" means any physical change in, change in the method of operation of, or addition to a stationary source which increases the potential emission rate of any air pollutant regulated under the act (including any not previously emitted and taking into account all accumulated increases in potential emissions since August 7, 1977, []) by either 100 tons per year or more for any source category identified in paragraph (b)(1)(i) of this section, or by 250 tons per year or more for any stationary source.[14]

The daily cap on $SO_2$ emissions from the tall stack, and therefore the facility's potential to emit, were not affected by the DEP.  Because the DEP did not increase the potential emission rate of $SO_2$ from the Luke Mill, the DEP was not a major modification under the 1978 PSD rule.

---

[13] See, 45 *Fed. Reg.* 7800, February 5, 1980.
[14] See, 43 *Fed. Reg.* 26380 at pp. 26403-26404.

### b. The DEP Was Not a Major Modification under the September 1979 Proposed PSD Rule Revisions and Was Covered by the January 1980 Stay

In the revisions to the PSD regulation that were proposed in September 1979, the determination of whether a project was a "major modification" was based on potential to emit:

> "Major modification" means any physical change in or change in the method of operation of a major stationary source, or series of contemporaneous physical changes in or changes in the method of operation of a major stationary source, that would result in a significant net increase in that source's potential to emit the pollutant for which the source is major (or that would make the stationary source major, taking into account all accumulated net increases in potential emissions occurring at the source, including any initial construction, since August 7, 1977.[15]

The daily cap on $SO_2$ emissions from the tall stack, and therefore the facility's potential to emit, were not affected by the DEP. Because the DEP did not increase the Luke Mill's potential to emit $SO_2$, the DEP would not have been a major modification under the 1978 PSD rule, and it therefore was covered by the January 1980 stay.

### c. Because It Was Not a Major Modification under the 1978 PSD Rule and Was Covered by the January 1980 Stay, the DEP Was Grandfathered from the 1980 PSD Rule in Its Entirety

The first of the two important grandfathering provisions in the 1980 PSD rule was 40 CFR § 52.21(i)(4)(v), which provided a complete exemption from the revised rule if the project was not subject to the 1978 PSD rule and met certain criteria related to timing:

> (i) Review of Major Stationary Sources and Major Modifications – Source Applicability and Exemptions.
> \*
> \*
> (4) The requirements of paragraphs (j) through (r) of this section shall not apply to a particular major stationary source or major modification, if;
> \*
> \*
> (v) The source or modification was not subject to 40 CFR 52.21 as in effect on June 19, 1978 or under the partial stay of regulations published on February 5, 1980 (45 FR 7800), and the owner or operator:
> (a) Obtained all final federal, state and local preconstruction approvals or permits necessary under the applicable State Implementation Plan before August 7, 1980;
> (b) Commenced construction within 18 months from August 7, 1980, or any earlier time required under the applicable State Implementation Plan; and
> (c) Did not discontinue construction for a period of 18 months or more and completed construction within a reasonable time.

---

[15] See, 44 *Fed. Reg.* 51924 at p. 51952.

Based on the rulings already made by the court in this matter, with respect to the DEP, Westvaco met the timing requirements set forth in 40 CFR § 52.21(i)(4)(v)(a) and (c).[16] Thus, because the DEP was not subject to the preconstruction permitting requirements in the 1978 PSD rule, the DEP was grandfathered from the preconstruction permitting requirements in the 1980 PSD rule.

### 5. Applicability of the BACT Requirement under the 1978 PSD Rule and the 1980 PSD Rule Grandfathering Provisions

As I noted in Paragraphs 4.a and 4.b, above, it is my opinion that the DEP was grandfathered from the 1980 PSD rule in its entirety pursuant to 40 CFR § 52.21(i)(4)(v) in that rule.

However, in the alternative, even assuming that the DEP did not qualify for the grandfathering provision at 40 CFR § 52.21(i)(4)(v), the BACT requirement in 1980 PSD rule still would not have applied to the DEP.

This is true because the 1980 PSD rule included a second, important grandfathering provision at 40 CFR § 52.21(i)(9). This rule provision grants a partial exemption from the new substantive requirements of the rule for projects subject to the requirements previously in effect:

> (i) Review of Major Stationary Sources and Major Modifications – Source Applicability and Exemptions.
> \*
> \*
> (9) The requirements for best available control technology in paragraph (j) of this section and the requirements for air quality analyses in paragraph (m)(1) shall not apply to a particular stationary source or modification that was subject to 40 CFR 52.21 as in effect on June 19, 1978, if the owner or operator of the source or modification submitted an application for a permit under those regulations before August 7, 1980, and the Administrator subsequently determines that the application as submitted before that date was complete. Instead, the requirements at 40 CFR 52.21(j) and (n) as in effect on June 19, 1978 apply to any such source or modification.

The Clean Air Act provides the permitting authority with one year to take final action on a complete application for a preconstruction PSD permit.[17] In the permit application submitted to the Maryland Department of Health and Mental Hygiene for the DEP, Westvaco indicated its intent to begin construction of the DEP in 1980.[18] Construction actually began in February 1981.[19] Thus, if Westvaco had elected to comply with the PSD regulation by obtaining a preconstruction PSD permit for the DEP, Westvaco would have had to submit a complete PSD

---

[16] See, Second Phase Decision re: Baseline Period and Post-Change Emissions Determination, Sept. 1, 2010 [Document 252], finding that the DEP "commenced," as that term is defined at 40 CFR § 52.21(b)(9) in the 1980 PSD rule, in February 1981. Under the criteria in that definition, this finding manifests a determination that the permits in place as of February 1981 represented "all necessary preconstruction approvals or permits." I am not aware of any permits relating to the DEP obtained between August 7, 1980, and the project commencement date of February 1981.
[17] See, § 165(c) of the Act (42 U.S.C. § 7475(c)): "Any completed permit application under section 7410 of this title for a major emitting facility in any area to which this part applies shall be granted or denied not later than one year after the date of filing of such completed application."
[18] See, permit application dated May 9, 1980 (WVCO_0418-0559).
[19] See, Memorandum and Order re: Post-Change Potential to Emit, June 7, 2011 [Document 282].

permit application by February 1980 in order to ensure its ability begin construction of the DEP on schedule.  This date precedes by approximately six months the deadline for grandfathering of BACT requirements under 40 CFR § 52.21(i)(9) of the 1980 PSD rule.

