```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA        *

        Plaintiff               *

        vs.                     *    CIVIL ACTION NO. MJG-00-2602

WESTVACO CORPORATION            *

        Defendant               *

*       *       *       *       *       *       *       *       *
```

BACKGROUND STATEMENT RE: PENDING SUMMARY JUDGMENT MOTIONS

The Court has before it Westvaco Corporation's Daubert Motion to Exclude the Reports, Opinions, and Testimony of Dr. James E. Staudt Re "Historic BACT"[1] and Excess Emissions From the No. 25 Power Boiler [Document 302], Motion for Summary Judgment on Lack of Evidence of Irreparable Harm [Document 303], Motion for Summary Judgment Based on the Inapplicability of BACT to the Digester Expansion Project [Document 304], Motion for Summary Judgment on the Unavailability of the Government's Proposed Equitable Relief [Document 305], and the materials submitted relating thereto.

The Court has held a hearing and had the benefit of the arguments of counsel. The Court herein sets forth a summary statement of the background[2] pertinent to each of the aforesaid motions for summary judgment.

---

[1] Best Available Control Technology ("BACT").
[2] For a detailed background statement, see the Memorandum of

In this case, the Government seeks to have the Court impose pollution control obligations upon Defendant Westvaco Corporation ("Westvaco"),[3] operator of a kraft pulp and paper production facility located in Western Maryland along the Maryland-West Virginia border (the "Luke Mill"). Specifically, the Government contends that construction at the Luke Mill during the Digester Expansion Project ("DEP") triggered compliance with the Clean Air Act's Prevention of Significant Deterioration ("PSD") program regulations. See 42 U.S.C. § 7070-7492; 40 C.F.R. § 51.166 (1987).[4]

The Luke Mill is predominantly powered by two power boilers that emit, among other things, sulfur dioxide ("$SO_2$"), a pollutant regulated by the Clean Air Act. The PSD regulations require existing major stationary sources of air pollutants, such as the Luke Mill,[5] to meet pre-construction permitting and

---

Decision Re: First Phase [Document 230].
[3] Reference to "Westvaco" herein is intended to include all predecessors and successors in interest to Westvaco Corporation in regard to the operation of the Luke Mill.
[4] All citations to the PSD regulations, 40 C.F.R. § 51.166 and 52.21, are to the PSD regulations promulgated August 7, 1980. These regulations were in effect at the time Westvaco began making changes to the Luke Mill as part of the DEP. The 1980 regulations, 45 Fed. Reg. 52676, were recodified in the 1987 Code of Federal Regulations.
[5] Kraft pulp mills are subject to regulation under the Clean Air Act. See 40 C.F.R. § 60.

pollution control regulations before undergoing a "major modification."[6]  40 C.F.R § 51.166(b)(2)(i) (1987).

The instant case has been proceeding to resolution in phases.  The Court first found:[7]

- That the digesters and power boilers are part of a multi-part emissions unit that was physically changed and had its method of operation changed during the DEP.

- That Power Boilers 25 and 26 were physically changed during the DEP.

- That BACT requirements may apply to Power Boilers 25 and 26 if the changes made produced a significant change in emissions.

- That only Power Boiler 25 had the "potential to emit" as that term is defined in 40 C.F.R. § 51.166(b)(4).

The Court then found:[8]

- That prior to the DEP, the Luke Mill's baseline "actual emissions" of $SO_2$, as defined in the 1980 version of 40 C.F.R. § 52.21(b)(21), are equivalent to the average annual emissions rate, calculated using the emissions monitoring data or other records from the Luke Mill, over a two-year period which is representative of normal source operation.

The Court then found:[9]

- That the baseline period for the determination of pre-change "actual emissions" is the two-year period from March 1979 to February 1981.

---

[6] Defined as "any physical change in or change in the method of operation [] that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 51.166(b)(2)(i).
[7] See Memorandum of Decision Re: First Phase [Document 230].
[8] See Memorandum and Order Re Baseline Emissions [Document 247].
[9] See Second Phase Decision Re: Baseline Period and Post-Change Emissions Determination [Document 252].

3

- That the pre-change rate of "actual emissions" shall be determined by reference to the actual physical emissions of $SO_2$ during the baseline period. This resulted in a pre-change rate of "actual emissions" of 12,228.7 tons per year.[10]

- That post-change rate of "actual emissions" shall be determined by reference to the post-change "potential to emit."

The Court then found:[11]

- That the Luke Mill's rate of post-change potential to emit is its maximum capacity to emit under its physical and operational design as limited by controls that are legally enforceable, that is 17,885 tons per year.

- That the Luke Mill's post-change potential to emit exceeds its pre-change rate of actual emissions

---

[10] Calculated as the average of annual actual emissions in the two-year baseline period, i.e. 11,003.7 (from March 1979 to February 1980) and 13,453.7 (from March 1980 to February 1981). See United States Opening Br. Ex. 6, ECF No. 265. From the same set of data, annual emissions for years following the baseline period are:
    Mar. 1981 – Feb. 1982: 14420.5
    Mar. 1982 – Feb. 1983: 15066.6
    Mar. 1983 – Feb. 1984: 14055.6
    Mar. 1984 – Feb. 1985: 13267.3
Id.
  Annual $SO_2$ emissions for the years 1973 – 1978, prior to the baseline period, were approximately:
    1973 – 18,834
    1974 – 18,907
    1975 – 16,571
    1976 – 14,083
    1977 – 14,636
    1978 – 11,023
Ltr. From Gov't Counsel, Mar. 11, 2011 (derived from Def.'s Mot. For Determination on the Proper Standard for Measuring "Post-Change" Emissions and Normal Source Operations Ex. 6, ECF. No. 245-6).

[11] Memorandum and Order Re: Post-Change Potential to Emit [Document 282].

> (12,228.7 tons per year) by more than 40 tons per year.
>
> - That a PSD permit was required unless there were contemporaneous changes that would also decrease emissions, providing an opportunity to "net" out the differences.[12]

With liability thus established, the Court, thereafter, issued the Remedy Phase Scheduling Order [Document 283] limiting the filing of summary judgment motions to those for which leave was granted, in view of the existence of a multitude of factual disputes. In the Supplemental Remedy Phase Scheduling Order [Document 299] the Court granted Westvaco's request to file:

> 1. A motion for summary judgment based on Plaintiff's lack of evidence of excess emissions, on the ground that Plaintiff's evidence of excess emissions rests entirely on an expert whose opinions on the topic are inadmissible under <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).
>
> 2. A motion for summary judgment based on the unavailability of Plaintiff's requested injunctive relief, on the ground that because Westvaco no longer owns or operates the Luke Mill, it lacks the capacity to perform the equitable relief requested by Plaintiff.
>
> 3. A motion for summary judgment based on the inapplicability of BACT to the DEP, on the ground that under the 1978 version of the PSD Regulations, which would have been applicable to any PSD permit application filed by Westvaco prior to the DEP, BACT would not have been required

---

[12] <u>See</u> 40 C.F.R. § 52.21(b)(3)(i) (defining "net emissions increase."). Westvaco subsequently advised the Court that it did not believe further proceedings were necessary with regard to "netting" issues. Def.'s Letter Jul. 18, 2011 [Document 285].

5

because there would be no increase in allowable emissions from the No. 25 Power Boiler.

Subsequently, Westvaco filed the pending summary judgment motions that shall be addressed in separate documents.

SO ISSUED, on Friday, September 14, 2012.

/s/_____<br>
Marvin J. Garbis<br>
United States District Judge