UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| WESTVACO CORP., | Civ. No. MJG 00-CV-2602 |
| *Defendant, and* | |
| LUKE PAPER COMPANY, | |
| *Intervenor.* | |

## PLAINTIFF'S PRETRIAL BRIEF

ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (PHONE)

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

MARK C. ELMER, Trial Attorney
CARA MROCZEK, Trial Attorney
DANIEL SMITH, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
999 Eighteenth Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1352 (PHONE)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

PRELIMINARY STATEMENT.............................................................................. 1

BACKGROUND ...................................................................................................... 1

    The PSD Program under the Clean Air Act.......................................................1

    Procedural History ............................................................................................4

    How BACT Determinations Are Made: Early 1980s vs. Today.........................5

STANDARD OF REVIEW ..................................................................................... 13

OVERVIEW OF PLAINTIFF'S EVIDENCE ....................................................... 16

    I.     Westvaco's Violations Have Caused Irreparable Harm to Human Health
        and the Environment, for which There Is No Adequate Remedy at Law ..............16

        A.    Westvaco's Violation Resulted in Excess Emissions ................................17

        B.    The Excess Emissions Have Adversely Affected Air Quality in the
            Region ....................................................................................................19

        C.    Poorer Air Quality Has Harmed Human Health And The
            Environment............................................................................................20

    II.    THE APPROPRIATE REMEDY IS AN INJUNCTION REQUIRING
        WESTVACO AND LPC TO OBTAIN A PSD PERMIT FOR THE DEP. ..........23

        A.    The Court Should Compel Prompt Compliance with the Clean Air
            Act.........................................................................................................24

        B.    The Court Should Require Mitigation of the Excess Emissions................29

    III.    The Balance of Hardships and the Public Interest Favor an Injunction.................31

CONCLUSION ........................................................................................................ 32

## **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ...................................... 14, 16

*Burlington N.R.R. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992)..................................................15

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) .................................................... 13

*Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir. 1983) ............................................ 15

*Envtl. Def. v. Duke Energy Corp.*, 127 S. Ct. 1423 (2007) ............................................................ 2

*Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753 (6th Cir. 2004) .................................................. 31

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) ...................................................... 15

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) .......................................................... 26

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984) ................................................ 2

*Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) ........................................................................ 16

*Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006) ........................... 16, 30

*Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174 (4th Cir. 2005) .................................. 16

*New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005) ........................................................................ 2

*New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003) .......... 25, 30

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625 (S.D.W. Va. 2007) ................................................................................................................................. 32

*Or. Envtl. Council v. Or. Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123 (D. Or. 1992) ................................................................................................................................ 26, 30

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ................................................................... 31

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) .................................................... 29

*Sierra Club v. EPA*, 557 F.3d 401, 403 (6th Cir. 2009) ................................................................ 3

*United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010 (N.D. Cal. 2002) ...................... 15, 23

*United States v. Cinergy Corp.* (*Cinergy I*), 582 F. Supp. 2d 1055 (S.D. Ind. 2008) ........ 2, 15, 30

*United States v. Cinergy Corp.* (*Cinergy II*), 618 F. Supp. 2d 942 (S.D. Ind. 2009) ....... 17, 21, 29

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) ............................ 26

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) ................................... 15

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) .................... 14

*United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722 (W.D. Mich. 1991) ................... 14

*United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338 (E.D. Va. 1997)................................21

*United States v. Telluride Co.*, 146 F.3d 1241 (10th Cir. 1998) ................................................. 30

*United States v. Westvaco Corp.*, 675 F. Supp. 2d 524 (D. Md. 2009) .......................................... 4

*Wehner v. Syntex Corp.*, 682 F. Supp. 39 (N.D. Cal. 1987) ........................................ 23

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ............................... 23

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) ............................................. 1


## STATE CASES

*Weston Paper Co. v. Pope*, 57 N.E. 719 (Ind. 1900) ................................... 20


## STATUTES

42 U.S.C § 7401 ............................................................................. 30

42 U.S.C. § 7401(b)(1) .................................................................... 2

42 U.S.C. § 7413(b) ...................................................................... 14

42 U.S.C. § 7470 ...................................................................... 2, 3

42 U.S.C. § 7475(a) ................................................................. 3, 24, 26

42 U.S.C. § 7479(3) (1978) ............................................................. 3, 6

42 U.S.C. § 7502(c)(5) ..................................................................... 3

42 U.S.C. § 7503 ........................................................................... 3


## LEGISLATIVE HISTORY

H.R. Rep. No. 91-1146 (1970)........................................................1, 25


## REGULATIONS

40 C.F.R. § 52.21(j)(3) ............................................................. 24, 25

40 C.F.R. § 52.21(r)(2) ............................................................. 24, 25


## ADMINISTRATIVE MATERIALS

*In re W. Suburban Recycling and Energy Ctr.*, 8 E.A.D. 192, 1999 WL 133041 (U.S. Envtl.
        Prot. Agency Mar. 10, 1999) ............................................... 24-25

## PRELIMINARY STATEMENT

Westvaco violated the Clean Air Act by making a "major modification" to the Luke Mill without first obtaining a PSD permit containing a requirement to install and operate Best Available Control Technology ("BACT") on the No. 25 power boiler. The violation of the Clean Air Act will continue until the mill meets Prevention of Significant Deterioration ("PSD") requirements, has a PSD permit, and installs appropriate pollution controls. As a direct result of the violation, the Luke Mill has emitted and continues to emit thousands of tons of excess sulfur dioxide ("$SO_2$") pollution. The government's evidence will demonstrate that excess emissions from the Luke Mill have harmed, and will continue to harm, human health and the environment. The excess emissions contribute to premature death, heart attacks, and hospitalizations, and exacerbate conditions like asthma. These emissions also contribute to reduced visibility and acidic deposition, which has cumulative, long-term, adverse effects on both forest and aquatic ecosystems, including those resources in the wilderness areas and national parks surrounding the Luke Mill. To remedy the violation, the government seeks an injunction requiring Westvaco (1) to comply with the Clean Air Act by obtaining a PSD permit containing a current-day BACT limit for $SO_2$ from the No. 25 power boiler and (2) to mitigate the harm resulting from the mill's past illegal $SO_2$ emissions.

## BACKGROUND

### The PSD Program under the Clean Air Act

In 1970, Congress enacted the Clean Air Act to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again." H.R. Rep. No. 91-1146 at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356; *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) (quoting

legislative history). One primary purpose of the statute is "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the productive capacity

of its population" 42 U.S.C. § 7401(b)(1); *see also United States v. Cinergy Corp.* (*Cinergy I*), 582

F. Supp. 2d 1055, 1057 (S.D. Ind. 2008) (quoting 42 U.S.C. § 7401(b)(1)).

Not satisfied with the results achieved under the 1970 statute, Congress added the New

Source Review ("NSR") program to the Act in 1977 to ensure that emissions from new and

modified sources would not interfere with an area's ability to meet or maintain air quality

standards. *See* 42 U.S.C. § 7470 (congressional declaration of purpose "*to protect public health

and welfare from any actual or potential adverse effect* in which the Administrator's judgment

may reasonably be anticipate [sic] . . . *notwithstanding attainment and maintenance of all national

ambient air quality standards*") (emphasis added); *New York v. EPA*, 413 F.3d 3, 10 (D.C. Cir.

