UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---------------------------------------------------------X

UNITED STATES OF AMERICA,    :

    *Plaintiff*,    :

    :

    v.    :    Civil Action No. MJG 00 CV 2602

    :

WESTVACO CORPORATION,    :

    :

    *Defendant*.    :

---------------------------------------------------------X


**INTERVENOR LUKE PAPER COMPANY'S
PRETRIAL BRIEF**


Howard B. Epstein
Sami B. Groff
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for Luke Paper Company*


Dated: November 28, 2012

# **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

LEGAL ISSUES .............................................................................................................2

I.  Luke is Not Liable for the Violations of PSD Found Here .........................................2

II.  BACT Does Not Require Imposition of a Particular Type of Emissions Control ....................5

III.  BACT is Not BART; and BART is Not at Issue in this Case....................................7

CONCLUSION................................................................................................................8

## <u>TABLE OF AUTHORITIES</u>

........................................................................................................... <u>Pages</u>

<u>New York v. Niagara Mohawk Power Corp.</u>, 263 F.Supp.2d 650 (W.D.N.Y. 2003) ................3, 4

<u>Sierra Club v. Otter Tail Power Co.</u>, 615 F.3d 1008 (8th Cir. 2010) ................................................3

<u>Sierra Club v. Wisconsin Dep't of Natural Resources</u>,
787 N.W.2d 855, 870-71 (Wi. Ct. App. 2010) ................................................................5

<u>United States v. Cinergy Corp.</u>, 397 F.Supp.2d 1025, 1030 (S.D.Ind. 2005)................................3

<u>U.S. v. EME Homer City Generation LP</u>, 823 F.Supp.2d 274 (W.D.Pa. 2011) ....................3, 4,5

<u>U.S. v. Louisiana Generating, LLC</u>, 2011 WL 6012997 (M.D. La. Dec. 1, 2011) ....................5, 6

<u>United States v. Midwest Generation, LLC</u>, 694 F.Supp.2d 999 (N.D.Ill. 2010) ..........................3

<u>United States v. Ohio Edison Co.</u>, Civ Action No. 2:99-CV-1181 (S.D. Ohio, 2005)...................6

<u>United States v. Southern Indiana Gas and Electric Co. ("SIGECO")</u>,
2002 WL 1760752, *4 (S.D.Ind.  July 26, 2002)...........................................................2

<u>United States v. Westvaco Corp.</u>, 144 F.Supp.2d 439, 441 (D.Md. 2001)..................................2, 3

42 U.S.C. § 7479(3) ...........................................................................................................5

**<u>INTRODUCTION</u>**

Intervenor Luke Paper Company ("Luke") takes no position in this litigation as to whether a remedy of Best Available Control Technology ("BACT") should be ordered for the violations of the New Source Review Prevention of Significant Deterioration program of the Clean Air Act ("NSR" or "PSD") previously determined by this court.  As this court has already held, Luke is *not* a successor to Westvaco's liability and is *not* liable for the violations of PSD at issue.  Luke has been joined as an Intervenor to this action only to help effectuate a remedy that may be imposed upon defendant Westvaco.  Memorandum and Order, April 7, 2011, Docket No. 279 at p.7 - 10.  That said, the court has specifically invited Luke to share its opinions as to the particular remedy sought, given that the remedy will affect the Luke Mill, which is currently owned and operated by Luke.  Id.

Despite its name, which seems to imply a finding of a particular control technology, a determination of BACT is actually just an emissions limit --  requiring a party to take action to reduce emissions of the regulated pollutant, here sulfur dioxide ("$SO_2$"), to the newly specified BACT emission level.  Though the BACT limit is determined based on an analysis of how much reduction *may* be accomplished by the available technologies, a remedy ruling imposing a BACT limit does not require a decision by the court as to what specific control technology or emissions reduction measure *should* be implemented to achieve the BACT limit. This may be left to the discretion of the facility, so long as the BACT limit is met.  Moreover, the BACT analysis is not limited to a strict determination of the most effective technology, but also considers other factors including the "economic impacts" of the proposed technologies.

