UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
------------------------------------------------------------x
UNITED STATES OF AMERICA,   :
              :
      *Plaintiff*,    :
              :  Civil Action No.: MJG 00 CV 2602
      -v-      :
              :
WESTVACO CORPORATION,   :
              :
      *Defendant*.   :
------------------------------------------------------------x

## INTERVENOR LUKE PAPER COMPANY'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Howard B. Epstein
Sami B. Groff
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY  10022
Telephone: 212.756.2000

*Attorneys for Luke Paper Company*

Dated: March 15, 2013

## TABLE OF CONTENTS

**Page**

INTRODUCTION.......................................................................................................... 1

I. PROPOSED CONCLUSIONS OF FACT ............................................................ 3

    A. The Purchase Agreement and the Scrubber Compliant Baghouses ................................... 3

    B. Emissions Reduction Technologies: Options and Considerations ...................................... 6

II. PROPOSED CONCLUSIONS OF LAW.............................................................. 11

    A. Luke is Not Liable for Any Violations Asserted Here ...................................................... 11

    B. BACT Does Not Require Imposition of a Particular Type of Emissions Control ............. 14

CONCLUSION. ............................................................................................................... 16

## **TABLE OF AUTHORITIES**

**Pages**

Gasner v. Board of Supervisors, 103 F.3d 351, 361 (4th Cir. 1996)..............................................14

Gibson v. Allstate Ins. Co., 64 Fed.Appx. 378, 2003 WL 21101723 (4th Cir. May 15, 2003)....14

Hunt Building Co. v. United States, 61Fed. Cl. 243, 279-280 (Ct. Cl. 2004)................................2

Indian River Recovery Co. v. The China, 645 F.Supp. 141 (D.De. 1986) ....................................2

Monovis, Inc. v. Aquino, 905 F.Supp. 1205, 1234-36 (W.D.N.Y. 1994)......................................2

New York v. Niagara Mohawk Power Corp., 263 F.Supp.2d 650 (W.D.N.Y. 2003)...................13

Ostergren v. Cuccinelli II,  615 F.3d 263, 287-88 (4th Cir. 2010)................................................14

Sierra Club v. Otter Tail Power Co., 615 F.3d 1008 (8th Cir. 2010) ............................................12

Sierra Club v. Wisconsin Dep't of Natural Resources,
787 N.W.2d 855, 870-71 (Wi. Ct. App. 2010)...............................................................................15

United States v. Cinergy Corp., 397 F.Supp.2d 1025, 1030 (S.D.Ind. 2005) ...............................12

U.S. v. EME Homer City Generation LP, 823 F.Supp.2d 274 (W.D.Pa. 2011)  ....................13,14

United States v. Midwest Generation, LLC, 694 F.Supp.2d 999 (N.D.Ill. 2010)........................13

United States v. Ohio Edison Co., Civ. Action No. 2:99-CV-1181 (S.D. Ohio, 2005) ...............15

United States v. Southern Indiana Gas and Electric Co. ("SIGECO"),
2002 WL 1760752, *4 (S.D.Ind.  July 26, 2002) .........................................................................12

United States v. Westvaco Corp., 144 F.Supp.2d 439, 441 (D.Md. 2001) ...................................12

42 U.S.C. § 7479(3)........................................................................................................................14

## INTRODUCTION

Intervenor Luke Paper Company ("Luke") hereby respectfully submits its Proposed Findings of Fact and Conclusions of Law in Sections I and II below.  Luke takes no position as to whether a remedy of Best Available Control Technology ("BACT") should be ordered for the violations of the New Source Review Prevention of Significant Deterioration program of the Clean Air Act ("NSR" or "PSD") by Defendant Westvaco Corporation ("Westvaco") previously determined by this Court.  As this Court has already held, Luke is *not* a successor to Westvaco's liability and is *not* liable for the violations of PSD at issue.  Luke has been joined as an Intervenor to this action only to help effectuate a remedy that may be imposed upon defendant Westvaco.  Memorandum and Order, April 7, 2011, Docket No. 279 at p.7 - 10. Moreover, no claim has been brought against Luke and there is no case and controversy against it in this action.  Any remedy ordered by the Court should be clear that it is imposed on defendant Westvaco and not on Luke.

