UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| WESTVACO CORP., | Civ. No. MJG 00-CV-2602 |
| *Defendant, and* | |
| LUKE PAPER COMPANY, | |
| *Intervenor.* | |

### UNITED STATES' PROPOSED CONCLUSIONS OF LAW (REMEDY PHASE)

ROD J. ROSENSTEIN
United States Attorney

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

MICHAEL DIPIETRO
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800 (PHONE)

MARK C. ELMER
CARA MROCZEK
DANIEL SMITH (Bar No. 27267)
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
999 Eighteenth Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1352 (PHONE)

OF COUNSEL:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

*Attorneys for the United States of America*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.    BACKGROUND ........................................................................................1

      A.    Structure and Purpose of the Clean Air Act ...........................................1

      B.    National Ambient Air Quality Standards (NAAQS) ...............................3

      C.    Non-attainment Areas .............................................................................6

II.   THE UNITED STATES IS ENTITLED TO INJUNCTIVE RELIEF ...............8

      A.    The Excess Emissions Have Caused Irreparable Harm .........................10

      B.    Any Remedies at Law Are Inadequate ..................................................12

      C.    The Balance of Hardships Strongly Favors an Injunction .....................12

      D.    Injunctive Relief Is in the Public Interest .............................................14

      E.    An Injunction Should Issue Even If the Amount of Pollution from
            Westvaco's Violation Is Relatively Small .............................................15

III.  THE REMEDY FOR THE PROVEN VIOLATION IS THE INSTALLATION OF
      CURRENT-DAY BACT ............................................................................16

IV.   THE GOVERNMENT IS ENTITLED TO CONTROLS THAT WILL REDUCE
      FUTURE EMISSIONS AS MITIGATION FOR 30 YEARS OF EXCESS
      EMISSIONS .............................................................................................20

      A.    Mitigation Is Available Under the Clean Air Act and Necessary To Accord
            Complete Relief. ....................................................................................20

      B.    Installation of Pollution Controls on the No. 24 Power Boiler Is the Most
            Fitting Mitigation Remedy......................................................................22

            1.    Installing Controls on the No. 24 Power Boiler As Mitigation Bears
                  an Equitable Relationship to the Degree and Kind of Wrong It Is
                  Intended to Remedy ......................................................................24

            2.    The Proposed Mitigation Remedy, Installation of Pollution Controls
                  on the No. 24 Power Boiler Is Achievable As a Practical Matter ............25

3.    Pollution Controls on The No. 24 Power Boiler Confer Maximum
      Environmental Benefits ............................................................26

## **TABLE OF AUTHORITIES**

**Federal Cases**

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) ............................................................. 10, 12

*Burlington N.R.R. v. Bair*, 957 F.2d 599 (8th Cir. 1992) ............................................................ 13

*Camp v. Boyd*, 229 U.S. 530 (1913) ............................................................................................... 21

*Cmtys. for a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128 (C.D. Cal. 2001) ............... 11

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ........................................................... 8

*Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331 (4th Cir. 1983) ....................................... 10, 13

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) ............................................................... 1

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955 (10th Cir. 2002) ................ 26

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) ........................................................... 14

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ........................................................20

*Hawaiian Elec. Co. v. U.S. EPA*, 723 F.2d 1440 (9th Cir. 1984) .................................................. 2

*Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006) ................................... 9

*Natural Resources Defense Council v. Sw. Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000) .............. 1

*New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003) ............... 18

*New York v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005) .................................................................... 1

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625 (S.D.W. Va. 2007) ................................................................................................................................ 13

*Or. Envtl. Council v. Or. Dep't of Envtl. Quality*, No. 91-13-FR, 1992 WL 252123 (D. Or. Sept. 24, 1992) ........................................................................................................................ 17

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ..................................................... 14, 21, 23

*Sierra Club v. Franklin Cnty. Power of Ill., L.L.C.*, 546 F.3d 918 (7th Cir. 2008) .............. 11, 15

*TVA v. Hill*, 437 U.S. 153 (1978) ................................................................................................ 10

*U.S. Pub. Interest Research Group v. Atl. Salmon of Me.*, 339 F.3d 23 (1st Cir. 2003) ............. 20

*United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010 (N.D. Cal. 2002) ........................... 16

*United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402 (S.D. Ill. July 28, 2008) ....................................................................................................................................... 14

*United States v. Cinergy Corp.* (*Cinergy I*), 582 F. Supp. 2d 1055 (S.D. Ind. 2008) ........... passim

*United States v. Cinergy Corp.* (*Cinergy II*), 618 F. Supp. 2d 942 (S.D. Ind. 2009) ........... 11, 12

*United States v. Deaton*, 332 F.3d 698 (4th Cir. 2003) ........................................... 23, 25, 26, 27

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) ............................ 19

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) .................................. 11

*United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002) ...................................................... 14

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) ............................ 9, 12

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ............................... 17

*United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722 (W.D. Mich. 1991) ................... 12

*United States v. Smithfield Foods*, 972 F. Supp. 338 (E.D. Va. 1997) ....................................... 15

*Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001) ....................................... 24

*Wehner v. Syntex Corp.*, 682 F. Supp. 39 (N.D. Cal. 1987) ................................................ 16, 23

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ........................................................... 9, 12

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ..................................................... 1

## State Cases

*Weston Paper Co. v. Pope*, 57 N.E. 719 (Ind. 1900) ................................................................. 16

## Federal Statutes

42 U.S.C. § 7401(b)(1) (2006) ..................................................................................................... 1

42 U.S.C. § 7407(d)(1)(B) (2006) ................................................................................................ 7

42 U.S.C. § 7407(d) (2006) .......................................................................................................... 7

42 U.S.C. § 7408 (2006) ........................................................................................................... 3, 4

42 U.S.C. § 7408(a)(1)(A) (2006) ................................................................................................ 3

42 U.S.C. § 7409 (2006) ........................................................................................................ 3, 4, 6

42 U.S.C. § 7409(b)(1) (2006) ..................................................................................................... 3

42 U.S.C. § 7409(b)(2) (2006) ...................................................................................................... 3

42 U.S.C. § 7409(d)(2) (2006) ...................................................................................................... 5

42 U.S.C. § 7410(a)(2) (2006) ...................................................................................................... 7

42 U.S.C. § 7413(b) (2006) ...................................................................................................... 8, 20

42 U.S.C. § 7470 (2006) ............................................................................................................... 2

42 U.S.C. § 7470(4) (2006) .................................................................................................... 22, 27

42 U.S.C. § 7475(a) (2006) ....................................................................................................... 2, 19

