# Guidance on the Appropriate Injunctive Relief for Violations of Major New Source Review Requirements
## (Memorandum)

Signed November 17, 1998

MEMORANDUM

SUBJECT:
>    Guidance on the Appropriate Injunctive Relief for
>    Violations of Major New Source Review Requirements

FROM:
>    Eric V. Schaeffer, Director
>    Office of Regulatory Enforcement

TO:
>    Addressees

This guidance sets forth the injunctive relief that the U.S. Environmental Protection Agency (EPA) should seek in settlements of major New Source Review (NSR) enforcement actions (1). Monetary penalties should continue to be determined pursuant to the Clean Air Act Stationary Source Penalty Policy and Appendices.

Introduction

To maintain a level playing field for regulated sources across the country, the Office of Regulatory Enforcement (ORE) is issuing this guidance setting forth the injunctive relief it expects to see in judicial Consent Decrees and in administrative case settlements concerning major NSR enforcement cases(2). In particular, this guidance addresses cases where either (1) a source failed to obtain a major NSR permit prior to commencing construction of a major source or a major modification or (2) a source with a synthetic minor limit(3) regularly violated that limit.

As Congress stated in the Prevention of Significant Deterioration (PSD) portion of the Clean Air Act (CAA or Act), the general purpose of the NSR programs is to protect public health and welfare (including air quality) while "insur[ing] that economic growth will occur in a manner consistent with the preservation of existing clean air resources." 42 U.S.C. § 7470. One method relied on to achieve this purpose is to require the use of ever-improving control technology as new sources of air pollution are built. The NSR programs also are a means to phaseout the grandfathering of existing sources created in the 1977 Act. As the D.C. Circuit stated in Alabama Power v. Costle, "[t]he statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that

Exhibit 2

this is not to constitute a perpetual immunity from all standards under the PSD program." 636 F.2d 323, 400 (D.C. Cir. 1979). Thus, the NSR programs are instrumental in implementing the Act and in attaining the goal of clean air throughout the United States.

In order to effectuate the purpose of the NSR programs, EPA generally should, at a minimum, require the installation and operation of control technology or process changes that result in emission reductions equivalent to the best available control technology (BACT) in PSD cases and the lowest achievable emission rate (LAER) in nonattainment cases when resolving NSR enforcement actions(4). When the case involves a source that failed to obtain any type of permit or limit at the time of construction, the source should not be allowed to avoid the installation and operation of pollution control equipment or process changes by obtaining a "synthetic" minor limit (usually a permit) after the fact unless compelling circumstances exist(5) (see below).

Similarly, if a case involves a source that obtained a timely synthetic minor limit, but which regularly violates that limit, this document provides guidance regarding when it is appropriate to allow the source to merely come into compliance with the limit and when it is appropriate to require that the source achieve emissions reduction equivalent to those achieved by BACT/LAER-equivalent air pollution control equipment or process changes.

Failure to Obtain a Permit Prior to Construction

There are two scenarios addressed in this portion of the guidance; both involve a source with potential emissions above the applicable major source threshold that failed to obtain either a major NSR permit or synthetic minor limits prior to construction of a new major source or major modification(6). Under the first scenario, the source's actual emissions exceeded the major source threshold. Under the second, the source's actual emissions never exceeded the major source threshold. This guidance only reflects the position that EPA may adopt in settling the matter and, like the Stationary Source Civil Penalty Policy, considers many factors when resolving an enforcement action. Importantly, under both scenarios, the source has violated the NSR requirements and could be compelled to comply fully with the statutory NSR permitting process. As discussed above, NSR is a key component to ensuring that economic growth and expansion occur in a way that minimizes any adverse impact on air quality. Thus, NSR violations often result in hundred of tons of excess emissions. Moreover, sources that violate major NSR requirements often gain a competitive advantage due to their ability to (1) avoid the time involved with the permitting process and (2) invest money that should have been allocated to emission reduction efforts to other activities. These reasons, as well as others, necessitate strict enforcement of NSR requirements.

When a violation involves the first scenario (the source's actual emissions exceeded the major source threshold) the source should be required to comply fully with all applicable NSR requirements, including major NSR permitting, control technology, air quality impact analysis and offsets. As part of an EPA settlement, the Consent Decree should require a minimum level of control which the Agency believes ensures BACT/LAER-equivalent emission reductions(7). The Consent Decree should be crafted to allow the source the option of installing and operating more effective control equipment if

the permitting agency requires a different (e.g., more stringent) control technology, but it should not allow the source to obtain a permit with controls that are less stringent than required by the Consent Decree.

If a violation involves a source with actual emissions that never exceeded the major source threshold, the source should be required to achieve BACT/ LAER-equivalent emission reductions. If the source's potential emissions are below the applicable major source thresholds after application of BACT/LAER-equivalent controls or process changes, Regions have discretion to determine based on facts of the specific case whether to require full NSR compliance, or whether to allow the source to obtain a synthetic minor permit after it achieves BACT/LAER-equivalent emission reductions.