Thus, if Westvaco had been required to obtain a preconstruction PSD permit for the DEP, it would have done so pursuant to the 1978 PSD rule.  Under the grandfathering provisions in the 1980 PSD rule, this would have remained true regardless of whether the PSD permit had been issued before or after the 1980 PSD rule took effect.

Applicability of BACT to the facilities affected by the DEP would have been governed by the following provisions of 40 CFR § 52.21(j) as in effect in the 1978 PSD rule:

> (j) Control technology review.
> *
> *
> (2) A major stationary source or major modification shall apply best available control technology for each applicable pollutant, unless the increase in allowable emissions of that pollutant from the source or modification would be less than 50 tons per year, 1,000 pounds per day, or 100 pounds per hour, whichever is most restrictive.
> *
> *
> (3) In the case of a modification, the requirement for best available control technology shall apply only to each new or modified facility which would increase the allowable emissions of an applicable pollutant.

Two important terms used in these provisions of the 1978 PSD rule, "allowable emissions" and "facility," both were expressly defined:

> (b) Definitions.
> *
> *
> (5) "Facility" means an identifiable piece of process equipment.
> *
> *
> (19) "Allowable emissions" means the emission rate calculated using the maximum rated capacity of the source (unless the source is subject to enforceable permit conditions which limit the operating rate, or hours of operation, or both) and the most stringent of the following:
> (i) Applicable standards as set forth in 40 CFR part 60 and part 61,
> (ii) The applicable State implementation plan emission limitation, or
> (iii) The emission rate specified as a permit condition.

The allowable emissions of the facilities that vented to the tall stack at the Luke Mill, including the power boilers and the digesters, were unchanged by the DEP, as specifically stated by Westvaco in the May 1980 permit application submitted to the Maryland Department of Health and Mental Hygiene.[20]

Thus, if Westvaco had submitted a PSD permit application for the DEP pursuant to the 1978 PSD rule, the BACT requirement would have applied neither to Power Boiler 25 nor to the multi-

---

[20] See, WVCO_0418-0561.  See, also, Memorandum and Order re Baseline Emissions, March 26, 2010 [Document 247], recognizing the 49 ton per day emission cap as the allowable emissions.

part emissions unit consisting primarily of the digesters, the evaporators, the lime kiln and Power Boiler 25.

### 6. Compliance Options Available to Westvaco Under the 1980 PSD Rule Had the DEP Not Been Grandfathered

Hypothetically, had the DEP not satisfied the grandfathering criteria in the 1980 PSD rule, Westvaco would have been faced with a decision regarding whether to pursue a PSD avoidance approach or to apply for a PSD permit.  Under this hypothetical, the PSD avoidance approach would have been evaluated under the applicability criteria in the 1980 PSD rule and the PSD permit application would have been reviewed for consistency with the substantive requirements in the 1980 PSD rule.  Examples of the specific options that would have been available to Westvaco are discussed in the following sections of my report.

#### a. Obtaining a PSD permit containing acceptable and reasonable BACT requirements applicable to the multi-part emissions unit that includes the digesters and Power Boiler 25

One of the options available to Westvaco with respect to the DEP would have been applying for and obtaining a PSD permit with no changes in project scope.  The PSD permit would have contained BACT requirements applicable to the multi-part emissions unit that includes the digesters and Power Boiler 25.  As discussed in the expert report of my colleague, Jack Burke, these BACT requirements would have been minimally costly, and Westvaco may have considered them acceptable and reasonable.[21]

#### b. Obtaining a PSD permit containing acceptable and reasonable BACT requirements applicable to the digesters

Westvaco in 1980 may not have considered acceptable the costs of pursuing a PSD permit under the conditions described in Section 6.a, above, either because the costs described in Mr. Burke's report were not tolerable in light of the expected economics of the DEP or because the permitting authority may have suggested a more costly BACT requirement for the multi-part emissions unit that includes the digesters and Power Boiler 25.[22]  In this case, one of the other options available to Westvaco with respect to the DEP would have involved revising the scope of the DEP in a manner that would preclude the use of the power boilers to control total reduced sulfur ("TRS") emissions from the digesters and evaporators, then applying for and obtaining a PSD permit in this revised configuration.[23]

Under this option, the PSD permit would have contained BACT requirements applicable only to the modified equipment, pursuant to the 1980 PSD rule at 40 CFR § 52.21(j)(3):

(j) Control Technology Review.
*
*

---

[21] See, Expert Report of John M. Burke, February 21, 2012.
[22] I understand that Dr. Staudt has opined that BACT would have required the installation of a wet scrubber with a capital cost of $3,162,616, and additional annual operating costs of $2,970,500.
[23] However, under this configuration, no emissions increase would have occurred and a PSD permit would not have been required.  See, paragraph 6.c.iii and footnote 31, below.