2005) ("In 1977, Congress amended the Clean Air Act . . . to strengthen the safeguards that protect

the nation's air quality."). The Prevention of Significant Deterioration ("PSD") component of

NSR, which applies to areas that are in attainment with air quality standards, was "aimed at giving

added protection to air quality" while fostering economic growth in a manner consistent with

preservation of existing clean air resources. *Envtl. Def. v. Duke Energy Corp.*, 127 S. Ct. 1423,

1429 (2007). In areas that already meet National Ambient Air Quality Standards ("NAAQS"), this

added protection is achieved, in part, by requiring the installation of "best available control

technology" ("BACT") on new and modified sources that would otherwise increase pollution.

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984) ("Congress found that it was

important to reduce pollution levels below those mandated by the standards and that the best means

of doing so was to require the installation of BACT on all sources which would otherwise increase pollution.").

Congress explicitly identified five "purposes" for the PSD program:

(1) to protect public health and welfare from *any actual or potential adverse effect* which in the Administrator's judgment may reasonably be anticipate[d] to occur from air pollution or from exposures to pollutants in other media . . . *notwithstanding attainment and maintenance of all national ambient air quality standards*;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality *for any other State*; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision making process.

42 U.S.C. § 7470 (emphasis added). The requirements of PSD were designed "to prevent backsliding." *Sierra Club v. EPA*, 557 F.3d 401, 403 (6th Cir. 2009).

Under the NSR/PSD program, no new major source or major modification to an existing major source can be built unless various requirements are met, including obtaining a preconstruction permit setting forth emission limitations and applying state-of-the-art pollution controls. 42 U.S.C. §§ 7475(a), 7479(3), 7502(c)(5), 7503.

**Procedural History**

The United States alleged in the complaint that Westvaco violated the Clean Air Act by failing to obtain a PSD permit before making certain modifications to the Luke Mill. Luke Paper Company ("LPC"), the current owner of the Luke Mill, subsequently intervened. While the case has been narrowed since the complaint was filed, an eight-day trial took place in June and August 2005. Subsequently, the Court issued four decisions, which collectively establish that Westvaco violated the Clean Air Act by failing to obtain a PSD permit before commencing construction of the Digester Expansion Project ("DEP"). First, the Court held that Westvaco's improvements during the DEP were "major modifications" that required BACT, if the improvements would result in a significant change in emissions. *United States v. Westvaco Corp.*, 675 F. Supp. 2d 524, 540 (D. Md. 2009). Next, the court held that baseline "actual emissions" were equal to the average annual emissions rate, calculated with regard to the actual amounts of pollutants emitted over a two-year period representative of normal Luke Mill operations. (Mem. Or. Re: Baseline Emissions, ECF No. 230, at 7.) Third, the Court found that the two-year period immediately preceding the DEP was representative of normal source operations and therefore was the applicable baseline period. (Second Phase Decision re: Baseline Period and Post-Change Emissions Det., ECF No. 252, at 12.) Finally, the Court found that the DEP constituted a "major modification" to the Luke Mill, which resulted in an emissions increase greater than 40 tons per year. (Mem. Or. Re: Post Change Potential to Emit, ECF No. 282, at 14.) Collectively, these decisions established that the DEP was a major modification and that Westvaco violated the PSD provisions of the Clean Air Act by undertaking the DEP without first obtaining a PSD permit or installing BACT.

**How BACT Determinations Are Made: Early 1980s vs. Today**

The United States has estimated the amount of excess emissions attributable to Westvaco's violation by comparing: (a) the amount of emissions that would have been allowed if Westvaco had installed BACT on the No. 25 power boiler; and (b) the amount of emissions actually emitted from Boiler No. 25. Thus, while the United States seeks an injunction that would result in controls that reflect current-day BACT, what BACT would have been at the beginning of the DEP is relevant to estimating excess emissions, which in turn is relevant to showing that Westvaco's violation has resulted in irreparable harm. Therefore, the Court will not only hear evidence about what BACT would be today (necessary to bring the mill into compliance with the Act) but what BACT would have been in the early 1980s (necessary to estimate the amount of excess emissions attributable to Westvaco's violation).

The approach used by EPA for determining BACT changed in the late 1980s. When the DEP started in the early 1980s, EPA was using an approach that has come to be known as the bottom-up approach. Today, EPA uses an approach called the top-down approach. However, as discussed in the United States' Combined Opposition To Defendant's Motions To Exclude Dr. Staudt's Opinions Concerning Historic BACT and Excess Emissions And For Summary Judgment On Lack Of Evidence Of Irreparable Harm (ECF No. 310), both approaches are intended to arrive at the same statutorily mandated result: the most stringent emissions limit that EPA determines is achievable taking into account energy, environmental, and economic impacts and other costs.

Both at the time of the DEP and today, BACT is defined by statute as:

[A]n emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this act emitted from or which resulted from any major emitting facility, which the permitting authority, on a case-by-case base,

> taking into account energy, environmental, and economic impacts and other costs,
> determines is achievable for such facility through application of production
> processes and available methods, systems, and techniques, including fuel cleaning
> or treatment or innovative fuel combustion techniques for control of such pollutant.
> In no event shall application of "best available control technology" result in
> emissions of any pollutants which will exceed the emissions allowed by any
> applicable standard established pursuant to section 111 or 112 of this Act.

42 U.S.C. § 7479(3) (1978). Notably, BACT is not a predetermined numerical limit. Instead, it is

determined on a case-by-case basis. This means that different emissions limits may be established

for similar facilities located in different areas. It also means that different emissions limits may be

established for the same facility at different points in time. In other words, what BACT was 10

years ago is not necessarily what BACT would be today. It is worth noting also that BACT is

determined by the permitting authority, which would have been EPA Region 3 in the early 1980s,

but today is the Maryland Department of the Environment. In establishing BACT, the permitting

authority must exercise its judgment in determining whether the use of a particular control strategy

would, among other things, impose unreasonable adverse energy, environmental, or economic

impacts. While the source initially proposes a BACT limit, ultimately it is the permitting

authority's responsibility to set the limit.