Here, Luke is expected to emerge from bankruptcy by the end of December as a reorganized entity under new indirect ownership and with a new, not yet constituted, board of

directors.  The company is in the process of analyzing the best options for reductions of $SO_2$

emissions at the Luke Mill from both a technological and cost standpoint.  At trial, the court will

hear testimony as to the BACT emissions limit that should be imposed, the various technologies

and measures available as options to achieve BACT, the costs of those options, and the timing it

will take to design, order, construct and install such measures.  Any remedy ordered by the Court

need only determine the applicable BACT limit and acknowledge the multiple appropriate

methods by which BACT may reasonably be achieved.

## LEGAL ISSUES

## I.  Luke is Not Liable for the Violations of PSD Found Here

Luke is not a successor to Westvaco's liability and is not liable for the violations

of PSD at issue.  Memorandum and Order, April 7, 2011, Docket No. 279 at p.7, 10.

Accordingly, a BACT remedy may not be ordered against Luke.

First, as a matter of law, no remedy can issue against Luke, because it was not an

owner or operator of the Luke Mill at the time of the PSD violations.  As the court has already

held in this case, a violation of PSD occurs at the time of construction and is not a continuing

operational violation.  United States v. Westvaco Corp., 144 F.Supp.2d 439, 441 (D.Md. 2001).

Specifically, this court explained that the PSD program, entitled "Preconstruction

Requirements," "clearly and unambiguously applies to the *construction* - not the *operation* - of

major stationary sources."  Id. at 444-45.  The difference between "preconstruction permit

violations and operation permit violations is crucial."  United States v. Southern Indiana Gas and

Electric Co. ("SIGECO"), 2002 WL 1760752, *4 (S.D.Ind.  July 26, 2002).  Whereas it is

"generally recognized that failure to obtain an operations permit is a continuing violation for

each day of operation without the permit. . . . In contrast, failure to obtain a preconstruction

permit is a discrete violation that occurs at the time of construction."  <u>Id</u>.

     Because the violation occurs at the time of construction, and does not continue

through operation of the facility, even the very party alleged to have violated NSR "cannot be

liable for failing to operate according to a non-existent pre-construction permit."  <u>United States</u>

<u>v. Cinergy Corp.</u>, 397 F.Supp.2d 1025, 1030 (S.D.Ind. 2005);  <u>Sierra Club v. Otter Tail Power</u>

<u>Co.</u>, 615 F.3d 1008 (8th Cir. 2010) (finding that PSD "obliges a facility to obtain a permit before

commencing construction" but does not impose an ongoing duty to employ BACT if no PSD

permit had been obtained prior to construction).  In <u>Cinergy</u>, the court ruled that Cinergy could

not be held liable for *operating* the facility without the PSD permit it did not obtain because the

PSD violation occurs only at the time of construction.  Similarly, here, no remedy can be ordered

against Luke for operating the Luke Mill without a PSD permit that Westvaco never obtained.

     Relying on this Court's decision in <u>Westvaco</u>, among others, federal courts have

dismissed NSR claims against new owners, holding that there is simply no basis for the

government to assert claims against a new owner for violations of NSR allegedly committed by a

prior owner.  <u>United States v. Midwest Generation, LLC</u>, 694 F.Supp.2d 999 (N.D.Ill. 2010);

<u>New York v. Niagara Mohawk Power Corp.</u>, 263 F.Supp.2d 650 (W.D.N.Y. 2003); <u>U.S. v. EME</u>

<u>Homer City Generation LP</u>, 823 F.Supp.2d 274 (W.D.Pa. 2011).  The <u>Niagara Mohawk</u> court

explained that a new owner, who did not own or operate the facilities at the time the

modifications occurred, could not be held liable for the violations because by their "plain terms"

the PSD provisions do not "impose liability on any person other than the one who fails to comply

with its requirements.  Preconstruction obligations are imposed only upon the person who

actually seeks to construct or modify a facility within the meaning of the Act . . . ."  Niagara

Mohawk, 263 F.Supp.2d at 668-69.