BACT is simply an emissions limit.  A determination of BACT merely requires a party to take action to reduce emissions of the regulated pollutant, here sulfur dioxide ("$SO_2$"), to the newly specified BACT emissions level.  Though the BACT limit is determined based on an analysis of how much reduction *may* be accomplished by the available technologies, a remedy ruling imposing a BACT limit does not require a decision by the Court as to what specific control technology or emissions reduction measure *should* be implemented to achieve the BACT limit.  This may be left to the discretion of the facility, so long as the BACT limit is met. Moreover, the BACT analysis is not limited to a strict determination of the most effective

technology, but also considers other factors including the "economic impacts" of the proposed technologies.

The remedy sought here is injunctive relief.  To that end, the Court must engage in a balancing of the equities.  Hunt Building Co. v. United States, 61Fed. Cl. 243, 279-280 (Ct. Cl. 2004) (balancing interests of the parties, intervenor and third parties in issuing injunctive relief); Indian River Recovery Co. v. The China, 645 F.Supp. 141 (D.De. 1986) (considering the harms to an intervenor in issuing injunctive relief).  Though the contractual agreement between Luke and Westvaco is not before the Court for a determination as to the rights of the parties as between those parties themselves, the plain language of the contract is properly before the Court for reference in making its equitable determination in balancing the equities and in crafting its order for injunctive relief.  Monovis, Inc. v. Aquino, 905 F.Supp. 1205, 1234-36 (W.D.N.Y. 1994) (considering the business practices of the parties in crafting an order of injunctive relief).

Here, Luke has just emerged from bankruptcy at the end of 2012 as a reorganized entity under new indirect ownership and with a new board of directors.  The company is in the process of analyzing the best options for reductions of $SO_2$ emissions at the Luke Mill from both a technological and cost standpoint.  The Court heard testimony at trial with respect to the types of technologies or measures that may be implemented to satisfy BACT.  Alternatives currently being studied by Luke for $SO_2$ reduction include installation of dry scrubbers on Power Boiler Number 25 and/ or Number 24 or a switch of one or both power boilers to natural gas.  The most recent engineering study undertaken by Luke indicates that the estimated cost of installing a scrubber on Power Boiler Number 25 is $10,266,778 and on Power Boiler Number 24 is $8,988,166, with an additional operating cost of approximately $3 million per boiler per year.

Each of these options contains pros and cons with respect to technology, operation and cost.  For example, installing a scrubber on only the Number 25 Power Boiler is expected to cause corrosion in the ductwork and in the Tall Stack; a problem that will need to be addressed and prevented by either installation of a second scrubber on Power Boiler Number 24 (with each scrubber operating at a lower efficiency to achieve the same rate of reduction equivalent to BACT) or by an operational measure such as reheating and mixing the gas stream. As the Court has heard from the witnesses at trial, the installation of dry scrubbers on the power boilers at the Luke Mill is complex, the areas in the vicinity of the power boilers are space constrained, and it will take approximately two to three years to complete design, engineering, ordering, fabrication, construction and installation of a scrubber system.  Any remedy ordered by the Court should provide sufficient time for Westvaco to implement it without unreasonably interfering with mill production.

# I.  PROPOSED CONCLUSIONS OF FACT

## A.  The Purchase Agreement and the Scrubber Compliant Baghouses

1.  The instant action was brought by the United States against Westvaco on April 28, 2000.

2.  During the pendency of this litigation, pursuant to the Equity and Asset Purchase Agreement, dated January 15, 2005, and its related agreements (the "Purchase Agreement"), the Luke Paper Company acquired the Luke Mill from MeadWestvaco Corporation ("MeadWestvaco").  Plaintiff's Exhibit (Ex.) 248.[1]

3.  No claims have been brought against Luke in this case.

---

[1]  Citations to Exhibits are to exhibits from the instant remedy phase trial.

4.  Pursuant to the Purchase Agreement, MeadWestvaco retained the responsibility for the defense, resolution and potential liability arising out of the instant litigation (the "Luke Mill NSR Litigation").  Plaintiff's Ex. 250.