42 U.S.C. § 7475(a)(4) (2006) .................................................................................................... 17

42 U.S.C. § 7479(3) (2006) ........................................................................................................... 2

42 U.S.C. § 7502(c)(1) (2006) ............................................................... 7

42 U.S.C. § 7502(c)(5) (2006) ............................................................... 2

42 U.S.C. § 7503 (2006) ....................................................................... 2

42 U.S.C. § 7509 (2006) ....................................................................... 3

42 U.S.C. § 7509(a) & (b) (2006)........................................................... 8

42 U.S.C. § 7651(a)(6) (2006) ............................................................. 15

**Legislative History**

H.R. Rep. No. 91-1146, at 1 (1970) reprinted in 1970 U.S.C.C.A.N. 5356, 5356 ................. 1, 18

**Regulations**

40 C.F.R. pt. 50 ............................................................................... 3, 4, 6

40 C.F.R. § 52.21(j)(3) ........................................................................ 17

40 C.F.R. § 52.21(r)(2) ........................................................................ 18

**Administrative Materials**

75 Fed. Reg. 35,520 (June 22, 2010) .................................................4, 5, 6

78 Fed. Reg. 3086 (Jan. 15, 2013) ..................................................... 4, 6

*In re W. Suburban Recycling and Energy Ctr.*, 8 E.A.D. 192, Clean Air Act Docket
No. 97-12, 1999 WL 133041 (U.S. Envtl. Prot. Agency Mar. 10 1999) ........................ 18

**Secondary Sources**

Restatement (Second) of Torts (1979) ...................................................... 16

## CONCLUSIONS OF LAW

### I.       BACKGROUND

#### A.       Structure and Purpose of the Clean Air Act

1.       The Clean Air Act passed in 1970 was intended to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R. Rep. No. 91-1146 at 1 (1970) reprinted in 1970 U.S.C.C.A.N. 5356, 5356;  *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) (quoting legislative history).  One primary purpose of the statute is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1) (2006); *see also United States v. Cinergy Corp. (Cinergy I), 582 F. Supp. 2d 1055, 1057 (S.D. Ind. 2008), rev'd on other grounds, 623 F.3d 455 (7th Cir. 2010)* (quoting 42 U.S.C. § 7401(b)(1)).

2.       Not satisfied with the results achieved under the 1970 statute, Congress added the statutory New Source Review ("NSR") program to the Act in 1977 to ensure that additional requirements were imposed on new and modified major sources of air pollution.  *New York v. U.S. EPA*, 413 F.3d 3, 10 (D.C. Cir. 2005) ("In 1977, Congress amended the Clean Air Act . . . to strengthen the safeguards that protect the nation's air quality.")  The Prevention of Significant Deterioration ("PSD") component of NSR – which applies to areas in attainment with national ambient air quality standards ("NAAQS") (or where attainment is unclassifiable) – was "aimed at giving added protection to air quality" while fostering economic growth in a manner consistent with preservation of existing clean air resources.  *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567 (2007).  In areas that already meet the NAAQS, this added protection was achieved, in part,

by requiring the installation of "best available control technology" ("BACT") on new and

modified major sources that "would otherwise increase pollution." *Hawaiian Elec. Co. v. U.S.*

*EPA*, 723 F.2d 1440, 1447 (9th Cir. 1984) ("Congress found that it was important to reduce

pollution levels below those mandated by the standards and that the best means of doing so was to

require the installation of BACT on all sources which would otherwise increase pollution.").

3.      Congress explicitly set forth five "purposes" for the PSD program:

(1) to protect public health and welfare from any actual or potential adverse effect
which in the Administrator's judgment may reasonably be anticipate[d] to occur
from air pollution or from exposures to pollutants in other media . . .
notwithstanding attainment and maintenance of all national ambient air quality
standards;

(2) to preserve, protect, and enhance the air quality in national parks, national
wilderness areas, national monuments, national seashores, and other areas of
special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the
preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any
portion of the applicable implementation plan to prevent significant deterioration
of air quality for any other State; and

(5) to assure that any decision to permit increased air pollution in any area to which
this section applies is made only after careful evaluation of all the consequences of
such a decision and after adequate procedural opportunities for informed public
participation in the decision making process.

42 U.S.C. § 7470 (emphasis added).

4.      Under the NSR program, no new major source or major modification to an existing

major source can be built unless various requirements are met, including obtaining a

preconstruction permit setting forth emission limitations and applying state-of-the-art pollution

controls. *Id.* §§ 7475(a), 7479(3), 7502(c)(5), 7503.

### B.     National Ambient Air Quality Standards (NAAQS)

5.     Section 108 of the Clean Air Act, 42 U.S.C. § 7408, directs EPA to identify

pollutants that "may reasonably be anticipated to endanger public health or welfare."  These

common air pollutants (also known as "criteria pollutants") are ubiquitous. There are six criteria

pollutants: particulate matter, ground-level ozone, carbon monoxide, sulfur oxides, nitrogen

oxides, and lead.  *See* 42 U.S.C. § 7408(a)(1)(A) and (B); Trial Tr. 156:2-4 (Dec. 17, 2012, Ross

Direct).

6.     Pursuant to Section 108(a)(2), EPA develops "air quality criteria" for each criteria

pollutant, which criteria are intended to "accurately reflect the latest scientific knowledge useful in

indicating the kind and extent of all identifiable effects on public health or welfare which may be

expected from the presence of [the] pollutant in the ambient air."  *Id.* § 7408(a)(2). Section 109

directs EPA to promulgate "primary" and "secondary" NAAQS for criteria pollutants, i.e., for the

pollutants for which EPA develops air quality criteria.  42 U.S.C. § 7409; 40 C.F.R. pt. 50 (2011).

7.     Primary standards prescribe the maximum permissible concentration of a pollutant

in the ambient air "requisite to protect the public health," with an "adequate margin of safety."  42

U.S.C. § 7409(b)(1).  Secondary standards specify a level of air quality "requisite to protect the

public welfare," and are set to provide ecological or welfare protection, including protection

against decreased visibility and damage to animals, crops, vegetation, and buildings.  *Id.*

§ 7409(b)(2);  Trial Tr. 159:25-160:6 (Dec. 17, 2012, Ross Direct); Trial Tr. 15:11-21 (Dec. 10,

2012, Fernandez Direct).