Moreover, based on the Agency's experience with enforcing the NSR requirements for the past 20 years, ORE has determined that it is no longer appropriate merely to allow a source to "correct" an NSR violation by dismantling an illegal modification, unless emissions from the new or modified unit would essentially become zero (e.g., the entire process line was shutdown). Thus, a source generally should not be able merely to return to pre-violation conditions in order to avoid installation of control equipment or implementation of process changes. For example, a source that illegally began burning tires in a boiler could not avoid NSR review (under scenario 1), or installation and operation of BACT/LAER-equivalent control equipment or process changes (under scenario 2), merely by agreeing to reducing the number of tires burned or by partial SO2 controls. If the source had properly permitted the boiler at the time it began burning tires, it would most likely have been required to install and operate pollution control equipment that would still be operational and control emissions after the source stopped burning tires because the boiler would still be operating after the "modification" was undone (e.g., there would be emissions from whatever fuel was burned in lieu of tires). Thus, ceasing the burning of tires would not necessarily bring the source to the same level of emissions that could be achieved with additional control equipment.

Nonetheless, as stated above, the appropriate injunctive relief articulated for both scenarios is subject to consideration of compelling circumstances. Because it is a very case-specific, fact-intensive determination, it is not possible to define all potential compelling circumstances. For instance, a source's actual emissions may be so low that imposition of add-on control equipment would constitute economic waste (e.g., in the above example, total SO2 and PM/PM10 emissions after the source stopped burning tires were too low to control in a cost-effective manner). Or perhaps the source is replacing the violating units with cleaner, energy-efficient new units that emit air pollution at levels near those that would be achieved by the older units with BACT/LAER-equivalent controls or process changes. Other compelling circumstances may involve significant, case-specific litigation risks related to whether a violation of major source requirements actually occurred or whether the injunctive relief set forth in this memorandum is appropriate in a particular case (e.g., permit shield or equity concerns; duration of violation is extremely short). Importantly, because Headquarters must concur on most Consent Decrees involving major NSR violations, Regions are encouraged to coordinate with Headquarters early regarding consideration of compelling circumstances and prior to initiating settlement discussions with a defendant. After this guidance has been implemented for some time, ORE will consider supplementing it with any trends regarding what constitutes a compelling

circumstance that may develop.

Failure to Comply with an Existing Synthetic Minor Limit

Generally, when a source with limits that restrict its potential emissions below major source threshold levels violates those limits, EPA can enforce the limits and/or the major source NSR requirements. This guidance is not meant to restrict the Regions' ability to enforce the terms of an existing synthetic minor limit or permit. However, pursuant to the court's reasoning in United States v. Louisiana-Pacific, 682 F. Supp. 1142, 1161-62 (D. Colo. 1988), when a source "knowingly and regularly" violates a synthetic minor limit, EPA's position is that it need not consider the limit when calculating the source's potential to emit and determining its major source status(8).

EPA should take the position that a source's synthetic minor limit does not effectively limit the source's potential emissions when evidence indicates that the source has knowingly or regularly violated (or currently regularly violates) the limit. Thus, the source cannot simply claim that it has a limit that restricts its potential emissions; obviously this is not the case if the source's actual emissions have exceeded that "limit." A source should not be able to hold a limit up as a shield to major source status when it repeatedly violates the limit. As the court in Louisiana-Pacific stated,

> to hold that permit limitations which are repeatedly violated should nonetheless be considered in determining potential to emit would give better treatment to sources which knowingly violate such conditions than the treatment currently afforded sources which comply with the law.

Id. at 1161. Allowing sources to merely come into compliance with the synthetic minor limits would encourage sources to make modifications without preconstruction review and even exceed existing permits until they were caught, rather than go through NSR review prior to making modifications. Treating the source as a major source or major modification should be EPA's position even when the source's actual emissions do not exceed major source thresholds or significance levels. To allow a source to violate a limit that restricts potential emissions until its actual emissions exceeded major source or significance levels would collapse potential and actual emissions and ignore the mandate of the Act to consider both.

> Nonetheless, there may be circumstances where the appropriate response is enforcement of the synthetic minor permit. Such circumstances may include situations where the permit violations are (a) relatively infrequent, (b) known to be minor in nature and (c) where the synthetic minor limit is significantly lower than the relevant applicability threshold(9). As with the first portion of this guidance, the Regions are encouraged to coordinate early with Headquarters regarding application of these distinctions.

Conclusion

The guidance is effective immediately with respect to all cases in which the first injunctive relief offer has not yet been transmitted to the opposing party. To the extent earlier guidance, memoranda or

other EPA documents imply that injunctive relief requiring a source to come into compliance with existing "synthetic" minor source limits, or obtain synthetic minor limits, is an acceptable resolution of an enforcement case, it is superseded by this guidance. As stated above, many major NSR enforcement cases are already considered "nationally significant," due to either issues in the case or penalty amounts of $500,000 or more, and thus require Headquarters concurrence. In addition, to ensure consistent implementation of this guidance, each Region should consider the first three major NSR cases (civil and administrative), regardless of the size of the penalty, it begins negotiating after the date of this guidance as "nationally significant" for delegation purposes and include Headquarters in the concurrence chain.