### BACT Determinations Using the Bottom-Up Approach

The bottom-up approach used by EPA to determine BACT in the early 1980s is described

in two EPA documents: a memorandum called "Guidance for Determining Best Available Control

Technology (BACT)," which was issued in December 1978 (the 1978 BACT guidance) and a 1980

PSD Workshop Manual published by EPA in October 1980 (1980 PSD Workshop Manual).[1] As is

---

[1] Both of these documents will be presented as exhibits at trial.

the case with the modern top-down approach, under the bottom-up approach the applicant is responsible for preparing the initial BACT analysis. For example, the 1978 BACT guidance provides that the applicant must (1) propose a control system representing BACT, (2) analyze more stringent alternative control systems, and (3) defend its BACT selection "by demonstrating that each alternative control system (representing a more stringent level of control for that pollutant) would cause unreasonable adverse energy, environmental, or economic impacts." 1978 BACT Guidance at 5-6. Of course, the permitting authority (in this case EPA Region 3) makes the final BACT determination. EPA can either accept an applicant's BACT proposal or require a BACT limit that is more stringent than the control system proposed by the applicant.

Under the 1980 PSD Workshop Manual, both the applicant and the review agency perform the bottom-up BACT analysis in six steps:

- Step 1 – determine pollutant applicability
- Step 2 – determine emissions unit applicability
- Step 3 – identify potentially sensitive concerns
- Step 4 – select control strategy alternatives
- Step 5 – analyze energy, environmental, and economic impacts
- Step 6 – determine BACT

*Bottom-up Steps 1 and 2: Applicable Pollutants and Emissions Units*

In this case, the first two steps have already been determined. The applicable pollutant is $SO_2$, and the applicable emissions unit includes the No. 25 power boiler.

*Bottom-up Step 3: Potentially Sensitive Concerns*

In step three, the applicant identifies "potentially sensitive concerns." This step involves narrowing down the number of factors that might conceivably apply to those specific factors (i.e., the potentially sensitive concerns) that are going to be analyzed further. In other words, the guidance identifies a number of different factors that can be considered in evaluating energy, environmental, and economic impacts. For example, the specific factors relating to energy impacts include energy consumption, impact on scarce fuels, impact on locally available coal, and (in the case of electric utilities) energy production impacts. 1978 BACT Guidance at 9-10. But not all of these specific factors need to be evaluated in every case. The only ones that need to be evaluated are those specific factors that the applicant may use to justify the use of a less stringent control.

Step three involves selecting the specific factors that will be evaluated further. The applicant is responsible for identifying these "potentially sensitive concerns" because it "is best suited for assessing the costs, environmental residuals, and energy penalties associated with alternative control options as they apply to his process." 1978 BACT Guidance at 4-5. If the applicant is not going to use a particular factor to justify the use of a less stringent control, then the applicant is not required to present an analysis of that factor in its application:

> [I]f an applicant wishes to reject an alternative control system, he would do so by demonstrating the adverse impacts which would result from the selection of that alternative system. This section [of the Guidance] lists specific energy, environmental, and economic impacts which may be addressed in this impact analysis and explains the data requirements for documenting an adverse impact. Each of the factors discussed below need not be addressed in every permit application. Rather this guideline presents a set of potential impacts any number of which may be addressed in a permit application depending on the individual situation. For example, even though a control system may produce solid waste by-products, such impacts need not be presented in the PSD permit application

unless the applicant wishes to use solid waste impact as an argument against selection of a particular control alternative as BACT.

1978 BACT Guidance at 6-7.

*Bottom-up Step 4: Control Strategy Alternatives*

In step four, control strategy alternatives are selected. These alternatives are identified based on industry surveys, EPA literature, and other similar sources of information. The 1978 BACT Guidance expressly identifies "flue gas treatment" (e.g., flue gas desulfurization or "scrubbers") as a control strategy that should be considered. 1978 BACT Guidance at 5.

As part of selecting control strategy alternatives, a "base case" is established. "The base case is the control strategy that, in the absence of BACT decisionmaking, would normally have been applied." 1980 PSD Workshop Manual at I-B-7. Here, both the United States and Westvaco have used a limit of 3.5 pounds per million British Thermal Units ("lb/MMBTU") as the base case. Control strategy alternatives providing a greater degree of emission reduction (i.e., a lower emissions limit) are then ranked in order of control efficiency and are evaluated for BACT. *Id.*

*Bottom-up Step 5: Energy, Environmental, and Economic Impact Analysis*

In step five, the impacts associated with each control strategy alternative are evaluated. Table 1 below summarizes the specific factors identified in the 1978 BACT Guidance that can be evaluated in determining whether a control strategy alternative would impose unreasonable adverse energy, environmental, or economic impacts.

**Table 1. Factors that may be considered in a BACT analysis under the bottom-up approach. Source: 1978 BACT Guidance at 9-15.**

| Impact | Specific Factor | Discussion |
|---|---|---|
| Energy | Energy Consumption | The amount, type (e.g., electric, coal, natural gas), and source of energy required by each alternative emission control system should be identified and compared to the quantities and types of energy required by the proposed BACT system. In analyzing for energy consumption, various alternatives can be compared in terms of a) energy consumption per unit of pollution removed and b) energy consumption versus the portion of the remaining PSD increment which is preserved for future growth. |
| | Impact on Scarce Fuels | The type and amount of scarce fuels (e.g., natural gas, distillate oil) which are required to comply with each alternative control requirement should be identified and compared with the BACT requirement. The designation of a scarce fuel may vary from area to area, but in general a scarce fuel is one which is in short supply locally and can better be used for alternative purposes, or one which may not be reasonably available to the source either at present or in the future. |
| | Impact on Locally Available Coal | Alternatives which require the use of a fuel other than locally or regionally available coal should be discouraged if such a requirement causes significant local economic disruption or unemployment. |
| Environmental | Air Pollution Impact | The impact of air pollutants emitted from a gas stream or a fugitive emission source can be assessed in terms of either quantity of emissions, modeled effects on air quality, or both. If application of a control system directly removes or releases other air pollutants (or precursors to other air pollutants), then the pollutants affected and the impact of these emission changes should be identified. |
| | Water Impact | Relative quantities of water used and water pollutants produced and discharged as a result of each alternative emission control system should be identified. Where possible, the analysis should assess their effect on such local surface water quality. The analysis should consider whether applicable water quality standards are met and the availability and effectiveness of various techniques to reduce potential adverse effects. |
| | Solid Waste Disposal Impact | The quality and quantity of solid waste that must be stored and disposed of or recycled as the result of the application of each alternative emission control system should be compared with the quality and quantity of wastes created if the emission control system proposed as BACT is used. |

10

| | Irreversible or Irretrievable Commitment of Resources | The BACT decision may consider the extent to which the alternative emission control systems may involve a trade-off between short-term environmental gains at the expense of long-term environmental losses and the extent to which the alternative systems may result in irreversible or irretrievable commitment of resources. |
| --- | --- | --- |
| | Other Environmental Impacts | Incremental differences in noise levels, radiant heat, or dissipated static electrical energy should be considered where appropriate. |
| Economic | Direct Economic Impacts on the Plant | The direct cost for each control alternative should be presented both on an incremental and on an overall basis. Investment costs, operations and maintenance costs and annualized costs should be presented separately. The analysis should also include the total investment cost of the new facility. As a guide in determining when control costs become excessive, alternative control systems can be compared in terms of certain cost effectiveness rations, including: a) ratio of total control costs to total investment costs, b) cost per unit of pollution removed (e.g., dollars per ton reduced), c) cost versus additional portion of remaining PSD increment preserved for future growth, and d) unit production costs (e.g., dollars per ton of paper). |
| | Local Economic Impacts | Local economic impacts should be assessed in terms of local employment effects including number of jobs, dollars paid in salaries, and changes in employee skill levels required. Local economic impacts also can address the effect of various BACT alternatives on air quality increment consumption and the subsequent impact on future growth potential in the surrounding area. The BACT decision should reflect policy decisions to conserve the available air quality increment for future growth. |
| | Other Costs | Other costs associated with alternative emission control systems may be considered where appropriate. |