Here, a remedy cannot be ordered against Luke where no NSR claim could have

been brought against it in the first instance.  As the Homer court held, the "Current Owners  . . .

cannot be held liable for injunctive relief because they did not violate the PSD program."

Homer, 823 F.Supp.2d at 288.

Separately, and independent of the fact that no legal claim for remedy lies against

Luke, Luke did not assume liability for Westvaco's preconstruction obligations by contract, as

this court has already held.  Memorandum and Order, April 7, 2011, Docket No. 279 at p.7.

Pursuant to the Equity and Asset Purchase Agreement, dated January 15, 2005, (the "Purchase

Agreement"), Westvaco retained the responsibility for the defense, resolution and potential

liability arising out of the instant litigation (the "Luke Mill NSR Litigation").  Specifically,

pursuant to Schedule 11.2(a)(viii) of the Purchase Agreement, Westvaco expressly retained the

obligation to defend and resolve the Luke Mill NSR Litigation, including "without limitation, the

design, installation and construction of any pollution control equipment required as a result of

any resolution thereof," except for the costs of a "Scrubber-Compliant Baghouse" (which has

already been built by Luke at an approximate cost of $30 million) and the operating costs of any

such pollution control equipment (other than amounts exceeding $2 million in the first five

years).  Westvaco also "is entitled to take all steps necessary in the defense and resolution of the

Luke Mill NSR Litigation, including the settlement thereof . . . ." and is required to defend and

/or resolve the litigation "in good faith."  Schedule 11.2(a)(viii)(2), (3).  Accordingly, in addition

to there being no basis under the Clean Air Act to impose a BACT remedy upon Luke, Luke has

not assumed Westvaco's PSD liability through the provisions of the Purchase Agreement.

## II.  BACT Does Not Require Imposition of a Particular Type of Emissions Control

Pursuant to the Clean Air Act, BACT is an emissions limit, determined on a case by case basis, by assessing the degree of emissions reductions that technology can achieve, while taking into consideration other factors, including energy, environmental and economic impacts. Specifically, the Clean Air Act provides that the term "best available control technology" means:

> an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant.

42 U.S.C. § 7479(3).

As the courts have explained, however, "BACT is not a particular type of technology." Homer, 823 F.Supp.2d at 281.  Once BACT has been determined, numerous technological or operational methods may satisfactorily be implemented to achieve the BACT limit.  For example, in Sierra Club v. Wisconsin Dep't of Natural Resources, the court noted that either a wet scrubber or a dry scrubber could have satisfied the BACT limit and upheld a challenge to the DNR's choice of a dry scrubber. Sierra Club v. Wisconsin Dep't of Natural Resources, 787 N.W.2d 855, 870-71 (Wi. Ct. App. 2010).

Similarly, in consent decrees settling NSR enforcement actions, the owner/ operator often retains the flexibility to achieve BACT by more than one means.  For example in U.S. v. Louisiana Generating, LLC, 2011 WL 6012997 (M.D. La. Dec. 1, 2011), a consent decree entered just this past month, Louisiana Generating agreed to pay $250 million in capital costs to install emissions reduction equipment at its affected power plants, a $3.5 million fine,

and $10.5 million in supplemental environmental projects.  With respect to the reduction of $SO_2$ emissions from the plant to satisfy BACT, the consent order provides that Louisiana Generating will have the option to "Retire, Refuel, Repower, or Retrofit" the affected unit by a particular date.  If it chooses to retrofit the unit, it agrees to " Continuously Operate Dry FGD *or an alternate equivalent pollution control technology* approved by EPA" so that the unit achieves the specified emissions limit.  (emphasis added).  Louisiana Generating Consent Decree at ¶¶62-63.[1] Similarly, in a consent decree entered in the <u>United States v. Ohio Edison Co.</u>, Civ Action No. 2:99-CV-1181 (S.D. Ohio, 2005), the owner/ operator agreed to "install an FGD (or equivalent $SO_2$ control technology. . . )" at each affected unit to achieve a specified removal efficiency. Ohio Edison Consent Decree at ¶¶81-85.[2]