5.  Specifically, pursuant to Schedule 11.2(a)(viii) of the Purchase Agreement, MeadWestvaco expressly retained the obligation to defend and resolve the Luke Mill NSR Litigation, including "without limitation, the design, installation and construction of any pollution control equipment required as a result of any resolution thereof," except for the costs of a "Scrubber-Compliant Baghouse" and the operating costs of any such pollution control equipment (other than amounts exceeding $2 million in the first five years).  Plaintiff's Ex. 250.

6.  Pursuant to Schedule 11.2(a)(viii)(2) & (3) of the Purchase Agreement, MeadWestvaco "is entitled to take all steps necessary in the defense and resolution of the Luke Mill NSR Litigation, including the settlement thereof . . . ." and is required to defend and /or resolve the litigation "in good faith."  Plaintiff's Ex. 250.

7.  Pursuant to Schedule 11.2(a)(viii) of the Purchase Agreement, Luke was required to install two Scrubber-Compliant Baghouses on the Number 24 and 25 Power Boilers at the Luke Mill in such a manner "that two 'dry' $SO_2$ scrubbers can be installed upstream of the baghouse . . . ."  Plaintiff's Ex. 250.

8.  Luke installed two Scrubber Compliant Baghouses, one each on the Number 24 and Number 25 Power Boilers, at an approximate cost of $30 million.  Paugh Tr.

1/18/13 at 23:2-24:7, Staudt Tr. 12/11/12 at 53:21 -54:1; Staudt Tr. 12/12/12 at 64:21 -64:25; 67:13 -15.[2]

9.  Luke has been operating the two Scrubber Compliant Baghouses since their construction was completed in approximately 2006-07.  Paugh Tr. 1/18/13 at 24:8-25:25, Staudt Tr. 12/12/12 at 64:21 -67:15.

10.  Luke incurs costs for the operation and maintenance of the baghouses, including over $1 million incurred to date for replacement of the more than 5,000 bags in the two baghouses.  Paugh Tr. 1/18/13 at 26:1-26:15.

11.  The baghouses are necessary for any potential future operation of dry scrubbers on the power boilers.  Staudt Tr. 12/11/12 at 47:23 -49:4;  Staudt Tr. 12/12/12 at 67:13 -68:10.

12.  This Court has found Westvaco liable for the violations of PSD asserted by plaintiff in this case.  Memorandum and Order, June 7, 2011, Docket No. 282.

13.  Should the Court order the installation of dry scrubbers on the power boilers as a remedy for the PSD violations found in this case, Westvaco will not need to build and install baghouses since that has already been done by Luke.  Staudt Tr. 12/12/12 at 67:13 -68:10.

---

[2] Citations to witness testimony are to testimony from the instant remedy phase trial and list the name of the witness, date of the trial testimony and page:line number of the trial transcript.

**B. Emissions Reduction Technologies: Options and Considerations**

1. Installation of $SO_2$ control technologies at a pulp and paper mill is a complex process, expected to take between two to three years, that requires engineering analyses, various phase studies, proposals to outside vendors, custom design, obtaining permits and regulatory approvals, implementation of infrastructure, off-site fabrication, and on-site installation. Paugh Tr. 1/18/13 at 57:17:-64:4; Staudt Tr. 12/12/12 at 74:6 -78:12.

2. The pulp and paper industry has limited experience with operating dry scrubbers (also known as FGD scrubbers) on coal fired boilers for $SO_2$ control. Plaintiff's Ex. 351 at p. USWR-00037348 (National Council for Air & Stream Improvement (NCASI) Memo, dated June 9, 2006); Thorp Tr. 1/15/13 at 126:9-131:1.

3. As is the case at the Luke Mill, retrofit considerations for installation of scrubbers at pulp and paper mills can involve space restraints. Plaintiff's Ex. 351 at p. USWR-00037348 (NCASI Memo); Thorp Tr. 1/15/13 at 130:14-131:1.

4. The Luke Mill is currently analyzing the options for $SO_2$ emissions reductions. Paugh Tr. 1/18/13 at 36:3-36:15.

5. Alternatives currently being studied by Luke include installation of a dry scrubber on Power Boiler Number 25, on Power Boiler Number 24, or on both, or a switch of one or both power boilers to natural gas. Paugh Tr. 1/18/13 at 37:12-38:10.