8.      While the NAAQS are designed to protect public health, they are not set at a zero-effects level.  Therefore, a primary standard does not represent an absolute threshold below which no effects on public health are observed.  Trial Tr. 178:24-25, 189:10-17 (Dec. 17, 2012, Ross Direct, Ross Cross); 77 Fed. Red. 38,890, 38,894 (June 29, 2012) (Pl.'s Ex. 508 (Ross Tab 7)); 75 Fed. Reg. 35,520, 35,521 (June 22, 2010) (Pl.'s Ex. 499); 78 Fed. Reg. 3086, 3090 (Jan. 15, 2013) (to be codified at 40 CFR Parts 50, 51, 52 et al); Trial Tr. 83:21-25 (Dec. 14, 2012, Schwartz Direct).

9.      EPA is required to review each of the NAAQS every five years to determine whether they adequately protect public health and the environment.  Trial Tr. 159:15-24 (Dec. 17, 2012, Ross Direct); 42 U.S.C. § 7409(d)(1).

10.      The first key step of the NAAQS review process is to gather, evaluate, and compile peer-reviewed scientific studies published since the previous review, integrating them with what was previously known, and prepare an integrated science assessment ("ISA"). Trial Tr. 160:13-24 (Dec. 17, 2012, Ross Direct).

11.      The ISA for a criteria pollutant reflects the state of the science on that pollutant.  It takes into account all of the studies, recent and older, and "reviews and evaluates all of the evidence . . . and draws conclusions about the overall body of evidence."  Trial Tr. 160:19-25, 161:1-9 (Dec. 17, 2012, Ross Direct); *see also* Pl.'s Ex. 490 at 1-1; Pl.'s Ex. 496 at 1-1; *see id.* § 7408.

12.      The ISAs for criteria pollutants undergo extensive peer review by the Clean Air Scientific Advisory Committee ("CASAC"), an independent advisory panel established by the

Clean Air Act.  42 U.S.C. § 7409(d)(2); Trial Tr. 160:10-18 (Dec. 17, 2012, Ross Direct).  CASAC

reviews the air quality criteria (including the ISAs) and recommends to EPA standards or revisions

to standards.  42 U.S.C. § 7409(d)(2)(A).  CASAC consists of seven members from fields of

expertise specified in the Clean Air Act, and approximately fifteen consultants from additional

areas of expertise.  CASAC members are preeminent experts in their fields.  Trial Tr. 161:10-25,

162:1-2 (Dec. 17, 2012, Ross Direct); 75 Fed. Reg. at 35,522 (Pl.'s Ex. 499).  The ISA is also

typically distributed for multiple rounds of public comment.

     13.    After the ISA is complete, EPA summarizes the scientific findings in another report

known as the Policy Assessment.  In the Policy Assessment, EPA includes additional analyses,

such as risk assessments or exposure assessments and draws conclusions on whether current

standards are adequately protecting public health and the environment. Trial Tr. 162:3-16 (Dec.

17, 2012, Ross Direct).

     14.    Similar to the ISA, the Policy Assessment is peer reviewed by CASAC and

distributed to the public for comment.  Trial Tr. 162:25-163:1, 173:1-8 (Dec. 17, 2012, Ross

Direct); Pl.'s Ex. 502 (Ross Tab 6).

     15.    Both the ISA and the Policy Assessment are used as a basis to either revise or retain

the NAAQS. Trial Tr. 162:3-16 (Dec. 17, 2012, Ross Direct).

     16.    A causal finding is the strongest finding that EPA can make.   75 Fed. Reg. at

35,525 (Pl.'s Ex. 499). Causal means that the:

> Evidence is sufficient to conclude that there is a causal relationship with relevant
> pollutant exposures.  That is, the pollutant has been shown to result in health effects
> in studies in which chance, bias, and confounding could be ruled out with

> reasonable confidence. . . . Evidence includes replicated and consistent
> high-quality studies by multiple investigators.

Pl.'s Ex. 496 at p.1-21, Table 1-3; Pl.'s Ex. 490 at USWR1_00012279 (Table 1-2); *see also* Trial

Tr. 168:3-15 (Dec. 17, 2012, Ross Direct).

17.     Sulfur dioxide ("SO$_2$") is considered a criteria pollutant.  Trial Tr. 156:2-6,

163:8-10 (Dec. 17, 2012, Ross Direct); *42 U.S.C. § 7409*; 40 C.F.R. pt. 50.

18.     EPA set a revised primary NAAQS for SO$_2$ on June 22, 2010.  The standard is 75

parts per billion on a one-hour average.  This standard replaced the 24-hour and annual primary

standards.  Trial Tr. 180:11-21 (Dec. 17, 2012, Ross Direct); 75 Fed. Reg. 35,520 (June 22, 2010)

(Pl.'s Ex. 499, Ross Tab 12).

19.     Particulate matter ("PM") is also a criteria pollutant.  Trial Tr. 156:2-6, 163:4-10

(Dec. 17, 2012, Ross Direct); 42 U.S.C. § 7409; 40 C.F.R. pt. 50.

20.     On December 14, 2012, EPA revised the primary standard for fine PM by

strengthening the annual NAAQS for PM$_{2.5}$ to 12.0 micrograms per cubic meter ($\mu g/m^3$) and

retaining the 24-hour PM$_{2.5}$ standard of 35 $\mu g/m^3$.  PM$_{2.5}$ means particulate matter that is 2.5

micrometers in diameter and smaller.  Trial Tr. 158:16-17, 159:5-11 (Dec. 17, 2012, Ross Direct);

78 Fed. Reg. 3086 (Jan. 15, 2013) (to be codified at 40 C.F.R. parts 50, 51, 52, et al).

### C.     Non-attainment Areas

21.     When EPA revises a NAAQS or establishes a new NAAQS, the states and EPA

must undertake specific obligations to ensure the NAAQS are met. Trial Tr. 16:6-17:4 (Dec. 10,

2012, Fernandez Direct).

22.     Within two years after a NAAQS is promulgated, EPA must identify or "designate" areas as meeting or not meeting the NAAQS.  Areas of the country meeting the standard are designated as "attainment." Areas of the country where air pollution levels exceed the NAAQS, and nearby areas that contribute to such exceedences, are designated "nonattainment." Designations are based on the most recent set of air monitoring data.  Trial Tr. 16:6-10 (Dec. 10, 2012, Fernandez Direct); 42 U.S.C. § 7407(d)(1)(B).

23.     An area can also be designated "unclassifiable," which means that EPA does not have enough information to make a determination whether an area should be designated as attainment or nonattainment.  Trial Tr. 16:6-20 (Dec. 10, 2012, Fernandez Direct); 42 U.S.C. § 7407(d).