The policies set forth in this memorandum are intended solely as guidance to government personnel to be used to settle enforcement actions. They do not represent final Agency action, are not binding on any party, and cannot be relied upon to create any rights enforceable by any party. The EPA reserves the right to change this guidance at any time without public notice.

Questions concerning specific issues and cases should be directed to Carol Holmes of the Air Enforcement Division,, at 202-564-8709. This document will also be available on AED's Webpage at http://www.epa.gov/oeca/ore/aed.

cc: John Seitz, OAQPS
Bruce Jordan, OAQPS
Lydia Wegman, OAQPS
Alan Eckert, OGC
Greg Foote, OGC

Addressees:
Regional Counsels, Regions I-X
Director, Office of Environmental Stewardship, Region I
Director, Division of Enforcement and Compliance Assurance, Region II
Director, Division of Air Quality, Region III
Director, Air, Pesticides, and Toxics Management Division, Region IV
Director, Air and Radiation Division, Region V
Director, Compliance Assurance and Enforcement Division, Region VI
Director, Enforcement Coordination Office, Region VII
Assistant Regional Administrator, Office of Enforcement, Compliance
  and Environmental Justice, Region VIII
Assistant Regional Administrator, Office of Pollution Prevention,
  State, and Tribal Assistance, Region VIII
Enforcement Coordinator, Office of Regional Enforcement
  Coordination, Region IX
Director, Office of Air Quality, Region X
Joel Gross, Chief, Environmental Enforcement Section, DOJ

(1)New Source Review includes the Clean Air Act Part D nonattainment NSR and the Part C Prevention of Significant Deterioration (PSD) programs.

(2)Many civil major NSR cases are deemed to be "nationally significant," and hence, require Headquarters concurrence. This guidance also applies to administrative major NSR cases. Thus, any reference to requirements of a "Consent Decree" in the context of a civil case applies equally to the resolution of an administrative major NSR case.

(3)A "synthetic" minor limit restricts potential emissions at an otherwise major source to levels below applicable major source thresholds. These limits generally are in the form of operational or production limits. The term may also refer to limits an existing major source takes to restrict its potential emissions from a modification to levels below applicable significance thresholds (e.g., 40 tpy of SO2). See 40 C.F.R. § 52.21(b)(23).

(4)Generally, BACT and LAER require the installation of add-on pollution control equipment. There are instances, however, when BACT or LAER may be reflected in a change in processes equipment design or operation (e.g., material usage). References to BACT/LAER in this guidance include both control equipment technology and operational changes.

(5)This reference to synthetic minor permits includes limits solely on operation and production (e.g., hours of operation) as well as limits that require installation and operation of control technology. In other words, a violating source may not avoid the injunctive relief required in this guidance by installing air pollution control equipment or making process changes emissions to the level possible with BACT/LAER-equivalent controls or process changes.

(6)This guidance applies equally to new and existing sources. Thus, any and all references to new source construction and major source thresholds apply equally to modifications at existing sources and the applicable significance thresholds (e.g., 40 tpy of SO2). See 40 C.F.R. § 52.12(b)(23).

(7)This guidance does not alter EPA's current policy that the BACT or LAER determination is made at the time a source goes through NSR permit review. Thus, if a source violates NSR in 1995 (e.g., by constructing a major source without a major NSR permit) and finally applies for a permit in 1998, whatever technology is BACT or LAER in 1998 should be required in the NSR permit. See, e.g., "BACT/LAER Determination Cut-off Date" (Jan. 11, 1990) (BACT determination cut-off at date of final permit issuance) (document no. 8.43 in New Source Review Guidance Notebook).

(8)Although all permit limits and conditions are enforceable, only operational or production limits that are "practically enforceable" will be used to determine a source's potential to emit. See, e.g.,, "Guidance on Limiting Potential to Emit in New Source Permitting" (June 13, 1989) (document no. 2.31 in NSR Guidance Notebook). The EPA is in the process of proposing a rule which would codify the elements of a practically enforceable limit.

(9)EPA realizes that in some instances, a new source may not precisely know what its emissions will be until it has constructed and begun operations. Thus, a source which in good faith obtained synthetic minor source limits may find itself unable to meet those limits. Although this is a concern when determining the appropriate penalty, it should not affect the appropriate injunctive relief.

*Disclaimer*

*This electronic file has been retyped to make it available to you in electronic form. Formatting (margins, page numbering, etc.) may differ from the original hard copy to make the document more easily readable on your*

*computer screen.  If any discrepancies are found, the file copy (hard copy original) which resides at the U.S. EPA provides the official policy.  Information on the file copy may be obtained from the Air Enforcement Division, Stationary Source Program at (202) 564-2414.*