*Bottom-up Step 6: Determine BACT*

In step six, the permitting authority determines BACT. This decision is made by assessing the impacts of each control strategy alternative relative to the base case. If the impacts of one or more alternatives are judged by the permitting authority to be reasonable relative to the base case, then the most stringent alternative with reasonable impacts would be used as the basis for establishing the BACT limit. If the permitting authority determines that all the alternatives have

unreasonable adverse impacts, then the base case would be used as the basis for establishing the BACT limit.

**BACT Determinations Under the Top-Down Approach**

The top-down approach was adopted by EPA in the late 1980s and is described in many EPA documents, including a Draft 1990 NSR Workshop Manual. According to this draft manual, the top-down approach consists of five steps:

- Step 1 – identify all available control technologies

- Step 2 – eliminate technically infeasible options

- Step 3 – rank remaining control technologies by control effectiveness

- Step 4 – evaluate most effective controls

- Step 5 – select BACT

*Top-down Step 1: Identify All Available Control Technologies*

The first step in a top-down analysis is to identify all available control options. An available control option is one with potential application to the source and pollutant at issue. As stated in the 1990 Draft NSR Workshop Manual:

> The control alternatives should include not only existing controls for the source category in question, but also (through technology transfer) controls applied to similar source categories and gas streams, and innovative control technologies. Technologies required under lowest achievable emission rate (LAER) determinations are available for BACT purposes and must also be included as control alternatives and usually represent the top alternative.

1990 Draft NSR Workshop Manual at B.5.

*Top-down Step 2: Eliminate Technically Infeasible Options*

The second step in a top-down analysis is to eliminate any technically infeasible alternatives. This step is straightforward for most control technologies. "If the control technology has been installed and operated successfully on the type of source under review, it is demonstrated and it is technically feasible." 1990 Draft NSR Workshop Manual at B.17.

*Top-down Step 3: Rank Remaining Alternatives by Control Effectiveness*

In step three, all remaining control alternatives are ranked in order of overall control effectiveness, with the most effective (or stringent) control at the top.

*Top-down Step 4: Evaluate Most Effective Alternatives*

In step four, the energy, environmental, and economic impacts associated with each control alternative are evaluated, starting with the most stringent or top alternative.

*Top-down Step 5: Select BACT*

The fifth and final step in a top-down analysis is to select BACT. Under the top-down approach, the most effective control option not eliminated in step four is used as the basis for setting the BACT limit.

## STANDARD OF REVIEW

In this phase of the litigation, the United States seeks a judgment awarding injunctive relief against Westvaco. The traditional standard for an injunction requires the plaintiff to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay , Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).*

Plaintiff's proof will be sufficient to compel an injunction under the traditional weighing analysis. However, this is not the typical case for injunctive relief for at least three reasons, which makes an injunction even more compelling. First, this case involves environmental harm, an area that, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *see also United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722, 729 (W.D. Mich. 1991) ("an injunction is normally the proper remedy for violations of an environmental statute."). Therefore, if the injury is sufficiently likely, the "balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545.

Second, a violation of the Clean Air Act, a federal statute that explicitly provides for injunctive relief, *see* 42 U.S.C. § 7413(b), has already been proven. Courts have held that in the face of an established violation of federal law, the law must be enforced:

> Once Congress, exercising its delegated powers has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all. . . . To the extent the district court considers the public interest and the conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms.

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) (internal citations and quotations omitted). In these circumstances, the balancing of equities leans heavily in favor of the United States because Congress "has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about

to engage in, any activity which the statute prohibits." *Burlington N.R.R. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) (citing *Atchison, T. & S.F. Ry. v. Lennen*, 640 F.2d 255, 259, 261 (10th Cir. 1981)). The Court's responsibility is "crafting a remedy that is protective of public health and this responsibility necessarily takes preeminence over all other considerations." *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) (addressing the Safe Drinking Water Act). In crafting such a remedy, "a court has the equitable authority to order a full and complete remedy for harms caused by a past violation, and in doing so may go beyond what is necessary for compliance with the statute." *Cinergy I*, 582 F. Supp. 2d at 1061.

Finally, this matter does not present a typical case for injunctive relief because the United States is acting on behalf of the public. The courts have a long tradition of deferring to the United States when it seeks an injunction to remedy a violation of its laws. Justice Holmes wrote more than 100 years ago that sovereigns are "somewhat more certainly entitled to specific relief than a private party might be." *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907).  More recently, the Fifth Circuit wrote than "when the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue constitutes a risk of danger to the public." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) (emphasis added) (referring to the idea as a "traditional principle of equity" and citing cases).

The Fourth Circuit has stated "[w]here the plaintiff is a sovereign and where the activity may endanger the public health, injunctive relief is proper, without resort to balancing." *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337–38 (4th Cir. 1983); *see also Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). However, even if the Court decides that the traditional equitable framework

is appropriate here, the fact that this case involves sovereigns acting on behalf of the public interest to enforce a federal statute designed to protect human health and the environment means that the analysis is weighted heavily in favor of injunctive relief. *See Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (finding trial court should consider balance of harms in case under environmental statute, but adding, "We caution, however, that the operation of that framework is inevitably colored by the nature of the case and the purposes of the underlying environmental statute"). The evidence presented at the upcoming trial will show that an injunction is necessary here to prevent continuing harm and mitigate past harm.

## OVERVIEW OF PLAINTIFF'S EVIDENCE

The government's presentation of evidence will detail how pollution is generated from the operation of the Luke Mill, what happens to those pollutants once they are emitted from the mill's 623-foot stack (aptly called the "tall stack"), and how they affect human health and the environment in areas where the emissions are dispersed. The evidence will be sufficient to satisfy the four-part test for issuing an injunction.