In the instant case, the court will hear testimony at trial with respect to the types of technologies or measures that may be implemented to satisfy BACT.  Alternatives currently being studied by Luke include installation of a dry scrubber on power boiler # 25, on power boiler #24, or on both, or a switch of one or both power boilers to natural gas.  The most recent engineering study undertaken by Luke indicates that the estimated cost of installing a scrubber on power boiler #25 is $10,266,778 and on power boiler  #24 is $8,988,166, with an additional operating cost of approximately $3 million per boiler per year.

Each of these options contains pros and cons with respect to technology, operation and cost.  For example, installing a scrubber on only one power boiler could cause corrosion on the stack that will need to be addressed by either installing two scrubbers, each operating at a lower efficiency to achieve the same rate of reduction equivalent to BACT, or by an operational measure such as reheating the second boiler, relining or rebuilding the stack.

---

[1]  http://www.epa.gov/enforcement/air/documents/decrees/lagen-cd.pdf

[2]  http://www.epa.gov/compliance/resources/decrees/civil/caa/ohioedison-cd.pdf

Each of these options contains a cost component that must be addressed. Moreover, the court will hear testimony regarding the time it will take to design, engineer, order, contract, fabricate, construct and install the varied options, as well as fit the work into the Mill's schedule for power boiler outages. Depending on the option selected, such process could take between two and three years.

A remedy ruling by the court, however, need only make a determination as to the applicable BACT limit and then order Westvaco to achieve BACT by implementing a remedy based upon a technology identified by Luke as consistent with its operational needs.

## III.  **BACT is Not BART; and BART is Not at Issue in this Case**

At trial, Luke expects the parties to attempt to elicit testimony as to what Luke's obligations might be under Maryland's Regional Haze BART rule; a separate rule under the Clean Air Act intended to improve visibility in designated areas of the country. Though some of the pollutants subject to BART, including $SO_2$, are the same as those at issue under BACT, Luke's future BART obligations are not relevant to a determination of Westvaco's liability for BACT under the PSD program and should not be factored into any BACT determination in this case.

Moreover, BART does not require that the Luke Mill install a particular control technology, rather, like BACT, it imposes an emissions limit. See, the BART Final Rule, 77 FR 39938, 7/6/12, 40 CFR Part 52. Specifically, as the final Maryland BART rule states in Response 5 with respect to the Luke Mill, "BART is an emission limit," it "does not require the facility to install specific controls at Unit 25 to meet these limits." Ex. B, Section III, Response 5. Accordingly, any suggestion by the parties that BART requires a particular technology to be installed at the Luke Mill is erroneous.

The parties' continued focus on Luke's potential BART obligations is nothing more than a transparent attempt to shift the burden of Westvaco's BACT compliance onto Luke's shoulders.  Such a shift would be substantially detrimental to the Mill and would be inequitable, particularly given the vast differential between MeadWestvaco and Luke's financial resources. Any such attempt to have Luke shoulder Westvaco's burden should be rejected.

## CONCLUSION

Luke takes no position as to whether a BACT remedy should be ordered as a result of the violations the court has found to exist in this case.  To the extent such a remedy is ordered, the court's order should provide for Westvaco to implement emissions reduction measures that achieve BACT and best protect Luke's financial position and the operational and timing needs of the Luke Mill.

Dated: November 28, 2012

*Attorneys for Luke Paper Company*

_____/s/Sami B. Groff_____

Howard B. Epstein
Sami B. Groff
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
(212)756-2000

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2012, a true and correct copy of the foregoing

INTERVENOR LUKE PAPER COMPANY'S PRETRIAL BRIEF was filed using the Court's

electronic case filing system, which results in service on all counsel of record registered on the

case management/electronic filing ("CM/ECF") system.


_____ /s/ Sami B. Groff __
Sami B. Groff

DOC ID - 19344905.4