6. In 2012, Jacobs Engineering was retained to conduct a study regarding application of the Industrial Boiler MACT Rule to the Luke Mill (the "2012 Jacobs Report").

The 2012 Jacobs report also considered $SO_2$ reduction options.  LPC Ex. 0001; Paugh Tr. 1/18/13 at 34:8-34:23.

7.  The 2012 Jacobs study indicates that the estimated cost of installing a dry scrubber on Power Boiler Number 25 is $10,266,778, the cost of installing a dry scrubber on Power Boiler Number 24 is $8,988,166, and each scrubber will cost approximately $3 million per year to operate.  LPC Ex. 0001 at p. LPC 42502; Paugh Tr. 1/18/13 at 38:11-39:3.

8.  The 2012 Jacobs Report is a Phase I engineering study.  LPC Ex. 0001; Paugh Tr. 1/18/13 at 39:4-39:5.

9.  Determination of the best method for reduction of $SO_2$ emissions at the Luke Mill will require additional engineering studies, including a possible new Phase I study and a Phase II engineering study.  Paugh Tr. 1/18/13 at 57:17-60:22, Staudt Tr. 12/12/12 at 75:7 -79:15.

10.  The option of switching to natural gas is considered by Luke to be too expensive at this time as estimates of the capital costs of installing the necessary pipeline alone exceed $20 million.  Paugh Tr. 1/18/13 at 16:9-17:8.

11.  The option of installing dry scrubbers on the Number 25 and/or the Number 24 Power Boilers is feasible but complicated by space constraints at the Luke Mill, including tightly constructed ductwork, which winds around the baghouses and the other power center equipment, and a narrow access road which must remain accessible for coal deliveries 10-20 times a day, chemical deliveries by 18 wheeler trucks and mill maintenance vehicles.  LPC Exs. 10-16; Paugh Tr. 1/18/13 at 42:10-55:2.

12.   Installation of either one or two dry scrubbers at the Luke Mill will need to be accomplished by fabricating the scrubber off-site, then bringing in a crane to drop the scrubber into place in the center of the power center ductwork.  LPC Exs. 10, 11;  Paugh Tr. 1/18/13 at 45:4-47:1; 51:25-52:23.

13.   Installation of one dry scrubber on only the Number 25 Power Boiler will cause operational difficulties and complicate the installation of emissions control technology at the Luke Mill.  Paugh Tr. 1/18/13 at 39:6-42:8; 49:22-52:23; 55:18-56:16.

14.   The gas streams from the Number 24 Power Boiler and the Number 25 Power Boiler at the Luke Mill combine in a mixed gas stream in common ductwork and emit out of a common stack, known as the Tall Stack.  Paugh Tr. 1/18/13 at 49:11-49:21; Staudt Tr. 12/12/12 at 73:2 -73:11.

15.   Installation of a dry scrubber on a power boiler lowers the temperature of the gas stream coming from that power boiler.  Paugh Tr. 1/18/13 at 41:7-41:20; Staudt Tr. 12/12/12 at 55:2 -55:16.

16.   If the lower temperature gas stream mixes in the combined ductwork and in the Tall Stack with a higher temperature gas stream, it will cause corrosion that will destroy the integrity of the ductwork and the Tall Stack.  Paugh Tr. 1/18/13 at 39:10-41:20; Staudt Tr. 12/12/12 at 55:2 -55:16.

17.   Installation of a dry scrubber on only the Number 25 Power Boiler, without also installing a scrubber on the Number 24 Power Boiler, will cause uneven

temperatures in the mixed gas stream leading to corrosion in the ductwork and Tall Stack. Paugh Tr. 1/18/13 at 39:6-:11-40:14.

18.   The proper design, installation and construction of a scrubber system for the Number 25 Power Boiler must include an appropriate measure to address the corrosion problem.  Staudt Tr. 12/12/12 at 89:10 -89:20.