24.     A nonattainment designation may result in tighter emissions controls for other sources in the area.  A State Implementation Plan ("SIP") that covers nonattainment areas may have to include additional measures to prohibit sources within the state from emitting air pollutants which will "contribute significantly to nonattainment in . . . any other State with respect to . . . [the primary or secondary NAAQS]" or "interfere with measures required to be included in the [SIP] for any other State . . . to prevent significant deterioration of air quality or to protect visibility"  42 U.S.C. § 7410(a)(2)(D)(i) (I)-(II).  The CAA also mandates that SIPs for nonattainment areas adopt certain specified control requirements including emissions reductions from existing sources by requiring "adoption, at a minimum, of reasonably available control technology" to provide for attainment of the NAAQS.  42 U.S.C. § 7502(c)(1); *see also* Trial Tr. 16:23-17:4, 22:21-25, 23:1-2 (Dec. 10, 2012, Fernandez Direct).

25.     A nonattainment designation can cause economic hardship on a region.  Not only is industrial growth constrained in order to reduce emissions and improve air quality, but sanctions can be imposed on states with nonattainment areas failing to submit adequate SIPs.  These sanctions may include: withholding of federal highway funding, and changing how emission offset requirements apply such that new and modified units must obtain an offset rate of at least two to one for emissions reductions, instead of a rate of one to one.  42 U.S.C. §  7509(a) & (b).

## II.     THE UNITED STATES IS ENTITLED TO INJUNCTIVE RELIEF

26.     This Court has determined that the Digester Expansion Project ("DEP") was subject to the PSD provisions of the Clean Air Act and that Westvaco violated the act by beginning the DEP without a PSD permit.  *See* Mem. Or. Re: Post-Change Potential to Emit, ECF No. 282.

27.     To obtain an injunction, a plaintiff must ordinarily show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

28.     In this case, the Government is not an ordinary plaintiff; it is a sovereign acting in the public interest to remedy an established violation of the Clean Air Act, a federal statute that explicitly provides for injunctive relief.  *See* 42 U.S.C. § 7413(b); *United States v. Cinergy Corp.* (*Cinergy I*), 582 F. Supp. 2d 1055, 1060-61 (S.D. Ind. 2008), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010).

29.     Although a district court does not have an absolute duty to mechanically issue an injunction for any established violation of law, it cannot "override Congress' policy choice,

articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). Where a violation of federal law has been established, the law must be enforced:

> Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all. . . . To the extent the district court considers the public interest and the conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms.

*Oakland Cannabis Buyers' Coop.*, 532 U.S. at 497-98 (2001) (internal citations and quotations omitted).

30.     Any remedy that would allow the Luke Mill to permanently avoid the application of BACT to the No. 25 power boiler would reject the balance that Congress struck in the Clean Air Act, which requires the installation of state-of-the-art pollution controls at facilities that undergo major modification. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 315 (1982) (upholding a district court order to the Navy to obtain a permit under the Clean Water Act on the grounds that it "temporarily, not permanently, allowed the Navy to continue its activities without a permit").

31.     The fact that this case involves a sovereign acting on behalf of the public interest to enforce a federal statute designed to protect human health and the environment means that the analysis is weighted heavily in favor of injunctive relief. *Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (finding that the trial court should consider balance of harms in a case under an environmental statute, but adding, "We caution, however, that the

operation of that framework is inevitably colored by the nature of the case and the purposes of the

underlying environmental statute"); *Envtl. Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337-38 (4th

Cir. 1983).

32.     While the traditional equitable considerations remain the starting point, courts must

also consider the direction provided by Congress in shaping the contours of injunctive relief.  As

the Supreme Court wrote:

> it is . . . the exclusive province of the Congress not only to formulate legislative
> policies and mandate programs and projects, but also to establish their relative
> priority for the Nation.  Once Congress, exercising its delegated powers, has
> decided the order of priorities in a given area, it is for the Executive to administer
> the laws and for the courts to enforce them when enforcement is sought.

*TVA v. Hill*, 437 U.S. 153, 194 (1978).

33.     Congress's passage of the Clean Air Act demonstrated, as a general matter, the

high priority placed on protecting the nation's air quality, and its passage of the PSD program in

particular demonstrated the high priority placed on the use of state-of-the-art pollution reduction

technologies at new and modified major sources, even in areas that already meet the NAAQS.

34.     These priorities should be reflected in determining whether an injunction shall

issue and how extensive the relief shall be.

### A.     The Excess Emissions Have Caused Irreparable Harm

35.     This case involves environmental harm, an area that, "by its nature, can seldom be

adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,*

irreparable."  *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987); *accord Nat'l Audubon*

*Soc'y v. Dep't of the Navy*, 422 F.3d 174, 201 (4th Cir. 2005)

36.     In particular, the failure to obtain a PSD permit and install BACT results in irreparable harm when the installation of BACT would have resulted in reduced emissions of air pollutants.  *See Sierra Club v. Franklin Cnty. Power of Ill., L.L.C.*, 546 F.3d 918, 936-37 (7th Cir. 2008); *Cmtys. for a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128, 1148 (C.D. Cal. 2001), *aff'd*, 35 F. App'x 508 (9th Cir. 2002).

37.     The Government need only prove a risk of harm, not actual harm.  "[W]hen the United States or a sovereign state sues in its capacity as protector of the public interest, a court may rest an injunction entirely upon a determination that the activity at issue *constitutes a risk of danger to the public*."  *United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) (emphasis added) (referring to the idea as a "traditional principle[] of equity" and citing cases).

38.     The "significant health and environmental effects in the form of $PM_{2.5}$" are "irreparable." *United States v. Cinergy Corp.* (*Cinergy II*), 618 F. Supp. 2d 942, 964 (S.D. Ind. 2009) (D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010).

39.     The Luke Mill should have obtained a PSD permit prior to constructing the DEP. This permit would have established BACT for the facility. Mem. and Or. Re: Post-Change Potential to Emit, ECF No. 282.

40.     Any emissions in excess of what the mill would have emitted if it had installed BACT prior to constructing the DEP (the "excess emissions"), have caused, and will continue to cause, an injury to human health and the environment. *See* Pl.'s Proposed Findings of Fact pt. V.

41.     Like the court in Cinergy II, this Court finds that the harms to human health and the environment that the Government has proven in this case are irreparable.

### B.     Any Remedies at Law Are Inadequate

42.     The harms to human health and the environment that the Government has proven in this case have no adequate remedy at law. *Id.* at 961 (finding that the "significant health and environmental effects in the form of PM2.5" have "no adequate remedy at law")

43.     Westvaco does not have the option of paying money to avoid compliance; Congress created no such provision when it amended the Clean Air Act. When faced with a violation of a statute, a district court has discretion to fashion a remedy, but it must exercise that discretion to order the "relief it considers necessary to secure prompt compliance with the Act." *Weinberger*, 456 U.S. at 320.