**I.      Westvaco's Violations Have Caused Irreparable Harm to Human
Health and the Environment, for which There Is No Adequate Remedy
at Law**

As the Supreme Court has stated, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco,* 480 U.S. at 545 (1987); *accord Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 201 (4th Cir. 2005). There is no indication that the harms to human health and the environment that the United States will prove in this case

16

are the rare exception that can be compensated by money damages. In fact, another court has held in similar circumstances that the "significant health and environmental effects in the form of PM2.5" are "irreparable and there is no adequate remedy at law." *United States v. Cinergy Corp.* (*Cinergy II*), 618 F. Supp. 2d 942, 964 (S.D. Ind. 2009) (D. Ind. 2009) *clarified by 2009 WL 6327415, rev'd on other grounds,* 623 F.3d 455 (7th Cir. 2010).[2]

### A.    Westvaco's Violation Resulted in Excess Emissions

Westvaco violated the Clean Air Act by making a major modification to the Luke Mill without first obtaining a PSD permit or installing BACT on the No. 25 power boiler.  This violation has resulted in thousands of tons of excess $SO_2$ pollution.  The amount of excess emissions can be estimated by taking the difference between (a) the amount of $SO_2$ that has actually been emitted from Boiler No. 25 and (b) the amount of $SO_2$ that would have been emitted from Boiler No. 25 had Westvaco installed BACT at the time of the modification.  The mill's actual emissions are measured and recorded using a continuous emissions monitor.  Thus, it is relatively easy to determine the amount of $SO_2$ actually emitted from Boiler No. 25.  The second half of the equation requires an estimate of what BACT would have been at the time of the modification.  This is a concept which, at times, will be referred to as historic BACT to distinguish it from what would be considered BACT today (i.e., current-day or modern BACT).

As part of estimating the amount of excess emissions, the government's expert, Dr. James Staudt, evaluated what BACT would have been in the early 1980s.  Using the bottom-up approach, described above, Dr. Staudt determined that BACT in the early 1980s would have been an

---

[2] $SO_2$ emissions are transformed by chemical reactions in the atmosphere in to other chemicals that form fine particulate matter or $PM_{2.5}$, which is addressed in more detail in Part I.B below.

emissions limit of 0.35 lb/MMBTU based on the use of a wet sodium scrubber operating at 90%

removal efficiency.[3] Its use would have dramatically reduced SO2 pollution. The government will

demonstrate at trial that the use of a wet sodium scrubber at the Luke Mill would not have, in

EPA's judgment, resulted in any unreasonable adverse energy, environmental, or economic

impacts.  This technology was widely-used in the early 1980s on industrial boilers, like the No. 25

power boiler at the Luke Mill. By then, there were already more than 100 wet sodium scrubbers in

operation.  The use of a wet sodium scrubber would have been particularly attractive at the Luke

Mill given the availability of a caustic waste from the bleach plant that could have been used as a

scrubber reagent. The use of this caustic waste would have significantly reduced the cost of

reagent, the largest cost of operating a scrubber. The liquid waste that would have been generated

by the scrubber could have been easily accommodated in the mill's existing waste water treatment

system.  Finally, the cost of such a system would not have been considered unreasonable by EPA.

Having established what BACT would have been at the time of the DEP, Dr. Staudt

calculated that excess emissions from Boiler No. 25 have exceeded 225,000 tons of $SO_2$ through

the end of 2011. While Westvaco disputes that figure, the Court will hear that Westvaco's own

expert has admitted that Westvaco's failure to install and operate BACT in connection with the

DEP has resulted in nearly 16,000 tons of excess emissions (an average of 570 tons per year).

---

[3] As noted above, Westvaco and LPC should be required to install current-day BACT. The United States will demonstrate that BACT today would be a limit of 0.175 lb/MMBTU based on the use of a CFB scrubber at 95% efficiency. The only reason to determine what BACT would have been in the early 1980s is to estimate the amount of excess emissions resulting from Westvaco's violation.

Regardless of the correct number of tons per year, the illegal emissions continue to accumulate as the Luke Mill continues to operate without pollution controls.

        **B.**      **The Excess Emissions Have Adversely Affected Air Quality in the Region**

Plaintiff will present testimony from expert witness Lyle Chinkin, an atmospheric scientist with over 30 years of experience in air quality analysis, on the substantial air quality impacts of the excess $SO_2$ emitted from the Luke Mill. Mr. Chinkin will explain that the $SO_2$ emitted from the Luke Mill is transformed by chemical reactions in the atmosphere into sulfate ($SO_4$) and other chemicals that form fine particulate matter, known as $PM_{2.5}$ (which stands for particles smaller than 2.5 microns, or smaller than a grain of beach sand). Mr. Chinkin will further explain how $PM_{2.5}$ can result in a haze that reduces visibility and how sulfate,[4] when deposited to land or water, can render soils and surface waters more acidic. This process is known as acidic deposition. Using sophisticated air quality modeling, Mr. Chinkin will quantify the increase in ambient $SO_2$ and $PM_{2.5}$ concentrations, the increase in acidic deposition, and the increase in mercury deposition that resulted from the excess emissions in 2005. Mr. Chinkin will further testify that the results from 2005 can be extended to the other years during which there were excess emissions.

It is well settled in the field of atmospheric science that $PM_{2.5}$ can have both local and regional impacts on air quality. Mr. Chinkin will testify that the $SO_2$ emissions from the Luke Mill contribute to the ambient levels of $PM_{2.5}$ in a large geographic area surrounding the mill, including several metropolitan areas with air quality concerns. Mr. Chinkin will also explain how the excess emissions from the Luke Mill have impacted visibility in Class 1 areas. Mr. Chinkin will provide

---

[4] Sulfate is a component of $PM_{2.5}$.

context on the magnitude of the illegal emissions from the Luke Mill. For example, the excess $SO_2$

emissions each year are equivalent to the annual emissions of all 223,000 heavy-duty semi trucks

registered in Maryland, Pennsylvania, West Virginia, New York and New Jersey combined. In

reaching his conclusions, Mr. Chinkin relied on, among other things, generally accepted

techniques in the field of air quality analysis and peer reviewed state-of-the science air quality

models.

### C.   Poorer Air Quality Has Harmed Human Health And The Environment

The United States will present several witness with regard to the effects of sulfur dioxide,

$PM_{2.5}$, and mercury on the environment. These witnesses will not attempt to quantify the precise

amount of harm caused by the excess emissions from the Luke Mill versus the harm caused by

other sources because the United States is not required to make such a showing. The Luke Mill's

emissions contribute to the acknowledged general harm stemming from the violation of law that

this Court is charged to remedy. The long-standing principle of equity in nuisance cases is that no

contributor is exonerated just because others also contribute to the harm. *See, e.g.*, *Weston Paper*

*Co. v. Pope*, 57 N.E. 719, 721 (Ind. 1900) ("The fact that a water course is already contaminated

from various causes does not entitle others to add thereto, nor preclude persons through whose land

the water flows from obtaining relief by injunction against its further pollution.") This principle is

even more compelling when the contributor is violating a statutory program designed to ameliorate

the very problem at issue. In such a situation, Westvaco's arguments are commonly made and just

as commonly rejected, as illustrated in a penalty case under the Clean Water Act:

> During the entire trial, defendants' approach to their Permit violations was rather
> cavalier. They repeatedly argued there was no real harm caused by their numerous

> violations, and stressed that the Pagan River would still be environmentally
> damaged, and unsafe for swimming and shellfish harvesting, even if defendants
> complied with their Permit. Such arguments miss the mark. As the United States
> pointed out in closing argument: The goal of the Clean Water Act is bit by bit to
> clean up the waters of the United States.... The defendants cannot evade their
> responsibility for their part in the damage to the Chesapeake Bay through the
> discharge of phosphorus [and other effluents] into the Chesapeake Bay by saying,
> 'If you took ours out, it wouldn't make any difference' because everybody
> contributing to the Bay bears a responsibility for what went into the Bay.'