19.   To avoid corrosion if only one scrubber is installed, it is expected that a reheater and static mixer will need to be installed to correct the uneven temperature in the gas streams.  Paugh Tr. 1/18/13 at 41:7-40:5.

20.   The reheater will need to be installed between the fan and the area in the ductwork where the gas streams mix.  Paugh Tr. 1/18/13 at 41:21-42:1; 49:22-51:15; Staudt Tr. 12/12/12 at 79:16 -81:10.

21.   If a reheater is needed to address the uneven gas stream from only one scrubber, the induced draft fan will likely need to be upgraded to handle the additional load on the flow.  Paugh Tr. 1/18/13 at 48:17-49:2; Staudt Tr. 12/12/12 at 86:22 -87:23.

22.   To address the uneven gas stream from only one scrubber, a static mixer will need to be installed.  Paugh Tr. 1/18/13 at 50:16 -51:10.

23.   A static mixer would be installed in the ductwork at the point in the ductwork after the two streams mix.  Paugh Tr. 1/18/13 at 50:16 -51:10; Staudt Tr. 12/12/12 at 84:12 -84:22.

24.   The installation of the static mixer involves safety concerns because the mixer will need to be installed in ductwork located approximately one hundred feet in the air, overhanging a narrow mill access road, overhead electrical lines and chemical lines.  LPC Ex. 15; Paugh Tr. 1/18/13 at 51:16:-52:23.

25.   Installation of a static mixer would require the shutdown of both power boilers at the Luke Mill at the same time.  Paugh Tr. 1/18/13 at 55:18:-56:13; Staudt Tr. 12/12/12 at 85:5 -85:25.

26.   To stay competitive and meet consumer demands, the Luke Mill does not conduct regularly scheduled millwide outages but instead operates 24 hours a day, seven days a week, 365 days a year.  Paugh Tr. 1/18/13 at 64:10-65:7.

27.   Simultaneous shutdown of both power boilers at the Luke Mill will require shutdown of the Mill and cessation of operations and paper production during the course of the boiler shutdown, which will have a detrimental impact on the Luke Mill's business operations.  Paugh Tr. 1/18/13 at 56:9:-56:16; 64:10-65:7; Staudt Tr. 12/12/12 at 85:13 - 86:21.

28.   Installation of two dry scrubbers at the Luke Mill, one on the Number 24 Power Boiler and one on the Number 25 Power Boiler, will avoid the problems caused by installation of only one dry scrubber, including the need for a reheater and a mixer or another corrective measure.  Paugh Tr. 1/18/13 at 63:5-63:15; Staudt Tr. 12/12/12 at 89:6 -89:9.

29.   Installation of two dry scrubbers at the Luke Mill, one on the Number 24 Power Boiler and one on the Number 25 Power Boiler, will avoid the need for simultaneous

shutdown of both power boilers.  Paugh Tr. 1/18/13 at 63:5-63:15; Staudt Tr. 12/12/12 at 89:6 -89:9.

       30.  Operation of two dry scrubbers, one on Power Boiler Number 25 and one on Power Boiler Number 24, could achieve a combined rate of emissions out of the Tall Stack that would achieve the BACT emissions limit sought by the plaintiff here.  Staudt Tr. 12/12/12 at 73:12 -74:5.

       31.  The two dry scrubbers, one on Power Boiler Number 25 and one on Power Boiler Number 24, could each be operated at a lower rate of reduction to combine to achieve the new BACT limit.  Staudt Tr. 12/12/12 at 73:12 -74:5.

       32.  From an engineering and operational standpoint, installation of two dry scrubbers, one on Power Boiler Number 25 and one on Power Boiler Number 24, would cause the least disruption to the operations and productivity of the Luke Mill.  Paugh Tr. 1/18/13 at 63:5-65:7.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Luke is Not Liable for Any Violations Asserted Here

       1.  Luke is not a successor to Westvaco's liability and therefore is not liable for the violations of PSD at issue in this case.  Memorandum and Order, April 7, 2011, Docket No. 279 at p.7, 10.

       2.  No remedy, including any order of BACT, can issue against Luke, because it was not an owner or operator of the Luke Mill at the time of the PSD violations.