44.     While courts enjoy great discretion in equity, they may not "reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001).  The requirements of the statute set the floor for any injunctive relief. *See United States v. Prod. Plated Plastics, Inc.*, 762 F. Supp. 722, 731 n.9 (W.D. Mich. 1991) ("The Court cannot order the defendants to do less than RCRA minimally requires.").

### C.     The Balance of Hardships Strongly Favors an Injunction

45.     Because environmental injuries are generally irreparable, if the injury is sufficiently likely, the "balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545.

46.     The Fourth Circuit has stated "[w]here the plaintiff is a sovereign and where the activity may endanger the public health, injunctive relief is proper, without resort to balancing." *Envtl. Def. Fund, Inc.*, 714 F.2d at 337-38 (internal citations omitted).

47.     The Court heard estimates of the costs that would be incurred to install and operate pollution controls at the Luke Mill.  *See* Pl.'s Proposed Findings of Fact at pt. VI.A.3. Those costs represent the extent of hardship on Westvaco.

48.     Those costs, while not trivial, pale in comparison to the injury to human health and the environment that has resulted from Westvaco's violation of the Clean Air Act, or that would result if all similarly situated sources of air pollution were permitted to violate the Clean Air Act.

49.     Even if this Court believed that the injury to the public did not outweigh the cost to Westvaco, the Court must defer to the balance of hardships that Congress has struck:

> The public has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection. While it is true that these statutes contemplate a certain amount of environmental degradation, they also mandate a certain amount of economic loss. Economic gain is not to be pursued at all costs, and certainly not when it is contrary to the law. The Court must ensure that it does not itself upset the balance struck by Congress.

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 633 (S.D.W. Va. 2007).

50.     Congress "has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." *Burlington N.R.R. v. Bair*, 957 F.2d 599, 601-02 (8th Cir. 1992) (citing *Atchison, T. & S.F. Ry. v. Lennen*, 640 F.2d 255, 259, 261 (10th Cir. 1981)).

### D.     Injunctive Relief Is in the Public Interest

51.     Injunctions to enforce environmental statutes are in the public interest because they reduce the risk of harm to human health and the environment.  *United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *84 (S.D. Ill. July 28, 2008) (granting injunction in case under another environmental statute, the Resource Conservation and Recovery Act, because "it is clear that entry of the requested injunction would benefit the citizens of Hartford and promote the Congressionally-expressed public interest in "minimiz[ing] the present and future threat to human health and the environment posed by solid and hazardous wastes.").

52.     Here, the Government is acting on behalf of the public.  The courts have a long tradition of deferring to the Government when it seeks an injunction to remedy a violation of its laws. Justice Holmes wrote more than 100 years ago that sovereigns are "somewhat more certainly entitled to specific relief than a private party might be."  *Georgia v. Tenn. Copper Co., 206 U.S. 230, 237 (1907).*

53.     "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."  *United States v. Miami Univ., 294 F.3d 797, 819 (6th Cir. 2002) (quoting Virginian Ry. v. Ry. Employees, 300 U.S. 515, 552 (1937)).*

54.     The Supreme Court has long recognized that a district court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake."  *Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946) (citing Virginian Ry. v. Ry. Employees, 300 U.S. 515, 552 (1937)).*

55.     In the 1990 Clean Air Act Amendments, Congress explicitly found that: "reduction of total atmospheric loading of sulfur dioxide and nitrogen oxides will enhance protection of the public health and welfare and the environment."  42 U.S.C. § 7651(a)(6).

56.     Indeed, at least one court has found simply requiring a proposed facility to *update* its NSR permit before beginning operation "would likely result in decreased emissions and improved public health, which would further a stated goal of the Clean Air Act."  *Sierra Club*, 546 F.3d at 936.

### E.     An Injunction Should Issue Even If the Amount of Pollution from Westvaco's Violation Is Relatively Small

57.     The arguments that the amount of pollution is small, or that eliminating it would not achieve any measureable benefit, are commonly made and just as commonly rejected, as illustrated in a penalty case under the Clean Water Act:

> During the entire trial, defendants' approach to their Permit violations was rather cavalier. They repeatedly argued there was no real harm caused by their numerous violations, and stressed that the Pagan River would still be environmentally damaged, and unsafe for swimming and shellfish harvesting, even if defendants complied with their Permit. Such arguments miss the mark. As the United States pointed out in closing argument: The goal of the Clean Water Act is bit by bit to clean up the waters of the United States.... The defendants cannot evade their responsibility for their part in the damage to the Chesapeake Bay through the discharge of phosphorus [and other effluents] into the Chesapeake Bay by saying, 'If you took ours out, it wouldn't make any difference' because everybody contributing to the Bay bears a responsibility for what went into the Bay.'

*United States v. Smithfield Foods*, 972 F. Supp. 338, 342 n.8 (E.D. Va. 1997), *aff'd in part remanded on other grounds* 191 F.3d 516 (4th Cir. 1999).

58.     A polluter causes injury by increasing the amount of a pollutant in the environment in violation of a statute, regardless of whether the pollutant is already present in the environment, and regardless of the amount of the increase.

59.     The long-standing principle of equity in nuisance cases is that no contributor is excused just because others also contribute to the harm.  *See, e.g.*, *Weston Paper Co. v. Pope*, 57 N.E. 719, 721 (Ind. 1900) ("The fact that a water course is already contaminated from various causes does not entitle others to add thereto, nor preclude persons through whose land the water flows from obtaining relief by injunction against its further pollution"); Restatement (Second) of Torts § 840E (1979) ("the fact that other persons contribute to a nuisance is not a bar to the defendant's liability for his own contribution.")

### III.    THE REMEDY FOR THE PROVEN VIOLATION IS THE INSTALLATION OF CURRENT-DAY BACT

60.     The Court's responsibility is "crafting a remedy that is protective of public health and this responsibility necessarily takes preeminence over all other considerations."  *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002) (addressing the Safe Drinking Water Act).

61.     An order redressing the harm to the public caused by the excess emissions is also "within the recognized power and within the highest tradition of a court of equity."  *Wehner v. Syntex Corp.*, 682 F. Supp. 39, 40 (N.D. Cal. 1987); *see also Alisal Water Corp.*, 326 F. Supp. 2d at 1027 (Safe Drinking Water Act decision in whichstating "Court has the responsibility . . . of crafting a remedy that is protective of public health, and this responsibility necessarily takes preeminence over all other considerations.")