*United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 342 n.8 (E.D. Va. 1997), *aff'd in part*

*and rev'd in other part*, 191 F.3d 516 (4th Cir. 1999). In a Clean Air Act remedy trial on point with

this case, the court found "irreparable injury for which there [was] no adequate remedy at law"

based on evidence showing that defendant's excess emissions resulting from its PSD violations

contributed to harm. *Cinergy II*, 618 F. Supp. 2d at 961.

Martha Bogle, the superintendent of the Shenandoah National Park, will testify about the

natural resources within the park at risk by this air pollution. Ms. Ellen Porter, a biologist with the

National Park Service, will testify about how acidic deposition has impacted the Shenandoah

National Park. Stephanie Connolly, a soil scientist with the U.S. Forest Service, will testify about

the effects of acidic deposition in the Monongahela National Forest, including the Dolly Sods and

Otter Creek Wilderness areas. Mr. James Webb will explain how the $SO_2$ emissions from the Luke

Mill contribute to the cumulative acidic effects on the environment, including soils, trees, and

streams. Mr. Webb, a Senior Scientist at the University of Virginia whose research focuses on

ecosystem health in the central Appalachian region, will testify about how Luke Mill emissions

have contributed to this harm in the region, and also on federal lands near the Luke Mill. Dr.

Charles Driscoll, a Syracuse University Professor who has published numerous peer reviewed

studies, will discuss how mercury from the Luke Mill impacts the environment. Dr. Driscoll will

show that the mercury emissions from the Luke Mill are deposited locally and regionally, where it accumulates in the environment and the food chain. Dr. Driscoll will also explain that acid rain accelerates pre-existing mercury concentrations in fish. All of the states impacted by the Luke Mill mercury emissions, including Maryland, West Virginia, Virginia and Pennsylvania have mercury fish advisories that restrict, for public health reasons, the amount of fish that can be safely eaten.

The United States will also present evidence of harm to human health. Mary Ross, a supervisory health specialist at EPA, will explain how the NAAQS are set to protect public health. She will also summarize EPA's findings related to the human health harm from ambient $PM_{2.5}$ and $SO_2$, and she will discuss the actions taken by EPA to reduce these pollution risks to the public.

Dr. Joel Schwartz, a Professor at the Harvard School of Public Health, will testify about the public health effects of $PM_{2.5}$, including the chronic effects from long term exposure. Dr. Schwartz will explain, for example, that $PM_{2.5}$ can lodge deep in the human lung and that the greater the concentration of $PM_{2.5}$, the greater adverse effect on public health. Dr. Schwartz's conclusions reflect the consensus reached among mainstream medical and public health organizations.

The United States expects to call Dr. Deck, an economist specializing in environmental health and benefits analysis, to quantify the harm from the excess emissions in 2005 related to $PM_{2.5}$. He will testify about his estimation of number of deaths and other health effects that occurred as a result of excess emissions from the Luke Mill in 2005, resulting in over $40 million in costs for year 2005 alone. He will also testify that that these health effects and costs may be avoided if the excess pollution is abated in future years.

To be clear, the United States is not required to and will *not* demonstrate that controlling the illegal emissions at the Luke Mill will resolve all of the public health and environmental

problems from air pollution. Rather, the Luke Mill ought not to be allowed to contribute to ongoing problems through the continued operation of its illegally modified coal-fired boiler.

## II.     THE APPROPRIATE REMEDY IS AN INJUNCTION REQUIRING WESTVACO AND LPC TO OBTAIN A PSD PERMIT FOR THE DEP.

At the most fundamental level, the United States seeks a two-part remedy: (1) compliance with the Clean Air Act at Boiler No. 25; and (2) mitigation of the historic excess emissions from Boiler No. 25. Westvaco does not have the option of paying money to avoid compliance; Congress created no such provision when it amended the Clean Air Act. The remedy must take the form of an order directing Westvaco to comply with the law going forward. Such orders are within the Court's equitable powers. When faced with a violation of a statute, a district court has discretion to fashion a remedy, but it must exercise that discretion to order the "relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

An order redressing the harm to the public caused by the excess emissions is also "within the recognized power and within the highest tradition of a court of equity." *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987); *see also Alisal*, 326 F. Supp. 2d at 1027 (Safe Drinking Water Act decision in which "Court has the responsibility . . . of crafting a remedy that is protective of public health, and this responsibility necessarily takes preeminence over all other considerations.")

### A.     The Court Should Compel Prompt Compliance with the Clean Air Act

As described above, the United States' proof will show that pollution from the Luke Mill has and is continuing to harm human health and the environment in the area surrounding the mill. Plaintiff's proposed remedy is crafted to require installation of pollution controls as quickly as possible and to redress the harm from the historic and continuing illegal emissions. As a remedy for Westvaco's violation of the Clean Air Act, the United States seeks an injunction requiring Westvaco and LPC to obtain a PSD permit for the DEP containing a current-day BACT limit for $SO_2$ from the No. 25 power boiler.

A current-day BACT limit is appropriate because a BACT determination is made when a PSD permit is issued, and none has been issued before the present day. To determine BACT at a time other than permit issuance would ignore the plain language and purpose of the Clean Air Act and its implementing regulations, which require installation of the "best *available*" pollution controls.  42 U.S.C. § 7475(a)(4); 40 C.F.R. § 52.21(j)(3) (emphasis added).  By definition, the best "available" controls are those currently available at the time of permit issuance.  It would make no sense to consider old, outdated technology as the "best available."  This is confirmed by EPA regulations, which provide that a final permit (and thus BACT determination) will be rendered invalid if construction is not commenced within 18 months of receipt of a final permit. *See* 40 C.F.R. § 52.21(r)(2).  This provision, which requires a new BACT determination if construction is not promptly begun upon PSD approval, "is one of the means of ensuring that the requirement for best available control technology ("BACT") involves reasonably current pollution controls." *See In re W. Suburban Recycling and Energy Ctr.*, 8 E.A.D. 192, Clean Air Act Docket

No. 97-12, 1999 WL 133041 (U.S. Envtl. Prot. Agency Mar. 10, 1999).  As the Environmental

Appeals Board held:

> Each time a BACT determination is made, it takes into account new pollution
> control equipment and processes . . . .  Therefore, it is important that decisions
> about pollution control methods and associated emission limitations are made
> based on the most current information possible.  If a facility fails to commence
> construction within the time frame permitted by 40 C.F.R. section 52.21(r), it is
> possible that the BACT determination for the facility may be outdated by the time
> construction actually begins.