3.  As this court has already held in this case, a violation of PSD occurs at the time of construction and is not a continuing operational violation.  United States v. Westvaco Corp., 144 F.Supp.2d 439, 441 (D.Md. 2001).

4.  The PSD program, entitled "Preconstruction Requirements," "clearly and unambiguously applies to the *construction* - not the *operation* - of major stationary sources." Id. at 444-45.

5.  The difference between "preconstruction permit violations and operation permit violations is crucial."  United States v. Southern Indiana Gas and Electric Co. ("SIGECO"), 2002 WL 1760752, *4 (S.D.Ind.  July 26, 2002).  Whereas it is "generally recognized that failure to obtain an operations permit is a continuing violation for each day of operation without the permit. . . . In contrast, failure to obtain a preconstruction permit is a discrete violation that occurs at the time of construction."  Id.

6.  Because the violation occurs at the time of construction, and does not continue through operation of the facility, even the very party alleged to have violated NSR "cannot be liable for failing to operate according to a non-existent pre-construction permit." United States v. Cinergy Corp., 397 F.Supp.2d 1025, 1030 (S.D.Ind. 2005);  Sierra Club v. Otter Tail Power Co., 615 F.3d 1008 (8th Cir. 2010) (finding that PSD "obliges a facility to obtain a permit before commencing construction" but does not impose an ongoing duty to employ BACT if no PSD permit had been obtained prior to construction).  In Cinergy, the court ruled that Cinergy could not be held liable for *operating* the facility without the PSD permit it did not obtain because the PSD violation occurs only at the time of construction.

12

Similarly, here, no remedy can be ordered against Luke for operating the Luke Mill without a PSD permit that Westvaco never obtained.

7.  Relying on this court's decision in <u>Westvaco</u>, among others, federal courts have dismissed NSR claims against new owners, holding that there is simply no basis for the government to assert claims against a new owner for violations of NSR allegedly committed by a prior owner.  <u>United States v. Midwest Generation, LLC</u>, 694 F.Supp.2d 999 (N.D.Ill. 2010); <u>New York v. Niagara Mohawk Power Corp.</u>, 263 F.Supp.2d 650 (W.D.N.Y. 2003); <u>U.S. v. EME Homer City Generation LP</u>, 823 F.Supp.2d 274 (W.D.Pa. 2011).

8.  The <u>Niagara Mohawk</u> court explained that a new owner, who did not own or operate the facilities at the time the modifications occurred, could not be held liable for the violations because by their "plain terms" the PSD provisions do not "impose liability on any person other than the one who fails to comply with its requirements.  Preconstruction obligations are imposed only upon the person who actually seeks to construct or modify a facility within the meaning of the Act . . . ."  <u>Niagara Mohawk</u>, 263 F.Supp.2d at 668-69.

9.  Here, a remedy cannot be ordered against Luke, which did not own or operate the Luke Mill at the time of the violation, because no NSR claim could have been brought against Luke in the first instance.  As the <u>Homer</u> court held, the "Current Owners  . . . cannot be held liable for injunctive relief because they did not violate the PSD program."  <u>Homer</u>, 823 F.Supp.2d at 288.

10.  As this court has already held, Luke did not assume liability for Westvaco's preconstruction obligations or PSD liability by contract.  Memorandum and Order, April 7, 2011, Docket No. 279 at p.7.

13

11. No remedy can issue against Luke here because there is no case and controversy against Luke as required by Article III of the Constitution and no claims for violation of law have been brought against it. Ostergren v. Cuccinelli II, 615 F.3d 263, 287-88 (4th Cir. 2010); Gibson v. Allstate Ins. Co., 64 Fed.Appx. 378, 2003 WL 21101723 (4th Cir. May 15, 2003); Gasner v. Board of Supervisors, 103 F.3d 351, 361 (4th Cir. 1996).

**B. BACT Does Not Require Imposition of a Particular Type of Emissions Control**

1. Pursuant to the Clean Air Act, BACT is an emissions limit, determined on a case by case basis, by assessing the degree of emissions reductions that technology can achieve, while taking into consideration other factors, including energy, environmental and economic impacts. 42 U.S.C. § 7479(3); Staudt Tr. 12/12/12 at 69:12 -70:5.