62.     In order for a facility to comply with the PSD requirements of the Clean Air Act, it

must install BACT.  *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 850 (S.D. Ohio 2003)

(a "modification triggers permitting requirements under the CAA as well as the duty to install

pollution controls"); *see also Or. Envtl. Council v. Or. Dep't of Envtl. Quality*, No. 91-13-FR,

1992 WL 252123, at *23 (D. Or. Sept. 24, 1992) (applicable NSR rules require "without

exception" that all major modifications, even those already constructed, are subject to control

retrofit and other NSR requirements).

63.     The Court has the authority to order Westvaco to install scrubbers on the power

boilers at the Luke Mill that are capable of meeting removal efficiencies or emissions limits that

are equivalent to BACT.  The Luke Paper Company ("LPC"), the current owner and operator of

the Luke Mill, is also a party to this litigation and, thus, subject to this Court's order.  *See* Mem.

and Or. Re: Motion to Join at 9, ECF No. 279.  Moreover, LPC has repeatedly represented that it

will cooperate with Westvaco and provide Westvaco with reasonable access to the Mill to comply

with the order of this Court.  Luke Paper Company's Opposition to Motion to Join Luke as a Party

Defendant at 3, ECF No. 260.

64.     When a source seeks a preconstruction permit in compliance with the PSD

regulations, a BACT determination is made when the PSD permit is issued, which reflects "best

*available*" pollution controls at the time the permit is issued.  42 U.S.C. § 7475(a)(4); 40 C.F.R.

§ 52.21(j)(3) (emphasis added).  Thus, BACT reflect the best "available" controls at the time the

BACT determination is made.  While the Government has not insisted that the Court go through

the technical process of determining case-by-case BACT, the requirements imposed must still

reflect state-of-the-art controls as of the date those controls become applicable to the source.  Old, outdated technology is obviously not the "best available."  Requiring current technology is consistent with EPA regulations, which provide that approval to construct will be rendered invalid if construction is not commenced within 18 months of receipt of such approval, or if construction is discontinued for 18 months or longer (or not completed within a reasonable time).  *See* 40 C.F.R. § 52.21(r)(2).  This provision "is one of the means of ensuring that the requirement for best available control technology ("BACT") involves reasonably current pollution controls." *See In re W. Suburban Recycling and Energy Ctr., 8 E.A.D. 192, Clean Air Act Docket No. 97-12, 1999 WL 133041 (U.S. Envtl. Prot. Agency Mar. 10 1999)*.  As the Environmental Appeals Board held:

> Each time a BACT determination is made, it takes into account new pollution control equipment and processes . . . .  Therefore, it is important that decisions about pollution control methods and associated emission limitations are made based on the most current information possible.  If a facility fails to commence construction within the time frame permitted by 40 C.F.R. section 52.21(r), it is possible that the BACT determination for the facility may be outdated by the time construction actually begins.

*Id.*

65.     Failing to determine BACT using the best controls available at the time specific control requirements are imposed would also frustrate the fundamental purpose of the Clean Air Act, which is to "speed up, expand, and intensify the war against air pollution in the United States . . . ." H.R. Rep. No. 91-1146, at 1 (1970) reprinted in 1970 U.S.C.C.A.N. 5356, 5356.  "A remedial statute should be liberally construed to effectuate its purpose . . . and should not be interpreted in a manner that would frustrate its goals."  *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) (citations omitted).

18

66.     It is undisputed that the Luke Mill never installed BACT controls on the No. 25

power boiler.  Therefore, the Court should order Westvaco to install controls equivalent to what

BACT would be today.

67.     Limiting the evaluation of control technologies to those existing at the time of the

modification would frustrate the goals of the PSD program by perversely rewarding sources who

ignore PSD requirements and construct modifications without prior approval.  It would create an

incentive for a source to defer installation and operation of costly pollution controls, knowing that

if a modification were discovered by the Government, the source would only have to install stale

(*i.e.*, no longer the "best available") control technology.  Such a result is clearly at odds with the

Clean Air Act's requirement to install the "best available" pollution controls.

68.     Freezing BACT as of the date of the initial PSD violation would also

inappropriately allow sources to benefit from their non-compliance.  As the *Niagara Mohawk*

court noted:

> Implicit in the requirement that a facility be subject to BACT . . . is an obligation
> on the part of the person proposing the construction or modification to obtain the
> appropriate BACT determination. [Defendant's] argument conveniently ignores
> the fact that the permitting authority never had the opportunity to determine BACT
> for the Facilities precisely because [Defendant] failed to follow the proper
> preconstruction procedures set forth in 42 U.S.C. § 7475(a). [Defendant's] initial
> failure to comply with the requirements of the Clean Air Act cannot now inure to its
> benefit.

*Id.*; *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 652 (M.D.N.C. 2003) (rejecting

construction of PSD provisions that could make it "more cost-effective to avoid the permit

obligations altogether. . . ."), *vacated in part* 2010 WL 3023517 (M.D.N.C. 2010).  The BACT

process should not be used to allow sources to benefit from their failure to comply with the Clean

Air Act's PSD provisions. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S. Ct. 3245, 73 L. Ed. 2d 973 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

69.     Consistent with the plain language and purpose of the Clean Air Act and EPA's PSD regulations, this Court should rule that Westvaco must install controls equivalent to what would be the best available control technology if a PSD permit were issued today for the DEP.

## IV.    THE GOVERNMENT IS ENTITLED TO CONTROLS THAT WILL REDUCE FUTURE EMISSIONS AS MITIGATION FOR 30 YEARS OF EXCESS EMISSIONS

### A.    Mitigation Is Available Under the Clean Air Act and Necessary To Accord Complete Relief.

70.     This Court has broad equitable authority to order relief to mitigate the harm from Westvaco's violation. "[U]nless otherwise specified by statute, a court has the equitable authority to order a full and complete remedy for harms caused by a past violation, and in doing so may go beyond what is necessary for compliance with the statute." *Cinergy I*, 582 F. Supp. 2d at 1061. By allowing courts to "grant additional injunctive relief . . . remedying harm caused by past violations," equity "gives meaning to the statute's grant of enforcement authority." *U.S. Pub. Interest Research Group v. Atl. Salmon of Me.*, 339 F.3d 23, 31 (1st Cir. 2003).