*Id.*

Failing to determine BACT using the best controls available at the time of final permit

issuance would also frustrate the fundamental purpose of the Clean Air Act, which is to "speed up,

expand, and intensify the war against air pollution in the United States . . . ."  H.R. Rep. No.

91-1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356, 5356.  "A remedial statute should be

liberally construed to effectuate its purpose . . . and should not be interpreted in a manner that

would frustrate its goals."  *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663

(W.D.N.Y. 2003) (citations omitted).  Limiting the evaluation of control technologies to those

existing at the time of the modification would frustrate the goals of the PSD program by creating

an incentive for a source to unlawfully defer installation and operation of costly pollution controls,

knowing full well that if a modification is discovered, the source would be entitled to install stale

(*i.e.*, no longer the "best available") control technology.  Such a result is clearly at odds with the

Clean Air Act's requirement to install the "best available" pollution controls.

Freezing BACT as of the date of a PSD violation would also inappropriately allow sources

to benefit from their non-compliance.  As the *Niagara Mohawk* court noted:

> Implicit in the requirement that a facility be subject to BACT . . . is an obligation on the part of the person proposing the construction or modification to obtain the appropriate BACT determination. [Defendant's] argument conveniently ignores the fact that the permitting authority never had the opportunity to determine BACT for the Facilities precisely because [Defendant] failed to follow the proper preconstruction procedures set forth in 42 U.S.C. § 7475(a). [Defendant's] initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit.

*Id.* at 663; *see also Oregon Envtl. Council*, 1992 WL 252123 at *22-23 (holding that new source review provisions do "not exempt a source of pollutants from the new source review requirements simply because the 'major modification' was constructed prior to the issuance of a requisite permit. Moreover, if such an exemption were allowed, a windfall would be created for those major new or modified sources that disregarded the SIP-mandated requirements."); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 652 (M.D.N.C. 2003) (rejecting construction of PSD provisions that could make it "more cost-effective to avoid the permit obligations altogether"). The BACT process should not be used to allow sources to benefit from their failure to comply with the Clean Air Act's PSD provisions. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Finally, requiring that BACT be determined based on control technologies currently available, as opposed to technologies available at the time of Defendants' major modifications, is also consistent with EPA guidance. EPA stated in its 1990 NSR Workshop Manual:

> The BACT emission limit in a new source permit is not set until the final permit is issued. The final permit is not issued until a draft permit has gone through public comment and the permitting agency has had an opportunity to consider any new information that may have come to light during the comment period. Consequently, in setting a proposed or final BACT limit, the permit agency can

consider new information it learns, including recent permit decisions, subsequent to the submittal of a complete application.

New Source Review Workshop Manual, Prevention of Significant Deterioration and Nonattainment Area Permitting, at B.54-55 (Draft October 1990) (the United States expects to present this document as exhibit 482). Consistent with this guidance, and as required by the plain language and purpose of the Clean Air Act and EPA's PSD regulations, this Court should rule that Defendants must install the best available control technology as determined at the time of final permit issuance (in this case post-trial) for the DEP.

At trial, Dr. Staudt will testify that BACT today would be a limit of 0.175 lb/MMBTU (30-day rolling average) based on the use of a circulating fluidized bed ("CFB") scrubber operating at 95% efficiency. Dr. Staudt will testify that such a scrubber would not impose unreasonable energy, environmental or economic impacts. Last year, the mill emitted nearly 11,000 tons of $SO_2$ pollution from the No. 25 power boiler.[5] Thus, the installation of BACT controls would reduce emissions from Boiler No. 25 by 95% or more than 10,374 tons per year.

This is the same type of scrubber that the mill has used in planning for future $SO_2$ reductions. As part of this planning, the mill has already completed extensive engineering studies to evaluate the feasibility and cost of installing CFB scrubbers. These studies indicate that CFB scrubbers are proven technologically capable of reducing $SO_2$ emissions by 95%, a target chosen by the mill because it considered that level of reduction BACT. These studies involved obtaining proposals specific to the Luke Mill from established control technology vendors. These proposals

---

[5] Total emissions exceeded 22,000 tons, making the Luke Mill the single largest source of $SO_2$ pollution in the entire state of Maryland.

included a proposal from Lurgi Lentjes North America offering to sell the mill a CFB scrubber and guaranteeing that the scrubber would reduce $SO_2$ emissions from the No. 25 power boiler by 95% to achieve an emissions limit of 0.15 lb/MMBTU – less than the 0.175 lb/MMBTU limit determined as current-day BACT by the United States.

The Court will hear that the Luke Mill is already legally obligated to reduce $SO_2$ pollution from the No. 25 power boiler by the year 2017 to meet another requirement of the Clean Air Act known as the Regional Haze Rule. This rule requires certain large sources of $SO_2$ and other visibility-impairing pollutants to install "Best Available Retrofit Technology" or BART. Indeed, the mill's long-range planning already includes the installation of CFB scrubbers on both Boilers 24 and 25, and the mill has already taken substantial steps toward installing CFB scrubbers, including:

- Demolishing and relocating the maintenance shop to make space for $SO_2$ scrubbers;

- Erecting a steel structure to support $SO_2$ scrubbers;

- Installing new induced draft fans on both boilers that were designed so that they could be modified (by re-tipping the blades) to accommodate the higher pressure drop that would result from the operation of $SO_2$ scrubbers;

- Installing baghouses (also known as fabric filters) that were sized and designed to accommodate the higher particulate loading from $SO_2$ scrubbers;

- Providing space within the mill for scrubber reagent preparation and storage silos; and

- Installing a power distribution system and electrical control room that was sized to accommodate $SO_2$ scrubbers.

To date, the mill has spent more than $30 million on these changes. The estimated capital cost to complete the installation of CFB scrubbers on Boilers 24 and 25 is approximately $4.5 million and $6 million, respectively.

### B.   The Court Should Require Mitigation of the Excess Emissions

In addition to an injunction requiring the installation of current-day BACT on Boiler No. 25, the United States seeks an injunction requiring Westvaco to mitigate the harm attributable to its violation. Had Westvaco complied with the Act and installed BACT on Boiler No. 25, its emissions would have been much less than its actual emissions. These "excess" emissions resulted, for example, in higher concentrations of $PM_{2.5}$, which results in a multitude of adverse health effects including mortality, and increased acidic deposition, which among other things adversely alters stream chemistry leading to the possible loss of aquatic life. *Cinergy II,* 618 F. Supp. 2d at 949-54.