2. The Clean Air Act provides that the term "best available control technology" means:

> an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant.

42 U.S.C. § 7479(3).

3. "BACT is not a particular type of technology" but is an emissions limit. Homer, 823 F.Supp.2d at 281; Staudt Tr. 12/11/12 at 41:24 -42:14; Staudt Tr. 12/12/12 at 68:17 -69:15.

14

4.  Once BACT has been determined, numerous technological or operational methods may satisfactorily be implemented to achieve the BACT limit.  For example, in Sierra Club v. Wisconsin Dep't of Natural Resources, the court noted that either a wet scrubber or a dry scrubber could have satisfied the BACT limit and upheld a challenge to the regulator's choice of a dry scrubber. Sierra Club v. Wisconsin Dep't of Natural Resources, 787 N.W.2d 855, 870-71 (Wi. Ct. App. 2010).

5.  In consent decrees settling NSR enforcement actions, the owner/ operator often retains the flexibility to achieve BACT by more than one means.  For example in the United States v. Ohio Edison Co., Civ. Action No. 2:99-CV-1181 (S.D. Ohio 2005), the consent order provides that the owner/ operator agreed to "install an FGD *(or equivalent SO$_2$ control technology. . . )*" at each affected unit to achieve a specified removal efficiency.  LPC Ex. 0009, Ohio Edison Consent Decree at ¶¶81-85 (emphasis added).

6.  In consent decrees settling NSR enforcement actions, the new BACT limit is incorporated into the facility's Title V permit and no new PSD permit is required for the installation of the control technology.  LPC Ex. 0009, Ohio Edison Consent Decree at ¶¶178-79; Campbell Tr. 12/21/12 at 29:14-30:24.

7.  BACT in this case would be satisfied by an emissions limit of .44 million pounds per BTU of SO2 for the Number 25 Power Boiler.  Burke Tr. 12/21/12 at 49:22 - 49:25.

8.  Based on the current version of the final Regional Haze Rule, by July 2017, the Luke Mill will be required to meet an emissions limit of .44 million pounds per BTU of SO$_2$ for the Number 25 Power Boiler to meet Best Available Retrofit Technology (BART)

requirements. LPC Ex.0005 at p. USWR1_00000412, Response 5; Paugh Tr. 1/18/13 at 33:1-34:7; Burke Tr. 1/14/13 at 159: 6-11.

9. If a BACT limit of .44 million pounds per BTU was already in place on the Number 25 Power Boiler at the time the Luke Mill undertook its BART analysis in 2010, and a scrubber was already operating on the Number 25 Power Boiler, Luke would not have had to install any additional controls to comply with BART. Burke Tr. 1/14/13 at 164:23- 165:3.

## **CONCLUSION**

Luke takes no position as to whether a BACT remedy should be ordered as a result of the violations the Court has found to exist in this case. To the extent such a remedy is ordered, and the Court's order provides for Westvaco to install specific emissions reduction technology, the Order should also allow flexibility for "an equivalent SO2 control technology" to achieve the BACT limit. To the extent such an order provides for one scrubber on the Number 25 Power Boiler, the order should also provide that Westvaco ensure that the installation of any such equipment be accomplished in a manner protective of the engineering, operational and timing concerns raised by Dr. Staudt and Ronald Paugh at trial, including effective measures to address the potential corrosion of the ductwork and Tall Stack. From an engineering and operational standpoint, installation of two dry scrubbers, one on Power Boiler Number 25 and one on Power Boiler Number 24, would cause the least disruption to the operations and productivity of the Luke Mill.

Dated:  March 15, 2013

*Attorneys for Luke Paper Company*


/s/ Sami B. Groff

_____

Howard B. Epstein
Sami B. Groff
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
(212)756-2000

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2013, a true and correct copy of the foregoing

INTERVENOR LUKE PAPER COMPANY'S PROPOSED FINDINGS OF FACT AND

CONCLUSIONS OF LAW was filed using the Court's electronic case filing system, which

results in service on all counsel of record registered on the case management/electronic filing

("CM/ECF") system.


_____/s/ Sami B. Groff
Sami B. Groff