71.      Section 113 of the CAA, 42 U.S.C. § 7413(b), grants a broad CAA enforcement jurisdiction authorizing the imposition of not only specific remedies but also "to award any other appropriate relief."  On its face, the phrase "award any other appropriate relief" is clear and matches the Court's inherent equitable discretion to order mitigation.

72.     In a comparable Clean Air Act remedy case, the *Cinergy* court concluded that courts have extensive authority to fashion measures to remedy PSD violations that include mitigation.  *Cinergy I*, 582 F. Supp. 2d at 1060 (declaring the court's "authority to order Defendants to take appropriate actions that remedy, mitigate and offset harms to the public and the environment caused by the Defendants' proven violations of the CAA").

73.     This case is fundamentally about the air pollution that resulted from Westvaco's violation of law and how to redress the harm from that violation.  Sitting in equity to enforce the Clean Air Act, the Court's charge is to dispense "complete rather than truncated justice." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also Camp v. Boyd*, 229 U.S. 530, 551 (1913) ("A court of equity ought to do justice completely, and not by halves").  In a case like this one, complete justice has two components: (1) bringing the violator into compliance; and (2) mitigating the harm resulting from the violation.

74.     Therefore, the second element of the appropriate relief in this case is mitigation of the prior, illegal emissions from the No. 25 power boiler at the Luke Mill.  Once a source has violated the law, the Court's role is not limited to requiring future compliance:  "The authority to 'enforce' an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed." *Natural Resources Defense Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000).

75.     While there is no practical method to remove Westvaco's unlawful emissions from the sky and the lungs of those who have breathed it in, the principle of mitigation applies here and can be achieved through the reduction of future pollution from the Luke Mill, which can help to

offset those past emissions.  The illegal emissions from the Luke Mill affect a number of

communities around the Mill.  By reducing future emissions in an amount comparable to its past

illegal emissions (and in addition to requiring the installation of BACT), those communities will,

over time, see their *total* exposure reduced to levels approximating those that would have occurred

had Westvaco complied with the law.  These communities have each suffered health effects and

some have also labored under the economic hardships of nonattainment status due, at least in part,

to the Luke Mill's excess emissions.  Pl.'s Proposed Findings of Fact pt. V.C.; Pl.'s Ex. 416.  The

PSD program was intended to eliminate such inequities.  42 U.S.C. § 7470(4) (Congressional PSD

purpose "to assure that emissions from any source in any State will not interfere with any portion

of the applicable implementation plan to prevent significant deterioration of air quality for any

other State") (emphasis added).

### B.      Installation of Pollution Controls on the No. 24 Power Boiler Is the Most Fitting Mitigation Remedy.

76.      Installing controls on a unit with similar emissions at the same facility is the most

appropriate mitigation.  The No. 24 power boiler emitted a similar quantity of $SO_2$ as the No. 25

power boiler since the time of the DEP.  Pl.'s Proposed Findings of Fact ¶¶ 131 n.12, 403.  The

No. 24 power boiler emits $SO_2$ through the same smokestack, which impacts the same area.  Pl.'s

Proposed Findings of Fact ¶¶ 116, 413.

77.       The proposed mitigation, installation of pollution controls on the No. 24 power

boiler, is based on the consequences of Westvaco's failure to comply with the law and flows from

the pollution that was emitted in violation of the law.  A full and complete remedy for the harms

caused by Westvaco's violation best comports with the equitable tradition and the purposes of the

Clean Air Act.  *See, e.g.*, *Porter*, 328 U.S. at 398; *Wehner*, 682 F. Supp. at 40 (when acting to

enforce a statute "intended for the public good . . . courts act in the public interest by restoring the

status quo . . . Such action is within the recognized power and within the highest tradition of a court

of equity").

78.     The purpose of the Clean Air Act itself compels such a full remedy:

an order requiring the Luke Mill to take actions that remedy, mitigate, and offset harms caused to

the public and the environment by Westvaco's CAA violation would give effect to the CAA's

purpose "to protect and *enhance* the quality of the Nation's air resources so as to promote the

public health and welfare."  *Cinergy I*, 582 F. Supp. 2d at 1061-62 (quoting 42 U.S.C. § 7401).

79.     In evaluating potential remedies for environmental enforcement cases, a court

should evaluate whether the proposed remedy "(1) . . . would confer maximum environmental

benefits, (2) . . . is 'achievable as a practical matter,' and (3) . . . bears an equitable relationship to

the degree and kind of wrong it is intended to remedy."  *United States v. Deaton*, 332 F.3d 698,

714 (4th Cir. 2003).  The *Deaton* formulation is particularly relevant here because the Clean Water

Act enforcement provisions at issue in that case were "modeled after those of the CAA."  *Cinergy*

*I*, 582 F. Supp. 2d at 1061 (citing *S. Pines Assoc. v. United States*, 912 F.2d 713, 716 (4th Cir.

1990) (citing S. Rep. 92-414 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3730)).  Ordering the

installation of pollution controls on the No. 24 power boiler as mitigation satisfies the *Deaton*

factors, and will serve the purposes of the Clean Air Act to enhance the quality of the nation's air.

1.      **Installing Controls on the No. 24 Power Boiler As Mitigation Bears an Equitable Relationship to the Degree and Kind of Wrong It Is Intended to Remedy**

80.     The third *Deaton* factor is achieved by measuring the pollution that the Luke Mill would *not* have emitted (the excess emissions) had Westvaco complied with the law and installed BACT on the No. 25 power boiler.

81.     There is no practical method for removing Westvaco's excess pollution from the lungs of those who have breathed it or from the lands and waters downwind of the plant.  But, the Court can order future reductions – *in addition to* the requirement to control pollution from the No. 25 power boiler – that will eventually offset the pollution that the Luke Mill should never have emitted.  In order to best match the communities harmed by Westvaco's violations and the benefit from mitigation, the Court can order that the future reductions come from uncontrolled units at the Luke mill.  In this case, by controlling the No. 24 power boiler, the reductions would come from the very same smokestack.

82.     Requiring controls on the No. 24 power boiler would benefit the very people harmed and continuing to be harmed by Westvaco's failure to install pollution controls at the time of the DEP.  It would have the requisite scope to provide complete relief needed to remedy the injury, without going "beyond the extent of the established violation."  *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n, 263 F.3d 379, 392-93 (4th Cir. 2001)* (quoting *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir.1993).  The injury to the public is the harm caused by nearly 30 years of excess pollution.  Control of an emissions unit similar in nature

24

and at the same facility as the unit in violation would accord the most significant nexus to the harm caused by the violation.