While the installation and operation of current-day BACT will end the accrual of new consequences flowing from Westvaco's failure to obtain a PSD permit, it will do nothing to address the more than 225,000 tons of excess $SO_2$ and the many pounds of excess mercury released from the mill from the time the violation began to the time that new pollution controls would be installed. It is impossible to scrub from the environment the pollution the Luke Mill has already emitted or bring back the good health of those harmed by these illegal emissions. Under the circumstances, the United States submits that the best possible redress is for the Court to require Westvaco to reduce future pollution from the mill. Such a mitigation order is analogous to the traditional remedy of disgorgement of ill-gotten gains. *See, e.g.*, *SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) (discussing disgorgement). Moreover, as the *Cinergy* court wrote, "an

order requiring Defendants to take actions that remedy, mitigate, and offset harms caused to the public and the environment by their past Clean Air Act violations would seem to give effect to the Clean Air Act's purpose 'to protect and *enhance* the quality of the Nation's air resources so as to promote the public health and welfare.'" *Cinergy I*, 582 F. Supp. 2d at 1061-62 (quoting 42 U.S.C. § 7401).

This nexus between the prior harm and the benefit of the Court's mitigation more than satisfies the requirements of the law. *See United States v. Telluride Co.*, 146 F.3d 1241, 1247 (10th Cir. 1998) (acknowledging lack of precise symmetry between injury and cost of compliance in upholding injunction and finding it not a penalty) (*citing United States v. Halper*, 490 U.S. 435, 446 (1989) ("the Government is entitled to rough remedial justice . . . it may demand compensation according to somewhat imprecise formulas"). This theory of mitigation has been ordered in prior environmental cases. For instance, the First Circuit upheld an order in a Clean Water Act case requiring the defendant to not merely stop violating the statute until obtaining a permit but to also restore the wetland at issue to its pre-violation condition. *Mallinckrodt*, 471 F.3d at 296.

Without such mitigation, Westvaco will have effectively obtained a free pass from the requirements of the Clean Air Act. Such a result harms the environment and human health while also undercutting the entire regulatory program by suggesting that companies can benefit by flouting the rules. *See Niagara Mohawk Power Corp.*, 263 F. Supp. 2d at 663 (utility's "initial failure to comply with the requirements of the Clean Air Act cannot now inure to its benefit."); *see also Or. Envtl. Council v. Or. Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123, at *23 (D. Or. Sept. 24, 1992) (rejecting "windfall" for "modified sources that disregarded the SIP-mandated requirements").

The government seeks an order requiring Westvaco to reduce emissions by an amount equal to the illegal emissions from Boiler No. 25 since the time of the modifications. At this point, the government does not ask this Court to dictate the specific method by which Westvaco achieves the necessary emissions reductions. The Court will hear that mitigation could readily be accomplished by requiring pollution controls on the No. 24 power boiler, which, like Boiler No. 25, is currently without $SO_2$ pollution controls.

An order requiring Westvaco to mitigate all of the illegal emissions from Boiler No. 25 will fulfill the Court's duty to implement the injunctive relief that provides "the most complete relief possible." *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004) (internal citation omitted); *see also Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (to ensure complete relief "court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice."). Such an order will also ensure that Westvaco is not simply allowed to pay solely for the installation of controls on Boiler No. 25, after it has enjoyed the economic benefit of delayed compliance.

### III.    The Balance of Hardships and the Public Interest Favor an Injunction

The Court will hear detailed estimates of the costs that Westvaco would incur to install and operate pollution controls with the capability of meeting a current-day BACT limit. Those costs represent the extent of hardship on Westvaco. As the Court will hear, those costs, while not trivial, pale in comparison to the amount that Westvaco spent on the DEP and other expansion projects at the mill. The Court will also hear that Westvaco can easily afford to pay for the injunctive relief sought in this case. More importantly, the costs of installing and operating controls are small in

31

comparison to estimates the Court will hear of the economic consequences of impacts to human

health and to the inestimable cost of the harms to the environment. Even if the cost of the controls

was not small in relation to those things, however, courts have noted that the balancing of equities

has largely already been performed by Congress:

> The public has a strong interest in maintaining the balance Congress sought to
> establish between economic gain and environmental protection. While it is true that
> these statutes contemplate a certain amount of environmental degradation, they also
> mandate a certain amount of economic loss. Economic gain is not [to] be pursued
> at all costs, and certainly not when it is contrary to the law. The Court must ensure
> that it does not itself upset the balance struck by Congress.

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 633 (S.D.W. Va.

2007).

## CONCLUSION

This Court has already found that Westvaco violated the law when it modified the Luke

Mill without first obtaining a PSD permit and installing BACT. The United States' evidence at trial

will show that this violation has had severe consequences for the health and environmental quality

in the area surrounding the Luke Mill. The harm from these excess emissions will continue until

the Court orders Westvaco to remedy its violation. Even then the harm already incurred as a result

of Westvaco's violations will not be redressed without additional reductions in $SO_2$ emissions.

The evidence sketched above and to be detailed at trial will support a finding that in order for

Boiler No. 25 at the Luke Mill to continue operating, the unit must meet the PSD requirements, be

covered by a permit that reflects those requirements, and operate with a scrubber that has an $SO_2$

removal efficiency of no less than 95%. The evidence will also support the following remedy for

Westvaco's violation:

1.      Order Westvaco and Luke to prepare and submit, within 90 days of the Court's order,

a complete application satisfying the PSD requirements for Boiler No. 25 and

proposing installation of a scrubber with an $SO_2$ removal efficiency of no less than

95%;

2.      Order Westvaco and Luke to complete the design and begin the procurement of a

scrubber for Boiler No. 25 with an $SO_2$ removal efficiency of no less than 95% within

90 days of the Court's order;

3.      Order Westvaco and Luke to complete the installation a scrubber with an $SO_2$ removal

efficiency of no less than 95% on Boiler No. 25 no later than 12 months after the

Court's order; and

4.      Require further $SO_2$ reductions at the Luke Mill, at Westvaco's expense, equal to the

amount of illegal emissions from Boiler No. 25.

Respectfully Submitted

ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
 Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

November 28, 2012 _____
Dated

/s/ Daniel S. Smith _____
MARK C. ELMER
CARA M. MROCZEK
DANIEL S. SMITH (Bar. No. 27267)
U.S. Department of Justice
Environmental Enforcement Section
999 Eighteenth Street
South Terrace, Suite 370
Denver, CO 80202
(303) 844-1352 (voice)
(303) 844-1350 (fax)
Mark.Elmer@usdoj.gov

Of Counsel:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

TERESA DYKES
Air Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2012, I electronically filed the foregoing pretrial brief using the court's CM/ECF system which sent notification of such filing to:

Charles Harry Haake
Peter Eric Seley
Raymond B. Ludwiszewski
GIBSON DUNN AND CRUTCHER LLP
1050 Connecticut Ave NW
Washington, DC 20036
chaake@gibsondunn.com
pseley@gibsondunn.com

*Attorneys for Defendant Westvaco Corporation*

Howard B. Epstein
Sami B. Groff
SCHULTE ROTH AND ZABEL LLP
919 Third Ave
New York, NY 10022
howard.epstein@srz.com
mark.dowd@srz.com
sami.groff@srz.com

*Attorneys for Intervenor Luke Paper Company*

/s/ Daniel S. Smith
Daniel S. Smith