> **2.      The Proposed Mitigation Remedy, Installation of Pollution Controls on the No. 24 Power Boiler Is Achievable As a Practical Matter**

83.      The second *Deaton* factor, whether the remedy is "achievable as a practical matter" is supported by the facts and evidence of this case. *Deaton*, 332 F.3d at 714.

84.      First, this Court granted the Government's motion to join LPC as a necessary party under Rule 19 of the Federal Rules of Civil Procedure, recognizing that as the current owner and operator of the Luke Mill, LPC must be "subject to whatever order is issued embodying the appropriate injunctive relief." Mem. and Order re: Motion to Join at 9, ECF No. 279.

85.      Second, LPC presented evidence that installing controls on both boiler 24 and boiler 25 is practical and feasible. Pl.'s Proposed Findings of Fact ¶¶ 385, 404-06, 415.

86.      Third, Westvaco and LPC have an enforceable mechanism to require cooperation: the Equity and Asset Purchase Agreement. This Agreement requires Westvaco to pay for installation and certain operating costs of the controls. LPC will cover operating costs under $2 million for the first five years and all operating costs thereafter.  Pl.'s Ex. 250 at USWR100002907.

87.      In addition, Westvaco and LPC have represented their intent to comply with the Equity and Asset Purchase Agreement in pleadings to this Court.  Defendant Westvaco's Response to Plaintiff United States' Motion to Join Newpage Corporation as a Party Defendant at 2, ECF No. 197; Non-Party Luke Paper Company's Opposition To The Motion By Plaintiff United

States Of America To Join Luke As A Party Defendant at 3, ECF No. 260.  The Equity and Asset

Purchase Agreement requires Westvaco to "pay for *any* pollution control equipment required."

Pl.'s Ex. 250 at USWR100002907. (*emphasis added*).   Thus, this Court can require mitigation

through installation of pollution controls on the No. 24 power boiler by LPC, Westvaco or both.

88.     Finally, Westvaco can easily afford to pay for the installation of pollution controls

on the No. 25 power boiler to comply with the Clean Air Act, and on the No. 24 power boiler as

mitigation. Pl.'s Proposed Findings of Fact ¶¶ 404-05, 482-84.

### 3.    Pollution Controls on The No. 24 Power Boiler Confer Maximum Environmental Benefits

89.     As described above, the Government estimated the amount of excess pollution

emitted as a result of Westvaco's failure to comply with the law.  This Court should look to craft

mitigation that confers the maximum environmental benefit related to the kind and degree of the

harm from the violations.  *Deaton*, 332 F.3d at 714.

90.     An order requiring the proposed mitigation remedy, installation of a scrubber on

the No. 24 power boiler, satisfies the first *Deaton* factor "to confer maximum environmental

benefits."  *Id.*

91.     Such an order is well within the Court's equitable authority "to order Defendants to

take appropriate actions that remedy, mitigate and offset harms to the public and the environment

caused by the Defendants' proven violations of the CAA" in order to "order a full and complete

remedy for harms caused by a past violation."  *Cinergy I*, 582 F. Supp. 2d at 1060-61; *see also*

*Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 961 (10th Cir. 2002) ("'A

federal court's equity jurisdiction affords it the power to enjoin otherwise lawful activity when

necessary and appropriate in the public interest to correct or dissipate the evil effects of past

unlawful conduct.'") (quoting *United States v. Holtzman*, 762 F.2d 720, 724 (9th Cir. 1985))

(further citations omitted).  Granting the injunctive relief necessary to remedy the harm caused by

Westvaco's violation is necessary to "give[] meaning to the statute's grant of enforcement

authority."  *U.S. Pub. Interest Research Group*, 339 F.3d at 31.

92.     New Source Review requires controls at particular sources in part because each

source has an impact on a specific geographic area.  As the Government showed at trial, the harm

from the Luke Mill has the greatest impacts on Maryland, West Virginia, Pennsylvania and

surrounding states, though the harm also reaches throughout the eastern United States. These

impacts have occurred in contravention of the Congressional PSD purpose "to assure that

emissions from *any source in any State* will not interfere with any portion of the applicable

implementation plan to prevent significant deterioration of air quality *for any other State*."  42

U.S.C. § 7470(4) (emphasis added).  Simply requiring controls on the No. 25 power boiler does

not mitigate the historic impacts suffered in the areas affected by the excess emissions resulting

from Westvaco's violation; and essentially would "go no further than requiring them to do what

would have been lawful in the first place."  *Deaton*, 332 F.3d at 714.  Additional controls at the

same facility – targeted to the levels of historic excess emissions – will provide a benefit to the

harmed areas that is proportionate to the undue burden they have suffered due to Westvaco's

failure to comply with the law.

93.     Westvaco should be required to achieve emissions reductions from the No. 24

power boiler at the Luke Mill comparable to the excess emissions from the No. 25 power boiler.

The Government's evidence demonstrates that these reductions could be achieved through the installation of a scrubber on both boilers.   Pl.'s Proposed Findings of Fact ¶ 403.

Respectfully Submitted

ROD J. ROSENSTEIN
United States Attorney

MICHAEL DIPIETRO
 Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, MD 21201
(410) 209-4800

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

March 15, 2013                                   /s/ Daniel S. Smith
Dated                                                MARK C. ELMER
                                                        CARA M. MROCZEK
                                                        DANIEL S. SMITH (Bar. No. 27267)
                                                        U.S. Department of Justice
                                                        Environmental Enforcement Section
                                                        999 Eighteenth Street
                                                        South Terrace, Suite 370
                                                        Denver, CO 80202
                                                        (303) 844-1352 (voice)
                                                        (303) 844-1350 (fax)
                                                        Mark.Elmer@usdoj.gov

Of Counsel:

ROBERT STOLTZFUS
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch Street (3RC42)
Philadelphia, PA 19103

TERESA DYKES
Air Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2013, I electronically filed the foregoing memorandum and accompanying exhibits using the court's CM/ECF system which sent notification of such filing to:

Charles Harry Haake
Peter Eric Seley
Raymond B. Ludwiszewski
GIBSON DUNN AND CRUTCHER LLP
1050 Connecticut Ave NW
Washington, DC 20036
chaake@gibsondunn.com
pseley@gibsondunn.com

*Attorneys for Defendant Westvaco Corporation*

Howard B. Epstein
Sami B. Groff
SCHULTE ROTH AND ZABEL LLP
919 Third Ave
New York, NY 10022
howard.epstein@srz.com
mark.dowd@srz.com
sami.groff@srz.com

*Attorneys for Intervenor Luke Paper Company*

/s/ Daniel S. Smith
_____
Daniel S. Smith